**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| 216 JAMAICA AVENUE, LLC, | ) ) ) Civil Action No. 06-1288 |
| Plaintiff, | ) ) ) |
| v. | ) JURY TRIAL DEMANDED ) ) |
| S & R PLAYHOUSE REALTY CO., | ) (Judge Boyko) ) |
| Defendant. | ) ) ) ) |

## **AMENDED COMPLAINT**

Plaintiff, 216 Jamaica Avenue, LLC, alleges as follows:

### **NATURE OF THIS ACTION**

1. This is an action for breach of contract. Plaintiff, 216 Jamaica Avenue, LLC ("216 Jamaica"), leases to defendant, S & R Playhouse Realty Company ("S & R Playhouse"), a prime parcel of land situated at 1228 Euclid Avenue in downtown Cleveland, Ohio (the "Lease"). S & R Playhouse controls a 500,000 square foot office building, a

substantial portion of which is on the leased parcel. S & R Playhouse rents the building, known as the Halle Building, to various tenants for millions of dollars per year. Yet, S & R Playhouse has been paying only $35,000 per year to lease the land—in clear breach of the explicit and straightforward terms of the Lease—and in fact has paid no rent at all since 216 Jamaica acquired ownership of the land in February 2006.

2. When the Lease was formed, in 1912, $35,000 per year was a substantial amount for a ground lease. But this was a very valuable piece of land. The city of Cleveland was growing rapidly, and the area around 1228 Euclid Avenue was emerging as Cleveland's commercial heart. The now-famous Halle Bros. department store was just hitting its stride as a leading retailer in Cleveland. Although Halle Bros. had just moved into an impressive building next door in 1910, it was already outgrowing that space. Geography afforded Halle Bros. only one option for expansion: acquiring 216 Jamaica's parcel.

3. 216 Jamaica's predecessor, however, would not sell its valuable property. Instead, Halle Bros. and 216 Jamaica's predecessor entered into a 99-year lease, with Halle Bros. holding an option to renew the lease for up to 99 more years. 216 Jamaica's predecessor insisted that the rent escalate periodically from $10,000 per year in the first year of the lease to $35,000 per year in the eleventh year and thereafter, including upon renewal.

4. The parties to the Lease fully realized that $35,000 would not have the same value in 10 years, 99 years, or 198 years. Accordingly, they included in the Lease a gold clause (the "Gold Clause"). At the time, gold clauses were the most common contractual device for mitigating the effects of currency fluctuations. Whereas the parties to a modern long-term lease might guard against currency fluctuations by providing that the amount of

rent will be adjusted according to a well-known index, such as the Producer Price Index, gold clauses adjust the amount of rent according to the price of gold.

5. In June 1933, Congress passed a joint resolution that rendered all gold clauses unenforceable as part of President Roosevelt's efforts to gain greater control over the currency. And for the next several decades, gold clauses remained unenforceable. But in 1971, the government discontinued all use of the gold standard. Thus, after 1971, the prohibition on gold clauses served no purpose whatsoever. Accordingly, Congress in 1977 amended the law to provide that all gold clauses in subsequent obligations would be valid and enforceable.

6. S & R Playhouse became lessee by assignment of the Lease in 1982 (the "1982 Assignment"). The 1982 Assignment constitutes an obligation issued after 1977, and thus the Gold Clause is valid and enforceable against S & R Playhouse.

7. The Gold Clause in the Lease explicitly obligates the lessee to pay annual rent in gold coin of the weight and fineness that was equivalent to $35,000 in 1912. In 1912, the value of gold $20.67 per ounce; today, gold is valued at more than $650 per ounce. S & R Playhouse, however, has continuously failed to comply with this obligation, and instead has paid only the face amount of rent—$35,000 per year. S & R Playhouse thus has been reaping an enormous windfall by charging tenants of the Halle Building rents that reflect the fair market value of real property in 2006 but paying rent that reflects the value of its real property in 1922. And since 216 Jamaica acquired ownership of the leased parcel in February 2006, S & R Playhouse has paid no rent at all.

