# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **216 JAMAICA AVENUE, LLC,** | ) | **CASE NO. 1:06CV1288** |
| | ) | |
| Plaintiff, | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| v. | ) | |
| | ) | |
| **S & R PLAYHOUSE REALTY CO.,** | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendant. | ) | |

Defendant S&R Playhouse Realty Co. ("S&R"), by and through counsel, respectfully moves this Court, pursuant to Fed. R. Civ. P. 56, for an order dismissing plaintiff 216 Jamaica Avenue, LLC's Amended Complaint. The reasons for this Motion are fully set forth in the attached Memorandum in Support, which is incorporated herein.

Respectfully submitted,

/s/ Stephen D. Williger
Stephen D. Williger (0014342)
Gary L. Walters (0071572)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
(216) 566-5500
(216) 566-5800 – Fax
Stephen.Williger@ThompsonHine.com
Gary.Walters@ThompsonHine.com

*Attorneys for Defendant*
*S & R Playhouse Realty Co.*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **216 JAMAICA AVENUE, LLC,** | ) | **CASE NO. 1:06CV1288** |
| | ) | |
| Plaintiff, | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| v. | ) | |
| | ) | |
| **S & R PLAYHOUSE REALTY CO.,** | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF DEFENDANT'S MOTION FOR** |
| Defendant. | ) | **SUMMARY JUDGMENT** |

## INTRODUCTION

Six months after purchasing the Halle Building for $845,000, plaintiff 216 Avenue, LLC ("Jamaica") filed this action seeking a windfall consisting of future and back rents from Defendant S&R Playhouse Realty Co. ("S&R Playhouse"), the tenant of the property. Plaintiff amended its Complaint, abandoning its retrospective claim for damages. The Amended Complaint seeks a declaration that future rent payments are to be escalated and paid in gold. The Amended Complaint should be dismissed.

The language of the lease does not support claims that rent should be raised based upon the price of gold. Moreover, even if plaintiff's gold clause theory had been viable at some time in the past, Jamaica's predecessors long ago waived the right of the owner to insist on payment in gold. Further, plaintiff is estopped from making its claims, among other reasons, because the deed by which plaintiff took the subject property plainly shows a different and lesser amount of rent than demanded by plaintiff. Plaintiff is bound by its deed. Accordingly, S&R moves this Court to dismiss plaintiff's action because the pertinent facts are undisputed and plaintiff's claims cannot be sustained as a matter of law.

## FACTS

The Lease at issue was created 94 years ago, in 1912, between The Realty Investment Company as lessor, and Salmon P. Halle and Samuel H. Halle, jointly, as lessees. (Compl. ¶ 21; Lease, Exhibit A.) The term of the Lease is 99 years. (Amd. Compl. ¶ 21.) S&R succeeded to the rights of the prior lessee under the Lease when the Halle Brothers Company assigned the leasehold estate to S&R in 1982 (the "1982 Assignment," Assignment and Assumption Agreement, attached as Exhibit B). (Amd. Compl. ¶ 31.) Jamaica succeeded to the rights of the original lessor, only eight months ago, in February 2006, when Halle Cleveland, LLC ("Halle Cleveland") transferred to Jamaica ownership of the land subject to the Lease. (Compl. ¶ 36.) The subject property was owned by Halle Cleveland LLC from November 17, 1997 until February 10, 2006, at which time it was sold to Jamaica Avenue LLC for $845,000. (Quesada Aff. ¶ 2, attached as Exhibit C; Parties' Joint Submission of Stipulations of Fact ("Joint Stipulations"), No. 2.)

The Lease's rental provision provides for rent to be escalated as follows: for the first two years of the term, rent was to be $10,000 per year, payable in quarterly installments. (Lease, at 2.) Then from April 1914 through March 1916, annual rent was to be $20,000; from April 1916 through March 1919, $25,000; from April 1919 through March 1922, $30,000 (Id.) The Lease clearly and unambiguously states that rent for the remaining eighty-nine years of the lease is $35,000: "For the remainder of said term, to wit: eighty nine (89) years the sum of thirty five thousand dollars ($35,000 per year . . .") (Id.)

At all times, rent payable under the 1912 Lease was payable and paid in United States currency in the annual amount of $35,000. (Quesada Aff. ¶ 4.) No tenant under the 1912 Lease, either S&R Playhouse Realty Co., or any other tenant, during the period of time that Halle

Cleveland LLC owned the subject property, ever paid rent in an amount exceeding $35,000 nor were any additional amounts ever requested or demanded. (Id.)

Furthermore, at no time did anyone at Halle Cleveland LLC—Jamaica's predecessor in interest as owner of the land—or anyone else, ever raise an issue or suggest in any way that the rent under the 1912 Lease was adjustable based upon the price of gold, or for any other reason. (Quesada Aff. ¶ 5.) Nor at any time while Halle Cleveland LLC owned the land, did any party raise an issue with the amount or method of paying rent in connection with the leasehold. (Quesada Aff. ¶ 6.) The rent paid, and the rent expected by the landlord, was at all times $35,000 per year. (Id.)

Plaintiff Jamaica acquired the Halle Building by deed on February 10, 2006 (the "Deed"). (Deed, attached as Exhibit D.[1]) The Deed states that the property was taken by Jamaica, "subject to the matters set forth in Schedule A." Schedule A provides that the Deed is subject to an estoppel certificate dated December 2001, which states: "The base annual rent under the Lease is $35,000, exclusive of taxes and other items of additional rental and all other amounts payable under the Lease." (Estoppel certificate, ¶ (c), attached as Exhibit E).

Since at least 2002, the Halle Office Building has suffered a negative cash flow.[2] (Ross Aff. ¶ 2.)

For the last 24 years, since 1982, S&R complied with the Lease terms by paying rent of $35,000 per year in U.S. currency. (Amd. Compl. ¶ 1.) Plaintiff does not and cannot allege that

---

[1] Plaintiff Jamaica has stipulated that the Deed and December 2001 estoppel Certificate are authentic. (Joint Stipulations, No. 5, filed 9/12/2006.)

[2] Plaintiff suggests in its Amended Complaint that S&R Playhouse enjoys a windfall from the Halle Building because it rents the building for $35,000 annually while it subleases the same space for of millions of dollars a year. (Amd. Compl. ¶ 1.) In fact, the Halle Building has suffered a negative cash flow in each of the past four years, and is projected to continue doing so for at least the next two years. (Ross Aff. ¶¶ 2-5, attached as Exhibit J.)

S&R has failed to pay $35,000 per year or that any lessor prior to plaintiff ever raised an issue concerning either the amount or method of S&R's rent payments.

## LAW AND ARGUMENT

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, Answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion, and must identify the portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party can discharge its burden by showing that the nonmoving party has failed to establish an essential element of the nonmoving party's case for which he bears the ultimate burden of proof at trial. *Id.; Morales v. American Honda Motor Co., Inc.,* 71 F.3d 531, 535 (6th Cir. 1995).

If the moving party meets this burden, then the nonmoving party must take affirmative steps to avoid the entry of a summary judgment. Fed.R.Civ.P. 56(e). The nonmoving party must present additional evidence beyond the pleadings. *Id.* The nonmoving party must do this by presenting more than a scintilla of evidence in support of his position. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court must grant summary judgment unless sufficient evidence exists that favors the nonmoving party such that a judge or jury could reasonably return a verdict for that party. *Id.* at 249. The Court is not "to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* If a party fails to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the Court is required to enter summary judgment. *Celotex Corp.,* 477 U.S. at 322.

Plaintiff cannot sustain a cause of action against S&R Playhouse for breach of contract because S&R fully complied with all of its obligations to pay rent as required by the Lease. The only conclusions that can be drawn from the evidence are (i) that the Lease requires S&R to pay $35,000 in rent per year and no more; (ii) that the "Gold Clause" was not reinstituted by the 1982 Assignment, because the 1982 Assignment is not an obligation "issued after" October 27, 1977, as required by federal law; (iii) that plaintiff's claims are estopped by the Deed by which plaintiff took the subject property; and (iv) plaintiff's claims are barred by the doctrine of waiver.

## I. S&R Playhouse's Motion for Summary Judgment should be granted because the Lease does not require S&R to pay more than $35,000 in annual rent.

This dispute is whether plaintiff is obligated, as stated unambiguously in the Lease, to accept $35,000 as full satisfaction of defendant's obligations to pay annual rent under the Lease, or whether, as plaintiff alleges, defendant is obligated to engage in complicated calculations that are not set forth in the Lease to convert 1912 dollars to ounces of gold and then to reconvert ounces of gold to current dollars. There is nothing in the words in the Lease to support plaintiff's contention.

A court must give a contract's words their plain and ordinary meaning unless an absurd interpretation would result or unless a different meaning is clearly evident from the document itself. *Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.,* 212 F.3d 332, 337 (6th Cir. 2000).

This rule of interpretation applies to leases. *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.,* 804 N.E.2d 979, 992 (Ohio Ct. App. 2004).

Here, the Lease provides,

> For the remainder of said term, to wit: eighty nine (89) years the sum of thirty five thousand dollars ($35,000.00) per year, payable in advance in quarterly installments of eight thousand seven hundred and fifty dollars ($8,750.00) each upon the first day of April, July, October and January in each year. All of said rents shall be paid in gold coin of the United States in present standard of weight and fineness by depositing it to the credit of the lessor, its successors or assigns, with the Citizens Savings & Trust of Cleveland, Ohio, or at such other place in the City of Cleveland as the said lessor, its successors or assigns, may from time to time designate.

(Lease, Exh. A, at 2.)

The language of the Lease is clear about what is owed—$35,000 payable in quarterly installments of $8,750 each. For unspecified reasons (the Lease is silent about the parties' intentions on this point), the landlord wished to be paid in gold instead of currency. Nevertheless, as plaintiff describes in its Amended Complaint, provisions requiring the payment of obligations in gold were outlawed by Congress after this Lease was executed. (Amd. Compl. ¶ 29.) But what the Court will not find in the Lease is any mention of inflation or any reference to potential escalations (or diminutions) in the value of gold and how those escalations or diminutions would affect the lessee's obligations to pay rent. Nor is there any mechanism provided for the establishment of current gold values or for the resolution of disputes about valuations. Presumably, sophisticated parties in a transaction like this one would have made express reference to these issues if they had any intention to provide for the kind of inflation hedge that plaintiff is advocating here.

What is clear from the Lease is that the original parties understood very clearly how to provide for an increase in rent. Rent under the Lease started at $10,000 and increased steadily

and materially to $20,000, then to $25,000, then to $30,000 and finally to $35,000 over the first ten years of the Lease. Had the parties intended some further escalation in rent, they knew how to use words to express their intentions in a clear manner.

Plaintiff is guilty of trying to rewrite the Lease. Five different times in the Amended Complaint, plaintiff alleges that S&R is required to make payments in the amount of gold "equivalent to" $35,000 in 1912, yet those words never appear in the Lease. "Weight" and "fineness," terms that do appear in the Lease, relate only to the quality of the ore, not to value, and nothing the plaintiff can write in its Amended Complaint or briefs today can change the terms of the Lease.

Moreover, the Deed by which plaintiff took the subject property makes clear that the rent due under the terms of the Lease is $35,000 per year. (See Section III below.)

The Lease is clear and unambiguous and does not require S&R Playhouse to pay more than $35,000 annually. S&R Playhouse's motion for summary judgment should be granted.

## II. Plaintiff's reliance on a payment in gold is unenforceable because the 1982 Assignment is not an obligation issued after October 27, 1977.

In 1933, Congress declared gold clauses to be illegal, and therefore the gold clause in the Lease was made unenforceable by federal law more than 70 years ago. In 1977, Congress changed course and allowed parties to create gold clauses in obligations "issued" subsequent to October 27, 1977. 31 U.S.C.S. § 5118(d) (LexisNexis 2000) (the "Gold Clause Statute"). Based on legislative history, the word "issued" has been held to mean "entered into." *Rudolph v. Steinhardt*, 721 F.2d 1324, 1330 (11th Cir. 1983) (quoting 123 Cong. Rec. 635 (1977) (detailing a debate in which Sen. Jesse Helms, author of the 1977 legislation, explained the meaning of the bill's language)). The logic behind Congress's inconsistent actions is that in 1933, the United

States abolished the gold standard, and thus declared gold clauses illegal. In 1977, Congress decided that if parties so agreed in a *new obligation,* a new "gold clause" could be enforceable.

While parties can now under federal law enter into a gold clause by creating an original obligation containing such a clause, some courts outside Ohio have held that the novation of a pre-existing contract may under narrow circumstances constitute "entering into" a new obligation. In those cases, courts have allowed parties to reactivate an old gold clause in a novated contract. *Grand Ave. Partners v. Goodan*, 25 F. Supp. 2d 1064, 1066 (C.D. Cal. 1996), *aff'd,* 160 F.3d 580 (9th Cir. 1998). State law determines whether a contract is novated. *Id.*

The initial question is whether under Ohio law the 1982 Assignment of the Lease created a new obligation to pay rent in gold in an escalated amount, despite the fact that even prior to 1982 rent in the amount of $35,000 in United States currency was being paid. If it is not, then plaintiff's case fails.

A new contract, one that is formed between parties expressly intending to utilize a gold clause, is required, at least under Ohio law, to reactive a long illegal and dormant gold clause. Here, plaintiff's attempt to drag the dormant 1912 gold clause into the 1977 law flies in the face of what Congress was doing when it renewed the ability to provide for payment in gold. This is a matter of first impression in Ohio, and there are no additional authorities to assist the Court in reaching a conclusion on this point.

Even if this Court were to conclude that novation of an earlier contract is sufficient to meet the Gold Clause Statute, there has been no novation here. The existing Lease is still in place, and the parties have done nothing to effect a novation of that agreement. The 1982 Assignment cannot be intended to renew the gold clause because rent from the lessee to the lessor under the 1982 Assigment was for $35,000 per year. That is the rent paid by S&R

Playhouse for the last 24 years under that assignment. If the parties intended the 1982 Assigment to create a new obligation in connection with rent, as Jamaica now argues, then the landlord would have demanded increased rent almost a quarter of a century ago. Jamaica was not involved in the 1982 Assigment, yet comes in now without any knowledge of the parties' intentions and attempts to unilaterally rewrite the terms of the Lease.

Under Ohio law, a novation occurs only when a valid obligation is completely extinguished by a new valid obligation. *McGlothin v. Huffman*, 640 N.E.2d 598, 601 (Ohio Ct. App. 1994). In this case, this would require that S & R's predecessor, Halle Cleveland, was absolved of any obligations it had by assigning the Lease to S&R Playhouse; as will be seen below, this is clearly not the case.

Moreover, the standard for concluding that an existing obligation constitutes a novation is high, and novation is never presumed. *See Bahner's Auto Parts v. Bahner,* No. 97CA2538, 1998 Ohio App. LEXIS 3453, at *24 (Ohio Ct. App. June 23, 1998), attached as Exhibit F. The court must find that the parties intended to effect an actual novation (as opposed to a mere assignment, which is the case here), and that they consented to novation with full knowledge of their actions. *See Garrett v. Lishawa*, 172 N.E. 845, 846 (Ohio Ct. App. 1930); 18 Oh. Jur. 3d Contracts § 247 (2005).

A court can examine the language of the writing purported to novate the obligation to determine whether novation has occurred. *See Snell v. Salem Ave. Assocs.* 675 N.E.2d 555, 561-62 (Ohio Ct. App. 1996). A court will not find novation unless all parties have evidenced a "clear and definite intent" to "completely do away with the original contractual obligation." *Wenner v. Marsh USA, Inc.*, No. 01AP-1211, 2002 WL 826021, at *2 (Ohio Ct. App. May 2, 2002).

In order for a novation to be valid, there must also be a complete meeting of the minds among the parties to substitute the new agreement for the old one. *Bahner's Auto Parts*, 1998 Ohio App. LEXIS 3453, at *23 (*citing State ex rel. Bettman v. Ct. Com. Pl. of Franklin County.,* 124 Ohio St. 269, 283-84 (1931)). Novation requires the parties' negotiation of a common understanding of their arrangement. *Wenner,* 2002 WL 826021, at *3. Each party must manifest knowledge and consent not only to the novation itself but to the terms of the new obligation they create through novation. *See Bahner's Auto Parts*, 1998 Ohio App. LEXIS 3453, at *24.

The language in the Lease and the 1982 Assignment, as well as the parties' conduct, shows there was no novation. One aspect of the assignment that demonstrates this conclusion is the treatment of the prior lessee's (the assignor's) liability under the Lease. In order to effect a novation, the assignor's liability would have had to have been completely extinguished (*see Kruppa v. All Souls Cemetery of the Diocese of Youngstown*, 2002 Ohio 713, *13 (Ohio Ct. App. 2002); if that occurred, the Court could conclude that the "new contract" (the 1982 Assignment) had replaced the prior contract.

In this case, however, S&R did not accept any of the assignor's obligations under the Lease. Instead, S&R agreed to assume only those obligations of the assignor and lessee "to be observed and performed after the date hereof." (1982 Assignment and Assumption, attached as Exhibit B at 2.) Thus, any obligations assignor had continued to exist after execution of the 1982 Assignment. Moreover, the Lease releases an assignor only from "personal liability." (Id.) Mere release of "personal liability" is not equivalent to release of all liability. *See Young v. M. Hargrave's Adm'r.,* 7 Ohio 63, 68-69 (1836).

The distinction about the extent of the release of an assignor's liability has been a controlling factor in other "Gold Clause" cases. In *Grand Avenue Partners v. Goodan*, 25 F.

Supp. 2d 1064 (C.D. Cal. 1996), *aff'd,* 160 F.3d 580 (9th Cir. 1998), the Court held that an assignment was not a novation because the assignment did not completely extinguish all liability of the assigning lessee. The original lease provided that an assignment meeting all of the lease's requirements would release the assignor from all "direct" liability under the lease. *Id.,* at 1069. The court noted that if the lessor had intended to release the assigning lessee of all liability, it could have done so by omitting the qualifying word "direct" between "all" and "liability." *Id.*, at 1070.

In contrast, *Trostel v. American Life and Casualty Ins. Co.*, 92 F.3d 736, 739 (8th Cir. 1996), *vacated* 519 U.S. 1104 (1997), *remanded to* 133 F.3d 679 (8th Cir. 1998), *appeal after remand*, 168 F.3d 1105 (8th Cir. 1999), involved a case where both parties expressly acknowledged that an instrument of assignment used in 1969 fully released the previous lessee from all liability and therefore constituted a novation. *Id. See Nebel v. The Mid-City Nat'l Bank of Chicago*, 769 N.E.2d 45 (Ill. App. Ct. 2002), (the court concluded that a material amendment of a lease was a novation because the new lease, as amended, completely replaced the old obligation). Of course, this is not the case here and this dispute presents similar facts to those in *Grand Avenue*. Plaintiff is a "modern day prospector" unsuccessfully "panning for security in the rivulets of commerce." *See Rudolph v. Steinhart*, 721 F.2d 1324, 1325 (11th Cir. 1983).

The 1982 Assignment of the Lease did not completely release liability under the Lease. No novation occurred, as the 1982 Assignment was not intended to, nor did it, create a new obligation in favor of a gold clause, and the Lease's gold clause is as unenforceable today as it was in 1933.

**III.    S&R Playhouse's motion for summary judgment should be granted because, by the terms of its Deed, Jamaica is estopped from claiming that the Lease requires rental payments exceeding $35,000 per year.**

Under the doctrine of estoppel by deed, Jamaica cannot increase S&R's rental payments because the Deed expressly states that S&R's rental payments are $35,000 per year. A deed's language is presumed to express the intent of the parties. *Lorenzen, Inc. v. North Star Recycling Co.*, No. 95-0577, 1996 Ohio Misc. LEXIS 77, at *5 (Lucas Cty. Aug. 13, 1996) (attached as Exhibit G). The language of the Deed is conclusively presumed to express the parties' intention absent any uncertainty in the language used. *Id.; Guida v. Thompson*, 160 N.E.2d 153 (Ohio Misc. 1957) (noting that "the court must seek for the real meaning intended to be expressed by the language used in the deed, the question being not what the parties meant to say, but the meaning of what they did say").

If a grantee accepts a deed, the knowledge of all its provisions are legally imputed to him. *Turner v. Fox*, No. 2003-09-251, 2005 Ohio App. LEXIS 694, at *15 (Butler Cty. Feb. 22, 2005) (Attached as Exhibit H). Accepting the deed, the grantee becomes bound by all of the deed's provisions and estopped from denying the provisions' legal effects. *Id.* The grantee loses any cause of action with respect to the essential terms covered by the deed when he accepts the deed. *Davis v. DiFilippo*, No. 95CA0046, 1996 Ohio App. LEXIS 1141, at *8 (Wayne Cty. Mar. 27, 1996) (Attached as Exhibit I). A grantee who accepts delivery of a warranty deed that is subject to "restrictions of record" is deemed to have knowledge of those restrictions that appear in the purchaser's chain of title, and, therefore takes the property subject to those restrictions. *Id.*

Finally, the doctrine of estoppel by deed precludes a party who has accepted a deed from denying specific facts recited in that deed when an action is brought on the instrument. *Robinwood Assocs. v. Health Inds., Inc.*, 547 N.E.2d 1019, 1022 (Ohio Ct. App. 1988). When the express language of a deed is in conflict with the express language of a prior contract, the

-12-

grantee is bound by the terms of the deed, and no cause of action exists on the prior contract. *Id.*
at 1021.

Under the doctrine of estoppel by deed, Jamaica is barred from denying that rent is
greater than $35,000 per year, in payable in currency. Halle Cleveland conveyed the leased
property to Jamaica by a deed that states it is "subject to the matters set forth in Schedule A."
(Deed, Exhibit D). Among the items named in Schedule A is an estoppel certificate dated
December 2001. (Id.) The estoppel certificate expressly states that the lessor certifies to S&R's
mortgagee that the "base annual rent under the Lease is $35,000, exclusive of taxes and other
items of additional rental and all other amounts payable under the Lease." (Estoppel Certificate,
attached as Exhibit E.) Moreover, the estoppel certificate recites that "[t]o the best of the
knowledge of the undersigned [Halle Cleveland], there has occurred no default under the Lease
and no event has occurred which, with the passage of time or the giving of notice or both will
constitute a default on the part of Lessee [S & R] under the Lease."

By accepting the property in February 2006 "subject to" the estoppel certificate, Jamaica
accepted that rent was $35,000 per year, payable in currency, and nothing more. Moreover,
Jamaica accepted the fact that S&R Playhouse's performance did not constitute a default.

The language in both the Lease and the Deed are clear and unambiguous, and do not
require judicial construction. The only conflict in existence with respect to the language of the
Lease, Deed, and other governing documents, has been artificially created by Jamaica's
allegations in this action. Jamaica, however, did not raise the issue of escalated rent or a gold
clause prior to the closing of its acquisition of the property here and it cannot do so now.
Despite knowledge of the rent dispute that Jamaica raises in this action, Jamaica accepted a deed

that contradicts its claims. In accepting the Deed, Jamaica became bound by all of the Deed's provisions.

Before closing, Jamaica could have sought to rectify any issues of rent through a delay in the closing. Jamaica chose not to do so. Now Jamaica seeks to deny the very terms it accepted. Once accepted, Jamaica became bound by the terms of the Deed, including the amount of rent prescribed by the December 2001 estoppel Certificate—$35,000. Accordingly, Jamaica is estopped from claiming that the Lease requires rental payments in excess of $35,000 per year and S&R Playhouse's motion for summary judgment should be granted.

Moreover, the closely related and also applicable doctrine of merger by deed provides that "where a deed is delivered and accepted without qualification pursuant to agreement, no cause of action upon the prior agreement thereafter exists." *Fuller v. Drenberg*, 209 N.E.2d 417 (1965). At that point, the parties are limited to the express covenants of the deed. *Id.* There are three exceptions to the doctrine of merger by deed. *Lorenzen, Inc. v. North Star Recycling Co.*, No. 95-0577, 1996 Ohio Misc. LEXIS 77, at *5 (Lucas Cty. Aug. 13, 1996) (attached as Exhibit G. The rights of the parties must be determined by deed, unless elements of (1) fraud or (2) mistake exists, or (3) the prior agreement is collateral to and independent of the main purpose of the transaction. *Id.* When a contractual provision runs with the land and concerns occupancy, title, size, enjoyment, possession, or quantity of land conveyed, the covenant is not collateral, and merges with the deed. *Id.* Here, neither fraud nor mistake has been alleged. Additionally, covenants to pay future rents runs with the land. *Smith v. Harrison*, 42 Ohio St. 180 (Ohio 1884); *see also* 65 Ohio Jurisprudence 3d, (2005) Landlord and Tenant §280. S&R Playhouse's covenant to pay $35,000 per year in rents was for future rents and, thus, it runs with the land.

Accordingly, Jamaica is estopped from claiming it is owed a different rent than $35,000 per year, and S&R Playhouse's Motion for Summary Judgment should be granted.

## IV.    Jamaica's predecessors in interest have waived the claims that Jamaica now asserts under the Lease for future rents greater than $35,000 per year.

S&R Playhouse paid rent in the amount of $35,000 in United States currency since 1982, and no evidence exists that any lessee ever paid rent in gold. Accordingly, any current claim that rent should be paid in gold or that the amount of rent should be somehow escalated, has been waived.

Waiver is an intentional relinquishment of a known right. *Bahner's Auto Parts v. Bahner* (4th App. Dist. 1998), 1998 Ohio App. LEXIS 3453, *18 (quoting *Russell v. Fourth Nat. Bank* (1921), 102 Ohio St. 248, 269, 131 N.E. 726), attached as Exhibit K. A party can waive a right either expressly or constructively. *Id.*

Waiver may be implied through conduct. Under Ohio law, waiver may be construed from conduct on the part of an obligee which misleads an obligor to believe that his performance satisfies a condition of an obligation. *Lewis & Michael Moving & Storage, Inc. v. Stofcheck Ambulance Service, Inc.* (10th App. Dist. 2006), 2006 Ohio App. LEXIS 3775, *16. Waiver allows a party's inconsistent conduct, rather than a party's intent, to establish a waiver of rights. Id. An example of such conduct is acceptance of partial or defective performance. *Komes v. Turner* (12th App. Dist. 1989 Ohio App. LEXIS 1564, *3 (citing *Allen v. Curles* (1856), 6 Ohio St. 505) (noting that acceptance of partial performance of a contract may operate as a waiver of strict compliance with the contract), attached as Exhibit L.

In determining whether a party has waived further performance, a court will consider the timing of the waiver. Failure to assert a right when circumstances require prompt action may serve as evidence that a party intends to relinquish the right. *Bahner's Auto Parts,* 1998 Ohio

App. LEXIS 3453 at *21 (citing 420 Oh. Jur. 3d <u>Limitations and Laches</u>, § 221 (1986)); *Baily v. Pochedly* (11th App. Dist. 2005), 2005 Ohio App. LEXIS 2865, *16, attached as Exhibit M.