8. In this action, 216 Jamaica seeks to recover the lost rent that S & R Playhouse was obligated to pay under the Lease and to have the Court declare that S & R Playhouse is obligated to comply with the Gold Clause in the future.

9. Attached to this complaint are: the Lease, dated March 15, 1912 (Exhibit A); the Modification of Lease, dated October 17, 1912 (Exhibit B); and the Assignment and Assumption of the Lease, dated May 21, 1982 (Exhibit C).

## PARTIES

10. Plaintiff, 216 Jamaica Avenue, is a limited liability company organized and existing under the laws of the State of New York. Its principal place of business is in the State of New York. All of its members are citizens of the State of New York.

11. Defendant, S & R Playhouse Realty Company, is a general partnership organized and existing under the laws of the State of Ohio. Its principal place of business is Terminal Tower, 50 Public Square, Suite 1160, Cleveland, Ohio 44113. Its purpose is to own and develop real property. It conducts business under the fictitious name "S & R Playhouse Realty Company." Its partners are Forest City Rental Properties Corporation and Playhouse Square Investments, Inc.

12. Forest City Rental Properties Corporation is a corporation organized and existing under the laws of the State of Ohio. Its principal place of business is Terminal Tower, 50 Public Square, Suite 1160, Cleveland, Ohio 44113.

13. Playhouse Square Investments, Inc., is a corporation organized and existing under the laws of the State of Ohio. Its principal place of business is Terminal Tower, 50 Public Square, Suite 1160, Cleveland, Ohio 44113.

## JURISDICTION AND VENUE

14. Jurisdiction is proper under 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of the State of New York. Defendant is a citizen of the State of Ohio. The amount in controversy, exclusive of costs and interest, exceeds $75,000.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(1) and (2). Defendant resides in this judicial district. Defendant's conduct that gives rise to plaintiff's claim occurred in this judicial district. And the real property that is the subject of plaintiff's claim is situated in this judicial district.

## HALLE BROS. AND THE EMERGENCE OF UPPER EUCLID AVENUE

16. In the late 19th Century, many Midwestern cities experienced tremendous economic growth as a result of industrialization. The confluence of the resulting disposable wealth and mass-manufacturing practices instigated a new era of retail commerce, led by department stores such as Sears Roebuck and Macy's.

17. In 1891, Salmon and Samuel Halle founded the Halle Bros. department store. Halle Bros. emerged quickly as one of the leading retailers in Cleveland, Ohio, in large part because of its reputation for greater refinement and quality than most department stores of the era. In its first year of operation, Halle Bros. recorded net sales $30,000. Within ten years, its net sales had increased 1,200% to $397,000. Ten years after that, in 1911, Halle Bros.' net sales were $2,571,000—648% more than in 1901 and 8,500% more than in 1891.

18. Halle Bros. began business on Superior Avenue, but almost immediately outgrew its building. After only two years there, the store relocated to lower Euclid Avenue, at East Fourth Street. The store's claim to a preeminent position among

Cleveland retailers, however, really began in 1910 when it moved to its new ten-story building at 1228 Euclid. Designed by New York architect Edward Bacon, who later designed the Lincoln Memorial, the store was marked by an elegant yet sedate terra cotta exterior and interior features that provided the appropriate environment for quiet good taste. This new building cost about $1,000,000 to construct.

19. The Halle brothers did not choose locations for their store haphazardly. The city was growing much like their store, and as it did, its commercial center shifted. Initially, lower Euclid Avenue supplanted the area around Superior Avenue, but by 1910 it was apparent that upper Euclid Avenue would become the commercial heart of the city. Only a few years earlier, the area around Euclid Avenue and East Twelfth Street had been populated with family hotels and old restaurants; by 1910, several leading retailers, the Cleveland Athletic Club, and the Hotel Statler had either already moved to upper Euclid Avenue or announced plans to do so imminently. Halle Bros.' move out beyond East Ninth Street was in tune with the trend. Although many people viewed it as a daring move at the time, it was a logical decision on the part of the management. Not only would the store be where the other better stores were located, but it also acquired a larger, more luxurious plant in which to operate.