Halle Cleveland, Jamaica's predecessor, accepted S&R's payments in cash and never suggested that it had any expectation of payment in gold. If Halle Cleveland and S&R had wished to recreate the obligation to pay in gold, they could have done so, either by entering into a new contract (which was not done) or by expressly recognizing that the 1982 Assignment triggered the gold clause in the original lease. But they did not do that either. In fact, Halle Cleveland continued the practice of accepting $35,000 in cash in satisfaction of its expectations of rent. If the 1982 Assignment created any opportunity for Halle Cleveland to demand payment in gold, it waived its right to do so by consistently accepting S&R's cash payments.

Jamaica has stepped into the shoes of Halle Cleveland. Jamaica is bound by Halle Cleveland's waiver of any right to collect rent in gold. "It is well established that an assignee stands in the shoes of the assignor, and that by assignment the assignee could acquire no greater rights than its assignor. . . ." 3 Williston on Contracts 182-83 (3d ed. 1960) (citations omitted). *Dana Corp. v. Fireman's Fund Ins. Co.*, 1997 U.S. Dist. LEXIS 16413 (S.D. Ohio 1997), attached as Exhibit N. This is a universally acknowledged doctrine of long-standing; see, e.g., *Spain v. Hamilton's Adm'r*, 68 U.S. 604, 624 (1863) ("assignee . . . is subject to all the equities between the assignor and his debtor"), and *Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 875 F. Supp. 1022, 1026 (S.D.N.Y. 1995) ("an assignee never stands in any better position than his assignor").

In conclusion, Jamaica's claims are barred because Halle Cleveland waived any right to receive escalated rents or payment in gold. For this reason alone, the Court should grant the motion to dismiss.

## CONCLUSION

For the all reasons above, S&R respectfully requests that this Court grant Defendant's

Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,

/s/ Stephen D. Williger
Stephen D. Williger (0014342)
Gary L. Walters (0071572)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
(216) 566-5500
(216) 566-5800 – Fax
Stephen.Williger@ThompsonHine.com
Gary.Walters@ThompsonHine.com

Attorneys for Defendant
S & R Playhouse Realty Co.

## CERTIFICATE OF SERVICE

A copy of the foregoing *Defendant's Motion for Summary Judgment* and supporting memorandum were filed electronically this 12th day of October, 2006. Parties will receive notice through the Court's electronic filing system.

/s/ Stephen D. Williger
One of the Attorneys for Defendant
S & R Playhouse Realty Co.

# Exhibit A

EX TRA Copy

Ground
Lease
Halle
Building
Cleveland, Ohio

Parcel 3

600422     The Realty Investment Co.     To     Salmon P. Halle et. al.

This indenture of lease made and entered into this 15 day of March A.D. 1912 by and
between The Realty Investment Company a corporation of Ohio, hereinafter called the
"lessor" party of the first part, and Salmon P. Halle and Samuel H. Halle jointly,
hereinafter called the "lessees" parties of the second part, Witnesseth; That the said
lessor hath demised and leased, and doth by these presents demise and lease, unto the
said lessees, their heirs and assigns, the following described premises, situate in
the City of Cleveland, County of Cuyahoga and State of Ohio, to wit: known as that
part of two acre lots numbers 157 and 158 which is bounded and described as follows
to wit: Beginning at the intersection of the easterly line of Short Alley with the
southerly line of Euclid Avenue; thence easterly along the southerly line of Euclid
Avenue one hundred (100) feet to the westerly line of property of Alfred A. Pope
thence southerly parallel with the easterly line of said Short Alley and along the
westerly line of said Popes property to a point in the northerly line of Huron Road
(formerly Huron Street) which point is one hundred (100) feet westerly measured along
said northerly line of Huron Road from the intersection of the northerly line of
Huron Road and the easterly line of Short Alley; thence westerly along the northerly
line of Huron Road forty eight (48) feet to the westerly line of premises conveyed
by Joel W. Tyler and wife to J. M. Henderson by deed recorded in volume 313 page 37
of Cuyahoga County Records of Deeds; thence northerly parallel with the easterly line
of Short Alley eighty (80) feet and along the easterly line of the premises conveyed
to the said Henderson as aforesaid to the northeasterly corner thereof; thence west-
erly along the northerly line of the premises conveyed to the said Henderson as afore-
said 52.54 feet to a point in the easterly line of Short Alley, which point is eighty

five (05) feet northerly, measured along said line of said Alley from the northerly line of Huron Road; thence northerly along the easterly line of Short Alley to the place of beginning. Being all the premises owned by The Realty Investment Company situated between Euclid Avenue on the north, Short Alley on the west, Huron Road on the south, and said premises of Alfred A. Pope on the east. Which premises shall at all times remain upon the tax duplicate in the name of the lessor, its successors or assigns. To have and to hold the above leased and demised premises, together with the privileges and appurtenances thereunto belonging, unto the said lessees, their heirs and assigns, for and during the term of ninety nine (99) years, beginning on the first day of April A. D. 1912, and ending on the thirty first day of March, A. D. 2011, at and upon the following terms and subject to the covenants, conditions and stipulations hereinafter expressed and declared of and concerning the same; that is to say;1. The lessees shall pay or cause to be paid unto the lessor, its successors and assigns, during the continuance of this lease, rental as follows; For the first two (2) years ending on the 31st. day of March, 1914, the sum of ten thousand dollars ($10,000.00) per year, payable in advance, in quarterly installments of twenty five hundred dollars ($2500.00) each upon the first day of April, July, October and January in each year. For the next succeeding two years, ending on the 31st. day of March, 1916 the sum of twenty thousand dollars ($20,000.00) per year, payable in advance, in quarterly installments of five thousand dollars ($5,000.00) each upon the first day of April, July, October and January in each year. For the next succeeding three (3) years, ending on the 31st. day of March, 1919, the sum of twenty five thousand dollars ($25,000.) per year, payable in advance in quarterly installments of six thousand two hundred and fifty dollars ($6,250.00) each upon the first day of April, July, October and January in each year. For the next succeeding three (3) years, ending on the 31st. day of March 1922, the sum of thirty thousand dollars ($30,000.00) per year, payable in advance in quarterly installments of seven thousand five hundred dollars ($7,500.00) each upon the first day of April, July, October and January in each year. For the remainder of said term, to wit; eighty nine (89) years the sum of thirty five thousand dollars ($35000.00) per year, payable in advance in quarterly installments of eight thousand seven hundred and fifty dollars ($8,750.00) each upon the first day of April, July, October and January in each year. All of said rents shall be paid in gold coin of the United States of the present standard of weight and fineness by depositing it to the credit of the lessor, its successors or assigns, with The Citizens Savings & Trust Company of Cleveland, Ohio, or at such other place in the City of Cleveland as the said lessor, its successors and assigns, may from time to time designate. 11. As a part of the consideration for this lease and in addition to the rentals hereinbefore provided, the lessees hereby covenant and agree to indemnify and save harmless the lessor, its successors and assigns, from any and all taxes, assessments or levies on or against this lease (excepting, however, any income tax that may be levied against the lessor by reason of this lease) the lessees estate hereunder and the premises hereby leased and all improvements thereon, for the full term of this lease and of any and all extensions thereof, beginning with the taxes, assessments and levies due and payable in December 1912; and free from all charges, liens, penalties and claims for damages chargeable to or payable for or in respect of said leased premises and all improvements thereon and the estate of the lessees hereunder, during the said term and any and all extensions thereof; and to punctually pay, in addition to the rents above provided for, all such taxes, assessments, levies and other charges as aforesaid, and upon application of the lessor, its successors and assigns, in writing, to

furnish The Citizens Savings & Trust Company with written evidence, duly certified,
that any and all such charges, claims, et cetera, are duly paid and satisfied; and
the lessees do hereby agree to pay the rents, taxes, assessments, levies and other
charges as hereinbefore provided. But the lessees shall at all times have the right
to contest in good faith in any proper proceeding and in the name of the lessor, if
necessary, the payment or satisfaction of any such taxes, assessments, charges, liens
penalties or claims so agreed to be paid by the lessees, if the validity thereof or
the right to assess or levy the same against or collect the same from the said prem-
ises or improvements or estate of the lessees be disputed by the lessees; but the
lessees shall in any and all such proceedings, protect and save harmless the lessor
from all cost, loss or damage resulting from any such proceeding or from the failure
of the lessees to make any such payment. The lessees hereby agree to promptly and
fully obey and comply with all requirements, rules, regulations, laws and ordinances
of all legally constituted authorities in any way affecting said premises, the build-
ings and improvements on or about the same or the use of the same, existing at any
time during the continuance of this lease (with the right however, to contest the
validity thereof in the manner and under the conditions above provided with respect
to taxes, assessments and other public charges) and to permit no unlawful occupation
to be carried on upon said premises and no use to be made of any part thereof contrary
to any law or ordinance governing the same. #17. The lessees agree to erect upon
said premises within five (5) years from the commencement of the term of this lease,
a building which shall cost not less than one hundred thousand dollars ($100,000.00)
V. From and after the erection and completion of the building provided for in Article
IV hereof the lessees agree to keep the buildings and improvements on said premises
insured against loss by fire for an amount equal to the full insurable value thereof
or, if such insurable value exceeds one hundred thousand dollars ($100 ,000.00) then
for an amount not less than one hundred thousand dollars ($100,000.00) in responsible
insurance companies authorized to do business in the State of Ohio or in such companies
as may from time to time approved by the lessor; all such policies representing such
insurance to contain clauses providing that the loss, if any, shall be payable to
The Citizens Savings & Trust Company of Cleveland, Ohio, and all amounts that shall
be paid under such insurance policies may be used by the lessees in the erection of
a new building or buildings upon said premises or in repairing the building standing
thereon, or in such manner as will fully protect the rights of the lessees and lessor
hereunder, and whenever any new building shall be erected upon the premises it shall
be kept insured by the lessees for the amount and in the manner before specified, all
amounts becoming payable under such policies to be paid and used as above provided.
All of the policies for the insurance herein provided for shall be deposited with and
retained by said Trust Company. It is further mutually agreed that in case the build-
ing or buildings and improvements upon said premises shall be at any time damaged or
destroyed this lease shall not be terminated, the laws of the State of Ohio to the con-
trary notwithstanding, and that neither of the parties hereto shall be released by
reason of any such damage or destruction from any obligation created or imposed by vir-
tue of this instrument. In the event lessees fail to insure said buildings and im-
provements as hereinbefore provided the lessor or The Citizens Savings & Trust Company
or its successor may insure the same in the manner and to the extent hereinbefore
stated, and collect from the lessees the premium or premiums paid therefor, the same
as is herein provided for the payment of rent, taxes and assessments. In the event that
said The Citizens Savings & Trust Company shall at any time resume the transaction

of business or for any reason shall cease to perform the duties and trusts herein sought to be imposed upon it, all such duties and trusts may be discharged and performed by such other trust Company in the City of Cleveland, Ohio, as may from time to time be designated by the lessor. VI. The lessees further covenant and agree not to assign or transfer this lease at any time without the consent of the lessor in writing, unless the rents and all charges, assessments, liens and penalties then payable and covenants thereof at that time required to be performed have been paid, satisfied and performed; and unless the assignee shall expressly assume the lessees engagements hereunder; and unless the lessees shall have placed in the hands of the lessor for inspection during a period of ten (10) days a legal and sufficient instrument of assignment and acceptance; and unless by instrument recorded at or about the time of delivery in the proper recorders office; provided, however, that the lessees, their heirs and assigns, may at any time directly or by conveyance in trust for that purpose, mortgage their estate in the premises to secure any actual debt, and may make all of the insurance payable, in case of loss, to the trustee or mortgagee after caring for the interests of the lessor. All personal liability of the lessees upon this lease and for the performance of the covenants herein contained shall cease and determine upon an assignment hereof when and after a building shall have been erected upon said premises in accordance with the provisions contained in Article IV hereof. VII. It is agreed that the whole amount of the rent agreed to be paid hereunder and all moneys due hereunder by reason of any engagement of this lease are and always shall be a valid and first lien upon the buildings and improvements upon said premises and upon all of the interest of the lessees in said premises and in this lease. The lessees covenant and agree to pay and indemnify the lessor, its successors and assigns, from all costs and charges lawfully and reasonably incurred in and about the premises in the defense of any suit in discharging the premises or any part thereof, from any liens, judgments or encumbrances placed or suffered to be placed thereon by said lessees or by any person or persons claiming under them or in obtaining possession after any default of the lessees or expiration of the term hereof; and the lessees further agree to and do hereby indemnify and save harmless the lessor from all loss, cost or damage in any manner arising from the erection of a building or buildings upon said premises and in excavating for the same or in the removal of any building from said premises. VIII. This lease is made upon the condition that the lessees shall punctually perform all the covenants and conditions herein set forth to be performed by the lessees, and that if at any time the rent, taxes, assessments, levies and other charges and payments aforesaid, or any of them or any part thereof, shall become in arrears and unpaid for the period of four (4) months after becoming due, or if any of the remaining covenants or agreements aforesaid shall not be performed as hereinbefore stipulated and agreed to be performed by the lessees, and such default shall continue for a period of four months, the lessor, its successors and assigns, shall, after such four (4) months period and after first giving to the lessees and to any one mortgagee of the lessees (if there be such mortgagee) sixty (60) days written notice of the lessors intention to enter upon said premises and forfeit this lease, have the right at the expiration of said sixty (60) day period or at any time thereafter such default being not cured, to enter upon said premises and resume possession thereof and bring suit for and collect all rents, taxes, assessments, levies payments or othercharges which shall have accrued up to the time of such entry, and thenceforth from the time of such entry this lease shall become void to all intents and purposes whatsoever, and the said leasehold es-

tate and all improvements made on said premises shall be forfeited to the lessor without compensation therefor to the said lessees; provided, however, that for rents due and non-performance of any other conditions, covenants, agreements or stipulations hereof, the lessor may, at its election sue for and collect all amounts due and enforce all other obligations of the lessees hereunder without such entry or forfeiture. IX. It is further mutually agreed that every demand for rent made after the same falls due shall have the same force and effect in law as if made at the time the same falls due, and that the waiver by the lessor, its successors and assigns, of any covenant, agreement, stipulation or condition herein contained shall not be construed as a waiver of any subsequent breach of such covenant, agreement, stipulation or condition. X. The lessees hereby covenant and agree at all times to keep in good condition and repair, at their own expense, the buildings and improvements on said premises, and that no waste either actual or permissive shall be permitted thereon but the removal of buildings or portions thereof, for the purposes of reconstruction or of erecting new buildings shall not be deemed to be waste. XI. The lessor for itself, its successors and assigns, hereby covenants to and with the lessees that if the rent, taxes, assessments, levied and other charges aforesaid, shall be paid as hereinbefore provided, and all other of the aforesaid agreements, covenants, conditions and stipulations, shall be performed by the lessees as is in this lease provided, the lessees shall have the peaceable possession and enjoyment of the premises above described without the let, hindrance or disturbance of any person whatsoever, to the end of said term and of any and all extensions thereof. XII. The lessor, for itself, its successors and assigns, further expressly agrees that the lessees shall have the right and option, which is hereby granted, to extend and renew this lease for a further period of twenty five (25) years or of fifty (50) years of of ninety nine (99)years, from and after the expiration of the said term herein granted if the lessees shall desire an extension thereof for either of said additional periods. In the event that the lessees shall elect to exercise such option for any such extension of this lease, the lessees shall, within the year commencing on the first day of April, A. D. 2009, and ending on the 31st. day of March, A. D. 2010, notify the lessor in writing of the lessees election and intention to have and acquire such extension and renewal for one of the periods of time above mentioned, and shall indicate in such notice whether such extension or renewal shall be for the period of twenty five (25) years or for fifty (50) years or for ninety nine (9) years; and after the service of said notice upon the lessor, such extension and renewal shall become effectual for all purposes, and the lessor and the lessees shall thereupon execute such further instruments or agreements as may at such time be proper or necessary for the full protection of the respective rights of the said parties during such extension of the original term thereof. In the event of any such renewal of the original term of this lease, the rental to be paid by the lessees hereunder during the renewal period so specified by the lessees shall be the sum of thirty five thousand dollars ($35,000.00) per year, payable quarterly in advance in the manner and upon the terms and conditions hereinbefore set forth, and all of the remaining conditions covenants and stipulations of this lease shall be and remain in full force and effect during such entire additional term hereof. XIII. Whenever this lease or any renewal thereof shall expire without election on the part of lessees to renew, then the lessees shall vacate said premises at the termination of this lease or any renewal thereof, as the case may be, and surrender possession thereof to the lessor, its successors and assigns. XIV. It is further agreed that all the covenants, agreements



stipulations, conditions, engagements and obligations of this lease shall accrue
to and be binding upon the successors and assigns of the said original lessor and
upon the heirs, personal representatives and assigns, of the said original lessees,
provided, as to their assigns, that they shall become such in accordance with the
terms and conditions hereof, with like force and effect in all respects as the same
accrue to and are binding upon said original lessor and lessees respectively. In
witness whereof, the said The Realty Investment Company had caused its corporate
name and seal to be affixed to duplicate originals hereof by its President and Secre-
tary, thereunto duly authorized by its Board of Directors; and the said Salmon P.
Halle and Samuel H. Halle have set their names to such duplicate originals hereof,
the day and year first above written.

Signed, Sealed and Acknowledged in the presence of)   The Realty Investment Company

Andrew Squire        Charles C. Owens.                 By Ralph King    President

G. B. Siddall        L. S Lommason                     Attest E. S. Sanderson Secretary

                         (The Realty Investment)
                         (Company Corporate Seal       Salmon P. Halle
                         (    Cleveland Ohio   )
                                      Samuel H. Halle

The State of Ohio ss ) Before me, a Notary Public within and for said County, per-

Cuyahoga County      ) sonally appeared the above named Ralph King and E. S. Sander-
son to me known and known to me to be the President and Secretary respectively of
The Realty Investment Company the corporation which executed the within instrument
as lessor and acknowledged that they did sign and seal said instrument for and in be-
half of said corporation; that the same is their free act and deed as such officials
respectively and the free and corporate act and deed of said The Realty Investment
Company. In testimony whereof, I have hereunto set my hand and official seal at
Cleveland, Ohio, this 23rd. day of March A. D. 1912.

                              Charles C. Owens      (Notarial Seal )
                                          Ohio
                                Notary Public(Cuyahoga County

The State of Ohio ss ) Before me, a Notary Public within and for said County, per-

Cuyahoga County      ) sonally appeared the above named Salmon P. Halle and Samuel
H. Halle, the lessees above named, who acknowledged that they did sign the foregoing
instrument, and that the same is their free act and deed. In testimony whereof, I
have hereunto set my hand and official seal at Cleveland, Ohio this 15" day of March
A.D. 1912.

Rec'd Apr. 3, 1912 at 3:10 P. M. )       E. S. Lommason --  (Notarial Seal   )
                                                          Ohio
Recorded Apr. 4, 1912           )       Notary Public (Cuyahoga County)

Fee for Record $4.00            ) Paul Schreiner  Recorder

6

# Exhibit B

WEST WING ANNEX

CORP RATE TRUST
775293
TRUST No. _14/6_

☐ ANNUALLY
☐ CORRESPONDENCE-OTHER
☐ CORRESPONDENCE OTHER ADDRESS
☐ DOCUMENTS
☐ FEES
☐ FINANCIAL STATEMENTS
☐ CUSTOMER STATEMENTS

## ASSIGNMENT AND ASSUMPTION

THIS ASSIGNMENT AND ASSUMPTION is made this ʒ̄lˢᵗ day of _____, 1982, by and between THE HALLE BROTHERS COMPANY, a Delaware corporation (herein "Assignor"), and S & R PLAYHOUSE REALTY COMPANY, an Ohio General Partnership (herein "Assignee"). *11800 Brookpark Rd.*
*Cleveland Ohio 44130*

### W I T N E S S E T H :

WHEREAS, by Indenture of Lease dated November 28, 1921, and recorded in Volume 149, page 52 of the Lease Records of Cuyahoga County, Ohio, on June 17, 1925, The Lake Shore Banking & Trust Company, an Ohio corporation, as lessor (and joined in the execution of said Indenture of Lease by John M. Henderson and Frank A. Quail), leased to The Halle Brothers Company, an Ohio corporation (and predecessor in interest to Assignor), as lessee, the property described in Exhibit A attached hereto (herein the "Premises"); and

WHEREAS, said Indenture of Lease was modified by a Modification of Covenants and Extension of Term of Lease dated July 6, 1925, recorded in Volume 149, page 182 of said Lease Records, by and between The Cleveland Trust Company, an Ohio corporation, as lessor, and The Halle Brothers Company, an Ohio corporation, as lessee (said Indenture of Lease, as so modified, being herein referred to as the "Lease"); and

WHEREAS, the Lease in Section B.7 contains the following clause pertaining to assignments:

That the Lessee shall not, except by way of mortgage or conveyance in trust to secure an actual indebtedness, assign or transfer this lease at any time unless the rents, charges, taxes, assessments, liens and other obligations assumed by the Lessee hereunder have been fully paid and satisfied in so far as they shall then have accrued, nor unless, in the case of the first lessee herein named, the lessee shall have acquired the ownership of the said building and improvements by the payment of the additional sum of fifty thousand dollars ($50,000) as above provided, nor unless the assignee shall expressly assume all the covenants and obligations of the Lessee hereunder, nor unless the Lessee shall have first delivered to the Lessors, for examination during a period of three (3) days, a legal and sufficient instrument of assignment and acceptance, nor unless by instrument recorded in the office of the Recorder of Cuyahoga County, Ohio. No assignment hereof, unless conforming in all respects to the above requirements, whether by written instrument, devise, descent or otherwise, shall be of any validity or effect; but after any assignment made in conformity to the foregoing provisions the assigning Lessee shall be released from further liability hereunder.

and

WHEREAS, as stated in the above-described Modification of Covenants and Extension of Term of Lease, the original

PARTNERSHIP FILED _5-21-82_
NO. _1721_ VOLUME _14_
COUNTY RECORDER
CUYAHOGA COUNTY
BY _Christine Clay_ DEPUTY

CONFIDENTIAL FCID 0209

lessee under the Lease satisfied and fulfilled the above-quoted requirement of purchase of building and improvements by the payment of Fifty Thousand Dollars ($50,000); and

WHEREAS, Assignor is the successor in interest to the original lessee under the Lease, and is now the lessee and owner of the leasehold estate under the Lease; and

WHEREAS, Assignor desires to assign all of its right, title, and interest in and to the Lease and as lessee and owner of the leasehold estate under the Lease to Assignee, and Assignee desires to accept such assignment;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements herein contained, the parties hereto agree as follows:

1. In consideration of Ten Dollars ($10.00) and other good and valuable consideration the receipt of which is hereby acknowledged, Assignor does hereby sell, assign, transfer and convey to Assignee, its successors and assigns (a) all of Assignor's right, title, and interest in and to the Lease and as lessee and owner of the leasehold estate thereunder, and (b) all of Assignor's right, title, and interest in and to all buildings and improvements located on the Premises, together with all appurtenances thereunto belonging, and all property of whasoever kind located therein or thereon; but subject, nevertheless, to the payment of the rents and the observance of all and singular the covenants, conditions, terms, and agreements in said Lease contained.

2. Assignor hereby covenants and agrees with Assignee that at and until the execution and delivery of this assignment, Assignor is well seized of the Lease and the leasehold estates thereby created and has good right to sell, assign, and transfer the same in manner and form as above written; and said Lease and leasehold estate are free and clear from all liens, claims, and encumbrances whatsoever, except taxes and assessments not yet due and payable; and Assignor warrants and defends said Lease and leasehold estate to Assignee, its successors and assigns, against all claims and demands whatsoever, except as above stated.

3. Assignee hereby accepts the foregoing assignment and transfer of said Lease, the leasehold estate thereunder, and said other property, and hereby assumes and agrees to perform each and all of the covenants, obligations, and engagements of the Assignor and lessee under said Lease and all other terms and provisions thereof on the part of lessee to be observed and performed after the date hereof.

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the date first above written.

Signed and acknowledged
in the presence of:

_Paisley Smith_

_Lo Heath_

_Perry Turner_

_Debbie Jewel_

ASSIGNOR:

THE HALLE BROTHERS COMPANY

By: _Jron Schttn_ V-

ASSIGNEE:

S & R PLAYHOUSE REALTY COMPANY

By: _J. Paul Lyons_
PAULLIPMAN, Authorized Represen

CONFIDENTIAL

STATE OF OHIO )
               ) SS.
COUNTY OF FRANKLIN )

    The foregoing instrument was acknowledged before me this 17 day of _May_____, 1982, by _Jerome Schottenstein_ the _President_._____ of THE HALLE BROTHERS COMPANY, a Delaware Corporation on behalf of said Corporation.

                                  _Caroline Smith_____
                                  Notary Public

CAROLINE SMITH
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES APRIL 23, 1983

STATE OF OHIO )
       COYAHOGA ) SS.
COUNTY OF FRANKLIN )

    The foregoing instrument was acknowledged before me this 21 day of _May_____, 1982, by _Paul Lipman_____, _Authorized Representative_, of S & R PLAYHOUSE REALTY COMPANY, an Ohio General Partnership on behalf of said partnership.

                                  _Perry Tenenbaum_____
                                  Notary Public

PERRY TENENBAUM, Attorney At Law
Notary Public - State of Ohio
My commission has no expiration date
Section 147.03 R.C.

This instrument was prepared by:  Leo Sternlicht
                                     250 East Broad Street
                                     14th Floor
                                     Columbus, Ohio 43215

CONFIDENTIAL

EXHIBIT A
To Assignment and Assumption
By and Between The Halle Brothers Company
and S & R Playhouse Realty Company

Being that portion of original two acre lots Nos.
156 and 157 in the City of Cleveland, County of Cuyahoga
and State of Ohio, which is bounded northwesterly by Barn
Alley, Northeasterly by East Twelfth Street (formerly Short
Alley), southeasterly by Huron Road, and southwesterly by
a line drawn parallel with and twenty feet distant south-
westerly from the northeasterly line of said two acre lot
No. 156, the Huron Road frontage thereof being about 88.5
feet.

The foregoing premises being also described as follows:

Situated in the City of Cleveland, County of Cuyahoga
and State of Ohio, and being that portion of Original Two
Acre Lots Nos. 156 and 157 in the City of Cleveland, which
is bounded Northerly by Barn Alley, Northeasterly by East
12th Place (formerly Cross Alley); thence Southeasterly by
Huron Road and Southwesterly by a line drawn parallel with
and 20 feet distant Southwesterly from the Northeasterly
line of said Two Acre Lot No. 156, the same having a frontage
of 88-5/10 feet on Huron Road and extending back of equal
width to Barn Alley, be the same more or less, but subject
to all legal highways.

CONFIDENTIAL FCID 0212

775293

Assignment
&
Assumption

COUNTY RECORDER

MAY 21   2 01 PH '02

VOL 555   383

CONFIDENTIAL

FCID 0213

FILE COPY
DO NOT REMOVE

Wm. Henderson - Elks Club

MODIFICATION OF COVENANTS AND EXTENSION OF TERM OF LEASE

FROM THE CLEVELAND TRUST COMPANY TO

THE HALLE BROTHERS COMPANY.