20. Once again, it soon became apparent, however, that the new building was not large enough to meet the needs of Halle's growing clientele. The Halle brothers had few options to expand. The North and South sides of the building were bounded by Euclid Avenue and Huron Road. Not far to the East of the building, Euclid and Huron converged at a point, leaving only a small triangle of land for easterly expansion;

moreover, a couple buildings had recently been constructed in that triangle. Thus, Halle Bros.' future lay to the West.

## THE LEASE AND THE GOLD CLAUSE

21. On March 15, 1912, the Realty Investment Company leased to the Halle brothers the lot adjacent to the West side of the Halle Building (the "Lease"). The Lease ran for 99 years, from April 1, 1912, to March 31, 2011.

22. The Lease also granted the Halle brothers an option to renew the Lease for 25, 50, or 99 years. To exercise this renewal option, the lessees must notify the lessor in writing of such intention between April 1, 2009, and March 31, 2010.

23. The Halle brothers then constructed a substantial addition to their building on the leased parcel, which was completed in 1914.

24. The Lease escalated the rent amount by 350% over the first eleven years, from $10,000 per year in the first year to $35,000 per year in the eleventh year and thereafter. All rent was to be paid in quarterly installments, on the first day of April, July, October, and January.

25. The Lease contains a gold clause, which required that "[a]ll of said rents shall be paid in gold coin of the United States of the present standard of weight and fineness" (the "Gold Clause").

26. The Lease also specifies that payment shall be made "by depositing it to the credit of the lessor, its successors or assigns, with The Citizens Savings & Trust Company of Cleveland, Ohio, or at such other place in the City of Cleveland as the said lessor, its successors and assigns, may from time to time designate."

27. The Gold Clause was a critical term of the Lease. The value of money in the future is always uncertain, and the farther into the future one attempts to look, the less certain one can be. The parties to a modern long-term lease might guard against the risk of currency fluctuations by providing that the amount of rent will be adjusted periodically according to a well-known index, such as the Producer Price Index. But in the late 19th Century and early 20th Century, gold clauses were the most commonly used contractual device to guard against inflation and the devaluation of the currency: the face amount of the rent under a lease would be converted to an equivalent weight of gold of a certain fineness using the price of gold at the time the lease began; as the price of gold increased over time, the value of that fixed amount of gold—and consequently of the rent—would increase proportionately.

28. In 1912, gold was valued at $20.67 per ounce. At that price, $35,000 was equivalent to 1,693.28 ounces of gold. Thus, the Lease requires the lessee to pay 1,693.28 ounces of gold per year in rent. From 1912 to 1933, the original lessee and its successors honored the Gold Clause.

## THE FEDERAL GOLD CLAUSE STATUTE

29. However, in order to manage the currency more carefully during the Great Depression, Congress, at the behest of President Roosevelt, imposed a series of restrictions on the private ownership and use of gold. In 1933, Congress declared gold clauses to be against public policy and provided that "dollar for dollar" payments in United States currency would discharge any such obligation (the "Gold Clause Statute"). Joint Resolution of June 5, 1933, 48 Stat. 112, 113 (1933) (formerly codified at 31 U.S.C.

§ 463) (codified as amended at 31 U.S.C. § 5118(d)(2)). Thus, all extant gold clauses became unenforceable.

30. But in 1971, the government discontinued all use of the gold standard and ceased buying and selling gold. Because the prohibition on gold clauses now served no purpose whatsoever, Congress in 1977 amended the Gold Clause Statute to permit gold clauses in subsequently issued obligations. As amended, the Gold Clause Statute provides: "An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar-for-dollar) in United States coin or currency that is legal tender at the time of payment. *This paragraph does not apply to an obligation issued after October 27, 1977*." Act of October 28, 1977, Pub. L. No. 95-147, § 4(c), 91 Stat. 1227, 1229 (originally codified at 31 U.S.C. § 463 (note)) (codified as amended at 31 U.S.C. § 5118(d)(2)) (emphasis added).