————————

THIS INDENTURE, Made and entered into this 6th day of July

1925 by and between THE CLEVELAND TRUST COMPANY, a corporation organized

under the laws of the State of Ohio, the Lessor (which expression when

used herein shall extend to and include its successors and assigns when

the context so admits), and THE HALLE BROTHERS COMPANY, a like Ohio cor-

poration, the Lessee (which expression when used herein shall extend to

and include its successors and assigns when the context so admits), is

to evidence, that,

WHEREAS, The Lake Shore Banking & Trust Company, a like Ohio cor-

poration, became by assignment of the same from John M. Henderson and

A. Quail possessed of the certain leasehold estate for the remainder of

its term in the following described premises, to wit:

Situated in the City of Cleveland, County of Cuyahoga
and State of Ohio, and being that portion of original two
acre lots Nos. 156 and 157 in the City of Cleveland which
is bounded northerly by Barn Alley, northeasterly by East
12th Street (formerly Short Alley), southeasterly by Huron
Road, and southwesterly by a line drawn parallel with and
twenty (20) feet distant southwesterly from the northeasterly
line of said two acre lot No. 156, the same having a frontage
of 88-5/12 feet on Huron Road and extending back of equal
width to Barn Alley,

which leasehold was created under the certain lease of said premises from

St. H. Tolles and others to the Cleveland Lodge Number Eighteen of the

Benevolent and Protective Order of Elks of America, bearing date March

25, 1909, and which is of record at page 54 of Volume 44 of the Records

of Leases in the Office of the County Recorder of Cuyahoga County, and

WHEREAS, The said The Lake Shore Banking & Trust Company being so

possessed of said leasehold estate by indenture in which the said John M.

Henderson and A. A. Quail were joined with it, bearing date November 28, 1921

and filed with the Recorder of said County for record on the 17th day of June

1925 (to which reference is hereby made for a more particular statement

CONFIDENTIAL                    FCID 0214

of its recitals, grants, terms and conditions), demised the said premises to the said The Halle Brothers Company for a term of eighty-six (86) years from and after the first day of November, 1921; and in connection with such demise thereof, granted to the Lessee therein named and its assigns the alternative privilege either of purchasing during the last three (3) years of the term of such lease the leasehold estate in the premises held by the said The Lake Shore Banking & Trust Company, the Lessor, in the leased premises for the remainder of its term, or of an extension of the lease for an additional term of ninety-nine (99) years; and,

WHEREAS, Thereafter the right, interest and estate of the said The Lake Shore Banking & Trust Company in said premises and in the rents accruing under the terms of such lease were duly assigned and conveyed to The Cleveland Trust Company, the Lessor; and,

WHEREAS, Contemporaneously with the execution and delivery of this instrument there has further been conveyed to the Lessor hereunder (a) by J. M. Henderson the reversionary estate remaining in the Lessors under the two original leases described as such in such lease from The Lake Shore Banking & Trust Company to the said The Halle Brothers Company, and (b) also by the said S. H. Tolles and others, the first and original leasehold in said premises created under the terms of the said original leases of said premises made to the said Tolles and others under dates of April 1, 1895, and March 13, 1898, and of record at page 175 of Volume 20 and at page 45 of volume 23, respectively, of said Records of Leases, by which conveyances the Lessor herein has become vested with the entire title to the said premises subject only to such lease in favor of the said The Halle Brothers Company; and,

WHEREAS, It is now desired by the parties hereto that the term of such existing lease as so granted be extended and that certain modifications be made in the grants, covenants and conditions of said lease.

NOW, THEREFORE, Looking to the accomplishment of such purpose, said parties do hereby mutually grant, covenant and agree each with the other as follows:

CONFIDENTIAL

-2-

FCID 0215

ON BEHALF OF THE LESSOR:

1. That by way of extension of the term of such lease (hereby confirming the said grant for such original term and extending the same for such thirteen year period) it does hereby demise to the said Lessee, and its assigns, the said premises for a further term of thirteen (13) years from and after the first day of November, 2007, upon the terms, conditions and covenants in such original lease expressed as modified by the terms of this agreement, with like effect as if such additional term had been embraced in the term of such original lease, but conditioned, as to such extended term, on the observance and performance by the Lessee of such terms, conditions and covenants as so modified during the remainder of the original term of this lease.

2. That in lieu of the provisions in the said lease contained granting privilege of renewal of the same, as well as the right of purchase of the leasehold estate therein described as held by the Lessor, all as contained in Clause 3 of the Lessor's Covenants and Clause 8 of the Mutual Covenants of said lease, the Lessor does hereby grant to the said Lessee, and its assigns, the right and privilege of a renewal of said lease for a period of ninety-nine (99) years from and after the expiration of the term hereof upon the terms and conditions and subject to the covenants as fixed by such original lease as hereby modified, conditioned, however, upon written notice being given to the Lessor of the intention of the Lessee to have such renewal at some time during the year previous to the last year of the term now granted by the extension above provided for; and the said Lessor does hereby further grant to the said Lessee, and its assigns, the right and privilege of terminating this lease at any time within the next ensuing ten (10) years from and after the date hereof by the purchase of the leased premises subject to such lease at a purchase price of Five hundred thousand dollars ($500,000.00), to be paid therefor in gold coin of the United States of America of the present standard of weight and fineness, or in current money of the United States of America having the same value, and does hereby covenant that in case of the exercise of such option of renewal the Lessor will thereupon execute and deliver to the

CONFIDENTIAL

FCID 0216

Lessee, or its assigns, a suitable instrument of renewal for such further term, and in case of its exercising such privilege of purchase will, upon payment of the purchase price, make due conveyance of the said premises subject only to this lease; its liability, however, in the execution and delivery of such renewal lease or conveyance, as the case may be, being confined to such title as is now vested in it under such conveyance to it of such leasehold estate from said The Lake Shore Banking & Trust Company and of the said reversionary estates by J. M. Henderson and of said previous leasehold estates as made to it by assignment to it of the same from S. H. Tolles, J. M. Henderson and The Union Trust Company, as Trustee.

3.   That treating the said reversionary and leasehold interests so conveyed to it as being merged with such leasehold estate so assigned to it by the said The Lake Shore Banking & Trust Company, and said lease to the Lessee herein as hereby modified, as fixing the relative interests of the parties hereto in said premises, it hereby, in consideration of the increase of annual rent payable under Clause 2 of the Lessee's Covenants of said lease from the sum of fourteen thousand, five hundred dollars ($14,500.00) (to which the same has been reduced by the payment of fifty thousand dollars ($50,000.00), as provided for in said lease) to the sum of twenty-two thousand dollars ($22,000.00) as hereinafter provided, does release the Lessee from all obligation for the payment of rent, or performance of covenants of underlying leases, and all liability by it assumed under Clause 1 of the said Lessee's Covenants as contained in such lease.

ON BEHALF OF THE LESSEE:

The said Lessee hereby covenants and agrees with the said Lessor:

1.   That accepting in substitution therefor the grants of right of renewal and privilege of purchase above made by the Lessor, it agrees with the Lessor that the privilege of purchase and of renewal of lease, as contained in Clause 3 of the Lessor's Covenants of said lease and in Clause 3 of the Mutual Covenants thereof, be treated as abrogated and the Lessor is released from any obligation arising under the same.

2. That having performed its covenant for the reduction of rent as provided for under Clause 2 of the lessee's Covenants of such lease, and having thereby reduced the amount of annual rent now payable under the terms of such lease (exclusive of rents assumed accruing upon underlying leases) to the sum of fourteen thousand, five hundred dollars ($14,500.00), and being hereby released from all liability so assumed for the payment of rents and performance of covenants in such original lease and first sublease, it will from and after the first day of July, 1925, during the remainder of the term of said lease, and any renewal thereof, pay to the Lessor by way of rent as hereby increased the sum of twenty-two thousand dollars ($22,000.00) per annum at like times and in like medium of payment and with like effect as if such sum of twenty-two thousand dollars ($22,000.00) had been provided for in such clause as the annual rent to be paid during the entire term of such lease after all reduction resulting from the payment of said fifty thousand dollars ($50,000.00).

3. As to all the remaining grants, covenants and conditions of such leases not so hereby modified or rescinded, the parties hereto hereby confirm and ratify the same as contained in such lease.

IN WITNESS WHEREOF, The said parties have set their names and have caused their respective corporate seals to be hereto attached as of the date first above written.

Signed and acknowledged                    THE CLEVELAND TRUST COMPANY
in the presence of:
                                           By _____
_____                                      President.
_____
                                           Attest _____
(Witnesses as to The Cleve-                                     Secretary.
land Trust Company)


                                           THE HALLE BROTHERS COMPANY.

Signed and acknowledged                    By _____
in the presence of:                                            President.
_____
_____                  Attest _____
(Witnesses as to The Halle                                      Secretary.
Brothers Company)

-5-

STATE OF OHIO, )
                ) S.S.
Cuyahoga County. )        Before me, a Notary Public in and for said
county and state, personally appeared R. A. MALM
as Vice President, and
HENRY PIRTLE as Assistant, of said The Cleveland Trust Company, a
corporation, who respectively acknowledged that as such officers they executed the foregoing instrument on behalf of said corporation and that
the same is the free act and deed of said corporation and their free act
and deed as such officers.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at Cleveland, Ohio, this 9th day of June 1925.

                                        _____
                                                Notary Public.

STATE OF OHIO, )
                ) S.S.
Cuyahoga County. )        Before me, a Notary Public in and for said
county and state, personally appeared SAMUEL H.
HALLE, as President, and JAY IGLAUER, as Secretary
of said The Halle Brothers Company, a corporation, who respectively acknowledged that as such officers they executed the foregoing instrument on behalf of said corporation and that the same is the free act and deed of said
corporation and their free act and deed as such officers.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at Cleveland, Ohio, this 9 day of June 1925.

                                        Floyd R. Palmer
                                                Notary Public.

This instrument, executed this 9th day of June 1925, in
evidence that we, the undersigned, being parties to the contract entered
into between The Cleveland Trust Company and ourselves under date of
June 1925, providing for the merger of the interests in the premises above described, do hereby ratify and approve the foregoing lease as
being in proper execution of the terms of such contract.

                        THE UNION TRUST COMPANY,

                        By _____
                                                President.
                        Attest: _____
                                                Secretary.
                                _____
                                _____
                                _____
                                _____
                                _____
                                John C. Barkley
                                _____
                                Sheldon H. Todd
                                _____
                                Holmes Marshall
                                _____
                                _____
                                _____
                                _____

CONFIDENTIAL        FCID 0219



CONFIDENTIAL

EXTENSION OF LEASE; COVENANTS AND EXTENSION

... TRUST COMPANY AND THE HALLE
BROTHERS COMPANY

RECEIVED FOR RECORD
JUL 18 1928
LYMAN D. NEWEL, Recorder
Fee for Record 3.00

Recorded July 18, 1928
In Cuyahoga County Recorder
Vol. 149 — Page 102-106 Inc.

Lyman D. Newel, Recorder

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **216 JAMAICA AVENUE, LLC,** | ) | **CASE NO. 1:06CV1288** |
| | ) | |
| Plaintiff, | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| v. | ) | |
| | ) | |
| **S & R PLAYHOUSE REALTY CO.,** | ) | **AFFIDAVIT OF ROBERT QUESADA** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| **STATE OF NEW YORK** | ) | |
| | ) | |
| | ) | |
| **ss.: COUNTY OF NEW YORK** | ) | |

Robert Quesada, being duly sworn, deposes and says:

1.      I am a resident of the State of New York and am competent to testify in a court of law.  I am personally knowledgeable about 1912 Lease that is the subject of this action and management of the Lease while the subject property was owned by Halle Cleveland LLC.

2.      The subject property was owned by Halle Cleveland LLC from November 17, 1997 until February 10, 2006, at which time it was sold to 216 Jamaica Avenue LLC for $845,000.

3.      Beginning on or about February 1999, I was the manager of the property.

4.      At all times, rent payable under the 1912 Lease was payable and paid in United States currency in the annual amount of $35,000.  To the best of my knowledge, no tenant under the 1912 Lease, either S&R Playhouse Realty Co. or any other tenant, during the period of time that Halle Cleveland LLC owned the subject property, ever paid rent in an amount exceeding $35,000 nor were any additional amounts ever requested or demanded.

5.     Furthermore, to the best of my knowledge, at no time did anyone at Halle

Cleveland LLC, or anyone else, ever raise an issue or suggest in any way that the rent under the

1912 Lease was adjustable based upon the price of gold.

6.     To the best of my knowledge, at no time while Halle Cleveland LLC was lessor

under the 1912 Lease did any  party raise an issue with the amount or method of paying rent in

connection with the leasehold.  The rent paid was at all times $35,000 per year.



FURTHER AFFIANT SAYETH NAUGHT

_____
                                          Robert Quesada

Sworn to before me this
19th day of October, 2006

_____
          Notary Public

AMELIA C. PORRICELLI
Notary Public, State of New York
No. 03-4677573 - Bronx County
Term Expires March 30, 2010

# Exhibit D

The Ohio Legal Blank
Publishers and E

CUYAHOGA COUNTY RECORDER
PATRICK J. OMALLEY
DEED 02/10/2006 02:22:43 PM
200602100641

# Know all Men by these Presents

That HALLE CLEVELAND LLC, a Delaware limited liability company, whose address is 645 Fifth Avenue, Suite 904, New York, New York 10022, grantor

*for valuable consideration paid, Grant(s), with limited warranty covenants, to*

216 JAMAICA AVENUE, LLC, a New York limited liability company, grantee,

*whose tax mailing address is*

237 Carlton Avenue, Brooklyn, Kings County, New York 12205,

*the following described Real Property:*

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio, more particularly bounded and described as set forth in Schedule A annexed hereto, and subject to the matters set forth in said Schedule A,

And all the estate, right, title and interest of the said grantor in and to said premises,

TO HAVE AND TO HOLD THE SAME, with all the privileges and appurtenances thereunto belonging, to said grantee, its successors and assigns forever.

The tax mailing address of the Grantee is 237 Carlton Avenue, Brooklyn, Kings County, New York 12205.

The County Auditor's Tax Parcel Numbers are as follows: 101-37-014 and 101-37-016.

The Prior Instrument Reference is Deed Book Vol. 11869 page 56, Recorders Office Cuyahoga County, Ohio.

*Witness Grantor's hand(s) this*                *day of February, 2006*

*Signed and acknowledged in presence of:*      HALLE CLEVELAND LLC, a
                                               Delaware limited liability company

Eileen D. Hatch                                By Halle Holdings Inc, a Delaware
_____                  Corporation, its sole member
Eileen D. Hatch

Adelaida Midel                                 By_____
_____                  Robert Quesada, Vice President
Adelaida Midel

FCID 0396

State of New York     County of New York    ss,

Be It Remembered, That on the *7th* day of February 2006, before me, *the subscriber, a notary public in and for said county, personally came* Robert Quesada, vice president of Halle Holdings Inc., sole member of Halle Cleveland, LLC, *the Grantor(s) in the foregoing Deed, and acknowledged the signing thereof to be* his *and* its *voluntary act and deed.*

*IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my notary seal, on the day and year last aforesaid.*

*Amelia C. Porricelli*

AMELIA C. PORRICELLI
Notary Public, State of New York
No. 03-4677573 - Bronx County
Term Expires March 09 *June 30, 2006*

*This instrument was prepared by*
Richard M. Frome
880 Third Avenue-15th Floor
New York, New York 10022

CUYAHOGA COUNTY RECORDER
200602100641  PAGE 2 of 4

Permanent   101-37-016
Parcel #:   101-37-014

Type Instrument: Limited Warranty
Tax District #: 3100
Grantor: Halle Cleveland Llc
Grantee: Halle Cleveland Llc
Balance Assumed: $ 0.00
Total Consideration: $ 845,000.00
Conv. Fee Paid: $ 3,380.00
Transfer Fee Paid: $ 1.00
Fee Paid by: Land AMERICA
Exempt Code:

Date: 2/10/2006 2:09:00 PM
Tax List Year: 2006
Land Use Code: 4240
Land Value: 276,000
Building Value: 670,000
Total Value: 846,000
Arms Length Sale: YES
Rcpt: g-02102006-15
Inst #: 207399
Check #:

*Frank Russo*
CUYAHOGA COUNTY AUDITOR

FROM

Halle Cleveland LLC

TO

216 Jamaica Avenue LLC

County Auditor

Transferred

State of Ohio,
Presented for record on the
County, ss.
day
of ____, ____, M., at ____
o'clock, ____ M.,
Recorded
in Deed Book No. ____ Page ____

County Recorder

BOX: LANDAMERICA LAYERS TITLE
424 MIDDLE AVENUE
ELYRIA, OHIO  44035
700052707 J

FCID 0397

## SCHEDULE "A"

## LEGAL DESCRIPTION

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio, and known as being part of Original Two Acre Lot Nos. 157 and 158, and bounded and described as follows:

    Beginning on the Southerly line of Euclid Avenue, 99 feet wide, at its intersection with the Easterly line of East 12th Street (formerly Short Alley, 16.50 feet wide); thence Easterly along the Southerly line of Euclid Avenue, 100 feet to the Northwesterly corner of land conveyed to Alfred A. Pope by deed dated September 26, 1892 and recorded in Volume 524, Page 411 of Cuyahoga, County Records; thence Southerly along the Westerly line of land so conveyed to Alfred A. Pope, said line being also parallel with the Easterly line of East 12th Street, to an angle therein; thence Southeasterly along the Southwesterly line of land so conveyed to Alfred A. Pope, said line being also parallel with the Northeasterly line of East 12th Street, to the Northwesterly line of Huron Road S.E. (formerly Huron Street, 99 feet wide); thence Southwesterly along the Northwesterly line of Huron Road S.E., 48 feet to the most Easterly corner of land conveyed to John. N. Henderson by deed dated April 5, 1880 and recorded in Volume 313, Page 37 of Cuyahoga County Records; thence Northwesterly along the Northeasterly line of land so conveyed, said line being also parallel with the Northeasterly line of East 12th Street, 80 feet to the most Northerly corner thereof; thence Southwesterly along the Northwesterly line of land so conveyed, 52.25 feet to the Northeasterly line of East 12th Street; thence Northwesterly along the Northeasterly line of East 12th street, 17.95 feet to an angle therein; thence Northerly, continuing along the Easterly line of East 12th Street, 104.52 feet to the place of beginning.

Subject to:

1. Any circumstance, condition, state of facts or objection to title which is (i) subordinate to the Lease, or (ii) the obligation to remove, remedy or otherwise deal with rests with Tenant under the Lease, or (iii) which has been created or suffered by Tenant under the Lease, or anyone acting by, through or under Tenant (including any former Tenant).

2. Temporary Right Of Way and Use Easement to Greater Cleveland Regional Transit Authority pursuant to grant dated October 31, 2005.

3. Estoppel certificate dated December __, 2001 made by Grantor to HSBC BANK USA.

4. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.

ROBERT KLAIBER P.E., P.S.
Legal Description complies with
Cuyahoga County Conveyance
Standards and is approved for
transfer·

FEB 1 0 2006

Agent

FCID 0398

5. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.

6. Any lien, or right to an lien, for services labor or material theretofore or hereafter furnished, imposed by law whether or not shown by the public records.

7. Rights of parties in actual possession of all or any part of the premises.

8. Special assessments and special taxes, if any, and taxes whether or not yet due and payable.

9. Lease from The Realty Investment Co., Lessor, to Salmon P. Halle and Samuel H. Halle, Lessees, dated March 15, 1912, filed for record April 3, 1912 and recorded in Lease Volume 52, Page 383 of Cuyahoga County Records.

Modification of Lease, dated October 17, 1912, filed for record November 6, 1912 and recorded in Lease Volume 56, Page 355 of Cuyahoga County Records.

Assignment of Lease to Alfred A. Pope, Harris Whittemore and Henry F. Pope, Trustees, dated April 3, 1924, filed for record April 21, 1924 and recorded in Lease Volume 132, Page 515 of Cuyahoga County Records.

Agreement, which may or may not be of record, dated October 27, 1936 concerning notice of intention to enter to any specified mortgagee.

Assignment and Assumption by and between The Halle Brothers Company and S & R Playhouse Realty Company, dated May 21, 1982, filed for record May 21, 1982 and recorded in Lease Volume 555, Page 401 of Cuyahoga County Records.

# Exhibit E

<center>CERTIFICATE</center>

THIS CERTIFICATE is dated as of December _20_, 2001 and is given by HALLE CLEVELAND, LLC with an address at One Rockefeller Plaza, Suite 2700, New York, New York 10020-2141, (the "Lessor") to HSBC BANK USA (formerly known as Marine Midland Bank) with an address at One HSBC Center, 27th Floor, Buffalo, New York 14203, Attention: Real Estate Finance Department (the "Mortgagee").

<center>WITNESSETH:</center>

WHEREA, Lessor and S & R Playhouse Realty Company ("S & R") are parties to a certain Indenture of Lease, dated March 15, 1912 ("Original Lease") by and between the Realty Investment Company, as Lessor, and Salmon P. Halle and Samuel H. Halle, as Lessees, for the term beginning April 1, 1912 and ending on March 31, 2011, and recorded in Volume 52, Page 383 of the Records of Cuyahoga County, Ohio, as modified by subsequent Agreement dated October 17, 1912, recorded in Volume 56, Page 355 of the Records of Cuyahoga County, Ohio, which Leasehold Estate was assigned by the said Salmon P. Halle and Samuel H. Halle by Instrument of Assignment dated November 1, 1912, and recorded in Volume 56, Page 359, of tile Records of Cuyahoga County, Ohio, to Alfred A. Pope, Harris Whittemore and Henry F. Pope, Trustees under a certain Instrument of Trust dated October 28, 1912 and recorded in Volume 1461, Page 83 of the Records of Cuyahoga County, Ohio, and was therefore further assigned by the said Trustees and their successors to The Halle Brothers Realty Company by Instrument of Assignment dated April 3, 1924, and recorded as instrument No. 1613844 in Volume 123, Page 515 of the Records of Cuyahoga County, Ohio, and was thereafter further assigned by The Halle Brothers Realty Company to The Halle Brothers Company by Instruments of Assignment dated December 30, 1929 and November 13, 1936 and recorded as Instrument Nos. 2,250,316 in Volume 176, Page 449 and 2,580,571 in Volume 209, Page 23, respectively, of the records of Cuyahoga County, Ohio and was thereafter assigned by The Halle Brothers Company, to S & R by Assignment and Assumption Agreement dated May 21, 1982 and recorded in Volume 555, Page 401 of Cuyahoga County Records, (collectively the "Lease") covering the premises described therein (the "Leased Premises"); and

WHEREAS, by deed from S & R to Halle Office Building Limited Partnership ("Halle") recorded on October 1, 1984 in the office of the Cuyahoga County Recorded as File No. 1086921, S & R partially assigned the Lease to Halle; and

WHEREAS, S & R has mortgaged and assigned to the Mortgagee, among other things, its right, title and interest in and to the Leased Premises and the leasehold estate created under the Lease, pursuant to (i) a Mortgage and Security Agreement and an Assignment of Leases securing certain Indebtedness of S & R to Mortgagee in an original principal amount not to exceed $1,750,000 plus interest, and (ii) a Collateral Mortgage and Security Agreement and an Assignment of Leases securing all indebtedness of Halle to Mortgagee in an original principal amount not to exceed $1,750,000 plus interest; and

WHEREAS, Halle has mortgaged and assigned to the Mortgagee, among other things, its right, title and interest in and to the Leased Premises and the leasehold estate created under the

Lease, pursuant to (i) a Mortgage and Security Agreement and an Assignment of Leases securing certain indebtedness of Halle to mortgagee in an original principal amount not to exceed $1,750,000, plus interest, and (ii) a Collateral Mortgage and Security Agreement and an Assignment of Leases securing all indebtedness of S & R to Mortgagee in an original principal amount not to exceed $1,750,000, plus interest; and

WHEREAS, The Mortgages and Assignments of Leases described in the preceding two paragraphs are sometimes hereinafter collectively referred to as the "Mortgages," and

WHEREAS, the Mortgagee has agreed to extend and modify the indebtedness secured by the Mortgages; and

WHEREAS, the Mortgagee has requested, as a condition to the extension and modification of the credit facilities secured by the Mortgages and the extension of certain letter of credit facilities provided by the Mortgagee for the benefit of S & R and Halle, that the Lessor execute and deliver this Certificate

NOW, THEREFORE, Lessor, hereby certifies to Mortgagee that:

(a)     The Lease is unmodified and in full force and effect;

(b)     To the best of the knowledge of the undersigned, there has occurred no default under the Lease and no event has occurred which, with the passage of time or the giving of notice or both will constitute a default on the part of Lessee under the Lease;

(c)     The base annual rental under the Lease is $35,000.00, exclusive of taxes and other items of additional rental and all other amounts payable under the Lease.

(d)     The base annual rental referred to in the foregoing paragraph is payable in equal quarterly installments in advance on the first day of April, July, October and January. All payments of rental due and all other sums due under the Lease up to and including the date of this Agreement have been paid;

(e)     The Lease term expires on March 31, 2011. The Lessee under the lease shall have the right and option to extend and renew the lease for a further period of 25 years or of 50 years of of 99 years, all as more particularly set forth in paragraph X11 of the Original Lease.

(f)     In accordance with Article VIII of the Lease, the Lessor shall give notice of default under the Lease to Mortgagee (as the "one mortgagee of the lessees" referred to in said Article VIII) at the address of Mortgagee first set forth above, or at such other address of which the undersigned has received written notice from Mortgagee; provided, however, that this paragraph (f) is for the sole and exclusive benefit of Mortgagee and shall not benefit or be deemed an agreement running to either S&R or Halle, or limit as between the undersigned and lessees

under the Lease the effect of any notice given under the Lease to lessees by the undersigned.

(g)     By its acceptance hereof said extension of the indebtedness Mortgagee agrees that all prior Certificates from Lessor are null and void.

IN WITNESS WHEREOF, the undersigned has caused this Certificate to be duly executed by its authorized officer as of the day and year firsts above written.

HALLE CLEVELAND, LLC

By: _____ *Member*

FCID 0395

# Exhibit F

LEXSEE 1998 OHIO APP. LEXIS 3453

**BAHNER'S AUTO PARTS, Plaintiff-Appellee -vs- MILLARD BAHNER, et al., Defendant-Appellants**

**Case No. 97CA2538**

**COURT OF APPEALS OF OHIO, FOURTH APPELLATE DISTRICT, SCIOTO COUNTY**

*1998 Ohio App. LEXIS 3453*

**June 23, 1998, Filed**

**DISPOSITION:** [*1]

JUDGMENT AFFIRMED.

**COUNSEL:** Roger L. Clark, Portsmouth, Ohio, for Appellant.

Rick Faulkner, Wheelersburg, Ohio, for Appellee.

**JUDGES:** Earl E. Stephenson, Presiding Judge. Abele, J. and Kline, J., Concur in Judgment & Opinion.

**OPINION BY:** Earl E. Stephenson

**OPINION:**

DECISION AND JUDGMENT ENTRY

Stephenson, P.J.