## ASSIGNMENT AND BREACH OF THE LEASE

31. On May 21, 1982, the Halle brothers' successor under the Lease, the Halle Brothers Company, assigned the Lease to defendant, S & R Playhouse (the "1982 Assignment").

32. The 1982 Assignment of the Lease to S & R Playhouse constitutes an obligation issued after October 27, 1977.

33. Because S & R Playhouse expressly "assume[d] and agree[d] to perform each and all of the covenants, obligations, and engagements of the Assignor and lessee under said Lease and all other terms and provisions thereof on the part of lessee to be observed and performed after the date hereof," the Gold Clause is and has been valid and enforceable against S & R Playhouse since S & R Playhouse became lessee in 1982.

34. The Gold Clause obligates S & R Playhouse to pay the annual rent in gold coin of the weight and fineness that was equivalent to $35,000 at the time the Lease was executed, March 15, 1912. Yet, since becoming lessee pursuant to the 1982 Assignment of the Lease, defendant S & R Playhouse has made rent payments at the "dollar for dollar," or face, amount of $35,000 per year. Accordingly, defendant S & R Playhouse has been in breach of its obligation under the Lease since it became lessee in 1982.

35. The value of the 1,693.28 ounces of gold that S & R Playhouse has been required to pay under the Lease exceeds substantially the value of the face amount of rent that S & R Playhouse has paid to 216 Jamaica and its predecessors. In 1912, the value of gold was $20.67 per ounce; today, gold is valued at more than $650 per ounce. By paying only the face amount of rent, in breach of the Gold Clause, S & R Playhouse thus has been reaping an enormous windfall—it charges tenants of the Halle Building rents that reflect the fair market value of real property in 2006 but pays rent that reflects the value of its real property in 1922.

36. In February 2006, Halle Cleveland, LLC, Realty Investment Company's successor in interest, transferred to plaintiff, 216 Jamaica, ownership of the land that is subject to the Lease. Concomitantly, Halle Cleveland, LLC, as lessor assigned the Lease to 216 Jamaica.

37. Since 216 Jamaica acquired ownership of the leased property in February 2006, S & R Playhouse has paid no rent at all. For its quarterly rent due April 1, 2006, S & R Playhouse tendered to 216 Jamaica only the face amount of $8,750. 216 Jamaica rejected this tender as being in breach of the Gold Clause and demanded that payment be

made in an amount consistent with the Gold Clause. S & R Playhouse has not tendered rent since.

38. Contemporaneously with the 1982 Assignment, S & R Playhouse also acquired interests in the parcels on which stood the remaining portion of the Halle Building. Thus, S & R Playhouse acquired control of the entire Halle Building and the ground beneath it.

39. S & R Playhouse then converted the Halle Building into an office building with approximately 500,000 square feet of space, approximately 170,000 square feet of which is situated on the parcel subject to the Lease.

40. Upon information and belief, S & R Playhouse sublets the Halle Building to various tenants for millions of dollars per year.

41. According to the Lease, "the whole amount of the rent agreed to be paid hereunder and all moneys due hereunder by reason of any engagement of this lease are and always shall be a valid and first lien upon the buildings and improvements upon said premises and upon all of the interest of the lessees in said premises and in this lease."

42. The Lease further provides that "if at any time the rent . . . shall become in arrears and unpaid for the period of four (4) months after becoming due . . . , the lessor, its successors and assigns, shall, after such four (4) months period and after first giving to the lessees and to any one mortgagee of the lessees (if there be such mortgagee) sixty (60) days written notice of the lessor[']s intention to enter upon said premises and forfeit this lease, have the right at the expiration of said sixty (60) day period or at any time thereafter such default being not cured, to enter upon said premises and resume possession thereof and bring suit for and collect all rents . . . which shall have accrued up

to the time of such entry, and thenceforth from the time of such entry this lease shall become void in all intents and purposes whatsoever, and the said leasehold estate and all improvements made on said premises shall be forfeited to the lessor without compensation therefore to the said lessees; provided, however, that for rents due and non-performance of any other conditions, covenants, agreements or stipulations hereof, the lessor may, at its election sue for and collect all amounts due and enforce all other obligations of the lessees hereunder without such entry and forfeiture."