This is an appeal from a judgment entered by the Court of Common Pleas of Scioto County in which the court granted Bahner's Auto Parts' (plaintiff below and appellee herein) demand for specific performance of an option to purchase real estate. Millard Bahner, et al (defendants below and appellants herein) appeal, assigning the following errors for our review:

I. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORMANCE."

II. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORM-

ANCE BECAUSE THE DOCTRINE OF LACHES APPLIED."

III. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORMANCE BECAUSE THE DOCTRINE OF WAIVER APPLIED."

IV. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY [*2] AWARDING APPELLEE SPECIFIC PERFORMANCE BECAUSE THE DOCTRINE OF NOVATION APPLIED."

V. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORMANCE BECAUSE THE STATUTE OF FRAUDS APPLIED."

The record reveals the following facts pertinent to this appeal. On January 1, 1984, appellee/lessee, Bahner's Auto Parts, and appellants/lessors, Millard and Temperance Bahner, entered into a ten year lease of property located at 747 Center Street in Wheelersburg, Ohio. n1 The lease provided for rental payments in the amount of One Thousand Dollars ($ 1,000) per month for the period of the leasehold and granted appellee an option to purchase the demised premises at the expiration of the leasehold. The purchase option clause, appearing as paragraph 21 in the lease, provides as follows:

"21. Option to Purchase and Option to Renew for Additional Term. Lessee is hereby granted the option to purchase the demised Premises herein. Said Option shall be exercisable upon written notice by Lessee to Lessor one hundred eighty (180) days prior to the end of the full ten (10) year term of this Lease of Lessee's intention to so exercise the [*3] option. Such Option is granted and conditioned upon Lessee's full compliance of the terms and conditions of the foregoing Lease Agreement. The purchase price of said option to purchase shall be ascertained as follows: Upon the receiving of Lessee's notice of intent to exercise the option to purchase herein, Lessor shall obtain and Lessee shall obtain thereafter appraisers to appraise the value of the real estate demised. Each of the respective appraisers shall choose a third appraiser which third appraiser shall also appraise the value of the demised Premises. Such appraisals shall then be added together and averaged. The purchase price shall be for Lessee % of the ascertained market value based upon the average of the three appraisals. Lessee shall then have thirty (30) days prior to the ending of the full term herein to deliver to Lessor the price so ascertained. Upon delivery of this purchase price amount, Lessor shall deliver to the Lessee, his heirs and assigns, a deed of general warranty for the demised premises herein subject to the exceptions contained in the description attached hereto and marked "Exhibit A". Lessor may set a purchase price to Lessee by mutual agreement with [*4] Lessee at any time during the course of this Lease Agreement. However, Lessee is not bound to accept or exercise any such purchase option price put forth by Lessor prior to the full and complete term of this Lease Agreement or any amendment or any extension or renewal thereof.

***"

n1 Bahner's Auto Parts is an Ohio partnership comprised of two partners, brothers David and Donald Morrison. According to the record, the Morrison brothers began working for the Bahners in their early teens (sometime in the late 60s or early 70s). On January 1, 1984, the Morrisons entered into a ten (10) year agreement with appellant Roger Bahner to purchase Bahner's Auto Parts. Simultaneously, the Morrisons entered into a separate agreement with Roger's parents, appellants Millard and Temperance Bahner, to lease/purchase the business premises (Roger Bahner owned the business - his parents owned the premises).

Sometime in May or June, 1993, David Morrison spoke with Millard Bahner regarding the Morrisons' desire to exercise [*5] the purchase option. Bahner advised Morrison that written notice was not necessary and that his son, Roger Bahner, would contact Morrison to further discuss the matter.

In accordance with the terms of the lease/purchase agreement, the Morrisons obtained appraisals of the demised property. An appraisal dated November 1, 1993 valued the property at $ 130,000. A subsequent appraisal of December 8, 1993 valued the property at $ 123,000.

Without obtaining an appraisal, and apparently based upon his own experience and his conversations with owners of nearby parcels, Millard Bahner demanded $ 200,000 for the property. The Morrisons declined to purchase the property for this amount.

In January, 1994, after the expiration of the initial ten-year leasehold, the parties entered into a month to month tenancy. The rent was increased from $ 1,000 per month to $ 1,350 per month and the Morrisons continued to operate their business out of the subject premises until July, 1996, when they filed the instant action seeking specific performance of the purchase option clause.

In a Decision and Judgment Entry filed on September 3, 1997, the trial court found the parties bound by the agreement. The [*6] court found specific performance to be the appropriate remedy and ordered the Bahners to convey the subject property to the Morrisons for $ 128,000, crediting the Morrisons for all rental payments made after the date the instant complaint was filed. This appeal followed.

In their first assignment of error, appellants contend that the trial court erred in ordering specific performance (1) because they did not "absolutely and unconditionally" repudiate the contract and (2) because appellees failed to tender full performance. For the reasons that follow, we disagree.

Specific performance is "the remedy of performance of a contract in the specific form in which it was made, or according to the precise terms agreed upon." Black's Law Dictionary (5th Ed. 1979) 1024. It is an equitable remedy resting in the sound discretion of the trial court.

*Sandusky Properties v. Aveni (1984), 15 Ohio St. 3d 273, 275, 473 N.E.2d 798,* quoting *Spengler v. Sonnenberg (1913), 88 Ohio St. 192, 203, 102 N.E. 737.* Accordingly, our standard of review is whether the trial court abused it's discretion. See Id. The term "abuse of discretion" connotes more than a mere error of judgment. *State v. Adams* [*7] *(1980), 62 Ohio St. 2d 151, 404 N.E.2d 144.* It implies an attitude that is unreasonable, arbitrary or unconscionable. *Steiner v. Custer (1940), 137 Ohio St. 448, 31 N.E.2d 855,* paragraph two of the syllabus.

A party seeking specific performance of a contract must establish that he has a valid, enforceable contract, that he has performed or tendered performance, and that he is ready, willing and able to promptly perform all acts required of him in the specific execution of the contract. 84 Ohio Jurisprudence 3d (1988) 311-312, Specific Performance, Section 34. "When an option *** for the purchase of *** property is consummated by acceptance according to its terms within the time specified, it merges into a contract for the purchase of the property which equity will enforce by specific performance the same as any other contract." *Rossman & Co. v. Donaldson, 1994 Ohio App. LEXIS 5535* (Dec. 6, 1994), Franklin App. Nos. 94APE03-388, 94 APE03-389 and 94APE05-695, unreported, quoting 71 American Jurisprudence 2d (1973) 184, Specific Performance, Section 142. An option for the purchase of real property may be specifically enforced if notice of the exercise of the option is given, the vendor refuses to comply [*8] and the purchase price is tendered. 84 Ohio Jurisprudence 3d (1988) 373-374, Specific Performance, Section 85.

There are exceptions to the general rule, heretofore stated, that a party seeking specific performance must show a tender of performance. "When the other party repudiates and makes it certain that he does not intend under any circumstances to comply, a showing of readiness and ability on the part of the complaining party to then and there perform his part communicated to the other party and accompanied with demand of compliance by such other party, is sufficient compliance without an actual formal tender." *Wiedemann Brewing Co. v. Maxwell (1908), 78 Ohio St. 54, 66-67, 84 N.E. 595.*

In the instant case, the lease-purchase agreement sets forth, quite specifically, the method by which the purchase price of the subject property is to be determined upon exercise of the purchase option:

"Upon the receiving of Lessee's notice of intent to exercise the option to purchase herein, Lessor shall obtain and Lessee shall obtain thereafter appraisers to appraise the value of the real estate demised. Each of the respective appraisers shall choose a third appraiser which third [*9] appraiser shall also appraise the value of the demised Premises. Such appraisals shall then be added together and averaged. The purchase price shall be for Lessee % of the ascertained market value based upon the average of the three appraisals."

As expressly found by the trial court, this contractual provision "*** placed an obligation upon [appellants] to have the property appraised." Appellants did not perform this obligation. Instead, they made a demand of $ 200,000 for the property, based upon Millard Bahner's (and/or, perhaps Roger Bahner's) own determination of the property's value. At trial, Millard Bahner testified, in pertinent part, as follows:

"Q. Did you tell them the price that you would sell the property for?

A. Yes, $ 200,000.00.

Q. I believe that you said in your deposition that you were told about their appraisals?

A. I was told about them, yes, I was told about them. I didn't see them.

Q. But you knew about them?

A. Oh, yes.

Q. And you said you wouldn't sell the property for less than $ 200,000.00?

A. Right.

Q. And that $ 200,000.00 was the only figure you would talk about?

A. Yes.
        ***

Q. And it [*10] didn't matter what the appraisal was, you were going to sell it for $ 200,000.00; right?

A. Right, that's what I asked for it."

Bahner's testimony amply supports a conclusion that his $ 200,000 demand was an absolute, unconditional, take-it-or-leave-it demand and that he had no intention whatsoever of complying with the terms of the option contract. n2 We find no abuse of discretion in the trial

court's implicit conclusion that appellants repudiated the parties' contract.

n2 We note that in arguing the applicability of the doctrine of laches under their second assignment of error, appellants assert that "the testimony clearly shows that Millard Bahner offered the property for sale for $ 200,000.00, and that no negotiations over the purchase price took place. Millard was clear that he would not sell for less than $ 200,000.00" (Emphasis added.)

Appellants argue that appellees failed to tender full performance in that they did not offer any amount of money to purchase the property prior to filing [*11] suit. We cannot agree.

The agreement granted the Morrisons the option to purchase the subject property for an amount to be ascertained in accordance with the terms of the agreement. n3 They were thus freed, by the terms of the agreement, from having to negotiate a price with appellants. This was the very essence of the contract. They were not obligated to offer appellants a sum of money to counter appellants' $ 200,000 demand and their failure to do so does not constitute failure of performance under the contract.

n3 We recognize that the contract appears to be missing a rather essential term - i.e., the contract provides that the purchase price shall be % of the ascertained market value based upon the average of the three appraisals. (The blank is not completed on the contract.) However, neither party raises this issue on appeal and testimony was presented at trial regarding this omission which supports the trial court's calculation of the purchase price.

The Morrisons fully performed their obligations [*12] under the terms of the contract so far as was practicable to do so. They notified appellants that they wished to exercise the purchase option (albeit orally; see Assignment of error 5, infra) and they had the property appraised. They could not tender purchase money "thirty (30); days prior to the ending of the full term [of the lease]" as required under the agreement, see supra, due to appellants' failure to have the property appraised. The purchase price was unascertained.

In any event, Millard Bahner's testimony amply supports a conclusion that tender of purchase money in any amount less than his $ 200,000 demand (or even a

counter offer for a lesser figure) would have been a futile act. Thus, the absence of such tender (if required under the facts herein) is excused. See *Wiedemann Brewing Co. v. Maxwell, supra.;* See, also, 84 Ohio Jurisprudence 3d (1988) 319, Specific Performance, Section 41 ("If the other party repudiates the contract and makes it certain that he does not intend under any circumstances to comply therewith, or if he absolutely and unconditionally refuses to proceed with the contract, the law excuses the absence of tender on the part of the other [*13] party, as equity does not require idle acts. An actual tender of the purchase price by the vendee in a real property contract is not necessary where from the acts of the seller, or from the situation of the property, it would be wholly nugatory and meaningless.").

Appellants' first assignment of error is without merit. Accordingly, it is overruled.

In their second assignment of error, appellants argue that the trial court abused its discretion in awarding specific performance because appellee's claim is barred by the doctrine of laches. For the reasons that follow, we disagree.

Laches is "an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party." *Connin v. Bailey (1984), 15 Ohio St. 3d 34, 35, 472 N.E.2d 328,* quoting *Smith v. Smith (1957), 107 Ohio App. 440, 443-444, 146 N.E.2d 454.* The elements of laches are (1) conduct on the part of the defendant giving rise to the situation of which complaint is made and for which the complainant seeks a remedy; (2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of defendant's conduct and having been afforded an opportunity [*14] to institute a suit; (3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the complainant. *Stevens v. Natl. City Bank (1989), 45 Ohio St. 3d 276, 285, 544 N.E.2d 612,* citing *Smith v. Smith (1950), 168 Ohio St. 447, 455, 156 N.E.2d 113.* The defendant must show prejudice. The prejudice must be material, *Wright v. Oliver (1988), 35 Ohio St. 3d 10, 11, 517 N.E.2d 883,* and it may not be inferred from a mere lapse of time. *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn. (1994), 71 Ohio St. 3d 26, 35, 641 N.E.2d 188.*

Appellants assert that specific performance of the contract would materially prejudice them inasmuch as the subject property has increased, substantially, in value during the period of appellee's delay in bringing suit. However, absent circumstances evincing speculation on the part of appellee, an increase in the property's value, without any change of position on the part of the appel-

lants, will not bar specific performance. See 66 Ohio Jurisprudence 3d (1986) 425-426, Limitations and Laches, [*15] Section 224.

Appellants made no improvements to the subject property during the period in question. They attribute the property's purported increase in value to development, by themselves and others, of adjacent parcels. While such development might, under appropriate circumstances, render specific performance materially prejudicial to a vendor, such circumstances are not present in the cause sub judice.

Roger Bahner testified that in 1993 he was in the process of purchasing and developing parcels adjacent to the subject property. Bahner testified, quite specifically, that he was aware at that time that the Morrisons had the option to buy the subject property from his father, Millard Bahner, and therefore, his plans for development of the adjacent parcels did not involve or incorporate the subject property. Although Bahner testified that his plans for development later came to involve the subject property, the meager evidence in the record regarding the development of the adjacent parcels is most consistent with Bahner's earlier testimony that the development did not involve the subject property. n4

n4 According to the record, appellants constructed a video store on one parcel and "additional buildings" on another parcel at the request of a tenant who needed additional space (for what purpose, the record does not disclose).

[*16]

Any increase in value of the subject property is properly characterized, vis-a-vis appellants, as passive appreciation. Appellants did not contribute, invest or expend sums toward improvement of the subject property in reliance upon the Morrisons' inaction. Nor did they develop the parcels adjacent to the subject property in reliance upon the Morrisons' inaction. These instances of development were independent business ventures, undertaken with full knowledge that the subject property was subject to the Morrisons' purchase option. Any increase in the subject property's value by virtue of this nearby, unrelated development was purely incidental.

Appellants imply in their brief that the Morrisons engaged in speculation, arguing that they "sat by idly, waiting to see whether it was going to be a profitable or a losing bargain. *** If the property value had gone down *** this suit would not have been filed." This assertion is meritless.

The Morrisons have been involved in Bahner's Auto Parts for more than two decades, first as employees, then

as owners. They have operated from the subject property, as business owners, since 1984, n5 and there is no indication in the record that their [*17] use of the subject property will change in the foreseeable future. Dave Morrison testified that he considers the subject property "an integral part *** of the business" and the evidence indicates overwhelmingly that the Morrisons have always intended to purchase the property as part of their ongoing, long-term business concern. While an increase in the value of the land would certainly be beneficial to the Morrisons, we simply cannot conclude, from the record before us, that they engaged in delay so that they could unfairly speculate as to the property's value.

n5 The record indicates that Bahner's Auto Parts operated from this location for a number of years before the Morrison brothers entered into the agreement to purchase the business and the agreement to lease/purchase the property in 1984. (Roger Bahner testified that he built the building for his father in 1978.)

Appellants bore the burden of showing that they were materially prejudiced by appellees' delay in asserting their rights. See Connin v. Bailey [*18] 15 Ohio St. 3d at 36, fn. 1. They did not meet this burden. They failed to establish that they changed position in reliance upon the Morrisons' inaction or that the Morrisons' delayed asserting their rights so that they could unfairly engage in speculation. Appellants have demonstrated no material prejudice. They cannot invoke the equitable defense of laches.

Accordingly, the trial court did not abuse its discretion in failing to find appellees' claim barred by laches. Appellants' second assignment of error is overruled.

In their third assignment of error, appellants assert that the trial court erred in awarding specific performance because the doctrine of waiver barred the Morrisons' claim. We find no abuse of discretion in the trial court's implicit conclusion that the Morrisons did not waive their right to exercise the purchase option and, consequently, we overrule appellants' third assignment of error.

Waiver is "an intentional relinquishment, either expressly or constructively, of a known right." Russell v. Fourth Nat. Bank (1921), 102 Ohio St. 248, 269, 131 N.E. 726. "It may be made by express words or by conduct which renders impossible a performance by the other party, [*19] or which seems to dispense with complete performance at a time when the obligor might fully perform. Mere silence will not amount to waiver where one is not bound to speak." White Co. v. Canton

*Transp. Co. (1936), 131 Ohio St. 190, 198-199, 2 N.E.2d 501* See, also, *Saydell v. Geppetto's Pizza & Ribs (1994), 100 Ohio App. 3d 111, 122-123, 652 N.E.2d 218.* "It [is] up to the defendant to assume and carry the burden of proving the waiver by the greater weight of the evidence[.] *** In so doing he [is] required to prove a clear, unequivocal, decisive act of the party against whom the waiver [is] asserted, showing such a purpose or acts amounting to an estoppel on the latter's part." *White Co. v. Canton Transp. Co., 131 Ohio St. at 198-199.*

Appellants argue that the Morrisons' waived their right to exercise the purchase option, as evidenced by their (1) notification to appellants that they would not purchase the subject property for $ 200,000, (2) inquiries into purchasing other property, (3) delay in filing suit and (4) failure to make further inquiries into appellants' hiring of an appraiser.

First, it borders on the inane to argue that the Morrisons waived their right [*20] to exercise the purchase option by refusing to agree to appellants' repudiatory $ 200,000 demand. The Morrisons refusal to acquiesce in appellants' breach of the purchase option hardly constitutes a clear, unequivocal and decisive act amounting to a waiver of their right to exercise that option.

Second, A purchase option is, by definition, a unilateral contract, binding one side without binding the other. See *Plikerd v. Mongeluzzo (1992), 73 Ohio App. 3d 115, 123, 596 N.E.2d 601,* citing 17 Ohio Jurisprudence 3d (1980) 453-455, Contracts, Section 22. The option prevents the party granting the option from disposing of the subject property until its expiration. Id. The party who is granted the option may, however, exercise the option according to its terms, or allow it to lapse. Id. Thus, a party who is granted a purchase option is not bound to the optioned property. He may freely consider other properties during the period of the option without prejudice to, or waiver of, his or her right to exercise the option. The Morrisons inquiries into other properties have no bearing on the instant purchase option and do not amount to a waiver of their right to exercise the option. [*21]

Third, the Morrisons delay in filing suit could not possibly operate as a waiver of their right to exercise the purchase option for the simple reason that the delay did not become manifest until long after the expiration of the period for exercising the option. Moreover, failure to assert a right does not, in and of itself, constitute an intentional relinquishment of that right. Although, failure to assert a right, when circumstances require its prompt attention may be evidence of the intent to relinquish the right. 66 Ohio Jurisprudence 3d (1986) 420, Limitations and Laches, Section 221. An abundance of evidence was adduced at trial to show that the Morrisons never intended to relinquish the right to exercise the purchase option. Accordingly, their delay in filing suit did not constitute a clear, unequivocal and decisive act amounting to a waiver of the right to exercise the option.

Fourth and finally, regarding the Morrisons failure to make further inquiries into appellants' hiring of an appraiser, we note that the contract's appraisal clause was self executing. See supra. ("Upon the receiving of Lessee's notice of intent to exercise the option to purchase herein, Lessor shall [*22] obtain *** [an] appraiser[] to appraise the value of the real estate demised.") The Morrisons were not bound by the agreement to demand that appellants obtain an appraisal. (It does appear from the record that they mentioned to appellants the fact that they were to get an appraisal.) "Mere silence will not amount to waiver where one is not bound to speak." *List & Son Co. v. Chase (1909), 80 Ohio St. 42, 49, 88 N.E. 120.* The Morrisons' were not bound to demand that appellants obtain an appraisal and their failure to do so does not constitute a clear, unequivocal and decisive act amounting to a waiver of their right to exercise the purchase option.

We find no waiver of the Morrisons right to exercise the purchase option. Appellants' third assignment of error is overruled.

In their fourth assignment of error, appellants assert that the trial court abused its discretion in ordering specific performance of the contract because the purchase option was extinguished through a novation. For the reasons that follow, we disagree.

First, it has been held that novation is an affirmative defense. See *Todd v. Berk, 1992 Ohio App. LEXIS 5503* (Oct. 30, 1992), Lake App. No. 91-L-067, unreported; The Continent [*23] JV326128 v. Metsker (Sept. 22, 1988), Franklin App. No. 88AP-388, unreported; *Braverman v. Spriggs, 1979 Ohio App. LEXIS 11751* (June 26, 1979), Franklin App. No. 78AP-681, unreported. Under *Civ.R. 8(C),* an affirmative defense must be pleaded or it is waived. *Hoover v. Sumlin (1984), 12 Ohio St. 3d 1, 465 N.E.2d 377.* Appellants failed to plead novation and they have, therefore, waived this defense.

Second, even if appellants had raised the affirmative defense of novation, they would not prevail. "[A] novation, as understood in modern law *** is a mutual agreement among all parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another ***." *Boblitt v. Briggs, 1997 Ohio App. LEXIS 6089* (Nov. 21, 1997), Clark App. No. 97-CA-0006, unreported, citing 18 Ohio Jurisprudence 3d (1980) 204-205, Contracts, Section 283. Novation is based upon the theory that a new contract has been made, in which there has been a complete meeting of the minds. *State ex rel. Bettman v.*

*Court of Common Pleas of Franklin County (1931), 124 Ohio St. 269, 283-284, 178 N.E. 258.* Thus, for a novation to be effective, all parties must agree to the new or changed terms [*24] pursuant to which the substitution is made. See *Bolling v. Clevepak Corp. (1984), 20 Ohio App. 3d 113, 125, 484 N.E.2d 1367.* Intent, knowledge and consent are essential elements in determining whether a novation has occurred. Id. Knowledge of, and consent to, the terms of a novation may be implied from circumstances or conduct. *Union Central Life Ins. Co. v. Hoyer (1992), 66 Ohio St. 344, 64 N.E. 435,* paragraph two of the syllabus. The evidence of such knowledge and consent must, however, be clear and definite, because a novation is never presumed. *Bolling v. Clevepak Corp., 20 Ohio App. 3d at 125,* citing *Grant-Holub Co. v. Goodman (1926), 23 Ohio App. 540, 156 N.E. 151.*

Appellants argue that the original ten year lease/purchase agreement was displaced by a subsequent oral lease which extinguished the purchase option. It is evident from the record that the original lease/purchase agreement was not displaced by the subsequent lease - no "discharge of a valid existing obligation by the substitution of a new valid obligation" occurred herein. The parties simply entered into an oral month to month tenancy following the expiration of (and appellants breach of) the original [*25] lease/purchase agreement. This does not constitute a novation.

Even if the parties' oral lease could somehow fairly be considered to have displaced the prior lease/purchase agreement, appellants have failed to point to clear, definite evidence that there was a meeting of the minds regarding the purchase option. It is undisputed that the terms of the oral lease were relayed from Millard Bahner to the Morrisons by Roger Bahner. And, Roger Bahner testified quite specifically that he did not negotiate with the Morrisons regarding their right to purchase the property because he "had no authority to do anything like that," "it wasn't within [his] scope" and he was "just merely a messenger." There is no indication in the record that the subject of the purchase option was ever addressed in conjunction with the subsequent oral lease. There was no meeting of the minds. A novation did not occur.

Appellants have failed to establish that the Morrisons right to exercise the purchase option was extinguished through a novation. Accordingly, appellants' fourth assignment of error is overruled.

In their fifth and final assignment of error, appellants argue that the trial court abused its discretion [*26] in failing to apply the statute of frauds to bar the Morrisons' claim. Appellants assert that the Morrisons' failure to give written notice of their intention to exercise the purchase option violated the statute of frauds. n6 We disagree.

n6 The purchase option clause of the lease/purchase agreement provides that the option "shall be exercisable upon written notice by Lessee to Lessor one hundred eighty (180) days prior to the end of the full ten (10) year term of this Lease ***." (Emphasis added.) Appellees asserted below, and the trial court found, that appellants expressly, orally, waived the requirement that notice be in writing. Substantial, competent, credible evidence supports this finding.

The Statute of Frauds was designed to prevent enforcement of unfounded fraudulent claims by requiring certain contracts to be evidenced in writing. *Jones v. Bonzo, 1991 Ohio App. LEXIS 5228* (Oct. 30, 1991), Lawrence App. No. 1977, unreported, citing 3 Williston on Contracts (3 Ed. 1960) 340-341, Section 448. In Ohio, the Statute of [*27] Frauds is embodied in R.C. Chapter 1335. *R.C. 1335.04* provides, in pertinent part, as follows:

"No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it ***."

Regarding the statute of frauds' effect on the acceptance of a purchase option, we note the following language of the Ohio Supreme Court, in *Wiedemann Brewing Co. v. Maxwell, supra:*

"The fact that the acceptance by plaintiff in the present case was verbal [does not] destroy its right to enforce the contract against the party who signed the option. Our statute of frauds *** denies the right to maintain an action upon any contract for the sale of any interest in lands unless the agreement is in writing signed by the party to be charged, or by some authorized person. This contract is so signed by the party to be charged. The assent of the other party may be shown by parol."

*78 Ohio St. at 64.* (Citations omitted.)

Thus, the Statute of Frauds is not implicated by, and does not operate to bar, oral notice [*28] of the exercise of a purchase option. The Morrisons oral notification of their intent to exercise the purchase option did not violate the Statute of Frauds.

The requirement that the Morrisons' notice be in writing was purely contractual. Appellants could freely waive this contractual requirement. See *Joyce/Dayton Corp. v. C.A. Manchester Tank & Equip. Co., 1996 Ohio App. LEXIS 5435* (Dec. 6, 1996), Montgomery App. No. 15977, unreported. ("The written notice requirement of a lease option is for the benefit of the lessor, not the lessee, and therefore the lessor may waive that requirement if he so chooses.") Competent, credible evidence supports the trial court's factual finding that appellants did so. We accept this finding.

We note that appellants characterize the waiver as an oral agreement modifying a written agreement which was subject to the Statute of Frauds. A subsequent oral agreement modifying an "essential" or "material" term of a written contract required to be in writing by the Statute of Frauds is invalid and unenforceable. *Jones v. Bonzo, supra* citing *Franke v. Blair Realty Co. (1928), 119 Ohio St. 338, 164 N.E. 353* and Shafer v. Nagy (Feb. 16, 1984), Highland App. No. 511, unreported. [*29] Obviously, not every term in a contract is "essential" or "material" for purposes of the Statute of Frauds. n7

n7 For instance, when a deed to real estate has been executed, subsequent oral agreements between vendor and vendee, which do not take away or confer any interest in the land, but only determine the time when the purchase money becomes due, are not affected by the Statute of Frauds. See *Jones v. Bonzo, supra,* citing *Nonamaker v. Amos (1905), 73 Ohio St. 163, 172, 76 N.E. 949* and *Negley v. Jeffers (1875), 28 Ohio St. 90.*

Inasmuch as the statute of frauds does not require that the Morrisons' notice of acceptance of an option be in writing and inasmuch as the purported oral modification does not take away or confer any interest in land, we conclude that the written notice requirement was not an "essential" or "material" term of the contract for the purposes of the Statute of Frauds. The oral modification is valid and enforceable. Accordingly, appellants' fifth and final assignment of error [*30] is overruled.