43. The Lease permits assignment without the written consent of the lessee only if "the rents and all charges, assessments, liens and penalties then payable and covenants thereof at that time required to be performed have been paid, satisfied and performed," the assignee "expressly assume[s] the lessees engagements" under the Lease, and other conditions were met.

44. The Lease further provides that "[a]ll personal liability of the lessees upon this lease and for the performance of the covenants herein contained shall cease and determine upon an assignment hereof when and after a building shall have been erected upon said premises" as required by the Lease.

45. The Lease also states that "all the covenants, agreements, stipulations, conditions, engagements and obligations of this lease shall accrue to and be binding upon the successors and assigns of the said original lessor and upon the heirs, personal representatives and assigns, of the said original lessees, provided, as to their assigns, that they shall become such in accordance with the terms and conditions hereof, with like force and effect in all respects as the same accrue to and are binding upon said original lessor and lessees respectively."

## COUNT I: BREACH OF CONTRACT

46. Plaintiff incorporates the allegations described in Paragraphs 1 through 44 above as if fully set forth herein.

47. Since the 1982 Assignment, defendant has been obligated under the Lease to pay to plaintiff and its predecessors annual rent in gold coin of the weight and fineness that was equivalent to $35,000 on March 15, 1912.

48. Since plaintiff acquired ownership of the leased property in February 2006, defendant has failed to fulfill its rent obligation under the Lease.

49. Therefore, defendant breached the Lease.

50. As the direct and proximate result of defendant's breaches of the Lease, plaintiff has been injured.

## COUNT II: DECLARATORY JUDGMENT

51. Plaintiff incorporates the allegations described in Paragraphs 1 through 49 above as if fully set forth herein.

52. The Lease obligates defendant to make all future rent payments in gold coin of the weight and fineness that was equivalent to $35,000 on March 15, 1912.

## JURY DEMAND

53. Plaintiff demands a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure, of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff demands:

(1) That defendant be adjudged and decreed to be have breached the Lease by failing to pay rent from April 1, 2006, to the present of $35,000 per year in gold coin of the United States of the standard of weight and fineness as it existed on March 15, 1912;

(2) That Plaintiff recover all rents due and owing under the Lease, in an amount of damages to be determined at trial;

(3) That Plaintiff recover all rents that come due and are owed under the Lease between this day and the day of final judgment, in an amount of damages to be determined at trial;

(3) That the Court declare that defendant is obligated under the Lease to make all future rent payments of $35,000 per year in gold coin of the United States of the standard of weight and fineness as it existed on March 15, 1912;

(4) That Plaintiff be granted such other, further, and different legal or equitable relief as the nature of the case may require or as may be deemed just and appropriate by this Court.

September 12, 2006                                    Respectfully Submitted,

/s/ James B. Niehaus

_____

Charles J. Cooper                             James B. Niehaus (0020128)
ccooper@cooperkirk.com                        jniehaus@frantzward.com
David H. Thompson                             Christopher G. Keim (0067117)
dthompson@cooperkirk.com                      ckeim@frantzward.com
David Lehn                                    Frantz Ward LLP
dlehn@cooperkirk.com                          2500 Key Center
COOPER & KIRK, PLLC                           127 Public Square
555 Eleventh Street NW                        Cleveland, Ohio 44114-1230
Suite 750                                     216-515-1660
Washington, DC 20004                          216-515-1650 (fax)
(202) 220-9600
(202) 220-9601 (fax)                          *Attorneys for Plaintiff*