Having considered the errors assigned and argued in the briefs and finding none of them to be meritorious, it is hereby ordered that the judgment of the trial court be affirmed in its entirety.

JUDGMENT AFFIRMED

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and APPELLEE recover of APPELLANT'S costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the SCIOTO COUNTY COURT OF COMMON PLEAS to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this Entry.

A certified copy of this entry shall constitute the mandate pursuant to *Rule 27 of the Rules of Appellate Procedure.* Exceptions.

Abele, J. and Kline, J.
Concur in Judgment & Opinion:

For the Court

BY: Earl E. Stephenson,

Presiding Judge

**NOTICE To COUNSEL**

**Pursuant to Local Rule No. 12, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**

# Exhibit G

LEXSEE 1996 OHIO MISC. LEXIS 77

**Lorenzen, Inc., et al., Plaintiffs, -vs- North Star Recycling Co., etc., Defendant.**

**Case No. 95-0577**

**STATE OF OHIO, COURT OF COMMON PLEAS, LUCAS COUNTY**

*1996 Ohio Misc. LEXIS 77*

**August 13, 1996, Filed**

**DISPOSITION:** [*1]

Motion granted.

**JUDGES:** Honorable Mark Schmollinger

**OPINION BY:** Mark Schmollinger

**OPINION:**

OPINION AND JUDGMENT ENTRY

This matter is before the Court on the motion for summary judgment filed by the defendant, North Star Recycling Co., fka Magnimet Corp. ("North Star"). Upon due consideration of the motion, memoranda of counsel, evidence, and applicable law, this Court grants North Star's motion.

The plaintiffs, Lorenzen, Inc. ("Lorenzen") and Millard Development, Inc., filed this action seeking a judicial determination of their rights with respect to an easement granted North Star as part of Lorenzen's sale of certain commercial property to North Star in 1988. The "Warranty Deed" delivered at closing conveyed fee simple title to the 15-acre parcel described in the deed. The Warranty Deed also conveyed an easement to Front Street by the following deed language:

> "Grantor, for itself, its successors and assigns does hereby grant to Grantee, its successors and assigns, as an easement running with the land, an easement through that portion of Lot One (1) in the Replat of a Portion of Ironville retained by Grantor, over, upon and under a strip of land being approximately 200 feet in [*2] length and 25 feet in width for the purpose of ingress and egress to and from the Property being conveyed to Grantee as described on Exhibit A hereto. The cen-

> terline of such easement shall be 490 feet, plus or minus, northeasterly of the intersection of the centerlines of Front Street and Millard Avenue as measured along the centerline of Front Street. Grantor, for itself, its successors and assigns, further grants to Grantee, its successors and assigns access to and from said easement, such access being from the most northwesterly portion of the Property hereby conveyed and further identified as being a 128.44 foot dimension."

(Emphasis added.)

The plaintiffs argue that the language of the deed is ambiguous and, therefore, the Court must consider parol evidence to determine the intent of the parties. Specifically, the plaintiffs suggest that the intention of the parties can be gleaned from the purchase agreement, an addendum made thereto, and the actions of the parties post-closing. According to the plaintiffs, these items provide the plaintiffs with the right to terminate and relocate the easement, and restrict North Star's use of the easement. Additionally, [*3] the plaintiffs contend that the pre-closing documents were not merged into the deed at closing because the purchase agreement and addendum contain collateral provisions.

The Court, however, finds that the language of the deed is unambiguous and, therefore, does not find it necessary to look beyond the deed to determine the parties' intention. Furthermore, the Court finds that the purchase agreement, addendum, and any other agreements regarding the easement were merged in the deed upon closing.

The language of the deed explicitly states that Lorenzen grants to North Star an easement running with the land for the purpose of ingress and egress. Generally, a deed's language is presumed to express the parties' intention:

"As a general principle of construction, a deed is to be construed most strongly against the grantor in the resolution of any ambiguities contained in the instrument; however, a deed's language is conclusively presumed to express the parties' intention absent 'uncertainty' in the language employed. [Citation omitted.] If a grantee accepts a deed, the knowledge of its provisions is legally imputed to him; and, by its acceptance, he is bound by all of its provisions [*4] and is estopped to deny their legal effect. [Citation omitted]."

37 *Robinwood Assoc. v. Health Industries (1988), 47 Ohio App. 3d 156, 157, 547 N.E.2d 1019.*

The plaintiffs suggests that an ambiguity exists regarding whether the easement granted automobile traffic ingress and egress privileges and truck traffic egress privileges only, or whether it granted both egress and ingress privileges for both cars and trucks. Plaintiffs' are attempting to create an ambiguity where none exists. The easement is a perpetual easement for both ingress and egress privileges. The privilege is unqualified. It makes no distinction between types of travel or the traffic expected. It does not specify or prohibit any type of traffic, automobile, truck, foot, or any other type. The deed is presumed to reflect the parties' unqualified intentions. See Id. If the parties intended to qualify the easement, they could have incorporated prior agreements in the deed; however, they did not.

Having found that the language in the deed is unambiguous, it would be improper for the Court to consider parol evidence to determine the parties' intent. This includes any alleged admissions made by North [*5] Star's previous attorney. Additionally, the Court finds that the pre-closing documents were merged in the deed upon closing.

The Ohio Supreme Court stated that "where a deed is delivered and accepted without qualification pursuant to agreement, no cause of action upon the prior agreement thereafter exists." *Fuller v. Drenberg (1965), 3 Ohio St. 2d 109, 209 N.E.2d 417,* paragraph one of the syllabus. The contract is said to be merged in the deed upon closing. At that point, the parties are "limited to the express covenants of the deed." *Id. at 111,* citing *Brumbaugh v. Chapman (1887), 45 Ohio St. 368, 13 N.E. 584,* There are, however, three exceptions to this general rule.

The rights of the parties must be determined by the deed, unless the elements of fraud or mistake exist, or unless the prior agreement is collateral to and independent of the main purpose of the transaction. *Mayer v. Sumergrade (1960), 111 Ohio App. 237, 240, 167 N.E.2d 516.* If the contractual provision runs with the land and concerns "title, occupancy, size, enjoyment, possession, or quantity of the parcel of land conveyed" then the covenant is not collateral and, therefore, is merged in the deed. [*6] *Id. at 239.* Once the contract is merged, it is unenforceable if omitted from the deed. Id. Moreover, the doctrine of "estoppel by deed" "precludes a party from denying a certain fact recited in a deed executed by or accepted by him in an action brought upon the instrument. [Citations omitted.]." *Robinwood, supra at 157.*

Here, the plaintiffs assert that a provision in the purchase agreement gives Lorenzen the option to terminate the easement to Front Street and to limit North Star's use of the easement for truck traffic to egress only. Both of these provisions apply directly to North Star's title, occupancy, size, enjoyment, possession, and quantity of the parcel of land conveyed. As such, the provisions are not collateral to the deed and, therefore, were merged in the deed upon closing. See *Mayer, supra.* Accordingly, the provisions contained in the pre-closing documents are unenforceable. See Id.

The plaintiffs also argue that a mistake was made with regard to the deed that was signed by Lorenzen. Specifically, the plaintiffs argue that Lorenzen was lead to believe that the granting of an easement for purpose of ingress and egress was solely for car privileges [*7] and that the addendum and purchase agreement applied to the truck traffic. Having signed the deed, however, the plaintiffs are estopped from denying that the easement is for something less than ingress and egress privileges for all uses. See *Robinwood, supra.* Lorenzen admittedly knew how the easement was phrased, yet nevertheless signed the deed as it appeared--providing for an unqualified ingress and egress easement and not incorporating the pre-closing documents. It is not for this Court now to rewrite the terms of the easement. Accordingly, North Star's motion is granted.

## JUDGMENT ENTRY

It is ORDERED, ADJUDGED, and DECREED that the motion for summary judgment filed by the defendant, North Star Recycling Co., fka Magnimet Corp., against the plaintiffs, Lorenzen, Inc. and Millard Development, Inc., is GRANTED.

It is further ORDERED that plaintiffs' complaint against North Star Recycling Co., fka Magnimet Corp., be dismissed with prejudice. Costs to be paid by the plaintiffs.

August 8, 1996                               JUDGE MARK SCHMOLLINGER

# Exhibit H

LEXSEE 2005 OHIO APP. LEXIS 694

**RONALD TURNER, ET AL., Plaintiffs-Appellants, vs. MICHAEL FOX, BUTLER COUNTY COMMISSIONER, ET AL., Defendants-Appellees.**

**CASE NO. CA2003-09-251**

**COURT OF APPEALS OF OHIO, TWELFTH APPELLATE DISTRICT, BUTLER COUNTY**

*2005 Ohio 677; 2005 Ohio App. LEXIS 694*

**February 22, 2005, Decided**

**PRIOR HISTORY:** [**1] CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS. Case No. CV 2003 04 0981.

**DISPOSITION:** Judgments affirmed.

**COUNSEL:** James M. Schnell, Fairfield, Ohio and James V. Magee, Jr., Cincinnati, Ohio, for Plaintiffs-Appellants.

Patrick O'Neal, Amy B. Spiller, Joseph C. Gruber, Stephen M. Bernat, Timothy P. Heather, John R. Wirthlin, Cincinnati, Ohio; Roger Gates, Asst. Pros. Attorney, Hamilton, Ohio; John W. Becker, Akron, OH; Michael J. Sikora, III, Amelia A. Bowers, James R. Havens, Brian E. Linhart, Columbus, OH, for Defendants-Appellees.

Richard Carnevale, Appellee Carnevale Homes, Inc., Pro se, Milford, Ohio.

**JUDGES:** GRADY, J. BROGAN, J. and FAIN, J., concur. Hon. James A. Brogan, Hon. Mike Fain, and Hon. Thomas J. Grady, Court of Appeals, Second Appellate District, Sitting by Assignment of the Supreme Court of Ohio, pursuant to Section 5(A)(3), Article IV of the Ohio Constitution.

**OPINION BY:** GRADY

**OPINION:** GRADY, J.

[*P1] This is an appeal from an order dismissing an action for declaratory and other relief concerning a road that was installed across the co-plaintiffs' adjoining properties against their opposition. The trial court found that the installation [**2] was pursuant to an easement created by a dedication for that purpose in favor of But-

ler County by coplaintiffs' predecessors in interest, and was therefore valid. We agree, and will affirm.

[*P2] In 1972, Carthal and Donna Jean Zimmerman platted a subdivision on their real property located along the east side of Liberty-Fairfield Road. The subdivision was named First Addition to County View Estates Subdivision. As platted, the Zimmerman property was subdivided into lots situated on the north and south sides of a proposed new street, Randall Drive, which was to run perpendicular to Liberty-Fairfield Road in an eastward direction. The Zimmermans retained a lot of approximately 4.73 acres at the east terminus of Randall Drive. The plat instrument dedicated a turnaround easement where Randall Drive ended at the Zimmermans' lot, which was marked: "Temporary turnaround easement to be automatically vacated when street is extended."

[*P3] In 1985, the Zimmermans, desiring to develop their 4.73 acre lot, sought a variance from the Butler County Board of Zoning Appeals allowing their one lot to be subdivided into two lots. The north/south property line of the proposed two lots ran [**3] eastward from Randall Drive where it ended at the Zimmermans' property. Because neither of the two new lots would have the required frontage on a dedicated roadway, the Board of Zoning Appeals approved the lot split subject to several stipulations in Board Resolution 85-48. The resolution provides that each lot must contain but one single-family dwelling, that each lot must be subject to a 30-foot easement allowing a future eastward extension of Randall Drive across their north/south boundary, and that the easements must be a part of any deed or deeds conveying the lots.

[*P4] Subsequently, a plat authorizing the division of the Zimmermans' property into two lots was presented to and approved by the Butler County Engineer. The plat contains a description of the future roadway easement

required by the variance that the Board of Zoning Appeals had granted the Zimmermans.

[*P5] On December 23, 1985, the Zimmermans conveyed both lots into which their property had been divided by warranty deed to Carthal's brother and sister-in-law, Leland and Betty J. Zimmerman. The deed contains the following recitation in the legal description of both lots:

[*P6] "* * * being subject [**4] to the turn-around easement shown on the Plat of County View Estates Subdivision, First Addition, and also to an easement which, upon request of the County, may be used for a public road, said easement being 30.00 feet wide, taken evenly off the [south/northerly] side of the above described, and being for a future eastward extension of Randall Drive.

[*P7] "Also said above is subject to a drainage easement * * *

[*P8] "Pursuant to the Butler County Board of Zoning Appeals, Resolution No. 85.48, both of the above described tracts are restricted to single family dwellings. Further both tracts are subject to a 30.00 foot easement, as shown on the Plat, for the purpose of future expansion of Randall Drive, as well as 10.00 foot construction easement." (Emphasis added.)

[*P9] Leland and Betty J. Zimmerman subsequently conveyed the northern of their two lots to plaintiffs David and Karen S. Taylor by warranty deed. The deed of conveyance provides that the Taylors' lot is:

[*P10] "subject to the turn-around easement shown on the Plat of County View Estates Subdivision, First Addition, and also to an easement which, upon request of the County, may be seen [**5] [sic] for a public road, said easement being 30.00 feet wide, taken evenly off the south side of the above described, and being for a future eastward extension of Randall Drive.

[*P11] "* * *

[*P12] "The plat of the herein tract is recorded in Volume 16, page 136 of the Butler County Engineer's Records." (Emphasis added.)

[*P13] The Taylors' deed also refers to the Butler County Board of Zoning Appeals Resolution granting the variance, referencing the single family dwelling restriction and the roadway easement. The records of the Butler County Recorder contain two mortgages of the Taylors' property. Both mortgages reference "an easement, which, upon request of the county, may be seen [sic] for a public road * * *."

[*P14] In August of 1988, Leland and Betty Zimmerman re-conveyed to themselves by survivorship deed the lot they had retained. The deed contains the same language referencing an easement quoted above from the deed that had conveyed the property to Leland and Betty Zimmerman in December of 1985.

[*P15] Leland and Betty Zimmerman constructed a home on their lot and resided there until May 1993, when they conveyed the property to plaintiffs [**6] Ronald and Michelle Turner by warranty deed. This deed stated that the property conveyed is "subject to easements and restrictions of record, if any."

[*P16] To the east of the Taylors' and the Turners' lots was a parcel of land owned by Calvin S. Rufener. In May of 1999, defendant James M. Dixon purchased fifty seven acres from Rufener. The Dixon property was landlocked, and it abutted the east side of Taylor and Turner lots.

[*P17] Dixon sought to plat twenty-nine acres of his newly-purchased land into a subdivision to be named the Country Oaks Subdivision. The new subdivision had no dedicated roadway frontage except that which would be created by an extension of Randall Drive in an eastward direction, across the Taylor and Turner properties, straddling their joint property line. Therefore, preliminary approval of the subdivision plat granted by the Butler County Planning Commission on April 15, 1999, was subject to the following condition: "The existing 'future Roadway Easement' for Randall Drive that is to be dedicated and constructed in accordance with the standards set by the Butler County Engineer. This dedication must take place along with, or prior to, the recording [**7] of this subdivision."

[*P18] Dixon asked the Taylors and Turners to agree to the extension of Randall Drive across and along their joint property line from where it terminated to connect with Dixon's new subdivision. They refused to agree.

[*P19] On July 23, 1999, the Butler County Engineer advised Dixon by letter that the extension of Randall Drive had been approved. Subsequently, Dixon entered onto the Taylor and Turner properties and bulldozed a road along their joint property line, extending Randall Drive east to Dixon's Country Oaks Subdivision. Controversy ensued, and after the Butler County Prosecutor expressed reservations about Dixon's authority to act as he did, the Board of Commissioners of Butler County on September 27, 1999, adopted Resolution 99-9-1578, which states:

[*P20] "The Board of County Commissioners hereby expressed its intention to accept and it hereby accepts an easement for public roadway purposes as the same is depicted on a Plat of survey recorded in Volume 16, Page 136 of the Butler County Engineer's Records

and as the same is described in the language of the following deeds Deed Book 1544, Page 427; Deed Book 1738, Page 434; and Deed [**8] Book 1643, Page 524, all of which concern an extension of Randall Drive in Liberty Township, Butler County, Ohio. Said deeds are attached to this Resolution as Exhibits A-1, A-2, and A-3.

[*P21] "The Board of County Commissioners recognizes a controversy exists between property owners in the vicinity as to the proper legal creation and existence of this easement. It is the Board's desire to bring this easement into existence in accordance with the foregoing deeds and its sense that the establishment of this easement is just and fair and in accordance with understanding of the parties involved in the proceedings of the Butler County Zoning Board leading to the passage of Zoning Board Resolution 85-48."

[*P22] The Taylors and Turners subsequently commenced the underlying action against the Board of Commissioners, Dixon and his company, Dixon Builders LLC, all the owners of lots in the Country Oaks subdivision, their mortgagee, and several public utilities that maintain service lines running beneath the Randall Road extension. The Plaintiffs asked the court to declare that Dixon had no right to install the road across their property, and that the Board of Commissioners Resolution [**9] 99-9-1578 is void absent such a right. Further the Taylors asked the court to quiet their title to the land and to permanently enjoin the Board of Commissioners from allowing a road across their land absent either (1) a proper dedication of the land by plaintiffs for that purpose or (2) an appropriation action and relief.

[*P23] The trial court, in several separate orders, granted motions to dismiss in favor of all the defendants. The Taylors filed a timely notice of appeal. The Turners did not appeal.

[*P24] ASSIGNMENT OF ERROR

[*P25] "THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANTS IN GRANTING THE MOTIONS TO DISMISS OF DEFENDANT WELLS FARGO AND OTHER DEFENDANTS, ON THE BASIS THAT PLAINTIFFS HAD FAILED TO STATE A CASE ON WHICH RELIEF COULD BE GRANTED."

[*P26] *Civ.R. 12(B)(6)* authorizes dismissal of complaints which fail to state a claim upon which relief can be granted. A motion to dismiss on those grounds tests the legal sufficiency of the pleadings in the complaint. Therefore, the motion may not rely on evidence outside the complaint. However, per *Civ.R. 12*, when "such matters are not excluded by the [**10] court, the motion shall be treated as a motion for summary judg-

ment and disposed of as provided in *Rule 56*." It appears that the court did that in the present case.

[*P27] Summary judgment may not be granted unless the entire record demonstrates that there is no genuine issue of material fact and that the moving party is, on that record, entitled to judgment as a matter of law. *Civ.R. 56*. The burden of showing that no genuine issue of material fact exists is on the moving party. *Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 375 N.E.2d 46*. All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made. *Morris v. First National Bank & Trust Co. (1970), 21 Ohio St.2d 25, 254 N.E.2d 683*. In reviewing a trial court's grant of summary judgment, an appellate court must view the facts in a light most favorable to the party who opposed the motion. *Osborne v. Lyles (1992), 63 Ohio St.3d 326, 587 N.E.2d 825*. Further, the issues of law involved are reviewed de novo. *Nilavar v. Osborn (1998), 127 Ohio App.3d 1, 711 N.E.2d 726*.

[*P28] The Taylors [**11] make two principal arguments on appeal. They first argue that no valid easement existed to allow the extension of Randall Drive across the property-line they share with the Turners. They also argue that, even if an easement of some kind was offered to Butler County through a prior dedication of private lands for that purpose, the offer of dedication had not been accepted so as to create an easement when Dixon extended Randall Drive. Both contentions lack merit.

[*P29] "An easement is an interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose." Black's Law dictionary (8th Ed. 2004) 548. Being an interest in lands, and pursuant to Ohio's Statute of Frauds, an easement may not be "granted except by deed, or note in writing, signed by the party . . . granting it . . . or by act and operation of law." *R.C. 1335.04*.

[*P30] "Dedication" is a voluntary and intentional gift or donation of land, or of an easement or other interest therein, for some public use, made by the owner of the land and accepted for such use, by or on behalf of the public. *Snyder v. Monroe Township Trustees (1996), 110 Ohio App.3d 443, 674 N.E.2d 741*. [**12]

[*P31] *R.C. 5553.31* states, in pertinent part:

[*P32] "Any person may, with the approval of the board of county commissioners, dedicate lands for road purposes. A definite description of the lands to be dedicated with a plat of such lands thereto attached and signed by the party dedicating such lands, with the approval and acceptance of the board indorsed thereon,

shall be placed upon the proper road records of the county in which such road is situated."

[*P33] *R.C. 711.01* authorizes creation of subdivisions of lands that have been surveyed "by having a plat of it made by a competent surveyor. The plat shall particularly describe the streets, alleys, commons, or public grounds . . ." Roads or streets in platted territories outside municipalities may be dedicated pursuant to *R.C. 5553.31*. 1949 Ohio Atty.Gen.Ops. No. 1209. A board of county commissioners is authorized to locate and establish roads thus dedicated. *R.C. 5553.02*.

[*P34] The Taylors contend that, because no easement was created by deed, the Statute of Frauds requirement in *R.C. 1335.04* [**13] is not satisfied. They also argue that a proper easement necessarily runs in favor of a grantee, and therefore cannot run in favor of a third party such as Butler County.

[*P35] Butler County is not a third party to conveyance of an easement. It is instead a donee of a dedication of lands for road purposes pursuant to *R.C. 5553.31*. Further, the dedication is sufficient to create a form of easement for that purpose "by operation of law," which satisfies the Statute of Frauds provision in *R.C. 1335.04*, if the dedication requirements of *R.C. 5553.31* are satisfied.

[*P36] The plat that Carthal and Donna Jean Zimmerman filed in 1985 to obtain a split of their one lot into two lots contains a description of an easement across the joint lot line sixty feet wide for the future extension of Randall Drive. That recitation is sufficient to create an *R.C. 5553.31* roadway dedication by the Zimmermans. The Taylors argue that any such dedication in 1985 was nevertheless insufficient to create a dedication when Randall Drive was extended because the dedication was incomplete until it [**14] was approved and accepted by the Board of County Commissioners in 1999, when the Board adopted Resolution 99-9-1578, after Dixon had installed the extension of Randall Drive across the Taylors' and Turners' property.

[*P37] *R.C. 5553.31* requires approval and acceptance by a board of county commissioners before a roadway dedication is complete. However, an act of dedication continues until the wants and convenience of the public require use of the facility the dedication permits, unless the dedication is time-limited or private rights which defeat the purpose of the dedication vest in the interim. 2 Curry and Durham, Ohio Real Property Law and Practice (5th Ed.) 428, § 23-5(b)(3).

[*P38] The Zimmermans' 1985 act of dedication was not time-limited. No private rights vested in the interim which defeated the purpose of the dedication, including any rights the Turners acquired when they purchased their property.

[*P39] After their plat containing their roadway dedication was filed, Carthal and Donna Jean Zimmerman conveyed two lots to Leland and Betty J. Zimmerman by warranty deed containing a description of the roadway easement to which those [**15] parcels of land could be subject. The same potential easement is set out in the deed from Leland and Betty J. Zimmerman conveying one of their lots to the Taylors. The later deed by which the Zimmermans conveyed the lot they had retained to the Turners states that the rights conveyed are "subject to easements and restrictions of record, if any."

[*P40] "If a grantee accepts a deed, the knowledge of its provisions is legally imputed to him; and, by its acceptance, he is bound by all of its provisions and is estopped to deny their legal effect." *37 Robinwood Associates v. Health Industries, Inc. (1988), 47 Ohio App.3d 156, 547 N.E.2d 1019*.

[*P41] The Taylors took the rights which were conveyed to them to the property they purchased in 1998 subject to the inchoate *R.C. 5553.31* roadway dedication established in the plat that Carthal and Donna Jean Zimmerman had recorded in 1985, which was referenced in the warranty deeds of the Taylors and their predecessors in interest. The Taylors are therefore estopped to deny the retroactive legal effect of the Board of County Commissioners' acceptance of the dedication through its adoption of Resolution 99-9-1578 in [**16] 1999, which the Board was authorized by *R.C. 5553.02* to adopt in order to locate and establish the Randall Drive extension. Therefore, the trial court did not err when it dismissed the action the Taylors had filed in opposition to the Resolution and the installation of the Randall Drive extension the Resolution had approved.

[*P42] The assignment of error is overruled. The judgments from which the appeals are taken will be affirmed.

BROGAN, J. and FAIN, J., concur.

Hon. James A. Brogan, Hon. Mike Fain, and Hon. Thomas J. Grady, Court of Appeals, Second Appellate District, Sitting by Assignment of the Supreme Court of Ohio, pursuant to *Section 5(A)(3), Article IV of the Ohio Constitution*.

# Exhibit I

LEXSEE 1996 OHIO APP. LEXIS 1141

**RICHARD A. DAVIS Appellee v. ALEXANDER & SUSAN DIFILIPPO Appellants**

**C.A. NO. 95CA0046**

**COURT OF APPEALS OF OHIO, NINTH APPELLATE DISTRICT, WAYNE COUNTY**

*1996 Ohio App. LEXIS 1141*

**March 27, 1996, Dated**

**NOTICE:** [*1] THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION.

**PRIOR HISTORY:** APPEAL FROM JUDGMENT ENTERED IN THE COMMON PLEAS COURT. COUNTY OF WAYNE, OHIO. CASE NO. 94-CI-307.

**DISPOSITION:** Judgment affirmed.

**COUNSEL:** APPEARANCES:

J. DOUGLAS DRUSHAL & SUSAN E. BAKER, Attorneys for Appellee, 225 North Market St., P.O. Box 599, Wooster, OH 44691.

CHARLES E. KENNEDY, Kennedy, Cicconetti & Rickett, LPA, 558 N. Market St., Wooster, OH 44691, Attorney for Appellants.

MICHAEL J. JORDAN, Attorney for Appellants, 1991 Crocker Rd., Ste. 550, Westlake, OH 44145.

**JUDGES:** LYNN C. SLABY, QUILLIN, P.J., DICKINSON, J., CONCUR

**OPINION BY:** LYNN C. SLABY

**OPINION:** DECISION AND JOURNAL ENTRY

Dated: March 27, 1996

This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:

SLABY, Judge.

Alexander and Susan DiFilippo appeal from the Wayne County Court of Common Pleas' entry of summary judgment in favor of Richard Davis. We affirm.

In September of 1993, the DiFilippos contracted to purchase from Davis real property located in Wayne County, Ohio. The property was [*2] a parcel in a new subdivision, yet to be platted and for which rezoning was sought. The contract provided:

"The Closing Date shall be no later than October 4, 1993. ***

"[Davis] shall deliver possession of the Premises to [the DiFilippos] on the Closing Date.

"The Closing shall proceed as if the rezoning *** has occurred, with the deed to be executed and recorded as soon as possible after the rezoning. If the rezoning has not occurred ***, then a different deed [described elsewhere] shall be executed and recorded as soon as possible after the rezoning is defeated or December 31, 1993, whichever occurs first."

The contract further provided:

"On the Closing Date, [Davis] shall convey to [the DiFilippos] good and marketable title in fee simple to the Premises (but subject to *** restrictions of record) by warranty deed in recordable form."

On October 7, 1993, the DiFilippos tendered the entire purchase price of the property to Davis. Davis negotiated the check on October 12, 1993. The property was rezoned prior to the end of 1993, and on December 30, 1993, Davis executed a warranty deed to the property "free from all encumbrances [*3] whatsoever except for *** restrictions *** of record." On January 3, 1994, Davis recorded the plat for the subdivision and a copy of the "Grant and Declaration of Easements and Restrictions" on the subdivision, which included a provision that forbade the placement of signs without the prior approval of Davis. Davis caused the deed to be recorded on January 6, 1994. The deed was not actually delivered to the DiFilippos until after that date.

In April of 1994, the DiFilippos purchased a sign, which they desired to place on their lot so as to draw attention to Mr. DiFilippo's dental practice from those travelling on a nearby road. The parties had a meeting in which Davis gave consent to the DiFilippos to place the sign in a specified area other than the one desired. The DiFilippos had the sign erected in the unapproved area.

Davis sought a mandatory injunction from the trial court to require the DiFilippos to remove their sign from the chosen location. The DiFilippos counter-claimed and sought a declaration from the court that the deed restriction against the sign was invalid. The parties filed cross-motions for summary judgment. Finding that the delivery date controlled the transaction [*4] and that delivery occurred at the time when the deed was recorded, the trial court held that the restriction was valid; accordingly, summary judgment was rendered in favor of Davis. The DiFilippos appeal from and assign one error to the proceedings below:

> "It was clearly erroneous for the trial court to hold that deed restrictions recorded by [Davis], with respect to property he transferred to [the DiFilippos], were valid."

In reviewing a trial court's entry of summary judgment, an appellate court applies the same standard used by the trial court. *McConville v. Jackson Comfort Sys., Inc. (1994), 95 Ohio App. 3d 297, 301, 642 N.E.2d 416.* In order to grant summary judgment pursuant to *Civ.R. 56(C)*, a trial court must first determine that:

> "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evi-

dence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party."

*State ex rel. Howard v. Ferreri (1994), 70 Ohio St. 3d [*5] 587, 589;* see, also, *Temple v. Wean United, Inc. (1977), 50 Ohio St. 2d 317, 327, 364 N.E.2d 267.* The moving party has the burden of showing that summary judgment is appropriate. *Mitseff v. Wheeler (1988), 38 Ohio St. 3d 112, 115, 526 N.E.2d 798.* It must:

> "*** inform[] the trial court of the basis for the motion, and identify[] those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim."

*Dresher v. Burt* (Mar. 6, 1996), __ Ohio St. 3d __, *1996 Ohio Lexis 187* at * 37. The nonmoving party bears a "reciprocal burden of specificity," which requires it to set forth specific facts, by affidavit or other evidence, explaining that a genuine issue for trial does exist. *Id.* at * 33, quoting *Mitseff, 38 Ohio St. 3d at 115; Jackson v. Alert Fire & Safety Equip., Inc. (1991), 58 Ohio St. 3d 48, 52, 567 N.E.2d 1027.* If the nonmoving party can offer only a scintilla of evidence, or if his evidence is merely colorable or not significantly probative, then the moving party is entitled to judgment as a matter of law. *Buckeye Union Ins. Co. v. Consol. Stores Corp. (1990), [*6] 68 Ohio App. 3d 19, 22, 587 N.E.2d 391.*

In the instant case, on cross-motions for summary judgment, Davis had the burden of showing that he was entitled to the mandatory injunction under the provisions of the deed; the DiFilippos had the burden of showing that the deed restrictions were invalid. Although the parties confused the issues, the controlling question in Davis' action was whether the restrictions to which the deed referred included the restrictions that were recorded on January 3, 1994; this issue, in turn, depended upon when the deed was effective to pass title. If the deed were effective when executed or earlier, the restrictions of record to which the deed referred would not include the sign restriction and the DiFilippos would prevail. If the deed were effective when recorded, the restrictions would include the sign restriction, and the DiFilippos could obtain relief only if the deed did not reflect the true intention of the parties, i.e., if they could establish a right to reformation. See *Pettry v. Pettry (1991), 81 Ohio App. 3d 30, 33-34, 610 N.E.2d 443.*

The trial court, while finding that the deed passed title when recorded, did not determine whether the [*7] deed conformed to the intention of the parties as stated in the purchase agreement. Indeed, this was unnecessary as the DiFilippos *never sought reformation of the deed in their counterclaim.* Instead, the DiFilippos requested that the restriction be declared unenforceable against them because they allegedly did not contract for restrictions imposed after the October "closing date." Davis countered that the transaction was not completed until the deed was constructively delivered through recording, and that the provisions of the deed controlled.

It is well-settled property law that a deed does not operate to transfer title to real property until it has been delivered to and accepted by the grantee. *In re Estate of Ault (1992), 80 Ohio App. 3d 399, 402-03, 609 N.E.2d 568.* The recording of the deed constitutes prima facie evidence of delivery. *Gatts v. GMBH (1983), 14 Ohio App. 3d 243, 246, 470 N.E.2d 425.* Moreover, unless there is evidence to the contrary, the deed is presumed to have been accepted by the grantee. 35 Ohio Jurisprudence 3d (1982) 291, Deeds, Section 58; see, generally, *Gatts, 14 Ohio App. 3d at 246.*

A grantee who accepts delivery of a warranty deed [*8] that is subject to "restrictions of record" is deemed to have knowledge of those restrictions that appear in the purchaser's chain of title, and, therefore, takes the property subject to those restrictions. *37 Robinwood Assoc. v. Health Industries, Inc. (1988), 47 Ohio App. 3d 156, 157, 547 N.E.2d 1019.* Once having accepted delivery of the deed, the grantee will no longer have a cause of action on his purchase contract with respect to essential terms covered by the deed. *Fuller v. Drenberg (1965), 3 Ohio St. 2d 109, 209 N.E.2d 417,* paragraph one of the syllabus. This doctrine is called "merger by deed" or "estoppel by deed." See *id. at 111; 37 Robinwood Assoc.,* 47 Ohio App. 3d at 157-58. The language of the deed, if unambiguous, is conclusively presumed to express the parties' intentions. *Id. at 157; Sword v. Sword (1993), 86 Ohio App. 3d 161, 166, 620 N.E.2d 199.*

In the case *sub judice,* the undisputed facts entitled Davis to judgment as a matter of law. Because the DiFilippos did not take actual delivery prior to January 6, 1994, when the deed was recorded, delivery was accomplished on that date. Acceptance of the deed may be presumed from the DiFilippos' [*9] actual receipt of the deed and their acquiescence in its clear and unambiguous terms. The deed provided that Davis warranted title subject to restrictions of record. The restrictions on the property were properly recorded and appeared in the DiFilippos' chain of title; accordingly, the DiFilippos had constructive notice of the restrictions. They cannot assert the terms of the contract, which were merged into the deed, to defeat enforcement of the restrictions against them.

Counsel for the DiFilippos maintained at oral argument that their declaratory judgment action was the equivalent of an action for reformation. Assuming *arguendo* that their counterclaim could be so construed, the DiFilippos failed to produce sufficient evidence of grounds for reformation to survive summary judgment. Reformation is generally available upon the grounds of mutual mistake or fraud. See *Wagner v. Nat. Fire Ins. Co. (1937), 132 Ohio St. 405, 412, 8 N.E.2d 144; Kungle v. Equitable Gen. Ins. Co. (1985), 27 Ohio App. 3d 203, 206, 500 N.E.2d 343.* Grounds for reformation must be shown by clear and convincing evidence. *Mason v. Swartz (1991), 76 Ohio App. 3d 43, 50, 600 N.E.2d 1121.*

The evidence [*10] produced on summary judgment did not demonstrate a question of fact supporting either mutual mistake or fraud. At best, the evidence showed that the DiFilippos may have believed that restrictions would not be added after they tendered the purchase price; the contract itself did not state this condition in any express terms. Instead, the contract contemplated a delay in the execution and recording of the deed until after the city decided whether to rezone the property. n1 In addition, Davis's promise to deliver fee simple title expressly permitted restrictions of record. Finally, there was no evidence that either party insisted on strict compliance with the contract deadlines, particularly regarding execution, delivery and recording of the deed.

n1 The contract is actually inconsistent with regard to the timing of execution: one provision provides for execution after rezoning up until December 31, 1993, while another refers to delivery on the "closing date," which was to be in October of that year. Delivery of an executed deed could not occur under those terms unless the rezoning decision was made prior to the closing date, which it was not.

[*11]

The trial court did not err in granting summary judgment to Davis. We overrule the assignment of error and affirm the judgment of the court below.

*Judgment affirmed.*

The Court finds that there were reasonable grounds for this appeal.

We order that a special mandate issue out of this court, directing the County of Wayne Common Pleas Court to carry this judgment into execution. A certified

copy of this journal entry shall constitute the mandate, pursuant to *App.R. 27*.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. *App.R. 22(E)*.

Costs taxed to Appellants.

Exceptions.

LYNN C. SLABY

FOR THE COURT

QUILLIN, P.J.

DICKINSON, J.

CONCUR

# Exhibit J

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **216 JAMAICA AVENUE, LLC,** | ) | **CASE NO. 1:06CV1288** |
| | ) | |
| Plaintiff, | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| v. | ) | |
| | ) | |
| **S & R PLAYHOUSE REALTY CO.,** | ) | **AFFIDAVIT OF WILLIAM ROSS** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| **STATE OF OHIO** | ) | |
| | ) | |
| **ss.: COUNTY OF CUYAHOGA** | ) | |

William Ross, being duly sworn, deposes and says:

1.      I am a resident of the State of Ohio and am competent to testify in a court of law.  I am Vice President for Forest City Enterprise's Commercial business.  I am personally knowledgeable about the finances of the Halle Office Building and the real estate that is the subject of this action while the subject property has been leased by S&R Playhouse Realty Company.

2.      The Halle Office Building, which is the subject of this action, has suffered a net negative cash flow in every year since at least 2002.  The net cash flow for the Halle Office building over the past four years has been as follows.  In 2002: ($1,482,458); 2003: ($867,235); 2004: ($1,552,055); and for 2005: ($4,671,743).

3.      The projected negative cash flow for 2006 is ($7,182,747).

4.      The projected negative cash flow for 2007 is ($846,487).

FURTHER AFFIANT SAYETH NAUGHT.

Sworn to before me this
11th day of October, 2006

_Cynthia L. Cain_
Notary Public

_William Ross_
William Ross

CYNTHIA L. CAIN
Notary Public - State of Ohio - Lorain County
My Commission Expires October 17, 2010.

# Exhibit K

LEXSEE 1998 OHIO APP. LEXIS 3453

**BAHNER'S AUTO PARTS, Plaintiff-Appellee -vs- MILLARD BAHNER, et al., Defendant-Appellants**

**Case No. 97CA2538**

**COURT OF APPEALS OF OHIO, FOURTH APPELLATE DISTRICT, SCIOTO COUNTY**

*1998 Ohio App. LEXIS 3453*

**June 23, 1998, Filed**

**DISPOSITION:** [*1]
JUDGMENT AFFIRMED.

**COUNSEL:** Roger L. Clark, Portsmouth, Ohio, for Appellant.

Rick Faulkner, Wheelersburg, Ohio, for Appellee.

**JUDGES:** Earl E. Stephenson, Presiding Judge. Abele, J. and Kline, J., Concur in Judgment & Opinion.

**OPINION BY:** Earl E. Stephenson

**OPINION:**

DECISION AND JUDGMENT ENTRY

Stephenson, P.J.

This is an appeal from a judgment entered by the Court of Common Pleas of Scioto County in which the court granted Bahner's Auto Parts' (plaintiff below and appellee herein) demand for specific performance of an option to purchase real estate. Millard Bahner, et al (defendants below and appellants herein) appeal, assigning the following errors for our review:

I. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORMANCE."

II. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORM-ANCE BECAUSE THE DOCTRINE OF LACHES APPLIED."

III. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORM-ANCE BECAUSE THE DOCTRINE OF WAIVER APPLIED."

IV. "THE TRIAL COURT COMMIT-TED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY [*2] AWARDING APPELLEE SPECIFIC PERFORMANCE BECAUSE THE DOCTRINE OF NOVATION AP-PLIED."

V. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION BY AWARDING APPELLEE SPECIFIC PERFORM-ANCE BECAUSE THE STATUTE OF FRAUDS APPLIED."

The record reveals the following facts pertinent to this appeal. On January 1, 1984, appellee/lessee, Bah-ner's Auto Parts, and appellants/lessors, Millard and Temperance Bahner, entered into a ten year lease of property located at 747 Center Street in Wheelersburg, Ohio. n1 The lease provided for rental payments in the amount of One Thousand Dollars ($ 1,000) per month for the period of the leasehold and granted appellee an option to purchase the demised premises at the expiration of the leasehold. The purchase option clause, appearing as paragraph 21 in the lease, provides as follows:

"21. Option to Purchase and Option to Renew for Additional Term. Lessee is hereby granted the option to purchase the demised Premises herein. Said Option shall be exercisable upon written notice by Lessee to Lessor one hundred eighty (180) days prior to the end of the full ten (10) year term of this Lease of Lessee's intention to so exercise the [*3] option. Such Option is granted and conditioned upon Lessee's full compliance of the terms and conditions of the foregoing Lease Agreement. The purchase price of said option to purchase shall be ascertained as follows: Upon the receiving of Lessee's notice of intent to exercise the option to purchase herein, Lessor shall obtain and Lessee shall obtain thereafter appraisers to appraise the value of the real estate demised. Each of the respective appraisers shall choose a third appraiser which third appraiser shall also appraise the value of the demised Premises. Such appraisals shall then be added together and averaged. The purchase price shall be for Lessee % of the ascertained market value based upon the average of the three appraisals. Lessee shall then have thirty (30) days prior to the ending of the full term herein to deliver to Lessor the price so ascertained. Upon delivery of this purchase price amount, Lessor shall deliver to the Lessee, his heirs and assigns, a deed of general warranty for the demised premises herein subject to the exceptions contained in the description attached hereto and marked "Exhibit A". Lessor may set a purchase price to Lessee by mutual agreement with [*4] Lessee at any time during the course of this Lease Agreement. However, Lessee is not bound to accept or exercise any such purchase option price put forth by Lessor prior to the full and complete term of this Lease Agreement or any amendment or any extension or renewal thereof.

***"

n1 Bahner's Auto Parts is an Ohio partnership comprised of two partners, brothers David and Donald Morrison. According to the record, the Morrison brothers began working for the Bahners in their early teens (sometime in the late 60s or early 70s). On January 1, 1984, the Morrisons entered into a ten (10) year agreement with appellant Roger Bahner to purchase Bahner's Auto Parts. Simultaneously, the Morrisons entered into a separate agreement with Roger's parents, appellants Millard and Temperance Bahner, to lease/purchase the business premises (Roger Bahner owned the business - his parents owned the premises).

Sometime in May or June, 1993, David Morrison spoke with Millard Bahner regarding the Morrisons' desire to exercise [*5] the purchase option. Bahner advised Morrison that written notice was not necessary and that his son, Roger Bahner, would contact Morrison to further discuss the matter.

In accordance with the terms of the lease/purchase agreement, the Morrisons obtained appraisals of the demised property. An appraisal dated November 1, 1993 valued the property at $ 130,000. A subsequent appraisal of December 8, 1993 valued the property at $ 123,000.

Without obtaining an appraisal, and apparently based upon his own experience and his conversations with owners of nearby parcels, Millard Bahner demanded $ 200,000 for the property. The Morrisons declined to purchase the property for this amount.

In January, 1994, after the expiration of the initial ten-year leasehold, the parties entered into a month to month tenancy. The rent was increased from $ 1,000 per month to $ 1,350 per month and the Morrisons continued to operate their business out of the subject premises until July, 1996, when they filed the instant action seeking specific performance of the purchase option clause.

In a Decision and Judgment Entry filed on September 3, 1997, the trial court found the parties bound by the agreement. The [*6] court found specific performance to be the appropriate remedy and ordered the Bahners to convey the subject property to the Morrisons for $ 128,000, crediting the Morrisons for all rental payments made after the date the instant complaint was filed. This appeal followed.

In their first assignment of error, appellants contend that the trial court erred in ordering specific performance (1) because they did not "absolutely and unconditionally" repudiate the contract and (2) because appellees failed to tender full performance. For the reasons that follow, we disagree.

Specific performance is "the remedy of performance of a contract in the specific form in which it was made, or according to the precise terms agreed upon." Black's Law Dictionary (5th Ed. 1979) 1024. It is an equitable remedy resting in the sound discretion of the trial court.

*Sandusky Properties v. Aveni (1984), 15 Ohio St. 3d 273, 275, 473 N.E.2d 798,* quoting *Spengler v. Sonnenberg (1913), 88 Ohio St. 192, 203, 102 N.E. 737.* Accordingly, our standard of review is whether the trial court abused it's discretion. See Id. The term "abuse of discretion" connotes more than a mere error of judgment. *State v. Adams* [*7] *(1980), 62 Ohio St. 2d 151, 404 N.E.2d 144.* It implies an attitude that is unreasonable, arbitrary or unconscionable. *Steiner v. Custer (1940), 137 Ohio St. 448, 31 N.E.2d 855,* paragraph two of the syllabus.

A party seeking specific performance of a contract must establish that he has a valid, enforceable contract, that he has performed or tendered performance, and that he is ready, willing and able to promptly perform all acts required of him in the specific execution of the contract. 84 Ohio Jurisprudence 3d (1988) 311-312, Specific Performance, Section 34. "When an option *** for the purchase of *** property is consummated by acceptance according to its terms within the time specified, it merges into a contract for the purchase of the property which equity will enforce by specific performance the same as any other contract." *Rossman & Co. v. Donaldson, 1994 Ohio App. LEXIS 5535* (Dec. 6, 1994), Franklin App. Nos. 94APE03-388, 94 APE03-389 and 94APE05-695, unreported, quoting 71 American Jurisprudence 2d (1973) 184, Specific Performance, Section 142. An option for the purchase of real property may be specifically enforced if notice of the exercise of the option is given, the vendor refuses to comply [*8] and the purchase price is tendered. 84 Ohio Jurisprudence 3d (1988) 373-374, Specific Performance, Section 85.

There are exceptions to the general rule, heretofore stated, that a party seeking specific performance must show a tender of performance. "When the other party repudiates and makes it certain that he does not intend under any circumstances to comply, a showing of readiness and ability on the part of the complaining party to then and there perform his part communicated to the other party and accompanied with demand of compliance by such other party, is sufficient compliance without an actual formal tender." *Wiedemann Brewing Co. v. Maxwell (1908), 78 Ohio St. 54, 66-67, 84 N.E. 595.*

In the instant case, the lease-purchase agreement sets forth, quite specifically, the method by which the purchase price of the subject property is to be determined upon exercise of the purchase option:

> "Upon the receiving of Lessee's notice of intent to exercise the option to purchase herein, Lessor shall obtain and Lessee shall obtain thereafter appraisers to appraise the value of the real estate demised. Each of the respective appraisers shall

choose a third appraiser which third [*9] appraiser shall also appraise the value of the demised Premises. Such appraisals shall then be added together and averaged. The purchase price shall be for Lessee % of the ascertained market value based upon the average of the three appraisals."

As expressly found by the trial court, this contractual provision "*** placed an obligation upon [appellants] to have the property appraised." Appellants did not perform this obligation. Instead, they made a demand of $ 200,000 for the property, based upon Millard Bahner's (and/or, perhaps Roger Bahner's) own determination of the property's value. At trial, Millard Bahner testified, in pertinent part, as follows:

> "Q. Did you tell them the price that you would sell the property for?
>
> A. Yes, $ 200,000.00.
>
> Q. I believe that you said in your deposition that you were told about their appraisals?
>
> A. I was told about them, yes, I was told about them. I didn't see them.
>
> Q. But you knew about them?
>
> A. Oh, yes.
>
> Q. And you said you wouldn't sell the property for less than $ 200,000.00?
>
> A. Right.
>
> Q. And that $ 200,000.00 was the only figure you would talk about?
>
> A. Yes.
>
> ***
>
> Q. And it [*10] didn't matter what the appraisal was, you were going to sell it for $ 200,000.00; right?
>
> A. Right, that's what I asked for it."

Bahner's testimony amply supports a conclusion that his $ 200,000 demand was an absolute, unconditional, take-it-or-leave-it demand and that he had no intention whatsoever of complying with the terms of the option contract. n2 We find no abuse of discretion in the trial

court's implicit conclusion that appellants repudiated the parties' contract.

> n2 We note that in arguing the applicability of the doctrine of laches under their second assignment of error, appellants assert that "the testimony clearly shows that Millard Bahner offered the property for sale for $ 200,000.00, and that no negotiations over the purchase price took place. Millard was clear that he would not sell for less than $ 200,000.00" (Emphasis added.)

Appellants argue that appellees failed to tender full performance in that they did not offer any amount of money to purchase the property prior to filing [*11] suit. We cannot agree.

The agreement granted the Morrisons the option to purchase the subject property for an amount to be ascertained in accordance with the terms of the agreement. n3 They were thus freed, by the terms of the agreement, from having to negotiate a price with appellants. This was the very essence of the contract. They were not obligated to offer appellants a sum of money to counter appellants' $ 200,000 demand and their failure to do so does not constitute failure of performance under the contract.

> n3 We recognize that the contract appears to be missing a rather essential term - i.e., the contract provides that the purchase price shall be % of the ascertained market value based upon the average of the three appraisals. (The blank is not completed on the contract.) However, neither party raises this issue on appeal and testimony was presented at trial regarding this omission which supports the trial court's calculation of the purchase price.

The Morrisons fully performed their obligations [*12] under the terms of the contract so far as was practicable to do so. They notified appellants that they wished to exercise the purchase option (albeit orally; see Assignment of error 5, infra) and they had the property appraised. They could not tender purchase money "thirty (30); days prior to the ending of the full term [of the lease]" as required under the agreement, see supra, due to appellants' failure to have the property appraised. The purchase price was unascertained.

In any event, Millard Bahner's testimony amply supports a conclusion that tender of purchase money in any amount less than his $ 200,000 demand (or even a counter offer for a lesser figure) would have been a futile act. Thus, the absence of such tender (if required under the facts herein) is excused. See *Wiedemann Brewing Co. v. Maxwell, supra.;* See, also, 84 Ohio Jurisprudence 3d (1988) 319, Specific Performance, Section 41 ("If the other party repudiates the contract and makes it certain that he does not intend under any circumstances to comply therewith, or if he absolutely and unconditionally refuses to proceed with the contract, the law excuses the absence of tender on the part of the other [*13] party, as equity does not require idle acts. An actual tender of the purchase price by the vendee in a real property contract is not necessary where from the acts of the seller, or from the situation of the property, it would be wholly nugatory and meaningless.").

Appellants' first assignment of error is without merit. Accordingly, it is overruled.

In their second assignment of error, appellants argue that the trial court abused its discretion in awarding specific performance because appellee's claim is barred by the doctrine of laches. For the reasons that follow, we disagree.

Laches is "an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party." *Connin v. Bailey (1984), 15 Ohio St. 3d 34, 35, 472 N.E.2d 328,* quoting *Smith v. Smith (1957), 107 Ohio App. 440, 443-444, 146 N.E.2d 454.* The elements of laches are (1) conduct on the part of the defendant giving rise to the situation of which complaint is made and for which the complainant seeks a remedy; (2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of defendant's conduct and having been afforded an opportunity [*14] to institute a suit; (3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the complainant. *Stevens v. Natl. City Bank (1989), 45 Ohio St. 3d 276, 285, 544 N.E.2d 612,* citing *Smith v. Smith (1950), 168 Ohio St. 447, 455, 156 N.E.2d 113.* The defendant must show prejudice. The prejudice must be material, *Wright v. Oliver (1988), 35 Ohio St. 3d 10, 11, 517 N.E.2d 883,* and it may not be inferred from a mere lapse of time. *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn. (1994), 71 Ohio St. 3d 26, 35, 641 N.E.2d 188.*

Appellants assert that specific performance of the contract would materially prejudice them inasmuch as the subject property has increased, substantially, in value during the period of appellee's delay in bringing suit. However, absent circumstances evincing speculation on the part of appellee, an increase in the property's value, without any change of position on the part of the appel-

Page 5

1998 Ohio App. LEXIS 3453, *

lants, will not bar specific performance. See 66 Ohio Jurisprudence 3d (1986) 425-426, Limitations and Laches, [*15] Section 224.

Appellants made no improvements to the subject property during the period in question. They attribute the property's purported increase in value to development, by themselves and others, of adjacent parcels. While such development might, under appropriate circumstances, render specific performance materially prejudicial to a vendor, such circumstances are not present in the cause sub judice.

Roger Bahner testified that in 1993 he was in the process of purchasing and developing parcels adjacent to the subject property. Bahner testified, quite specifically, that he was aware at that time that the Morrisons had the option to buy the subject property from his father, Millard Bahner, and therefore, his plans for development of the adjacent parcels did not involve or incorporate the subject property. Although Bahner testified that his plans for development later came to involve the subject property, the meager evidence in the record regarding the development of the adjacent parcels is most consistent with Bahner's earlier testimony that the development did not involve the subject property. n4

n4 According to the record, appellants constructed a video store on one parcel and "additional buildings" on another parcel at the request of a tenant who needed additional space (for what purpose, the record does not disclose).

[*16]

Any increase in value of the subject property is properly characterized, vis-a-vis appellants, as passive appreciation. Appellants did not contribute, invest or expend sums toward improvement of the subject property in reliance upon the Morrisons' inaction. Nor did they develop the parcels adjacent to the subject property in reliance upon the Morrisons' inaction. These instances of development were independent business ventures, undertaken with full knowledge that the subject property was subject to the Morrisons' purchase option. Any increase in the subject property's value by virtue of this nearby, unrelated development was purely incidental.

Appellants imply in their brief that the Morrisons engaged in speculation, arguing that they "sat by idly, waiting to see whether it was going to be a profitable or a losing bargain. *** If the property value had gone down *** this suit would not have been filed." This assertion is meritless.

The Morrisons have been involved in Bahner's Auto Parts for more than two decades, first as employees, then

as owners. They have operated from the subject property, as business owners, since 1984, n5 and there is no indication in the record that their [*17] use of the subject property will change in the foreseeable future. Dave Morrison testified that he considers the subject property "an integral part *** of the business" and the evidence indicates overwhelmingly that the Morrisons have always intended to purchase the property as part of their ongoing, long-term business concern. While an increase in the value of the land would certainly be beneficial to the Morrisons, we simply cannot conclude, from the record before us, that they engaged in delay so that they could unfairly speculate as to the property's value.

n5 The record indicates that Bahner's Auto Parts operated from this location for a number of years before the Morrison brothers entered into the agreement to purchase the business and the agreement to lease/purchase the property in 1984. (Roger Bahner testified that he built the building for his father in 1978.)

Appellants bore the burden of showing that they were materially prejudiced by appellees' delay in asserting their rights. See Connin v. Bailey [*18] 15 Ohio St. 3d at 36, fn. 1. They did not meet this burden. They failed to establish that they changed position in reliance upon the Morrisons' inaction or that the Morrisons' delayed asserting their rights so that they could unfairly engage in speculation. Appellants have demonstrated no material prejudice. They cannot invoke the equitable defense of laches.

Accordingly, the trial court did not abuse its discretion in failing to find appellees' claim barred by laches. Appellants' second assignment of error is overruled.

In their third assignment of error, appellants assert that the trial court erred in awarding specific performance because the doctrine of waiver barred the Morrisons' claim. We find no abuse of discretion in the trial court's implicit conclusion that the Morrisons did not waive their right to exercise the purchase option and, consequently, we overrule appellants' third assignment of error.

Waiver is "an intentional relinquishment, either expressly or constructively, of a known right." Russell v. Fourth Nat. Bank (1921), 102 Ohio St. 248, 269, 131 N.E. 726. "It may be made by express words or by conduct which renders impossible a performance by the other party, [*19] or which seems to dispense with complete performance at a time when the obligor might fully perform. Mere silence will not amount to waiver where one is not bound to speak." White Co. v. Canton

*Transp. Co. (1936), 131 Ohio St. 190, 198-199, 2 N.E.2d 501* See, also, *Saydell v. Geppetto's Pizza & Ribs (1994), 100 Ohio App. 3d 111, 122-123, 652 N.E.2d 218.* "It [is] up to the defendant to assume and carry the burden of proving the waiver by the greater weight of the evidence[.] *** In so doing he [is] required to prove a clear, unequivocal, decisive act of the party against whom the waiver [is] asserted, showing such a purpose or acts amounting to an estoppel on the latter's part." *White Co. v. Canton Transp. Co., 131 Ohio St. at 198-199.*

Appellants argue that the Morrisons' waived their right to exercise the purchase option, as evidenced by their (1) notification to appellants that they would not purchase the subject property for $ 200,000, (2) inquiries into purchasing other property, (3) delay in filing suit and (4) failure to make further inquiries into appellants' hiring of an appraiser.

First, it borders on the inane to argue that the Morrisons waived their right [*20] to exercise the purchase option by refusing to agree to appellants' repudiatory $ 200,000 demand. The Morrisons refusal to acquiesce in appellants' breach of the purchase option hardly constitutes a clear, unequivocal and decisive act amounting to a waiver of their right to exercise that option.

Second, A purchase option is, by definition, a unilateral contract, binding one side without binding the other. See *Plikerd v. Mongeluzzo (1992), 73 Ohio App. 3d 115, 123, 596 N.E.2d 601,* citing 17 Ohio Jurisprudence 3d (1980) 453-455, Contracts, Section 22. The option prevents the party granting the option from disposing of the subject property until its expiration. Id. The party who is granted the option may, however, exercise the option according to its terms, or allow it to lapse. Id. Thus, a party who is granted a purchase option is not bound to the optioned property. He may freely consider other properties during the period of the option without prejudice to, or waiver of, his or her right to exercise the option. The Morrisons inquiries into other properties have no bearing on the instant purchase option and do not amount to a waiver of their right to exercise the option. [*21]

Third, the Morrisons delay in filing suit could not possibly operate as a waiver of their right to exercise the purchase option for the simple reason that the delay did not become manifest until long after the expiration of the period for exercising the option. Moreover, failure to assert a right does not, in and of itself, constitute an intentional relinquishment of that right. Although, failure to assert a right, when circumstances require its prompt attention may be evidence of the intent to relinquish the right. 66 Ohio Jurisprudence 3d (1986) 420, Limitations and Laches, Section 221. An abundance of evidence was adduced at trial to show that the Morrisons never intended to relinquish the right to exercise the purchase option. Accordingly, their delay in filing suit did not constitute a clear, unequivocal and decisive act amounting to a waiver of the right to exercise the option.

Fourth and finally, regarding the Morrisons failure to make further inquiries into appellants' hiring of an appraiser, we note that the contract's appraisal clause was self executing. See supra. ("Upon the receiving of Lessee's notice of intent to exercise the option to purchase herein, Lessor shall [*22] obtain *** [an] appraiser[] to appraise the value of the real estate demised.") The Morrisons were not bound by the agreement to demand that appellants obtain an appraisal. (It does appear from the record that they mentioned to appellants the fact that they were to get an appraisal.) "Mere silence will not amount to waiver where one is not bound to speak." *List & Son Co. v. Chase (1909), 80 Ohio St. 42, 49, 88 N.E. 120.* The Morrisons' were not bound to demand that appellants obtain an appraisal and their failure to do so does not constitute a clear, unequivocal and decisive act amounting to a waiver of their right to exercise the purchase option.

We find no waiver of the Morrisons right to exercise the purchase option. Appellants' third assignment of error is overruled.

In their fourth assignment of error, appellants assert that the trial court abused its discretion in ordering specific performance of the contract because the purchase option was extinguished through a novation. For the reasons that follow, we disagree.

First, it has been held that novation is an affirmative defense. See *Todd v. Berk, 1992 Ohio App. LEXIS 5503* (Oct. 30, 1992), Lake App. No. 91-L-067, unreported; The Continent [*23] JV326128 v. Metsker (Sept. 22, 1988), Franklin App. No. 88AP-388, unreported; *Braverman v. Spriggs, 1979 Ohio App. LEXIS 11751* (June 26, 1979), Franklin App. No. 78AP-681, unreported. Under *Civ.R. 8(C)*, an affirmative defense must be pleaded or it is waived. *Hoover v. Sumlin (1984), 12 Ohio St. 3d 1, 465 N.E.2d 377.* Appellants failed to plead novation and they have, therefore, waived this defense.

Second, even if appellants had raised the affirmative defense of novation, they would not prevail. "[A] novation, as understood in modern law *** is a mutual agreement among all parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another ***." *Boblitt v. Briggs, 1997 Ohio App. LEXIS 6089* (Nov. 21, 1997), Clark App. No. 97-CA-0006, unreported, citing 18 Ohio Jurisprudence 3d (1980) 204-205, Contracts, Section 283. Novation is based upon the theory that a new contract has been made, in which there has been a complete meeting of the minds. *State ex rel. Bettman v.*

*Court of Common Pleas of Franklin County (1931), 124 Ohio St. 269, 283-284, 178 N.E. 258.* Thus, for a novation to be effective, all parties must agree to the new or changed terms [*24] pursuant to which the substitution is made. See *Bolling v. Clevepak Corp. (1984), 20 Ohio App. 3d 113, 125, 484 N.E.2d 1367.* Intent, knowledge and consent are essential elements in determining whether a novation has occurred. Id. Knowledge of, and consent to, the terms of a novation may be implied from circumstances or conduct. *Union Central Life Ins. Co. v. Hoyer (1992), 66 Ohio St. 344, 64 N.E. 435,* paragraph two of the syllabus. The evidence of such knowledge and consent must, however, be clear and definite, because a novation is never presumed. *Bolling v. Clevepak Corp., 20 Ohio App. 3d at 125,* citing *Grant-Holub Co. v. Goodman (1926), 23 Ohio App. 540, 156 N.E. 151.*

Appellants argue that the original ten year lease/purchase agreement was displaced by a subsequent oral lease which extinguished the purchase option. It is evident from the record that the original lease/purchase agreement was not displaced by the subsequent lease - no "discharge of a valid existing obligation by the substitution of a new valid obligation" occurred herein. The parties simply entered into an oral month to month tenancy following the expiration of (and appellants breach of) the original [*25] lease/purchase agreement. This does not constitute a novation.

Even if the parties' oral lease could somehow fairly be considered to have displaced the prior lease/purchase agreement, appellants have failed to point to clear, definite evidence that there was a meeting of the minds regarding the purchase option. It is undisputed that the terms of the oral lease were relayed from Millard Bahner to the Morrisons by Roger Bahner. And, Roger Bahner testified quite specifically that he did not negotiate with the Morrisons regarding their right to purchase the property because he "had no authority to do anything like that," "it wasn't within [his] scope" and he was "just merely a messenger." There is no indication in the record that the subject of the purchase option was ever addressed in conjunction with the subsequent oral lease. There was no meeting of the minds. A novation did not occur.

Appellants have failed to establish that the Morrisons right to exercise the purchase option was extinguished through a novation. Accordingly, appellants' fourth assignment of error is overruled.

In their fifth and final assignment of error, appellants argue that the trial court abused its discretion [*26] in failing to apply the statute of frauds to bar the Morrisons' claim. Appellants assert that the Morrisons' failure to give written notice of their intention to exercise the

purchase option violated the statute of frauds. n6 We disagree.

> n6 The purchase option clause of the lease/purchase agreement provides that the option "shall be exercisable upon written notice by Lessee to Lessor one hundred eighty (180) days prior to the end of the full ten (10) year term of this Lease ***." (Emphasis added.) Appellees asserted below, and the trial court found, that appellants expressly, orally, waived the requirement that notice be in writing. Substantial, competent, credible evidence supports this finding.

The Statute of Frauds was designed to prevent enforcement of unfounded fraudulent claims by requiring certain contracts to be evidenced in writing. *Jones v. Bonzo, 1991 Ohio App. LEXIS 5228* (Oct. 30, 1991), Lawrence App. No. 1977, unreported, citing 3 Williston on Contracts (3 Ed. 1960) 340-341, Section 448. In Ohio, the Statute of [*27] Frauds is embodied in R.C. Chapter 1335. *R.C. 1335.04* provides, in pertinent part, as follows:

> "No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it ***."

Regarding the statute of frauds' effect on the acceptance of a purchase option, we note the following language of the Ohio Supreme Court, in *Wiedemann Brewing Co. v. Maxwell, supra:*

> "The fact that the acceptance by plaintiff in the present case was verbal [does not] destroy its right to enforce the contract against the party who signed the option. Our statute of frauds *** denies the right to maintain an action upon any contract for the sale of any interest in lands unless the agreement is in writing signed by the party to be charged, or by some authorized person. This contract is so signed by the party to be charged. The assent of the other party may be shown by parol."

*78 Ohio St. at 64.* (Citations omitted.)

Thus, the Statute of Frauds is not implicated by, and does not operate to bar, oral notice [*28] of the exercise of a purchase option. The Morrisons oral notification of their intent to exercise the purchase option did not violate the Statute of Frauds.

The requirement that the Morrisons' notice be in writing was purely contractual. Appellants could freely waive this contractual requirement. See *Joyce/Dayton Corp. v. C.A. Manchester Tank & Equip. Co., 1996 Ohio App. LEXIS 5435* (Dec. 6, 1996), Montgomery App. No. 15977, unreported. ("The written notice requirement of a lease option is for the benefit of the lessor, not the lessee, and therefore the lessor may waive that requirement if he so chooses.") Competent, credible evidence supports the trial court's factual finding that appellants did so. We accept this finding.

We note that appellants characterize the waiver as an oral agreement modifying a written agreement which was subject to the Statute of Frauds. A subsequent oral agreement modifying an "essential" or "material" term of a written contract required to be in writing by the Statute of Frauds is invalid and unenforceable. *Jones v. Bonzo, supra* citing *Franke v. Blair Realty Co. (1928), 119 Ohio St. 338, 164 N.E. 353* and Shafer v. Nagy (Feb. 16, 1984), Highland App. No. 511, unreported. [*29] Obviously, not every term in a contract is "essential" or "material" for purposes of the Statute of Frauds. n7

n7 For instance, when a deed to real estate has been executed, subsequent oral agreements between vendor and vendee, which do not take away or confer any interest in the land, but only determine the time when the purchase money becomes due, are not affected by the Statute of Frauds. See *Jones v. Bonzo, supra,* citing *Nonamaker v. Amos (1905), 73 Ohio St. 163, 172, 76 N.E. 949* and *Negley v. Jeffers (1875), 28 Ohio St. 90.*

Inasmuch as the statute of frauds does not require that the Morrisons' notice of acceptance of an option be in writing and inasmuch as the purported oral modification does not take away or confer any interest in land, we conclude that the written notice requirement was not an "essential" or "material" term of the contract for the purposes of the Statute of Frauds. The oral modification is valid and enforceable. Accordingly, appellants' fifth and final assignment of error [*30] is overruled.

Having considered the errors assigned and argued in the briefs and finding none of them to be meritorious, it is hereby ordered that the judgment of the trial court be affirmed in its entirety.

JUDGMENT AFFIRMED

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and APPELLEE recover of APPELLANT'S costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the SCIOTO COUNTY COURT OF COMMON PLEAS to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this Entry.

A certified copy of this entry shall constitute the mandate pursuant to *Rule 27 of the Rules of Appellate Procedure.* Exceptions.

Abele, J. and Kline, J.
Concur in Judgment & Opinion:

For the Court

BY: Earl E. Stephenson,

Presiding Judge

**NOTICE To COUNSEL**

**Pursuant to Local Rule No. 12, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**

# Exhibit L

LEXSEE 1989 OHIO APP. LEXIS 1564

**JIMMY KOMES, et al., Plaintiffs-Appellees, v. GARLAND TURNER dba SPRINGBORO HOME IMPROVEMENT, Defendant-Appellant**

**Case No. CA88-09-074**

**Court of Appeals of Ohio, Twelfth Appellate District, Warren County**

*1989 Ohio App. LEXIS 1564*

**May 1, 1989, Decided**

**COUNSEL:** [*1]

Steven M. Runge, Franklin, Ohio, for plaintiffs-appellees

Jeffery E. Richards, Springboro, Ohio, for defendant-appellant

**JUDGES:**

JONES, P.J., HENDRICKSON and YOUNG, JJ., concur.

**OPINION:**

MEMORANDUM DECISION AND JUDGMENT ENTRY

Per Curiam. This cause came on to be heard upon an appeal, transcript of the docket, journal entries and original papers from the Franklin Municipal Court of Warren County, transcript of proceedings, and the brief of appellant, oral argument having been waived.

Now, therefore, the assignments of error having been fully considered are passed upon in conformity with *App. R. 12(A)* as follows:

Defendant-appellant, Garland Turner, dba Springboro Home Improvement, appeals a judgment granted to plaintiffs-appellees, Jimmy and Sandra Komes.

On March 16, 1987, the parties contracted for appellant to make certain repairs to appellees' residence which included, among other things, a promise to "take out bow [in the roof] over garage." Work began shortly thereafter and was completed by the end of March. At least nine months later, appellees contacted appellant and claimed that he had failed to remove the bow from the roof over the garage as required by the contract. When appellant

[*2] refused to meet their request to complete the repairs, appellees filed a complaint for breach of contract in which they sought $ 1,500 in damages.

Following a bench trial in Franklin Municipal Court, the trial judge found in favor of appellees and granted judgment in the amount prayed for in the complaint. Appellant now appeals and submits the following two assignments of error for our consideration:

First Assignment of Error

"The trial court erred in failing to consider defendant-appellant's argument that plaintiffs-appellees waived any breach of contract claims."

Second Assignment of Error

"The trial court erred in assessing damages for $ 1,500.00 when the only estimate presented at trial was for $ 1,080.00."

In his first assignment of error, appellant claims that the trial court erred by failing to consider that appellees waived any breach of contract claim by acquiescing in the roof repairs which they knew were not proceeding according to contract. According to appellant's brief, which is supported by the record, n1 the contractor to whom appellant sub-contracted the job of removing the roof bow informed appellees that he could not remove the entire bow but was only [*3] able to remove approximately eighty-five to ninety percent of the bow. Furthermore, appellees were made aware of this fact before the sub-contractor began placing shingles on the roof. Appellees indicated their satisfaction with the job despite appellant's inability to remove the entire bow.

n1 Appellees failed to file a brief or otherwise make an appearance in this appeal. Under

such circumstances, an appellate court may accept the appellant's statement of the facts and issues as correct if such are supported by the record. *Ford Motor Credit Co. v. Potts (1986), 28 Ohio App. 3d 93; App. R. 18(C)*.

Generally, acceptance of partial performance of a contract may operate as a waiver of strict compliance with the contract. *Allen v. Curles (1856), 6 Ohio St. 505*. Thus, where a party expresses satisfaction with less than full performance, the facts present "* * * a case of waiver of some item of performance of the contract by a party entitled to insist upon or to waive such performance, as he may elect." *Williams v. Fortlage (1910), 17 Ohio C.C. (N.S.) 242, 243*.

The trial court correctly observed that appellant failed to completely remove the bow above **[*4]** the garage. However, appellees accepted less than full performance on this particular item and such acceptance of partial performance constitutes a waiver of appellees' right to demand full performance. Appellant's first assignment of error is well-taken and is hereby sustained.

In his second assignment of error, appellant challenges the amount of damages which the trial court awarded to appellees. Having decided that appellees waived any right to demand strict compliance by accepting appellant's partial performance, we nevertheless note that the court also erred in the amount of damages. Appellees' complaint requested damages of $ 1,500. In its separate findings of fact and conclusions of law, the trial court found that the cost of completing the contract as specified would exceed $ 2,000. Our review of the record reveals absolutely no evidence to support this finding.

Appellees' evidence consisted of a written estimate of $ 1,030 and a building contractor's testimony which established the cost of necessary repairs at $ 1,080. In any event, the evidence would only support a judgment of no more than the latter amount. Given our disposition of the first assignment of error, we also **[*5]** conclude that the trial court erred in awarding damages of $ 1,500.

We find both assignments of error to be well-taken. The judgment in favor of appellees is hereby vacated and judgment is entered in favor of appellant on the complaint.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, reversed and judgment is entered for appellant.

It is further ordered that a mandate be sent to the Franklin Municipal Court of Warren County, for execution upon this judgment.

Costs to be taxed in compliance with *App. R. 24*.

And the court being of the opinion that there were reasonable grounds for this appeal, allows no penalty.

It is further ordered that a certified copy of this Memorandum Decision and Judgment Entry shall constitute the mandate pursuant to *App. R. 27*.

To all of which the appellees, by their counsel, except.

JONES, P.J., HENDRICKSON and YOUNG, JJ., concur.

# Exhibit M

LEXSEE 2005 OHIO APP. LEXIS 2865

**RICHARD E. BAILEY, Plaintiff-Appellant, vs. RANDALL L. POCHEDLY, et al., Defendants-Appellees.**

**CASE NO. 2004-T-0037**

**COURT OF APPEALS OF OHIO, ELEVENTH APPELLATE DISTRICT, TRUMBULL COUNTY**

*2005 Ohio 3087; 2005 Ohio App. LEXIS 2865*

**June 17, 2005, Decided**

**PRIOR HISTORY:** [**1] Civil Appeal from the Trumbull County Court of Common Pleas, Case No. 02 CV 438.

**DISPOSITION:** Affirmed.

**COUNSEL:** Robert F. Burkey, Burkey, Burkey & Scher Co., L.P.A., Warren, OH (For Plaintiff-Appellant).

Richard S. Hlaudy, James E. Gray & Associates, Warren, OH (For Defendants-Appellees).

**JUDGES:** DIANE V. GRENDELL, J. CYNTHIA WESTCOTT RICE, J., concurs, DONALD R. FORD, P.J., concurs in judgment only.

**OPINION BY:** DIANE V. GRENDELL

**OPINION:**

DIANE V. GRENDELL, J.

[*P1] Plaintiff-appellant, Richard E. Bailey ("Bailey"), appeals from the judgment of the Trumbull County Court of Common Pleas, awarding exclusive possession and ownership of the property subject to this dispute to defendants-appellees, Randall ("Randy") and Allen ("Allen") Pochedly n1 (collectively "the Pochedlys"). We affirm the decision of the trial court.

n1 Allen Pochedly died on May 29, 2003, during the pendency of this case. His interest is represented by his estate, with Amber Jayne Pochedly-Wintz, Allen's daughter, as executrix.

[*P2] The following relevant facts [**2] were mutually stipulated to by the parties. Bailey and Dolores

Bailey ("Dolores") were married on August 29, 1960. During the course of the marriage, Bailey and Dolores owned a dairy farming operation located on approximately 98 acres in southern Ashtabula County and on approximately 61 acres in northern Trumbull County. The Trumbull County property, the subject property of this dispute, consisted of two separate parcels located in Gustavus Township. The first parcel ("parcel one"), purchased by Bailey and Dolores in 1974, contained approximately 58 acres of open farmland, with fencing and a variety of outbuildings. The second parcel ("parcel two"), purchased in 1983, contained approximately 2.066 acres with a farmhouse. Bailey and Dolores utilized the subject property for farming, the pasturing of dairy cows, and storage of grain and farm equipment. [*P3]

On August 15, 1991, Bailey and Dolores were granted a divorce. Pursuant to the Final Decree of Divorce, the parties divided their land holdings. Dolores was awarded all right, title, and interest in the Trumbull County property. However, the agreement provided that Bailey would continue to lease parcel one for "general agricultural [**3] purposes" from Dolores or her successors in interest in return for Bailey's payment of real estate taxes on both parcel one and parcel two. The lease was to continue until such time as the property was offered for sale "by Plaintiff, her estate, beneficiaries, heirs or assigns."

[*P4] The decree of divorce further provided Bailey with an option to purchase the parcel one at a price of $ 800 per acre for a period of ten years following the date of the decree. In addition, the decree also provided Bailey with a right of first refusal *at any time* Dolores or her successors in interest offered parcel one for sale at a price less than $ 800 per acre. In the event that Bailey did not exercise either his option or his right of first refusal on parcel one under either of the prescribed conditions, the agricultural lease was to "fully and permanently terminate."

[*P5] The decree also provided Bailey with a right of first refusal on parcel two *at any time and at any price* if this parcel were offered for sale by Dolores or her successors in interest.

[*P6] Dolores died in November 1991, and the Trumbull County property subsequently passed from her estate to her sons, Randy [**4] and Allen, on February 8, 1993, via a certificate of transfer.

[*P7] In 1998, Bailey and the Pochedlys entered into informal discussions related to the purchase of parcel one and parcel two. In a letter to Randy dated March 31, 1998, Bailey, through his attorney, Robert Burkey ("Burkey") expressed a desire to negotiate the purchase of both parcels, but indicated that the parties were far apart in terms of price. The letter further indicated that Bailey was "otherwise *** interested in going forward with the purchase of the land."

[*P8] On December 9, 1998, upon learning that a purchase agreement for parcel two was imminent, Bailey had Burkey send a letter to the Pochedlys, formally exercising Bailey's option to purchase parcel one for $ 800 per acre and reminding the Pochedlys that Bailey had a right of first refusal on parcel two. The letter requested that the Pochedlys contact Burkey to "finalize the terms and conditions of the sale that need to be finalized" and to establish a closing date. The Pochedlys do not dispute that Bailey exercised his option to purchase parcel one in this letter.

[*P9] On March 2, 1999, the Pochedlys' attorney, Michael Hiener ("Hiener") [**5] sent a letter responding to Burkey's two 1998 letters, and indicated that the two parcels of land are not clearly titled, since the legal description in the divorce decree was incomplete. n2 The letter indicated that, as a result of the error, both parcels of land were not transferred to Dolores as provided by the divorce decree. Hiener's letter requested Bailey's and Burkey's cooperation in "clearing the error in the title before we proceed."

---

n2 The 61 total acres which was to be transferred to Dolores in the divorce decree was covered by two separate deeds. The first deed, corresponding to parcel one, described a total area of 61 acres, of which parcel two, the 2.066 acre portion, was listed separately but "contained within said bounds" of parcel one. The second deed covered parcel two. The final decree of divorce, which both parties agree should have included both deeded properties, only listed the legal description for parcel one, which described the 2.066 acres of parcel two as an *exception* to the property transferred. As a result, after the divorce

decree was finalized, the legal effect of the transfer was that Dolores had sole undivided interest in the 58 acres of parcel one, but only an undivided *half-interest* in parcel two, the other half-interest remaining in Bailey. This is Dolores' property interest which transferred to Randy and Allen from her estate as the result of the error on the divorce decree. This error was not discovered until some time prior to March of 1999, when the aforementioned letter was sent.

[**6]

[*P10] On May 18, 1999, Hiener sent a letter to the Pochedlys, recounting a discussion with Burkey about the problems with the transfer of property pursuant to the decree of divorce and indicating that Burkey "seemed amenable to correcting the problem." The letter also reminded the Pochedlys of Bailey's "request to purchase the farm *** and *** in purchasing the house for his right of first refusal" (sic).

[*P11] From June to December of 1999, the record reveals that the parties and their attorneys corresponded numerous times relating to a possible sale of parcel one for $ 800 per acre, and the possible sale of parcel two, including the house for $ 79,900, for a total purchase price of $ 126,300, and also corresponded both formally and informally regarding a request from the Pochedlys to see if Bailey would agree to help clear up the title problem by means of an agreed judgment entry amending the divorce decree.

[*P12] On December 10, 1999, following months of failing to resolve the title issue by means of agreement, the Pochedlys filed a motion to correct the error in the divorce decree which caused the defective title transfer, pursuant to *Civ.R. 60(A)* [**7] . On January 5, 2000, the court granted this motion. On February 2, 2000, an amended certificate of transfer, reflecting the trial court's amended judgment entry was issued.

[*P13] On October 3, 2000, Attorney Mark Van-Rooy ("VanRooy"), who was retained by the Pochedlys to handle matters related to the Trumbull County Property, sent a letter to Bailey informing him that the Pochedlys had conditionally accepted an offer of $ 86,000 for the purchase of parcel two and requested that Bailey make his intentions known with respect to his right of first refusal by October 9, 2000. On November 9, 2000, Burkey responded, requesting clarification of the size and value of parcel two, related to a resurvey which was conducted pursuant to the conditional sales contract on that property. Evidence shows that this resurvey was performed in April of 1998. Burkey reiterated in this letter that Bailey had exercised the option in relation to parcel one, asked if the "cloud on the title" still existed,

and asserted that an offer of $ 90,000 for the purchase of both parcels "remains on the table."

[*P14] VanRooy responded by letter on December 28, 2000, forwarding a copy of the proposed purchase agreement [**8] on parcel two. VanRooy indicated that he was not aware that Bailey had exercised his option on parcel one and requested that Burkey contact him to "make the necessary arrangements to get this deal moving." Burkey responded via letter to VanRooy on January 5, 2001, requesting to see the survey to determine what part of the property is involved in the proposed transfer, and giving conditional approval for the sale of parcel two to the third party. Burkey expressed concern about the survey since access to the outbuildings was now in question and that Bailey intended to maintain his rights to access the property via the shared driveway. The letter also indicated that Bailey had arranged financing and that Burkey would "be notifying [VanRooy] shortly concerning obtaining the deed transferring this interest to Mr. Bailey."

[*P15] On February 21, 2001, VanRooy sent a letter to Randy advising him that there had been no communication since January 5, 2001, regarding the exercise of the option to purchase parcel one. VanRooy advised Randy that he did not consider the option to be formally exercised until the funds were placed in escrow or otherwise made available. VanRooy indicated that [**9] he was "not going to press the issue with them" in light of the continued lack of communication between the parties.

[*P16] On June 7, 2001, Cortland Savings Bank sent a letter to Burkey, indicating that the bank executed a mortgage deed for Bailey and requested a title search and a filing of the mortgage. The letter also indicated that the bank was preparing a check in the amount of $ 47,147.20 for the purchase of parcel two. On June 19, 2001, VanRooy faxed a letter requesting that Burkey prepare quit claim deeds for parcel one, and informing Burkey that Randy did not have the documentation relating to the survey, but giving Burkey the name of a person who might have that information. The letter additionally referenced payments that the Pochedlys had made for property taxes and the title fees, legal expenses and other charges related to the transaction and stated that the Pochedlys were "adamant in their position that they not be assessed any closing costs." In closing, the letter requested that Burkey inform VanRooy when the funds are placed in escrow and the title work completed.

[*P17] On July 5, 2001, Burkey sent a letter to VanRooy with an estimate of costs for the transaction. [**10] The letter noted a slight discrepancy between deed and the 1998 survey, indicating that the placement of the stakes now appeared to give "more of the drive-

way" to parcel two than to parcel one, and that this may be an issue in terms of Bailey's access to parcel one. The letter also indicated that a deed was being submitted for the Pochedlys' signature. On July 25, 2001, Van Rooy sent a letter to Burkey indicating that he did not receive the deed referenced in the July 5 letter. On August 1, 2001, Burkey sent a letter to Van Rooy with the deed, but the description on that deed was not resolved. The letter additionally referenced an estimate for deed preparation and conveyance fees and proposed that the parties split these expenses. On September 10, 2001, VanRooy wrote a letter to Burkey inquiring if Burkey had received any additional information regarding the discrepancy in the legal description, and indicating that the Pochedlys could not sign the deed until this matter was resolved. The letter reiterated the Pochedlys' refusal to contribute toward closing costs and insistence that they be reimbursed for the expenses enumerated in the letter of June 19, 2001.

[*P18] On February 21, 2002, Bailey [**11] filed his complaint against the Pochedlys, alleging that following the exercise of his option to purchase parcel one, the Pochedlys refused to execute a deed of conveyance after Bailey demanded it. Bailey sought specific performance on the contract, or, in the alternative, damages in the amount of $ 100,000.

[*P19] On February 12, 2004, a bench trial was held. At close of trial, the court requested that the parties file a post-trial brief with arguments regarding the testimony heard, and proposed conclusions of law.

[*P20] On March 24, 2004, the court issued its judgment entry. The court concluded that Bailey had validly exercised his option on parcel one, but his conduct of ignoring correspondence from the Pochedlys and failure to cooperate by taking actions in furtherance of closing, including Bailey's failure to tender a purchase price, give notice of escrow of the funds, or set a closing date over a period of three years, operated as a breach of the contract to purchase. The court granted the Pochedlys exclusive possession and ownership of the property.

[*P21] Bailey timely appealed, raising three assignments of error:

[*P22] "[1] The trial court erred to the [**12] prejudice of the appellant in finding and concluding that appellant had breached the contract for sale and purchase of the "property" created by appellant's exercise of the option set forth in the final divorce decree of August 15, 1991.

[*P23] "[2] The trial court erred to the prejudice of appellant and abused its discretion (sic) by failing to award appellant specific performance and damages.

**[*P24]** "[3] The trial court erred to the prejudice of appellant and abused its discretion by relying soley (sic) on Appellees' proposed findings of fact and conclusions of law."

**[*P25]** An action for specific performance is "an equitable remedy resting in the sound discretion of the trial court." *Bahner's Auto Parts v. Bahner* (Jun. 23, 1998), 4th Dist. No. 97CA2538, 1998 Ohio App. LEXIS 3453, at *6 (citations omitted). Therefore, the standard of review to be applied is whether the trial court abused its discretion. Id; *Metal Craft Docks Acquisition, Inc. v. Richlak, 11th Dist. Nos. 2001-G-2351 and 2001-G-2368, 2003 Ohio 191, at P17.*

**[*P26]** An abuse of discretion consists of more than an error of law or judgment. Rather, it implies that the **[**13]** court's attitude is unreasonable, arbitrary, or unconscionable. *Berk v. Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301* (citation omitted). Reversal, under an abuse of discretion standard is not warranted merely because appellate judges disagree with the trial judge or believe the trial judge erred. Id. Reversal is appropriate only if the abuse of discretion renders "the result *** palpably and grossly violative of fact and logic [so] that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." *State v. Jenkins (1984), 15 Ohio St.3d 164, 222, 15 Ohio B. 311, 473 N.E.2d 264* (citation omitted).

**[*P27]** As the first and second assignments of error are related, they will be discussed together in the interests of judicial economy.

**[*P28]** In his first assignment of error, Bailey maintains that the trial court erred as a matter of law by not excusing him from tendering full performance under the contract. Bailey argues that since the Pochedlys were unable to present marketable title to the property when Bailey expressed that he was "ready, willing, and able" to perform within **[**14]** the option period, and since the Pochedlys instructed him not to proceed until the title to the property was cleared, his non-performance should be excused. In his second assignment of error, Bailey argues that the trial court erred by failing to award him specific performance on the option contract for the purchase of parcel one, since Bailey established that he had both a valid enforceable contract, and showed that he was ready, willing and able to perform his obligations under the contract. These arguments are without merit.

**[*P29]** "A party seeking specific performance of a contract must establish that he has a valid, enforceable contract, that he has performed or tendered performance, and that he is ready, willing and able to promptly perform all acts required of him in the specific execution of the contract." *Bahner*, 1998 Ohio App. LEXIS 3453, at *7, citing 84 Ohio Jurisprudence 3d (1988) 311-312, Specific Performance, Section 34.

**[*P30]** The general rule is that an option for the purchase of real estate may be specifically enforced if: 1) notice of the exercise of the option is given; 2) the vendor refuses to comply; and, 3) the purchase price is tendered. **[**15]** *Bahner*, 1998 Ohio App. LEXIS 3453, at *7-*8.

**[*P31]** Here, the parties stipulated that Bailey exercised his option to purchase parcel one, pursuant to the divorce decree, in his letter of December 9, 1998. However, a careful review of the record reveals that Bailey never tendered the purchase price to the Pochedlys, nor did Bailey deny this fact at trial. Relying on *Wiedemann Brewing Co. v. Maxwell (1908), 78 Ohio St. 54, 84 N.E. 595, 5 Ohio L. Rep. 620*, Bailey argues that tender was excused, since it would have been wholly meaningless. Bailey's reliance on *Wiedemann* is inapposite.

**[*P32]** While it is true that the Pochedlys stated via letter to Bailey's attorney that there was a problem with the title, there was no indication that the Pochedlys were unwilling to produce a deed. Over the course of the nine months prior to filing their 60(A) motion, the Pochedlys made several attempts, to no avail, to get Bailey to cooperate in resolving the title problem by filing an agreed judgment entry to the divorce proceeding. These facts are readily distinguishable from the facts in *Wiedemann*, where the plaintiff who held the option attempted to deliver payment and the seller showed **[**16]** absolutely no inclination to honor their end of the agreement. The evidence is uncontroverted that Bailey never attempted to tender payment, despite his insistence that he was "ready, willing, and able" to do so.

**[*P33]** Bailey next argues that the Pocheldys could not grant title as described in the terms of the original option grant, because the survey on parcel two changed the acreage of parcel one slightly from what was contained in the original legal description. Evidence adduced at trial shows that the survey was conducted as a condition to the proposed sale of parcel two. The sale of parcel two was subject to Bailey's right of first refusal, which the evidence shows, was voluntarily waived. Thus, Bailey cannot now rely on a change in condition brought about by his own waiver of rights to excuse his failure to tender performance. "Failure to assert a right, when circumstances require its prompt attention may be evidence of the intent to relinquish the right." *Bahner*, 1998 Ohio App. LEXIS 3453, at *21. Such was the case here. Thus, the trial court did not abuse its discretion in finding that specific performance was not warranted, since Bailey failed to satisfy **[**17]** the third element of the test and there was competent and credible evidence

adduced at trial which showed that there were no conditions warranting an excusal of Bailey's performance.

[*P34] We further note that despite Bailey's assertions that he was ready willing and able to go forward with the transaction prior to August 15, 2001, there remained unresolved issues, including the extent to which each party bear the responsibility for closing and other transaction costs, as well as uncontroverted evidence on the record showing that Bailey stopped paying taxes on parcel one as required by the lease agreement, for which the Pochedlys were demanding reimbursement. In sum, not only has Bailey never tendered payment, but the parties failed to reach agreement on a number of other issues essential to the completion of the sale. Bailey's first assignment of error is without merit.

[*P35] For the aforementioned reasons, the trial court did not abuse its discretion by not ordering specific performance on the contract or damages. Bailey's second assignment of error is likewise without merit.

[*P36] In his third assignment of error, Bailey contends that the trial court erred by relying [**18] solely on the Pochedlys' findings of fact and conclusions of law, and that the court's "verbatim" adoption of these findings was against the manifest weight of the evidence.

[*P37] Manifest weight of the evidence raises a factual issue. *Buck v. Canacci* (Nov. 21, 1997), 11th Dist. No. 96-L-185, 1997 Ohio App. LEXIS 5236, at *4. In reviewing a civil judgment under a manifest weight of the evidence standard, the trier of fact is in the best position to view the witnesses and their demeanor, and the reviewing court indulges every reasonable presumption in favor of the lower court's judgment and findings of fact. *Shemo v. Mayfield Hts.*, 88 Ohio St.3d 7, 10, 2000 Ohio 258, 722 N.E.2d 1018. Thus, "judgments supported by some competent, credible evidence *** shall not be reversed by a reviewing court as against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at syllabus.

[*P38] Bailey does not challenge the trial court's ability to adopt proposed findings of fact and conclusions of law verbatim from one of the parties. However, relying on *Paxton v. McGranahan* (Oct. 31, 1985), 8th Dist. No. 49645, 25 Ohio B. Rep. 352, 1985 Ohio App. LEXIS 9094, [**19] Bailey argues that the trial judge failed in his duty to read the proposed findings thoroughly, and if he had, he would find several inaccuracies in the findings of fact that were submitted.

[*P39] Bailey alleges that the findings of fact and conclusions of law adopted by the trial court were "legally and factually inaccurate" and against the manifest weight of the evidence. We have reviewed the record

thoroughly and find that the alleged inaccuracies are irrelevant to the issue of whether Bailey's failure to tender payment was excused.

[*P40] Bailey first alleges that the trial court's adoption of the finding that the option was exercised in the letter dated March 31, 1998 was inaccurate. He claims that the actual exercise date of the option was December 9, 1998. We agree that the letter of December 9, 1998, unequivocally states Bailey's intent to exercise the option; however, the letter of March 31, 1998, states, in relevant part, "[Bailey] is interested in going forward with the purchase of the land." This was apparently misconstrued by both defense counsel and the trial court as relating to the exercise of the option. Both parties stipulated at trial that Bailey exercised [**20] the option prior to the expiration of the ten-year period. Thus, the actual day the option was exercised is irrelevant, as long as the exercise took place before the expiration of the option period. Since both dates satisfied this requirement, the incorrect date as stated in the judgment entry is irrelevant to the disposition of the case.

[*P41] Bailey next complains that the trial court erred in finding that he ignored a request by Hiener to cooperate in correcting divorce decree. We disagree. In our review of the record, there was competent and credible evidence adduced at trial that Bailey delayed responding to this request. Contrary to Bailey's assertion that the letter sent by his counsel "suggested a possible and simple resolution to correcting the description," the letter instead requested clarification as to the exact nature of the title issue. While Bailey is correct that Hiener stated in a later correspondence that "counsel seemed amenable to correcting the description," it was only after nine months of fruitless correspondence between the parties that the Pochedlys ultimately filed a motion to intervene and a *Civ.R. 60(A)* motion to amend the divorce [**21] decree.

[*P42] Furthermore, the finding that from the time of the exercise of the option in December 1998, through November of 2000, Bailey ignored months of correspondence in furtherance of closing was supported by competent and credible evidence. Bailey maintains that the letter of March 2, 1999, instructed him not to proceed further until the title to the property had cleared. Contrary to this assertion, the letter *asked* that "[Bailey] cooperate in clearing the error in title before we proceed."

[*P43] Bailey further argues that the trial court's adoption of the finding that financing was not approved until June of 2001 was inaccurate, and that instead Bailey provided notice that "he had obtained financing" in January of 2001. This argument misstates the fact. The letter from Burkey, dated January 5, 2001, notifies Van-Rooy, who was the second attorney retained by the

Pochedlys to handle this matter, that financing had been "arranged." Financing was not, in fact, *approved* until June, as evidenced by the letter from Cortland Bank, dated June 7, 2001. Moreover, the date financing was actually obtained was irrelevant, as it is undisputed that Bailey never tendered [**22] the purchase price to the Pochedlys.

[*P44] Finally, Bailey makes arguments relating to the inaccuracy of the trial court's findings concerning taxes paid on the parcels. Since the payment of taxes was merely considered Bailey's rent for the use of the prop-erty, it is irrelevant to any issue related to Bailey's option to purchase.

[*P45] Unlike the facts in *Paxton*, here, the rele-vant findings of the trial court were supported by compe-tent and credible evidence and, therefore, were not against the manifest weight of the evidence. Bailey's third assignment of error is without merit.

[*P46] We affirm the judgment of the Trumbull County Court of Common Pleas.

CYNTHIA WESTCOTT RICE, J., concurs, DON-ALD R. FORD, P.J., concurs in judgment only.

# Exhibit N

LEXSEE 1997 U.S. DIST. LEXIS 16413

**Dana Corporation, Plaintiff, v. Fireman's Fund Insurance Co., et al., Defendants. The Celotex Corporation, Plaintiff, v. Dana Corporation, Defendant.**

**3:83CV1153, 3:85CV7491**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*1997 U.S. Dist. LEXIS 16413*

**February 10, 1997, Filed**

**DISPOSITION:** [*1] Anderson's objections to the jurisdiction of this court overruled.

**COUNSEL:** For DANA CORPORATION, plaintiff (83-CV-1153): Richard S. Walinski, Esq., Cooper, Walinski & Cramer, Toledo, OH.

For FIREMAN'S FUND INSURANCE COMPANY, AMERICAN INSURANCE COMPANY, THE, ASSOC INDEMNITY CORP, defendants (83-CV-1153): Steven Timonere, Doyle, Lewis & Warner, Toledo, OH.

For HARTFORD ACCIDENT AND INDEMNITY CO., defendant (83-CV-1153): Jack Zouhary, Robison, Curphey & O'Connell, Toledo, OH.

For CELOTEX CORPORATION, defendant (83-CV-1153): James F. Nooney, Esq., Eastman & Smith, Toledo, OH.

For FIREMAN'S FUND INSURANCE COMPANY, AMERICAN INSURANCE COMPANY, THE, ASSOC INDEMNITY CORP, CELOTEX CORPORATION, counter-claimants (83-CV-1153): James F. Nooney, Esq., Eastman & Smith, Toledo, OH.

For AMERICAN INSURANCE COMPANY, THE, ASSOC INDEMNITY CORP, counter-claimants (83-CV-1153): Steven Timonere, Doyle, Lewis & Warner, Toledo, OH.

For DANA CORPORATION, counter-defendant (83-CV-1153): James F. Nooney, Esq., Eastman & Smith, Richard S. Walinski, Esq., Cooper, Walinski & Cramer, Toledo, OH.

For FIREMAN'S FUND INSURANCE COMPANY, AMERICAN INSURANCE COMPANY, THE, ASSOC INDEMNITY CORP, [*2] cross-claimants (83-CV-1153): James F. Nooney, Esq., Eastman & Smith, Steven Timonere, Doyle, Lewis & Warner, Toledo, OH.

For HARTFORD ACCIDENT AND INDEMNITY CO., CELOTEX CORPORATION, cross-defendants (83-CV-1153): James F. Nooney, Esq., Eastman & Smith, Toledo, OH.

**JUDGES:** James G. Carr, United States District Judge.

**OPINION BY:** James G. Carr

**OPINION:**

Order

Pending in this cause is a motion by Dana Corporation (Dana) for an order finding that Anderson Memorial Hospital, of Anderson, South Carolina (Anderson), has violated an injunction which prohibits the Celotex Corporation (Celotex) and sundry of its agents "from instituting, directly or indirectly, new actions or claims in any courts" other than this Court, "which claims are based upon a claimed right of indemnity from Dana related to the product liabilities of Smith & Kanzler Company." Proceedings have been held with regard to Dana's motion during the past twelve months; most recently, argument was heard on February 6, 1997, on supplemental briefs filed by the parties pursuant to an order (entered December 27, 1996) requesting such briefs.

Contrary to the expectation of the parties and the undersigned, the issues raised by Dana's [*3] show cause motion have yet to become decisional, as I have again ordered further supplemental briefing, to be concluded in accordance with the schedule set herein, on the issue of whether certain acts by Anderson during judicial proceedings against Dana in a South Carolina state court constituted "instituting" a "claim" against Dana for in-

demnification under the Smith & Kanzler indemnity agreement.

Because my final decision on Dana's show cause order is, at best, still some weeks away, I have been asked to prepare and file a partial opinion on two predicate issues: namely, 1) whether I have jurisdiction in this district and these show cause proceedings over Anderson, which has no other contacts with this jurisdiction and whose alleged contumacious conduct occurred outside this district; and, 2) whether Anderson, as an assignee from Celotex of the Smith & Kanzler indemnity agreement, can take such assignment from Celotex (the party against whom the injunction issued) free and clear of any restrictions imposed on Celotex by the injunction which Anderson is alleged to have violated.

Although I have addressed both issues, at least in passing, during earlier stages of this proceeding, [*4] I deem Anderson's objections to my jurisdiction to be continuing. I likewise deem Anderson to be seeking dismissal on the basis that it is not bound by any limitations in the injunction that issued against Celotex, and prevented Celotex from instituting a claim or action for indemnity against Dana in any court other than this court.

For the reasons that follow, Anderson's objections to this court's jurisdiction over it are overruled. I likewise hold that whatever rights Anderson obtained from Celotex by way of assignment were encumbered by the restrictions on the exercise of those rights resulting from the injunction issued against Celotex. The injunction runs with the indemnity and any assignment thereof, so that an assignee, such as Anderson, must obey the injunction or seek leave in this court to have it altered, amended, modified, or vacated.

1. Jurisdiction Over Anderson

Anderson contends, and has contended since service of the order to show cause, that this court is without jurisdiction over it and its alleged contumacious conduct. I disagree.

As the Fifth Circuit stated in *Waffenschmidt v. MacKay, 763 F.2d 711, 714 (5th Cir. 1985):*

> Nonparties who reside outside [*5] the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order. This is so despite the absence of other contacts with the forum.

Accord, *United States v. Barnette, 902 F. Supp. 1522, 1532 (M.D. Fla. 1995).*

The court's rationale in *Waffenschmidt* is not accompanied by further explanation; and its holding is unadorned by citation to other authority. The court in Barnette simply repeats the first sentence of the above-quoted statement from Waffenschmidt.

The brevity of the holding in Waffenschmidt is not a basis for disregarding its weight or discounting its soundness. Any other ruling would impair substantially the power of a court to enforce its own orders, regardless of the circumstances leading to a violation of those orders. Whenever an enjoined party wanted to evade the injunction, he, she, or it could simply prevail on someone outside the issuing court's jurisdiction to do the enjoined party's forbidden deeds. If the proclamation by Waffenschmidt were not sound, any court issuing an injunction would be powerless to [*6] enforce its orders. A court powerless to enforce its orders is a court without power.

The ruling in Waffenschmidt represents not a expansion of this court's jurisdiction but a preservation of its jurisdiction. Anderson had notice of the injunction: if it acted alone or in concert with Celotex to violate the injunction, it can be held answerable to this court, whose injunction it is alleged to have violated.

In addition to diminishing the power of this court to enforce its orders (and the utility and integrity of those orders), a different ruling would allow other courts to interpret the orders of this court. Were putative contempts to occur multiply in diverse jurisdictions, the result would be the kind of forum shopping and risk of inconsistent decisions that the injunction in this case seeks to prevent with regard to the merits of the underlying dispute.

More importantly, those other courts would be called on to sit in judgment for purposes of reviewing the orders of a court of coequal and equivalent jurisdiction. One district court has no such jurisdiction over another district court. As pointed out by the Sixth Circuit in *Graves v. Sneed, 541 F.2d 159, 161 (6th Cir.* [*7] *1976),* "United States district courts are not courts of general jurisdiction [and they] have no jurisdiction except as prescribed by Congress pursuant to Article III." I am unaware of any jurisdictional grant by Congress that authorizes one district court to sit in review of judgments by another district court.

Finally, and most importantly, if this court cannot exercise jurisdiction over Anderson and its alleged contempt, the way is laid open, if Dana has to go elsewhere to preserve and enforce its rights under the injunction, to collateral attack on the injunction by Anderson or any other interested party. As the Supreme Court made clear in Celotex Corp. v. Edwards, U.S. , *514 U.S. 300, 115 S. Ct. 1493, 1501, 131 L. Ed. 2d 403 (1995),* "'It is for the court of first instance to determine the question of the

validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected.'" (quoting *Walker v. Birmingham, 388 U.S. 307, 314, 18 L. Ed. 2d 1210, 87 S. Ct. 1824 (1967)* (quoting *Howat v. Kansas, 258 U.S. 181, 189-90, 66 L. Ed. 550, 42 S. Ct. 277 (1922))*. **[*8]** n1 As a result of this doctrine, Anderson is not only amenable to this court's jurisdiction for any contempt, it is also compelled, if it has any dispute about the meaning, scope, or consequences of the injunction, to bring those disputes here, and not seek to have them adjudicated elsewhere.

n1 Jeffrey Warren, Esq., counsel for Celotex attended the February 6, 1997, argument as a non-participating observer. During the course of that hearing, I called on him to provide some general information about the status of the bankruptcy proceeding and objections thereto. During the course of responding to my inquiries, Mr. Warren noted that he had argued Celotex v. Edwards in the Supreme Court, and that, speaking solely personally, and not as counsel for Celotex (which has not been and is not a party to the instant proceedings before me), he shared my understanding of the Court's decision in that case: i.e., that no court has jurisdiction to entertain a collateral attack on an injunction issued by another court.

**[*9]**

On reflection, there should be little surprise that the holding of Waffenschmidt, despite its ex cathedra appearance and tone, encapsulates a jurisprudential doctrine that is as sound as its recitation is brief. In the typical situation, the enjoined party and putative contemnors either are already within the court's territorial jurisdiction or violate the court's order within its jurisdiction. Only on rare occasion, apparently, has a party been called to explain a "long distance" contempt, as in this case. The uniqueness of the situation is no reason to disregard Waffenschmidt or doubt its soundness. The doctrine espoused in that case is universal, even if the circumstances are unique.

This court's power to enforce its orders does not expire at the borders of the Northern District of Ohio. That power and the jurisdiction necessary to exercise that power extend beyond those territorial limits, and reach as far as necessary to uphold this court's orders. I conclude, accordingly, that Anderson's objections to this court's jurisdiction have no merit. My refusal to dismiss this proceeding on that basis shall be confirmed through this order.

### 2. As Assignee, Anderson Took **[*10]** Subject to the Injunction

Celotex has contended in this litigation and elsewhere that, as a result of the Smith & Kanzler indemnity, Dana is obligated to indemnify Celotex for damages incurred by Celotex as a result of Smith & Kanzler's asbestos business. As a result of the injunction that issued in this case, Celotex' right to secure judicial enforcement of its rights under the indemnity is restricted: Celotex can institute a new claim or action based on the indemnity provision only in this court. As noted in the foregoing discussion, only this court has jurisdiction to alter, amend, modify, or vacate its injunctions. In light of Celotex v. Edwards, supra, no other court has that power (except the Sixth Circuit or Supreme Court). If no court has that power, then no private party (even if that private party purports to act with judicial approval) has the power to undo the effect and effectiveness of this court's orders.

I conclude, accordingly, that when Anderson took the assignment of rights from Celotex, it subjected itself to the restriction on those rights imposed by the injunction. Celotex could give no more than it had, and Anderson, as an assignee, could take no more **[*11]** than Celotex could give. As is often expressed, "the assignee 'stands in the shoes' of the assignor: 'It is well established that an assignee stands in the shoes of the assignor, and that by assignment the assignee could acquire no greater rights than its assignor. . .'" 3 Williston on Contracts 182-83 (3d ed. 1960) (citations omitted). This is a universally acknowledged doctrine of long-standing, see, e.g., *Spain v. Hamilton's Adm'r, 68 U.S. 604, 624, 17 L. Ed. 619 (1863)* ("assignee . . . is subject to all the equities between the assignor and his debtor") and enduring vitality. See, e.g., *Allstate Ins. Co. v. Administratia Asigurarilor De Stat, 875 F. Supp. 1022, 1026 (S.D.N.Y. 1995)* ("an assignee never stands in any better position than his assignor").

An assignee is in privity with his, her, or its assignor. See, e.g., *Rhode Island Hospital Trust Co. v. Ohio Casualty Ins. Co., 789 F.2d 74, 82 (1st Cir. 1986).* As stated expressly by the Supreme Court in *Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 14, 65 S. Ct. 478, 89 L. Ed. 661 (1945)*, an injunction issued under *Fed. R. Civ. P. 65(d)* enjoins not only the named party, but others, including those acting in privity with the named party. The **[*12]** powers of Rule 65(d), the Court stated in Regal Knitwear, are "derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." See also *Golden State Bottling Co. v. N.L.R.B., 414 U.S. 168, 179-83, 38 L. Ed. 2d 388, 94 S.*

*Ct. 414 (1973)* (party in privity to enjoined party is as bound by an injunction as is the named party).

In view of the black letter doctrines as stated in Williston's treatise and these cases, an assignment is not an alchemist's instrument for changing lead in the hands of the assignor into gold in the pocket of the assignee. Because an assignee can take no more than the assignor can give, and parties in privity are equally restrained by an injunction, there can be no doubt, in my view, that Anderson was limited, as was Celotex, in its choice of forum when instituting a claim under the Smith & Kanzler indemnity contract.

Conclusion

For the foregoing reasons, I conclude that I have jurisdiction over Anderson, and can properly call on it to show cause why it should not be held in contempt. I conclude, [*13] as well, that Anderson, in privity to Celotex by virtue of its status as an assignee of the subject matter of this litigation, took its assignment subject to the full force and effect of the restriction requiring Celotex to institute any new action or claim for relief in this court--and nowhere else.

It is, therefore,

**ORDERED THAT** Anderson's objections to the jurisdiction of this court be, and the same hereby are overruled; and it is

**FURTHER ORDERED THAT** the further supplemental briefing on the issue of whether Anderson instituted a new claim or action in the courts of South Carolina on or after January 10, 1996, is to be submitted by Dana on or before February 17, 1997; Anderson's response to be filed on or before February 27, 1997; Dana's reply to be filed on or before February 28, 1997.

So ordered.

**James G. Carr**

**United States District Judge**