**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| _____ ) | |
| 216 JAMAICA AVENUE, LLC,                ) | Civil Action No. 06-1288 |
| ) | |
| Plaintiff,                ) | (Judge Boyko) |
| ) | |
| v.                ) | |
| ) | |
| S & R PLAYHOUSE REALTY CO.,                ) | |
| ) | |
| Defendant.                ) | |
| _____ ) | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF PLAINTIFF
216 JAMAICA AVENUE LLC FOR SUMMARY JUDGMENT**

James B. Niehaus (0020128)
jniehaus@frantzward.com
Christopher G. Keim (0067117)
ckeim@frantzward.com
FRANTZ WARD LLP
2500 Key Center
127 Public Square
Cleveland, Ohio 44114-1230
216-515-1660
216-515-1650 (fax)

Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
David Lehn
dlehn@cooperkirk.com
COOPER & KIRK, PLLC
555 Eleventh Street NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

November 27, 2006

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

I.   Plaintiff's Claim Is Not Barred by Merger by Deed or Estoppel by Deed. ......................... 2

II.  The Lease Sets the Rent Amount at 1,693 Ounces of Pure Gold per Year. ........................ 5

III. The Gold Clause Is Valid and Enforceable Against S&R. ................................................ 11

IV.  Plaintiff's Claim Is Not Barred by Waiver. ...................................................................... 15

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                  **Page**

*Bronson v. Rodes*, 74 U.S. 229 (1868)........................................................................5, 10

*Butler v. Horwitz*, 74 U.S. 258 (1869) ......................................................................5, 7

*Davis v. DiFilippo*, No. 95-0046, 1996 Ohio App. LEXIS 1141 (Ohio Ct. App. Mar. 27, 1996) ..3

*Dewing v. Sears*, 78 U.S. 379 (1871)...........................................................................5

*Equitable Life Assurance Soc'y v. Freda*, 32 Ohio N.P. (n.s.) 65 (Ohio Ct. C.P. 1934)...1, 5, 6, 11

*Equitable Life Assurance Soc'y v. Grosvenor*, 426 F. Supp. 67 (W.D. Tenn. 1976), *aff'd*, 582 F.2d 1279 (6th Cir. 1978) ..........................................................................5, 11

*Emery Bird Thayer Dry Goods Co. v. Williams*, 107 F.2d 965 (8th Cir. 1939) ............................5

*Endersby v. Schneppe*, 596 N.E.2d 1081 (Ohio Ct. App. 1991)...................................................4

*Fay Corp. v. BAT Holdings I, Inc.*, 682 F. Supp. 1116 (W.D. Wash. 1988), *aff'd*, 896 F.2d 1227 (9th Cir. 1990) ....................................................................5, 11

*Fay Corp. v. BAT Holdings I, Inc.*, 646 F. Supp. 946 (W.D. Wash. 1986) ................................5, 8

*Fuller v. Drenberg*, 209 N.E.2d 417 (Ohio 1965) ..........................................................4

*Grand Ave. Partners, L.P. v. Goodan*, 25 F. Supp. 2d 1064 (C.D. Cal. 1996), *aff'd*, 160 F.3d 580 (9th Cir. 1998) ....................................................................5, 13

*Gregory v. Morris*, 96 U.S. 619 (1878) ......................................................................5

*Guaranty Trust Co. v. Henwood*, 307 U.S. 247 (1939) ..............................................5, 8, 10

*Holyoke Water Power Co. v. American Writing Paper Co.*, 300 U.S. 324 (1937)..........1, 5, 6, 8, 9

*In re Missouri P. R. Co.*, 7 F. Supp. 1 (E.D. Mo. 1934) ..................................................5

*Nebel, Inc. v. Mid-City Nat'l Bank of Chicago*, 769 N.E.2d 45 (Ill. App. Ct. 2002)................5, 14

*Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240 (1935) ........................................5, 8, 10, 11

*Nortz v. United States*, 294 U.S. 317 (1935)...............................................................5, 10

*Perry v. United States*, 294 U.S. 330 (1935) ...........................................................5, 9, 10

*Trebilcock v. Wilson*, 79 U.S. 687 (1872)....................................................................5

*Trostel v. American Life & Cas. Ins. Co.*, 168 F.3d 1105 (8th Cir. 1999) .......................5, 7, 8, 10

*Trostel v. American Life & Cas. Ins. Co.*, 92 F.3d 736 (8th Cir. 1996).............................5, 13

*Wells Fargo Bank, N.A. v. Bank of Am.*, 38 Cal. Rptr. 2d 521 (Cal. Ct. App. 1995) ...............5, 11

*Zilka v. Central South Ltd.*, No. 99-7482, 2000 Ohio App. LEXIS 3217 (Ohio Ct. App. July 19, 2000) ....................................................................................................3

**Statutes**

31 U.S.C. § 5118(d)(2) .....................................................................................................13

**Other Materials**

Kenneth W. Dam, *From the* Gold Clause Cases *to the Gold Commission: A Half Century of American Monetary Law*, 50 U. CHI. L. REV. 504 (1983) .....................................................8

Lawrence H. Officer, "The Price of Gold, 1257-2005," at http://www.measuringworth.com/gold/ ...................................................................................2

Inflation Calculator, U.S. Dep't of Labor, Bureau of Labor Statistics, http://data.bls.gov/ cgi-bin/cpicalc.pl...................................................................................................................8

Kitco, Historical Gold Chart, at http://www.kitco.com/charts/historicalgold.html. ........................8

## INTRODUCTION

For well over a century, the United States Supreme Court and courts throughout the nation have acknowledged uniformly that gold clauses protect against currency fluctuations, require conversion of the face amount of rent to an amount of gold using the value of gold at the time the contract was formed, and hold that amount of gold constant for the duration of the contract. In the face of this precedent, S&R posits that the gold clause, for no particular reason, requires payment of an amount of gold equal to $35,000 at the time of each payment. But such a view of the gold clause would strip it of all economic purpose and thus "would destroy the contract." *Equitable Life Assurance Society v. Freda*, 32 Ohio N.P. (n.s.) 65, 71 (Ohio Ct. C.P. 1934). Not surprisingly, no court has accepted such a view, and both an Ohio court and the United States Supreme Court have explicitly rejected it. *Id.* at 70-71; *Holyoke Water Power Co. v. American Writing Paper Co.*, 300 U.S. 324, 335-36 (1937).

As for the applicability of the gold clause here, S&R had previously denied that there was a novation on the grounds that the Lease released the assignor of only "personal liability" and that S&R assumed only future obligations. Def.'s Opening Br. at 7. We demonstrated that those arguments lack merit. Pl.'s Opening Br. at 11-14, 16. S&R says nothing in reply to our response on these points; instead, it advances a new argument: S&R now claims that it assumed only the obligations of the assignor, and the assignor was not subject to the gold clause at the time of assignment, therefore S&R is not subject to the gold clause. But S&R's newfound argument is inconsistent with its many representations regarding its status as lessee, with the terms of the 1982 Assignment and Assumption, and with the Joint Resolution.[1]

_____

[1] In its introduction, S&R attempts to introduce without citation a slew of factual evidence relating to past conduct of lessees and lessors in an effort to determine the meaning of the Lease of novation generally and the gold clause specifically. *See* Def.'s Opp'n Br. at 2. But S&R

1

Finally, S&R asserts that even if the gold clause did issue in 1982, plaintiff still cannot

enforce it as written against S&R because of the doctrines of estoppel by deed, merger by deed,

and waiver. We have already demonstrated the bankruptcy of these arguments. S&R's

opposition brief adds nothing new of substance on these points.

## ARGUMENT

## I. Plaintiff's Claim Is Not Barred by Merger by Deed or Estoppel by Deed.

S&R repeats, largely verbatim, the arguments set forth in its opening brief that the

doctrines of merger by deed and estoppel by deed bar plaintiff's claim. Because we refuted

---

concedes that "[t]he language in . . . the Lease . . . [is] **clear and unambiguous**," Def.'s Opp'n Br. at 5 (emphasis added), and concedes that "the rent due is plain on the face of the 1912 Lease," Def.'s Opp'n Br. at 1. Thus, this evidence is inadmissible parol evidence. *See* Pl.'s Opp'n Br. at 8-10. There are other problems with this evidence, as well. First, S&R asserts that, since 1912, no lessee "has ever paid . . . either rent in gold or in an amount greater than $35,000" per year. But, whereas the parties have stipulated that S&R has never paid in gold or more than $35,000 per year, no stipulation covers the conduct of lessees prior to the 1982 Assignment and Assumption and S&R has adduced no support for its assertion with respect to lessees' conduct before the 1982 Assignment and Assumption. Moreover, prior to the 1982 Assignment and Assumption, there was no reason for a lessee to pay in gold or to pay more than $35,000 per year in order to comply with the Lease. From 1912 until 1923, the nominal annual rent was expressly less than $35,000. *See* Lease at 2. And from 1912 until the 1933, the price of gold was such that, even under our view of how the gold clause functions, full compliance with the gold clause would have resulted in payment of gold whose value was equal to the nominal amount of rent anyway. *See* Lawrence H. Officer, "The Price of Gold, 1257-2005," at http://www.measuringworth.com/gold/. In other words, the payment of $35,000 before 1933 was equal in value to 1,693 ounces of pure gold. And between 1933 and 1982, of course, the Joint Resolution permitted payment of only the nominal amount of rent regardless of what the gold clause required. Second, S&R asserts that no lessor "ever demanded . . . either rent in gold or in an amount greater than $35,000" and that "[n]o lessor has ever until now raised an issue with the gold clause." This evidence is relevant only to the issue of waiver, which we have thoroughly addressed elsewhere. Pl.'s Opp'n Br. at 17-20. Third, S&R asserts that plaintiff "did not demand increased rent or point to the gold clause as a source of escalated rent at the time it acquired the Halle Building." This is irrelevant and misleading because the acquisition transaction did not involve a lessee at all—it involved only the prior lessor and the current lessor, plaintiff—and thus there was no occasion or need for plaintiff to demand compliance with the gold clause at that time. We note, however, that each time rent has come due since plaintiff became lessor, plaintiff has demanded compliance with the terms of the gold clause. *See* Parties' First Submission of Joint Stipulated Facts ¶ 3.

completely these arguments in our response brief, we provide only a brief discussion below and respectfully refer the Court to our opposition brief. *See* Pl.'s Opp'n Br. at 10-17.

As we demonstrated, the doctrine of merger by deed applies to bar enforcement only of the underlying purchase contract by a party to a transaction conveying land once the deed effecting the conveyance has been delivered and accepted. It does not bar enforcements of agreements, such as the Lease, that are collateral to the conveyance or involve third parties, such as S&R, that are strangers to the conveyance. Furthermore, even if the doctrine of merger somehow could apply, it is only a default rule that specifically would be precluded by the Deed's express statement that it is "subject to" the Lease.

In addition to the decisions cited in its opening brief, S&R cites two new decisions, as well as one decision previously cited only in support of its estoppel argument. These decisions, however, undermine S&R's argument because they confirm that merger by deed is limited to purchase contracts and does not reach agreements, such as the Lease, that are "**collateral to and independent of**" the conveyance. *Zilka v. Central South Ltd.*, No. 99-7482, 2000 Ohio App. LEXIS 3217, at *15-16 (Ohio Ct. App. July 19, 2000) ("Under the doctrine of merger, when a deed is delivered and accepted without qualification pursuant to **a real estate purchase contract**, the contract becomes merged into the deed, and no cause of action upon the prior agreement exists.") (emphasis added); *see also Davis v. DiFilippo*, No. 95-0046, 1996 Ohio App. LEXIS 1141, at *8 (Ohio Ct. App. Mar. 27, 1996) ("Once having accepted delivery of the deed, the grantee will no longer have a cause of action on his **purchase contract** with respect to essential terms covered by the deed.") (emphasis added). Indeed, in one of the new cases S&R cites, the defendant, much like S&R, attempted to invoke the doctrine of merger and the terms of a deed conveying rental property as a defense to an action for breach of a pre-existing lease.

Noting that the lessee "was not a party to the purchase agreement," the court held that the doctrine of merger did not apply and that the lease could be enforced directly without regard to the purchase agreement or the deed. *Endersby v. Schneppe*, 596 N.E.2d 1081, 1082-83 (Ohio Ct. App. 1991). Plainly, S&R's merger argument is foreclosed by its own authorities.

Nor does the doctrine of estoppel by deed bar plaintiff's claim. As we have demonstrated, this doctrine does not apply here for three independent reasons: (1) S&R has failed to establish that it relied on the Deed's reference to the 2001 Certificate; (2) this is not an action brought upon the Deed; and (3) S&R was not a party to the conveyance effected by the Deed. Furthermore, even if the doctrine did apply, the Deed's statement that it is subject to the 2001 Certificate combined with the terms of that certificate could not override the plain terms of the Lease because the Deed also states that it is subject to the Lease. The terms of the 2001 Certificate can and should be interpreted to be consistent with the terms of the Lease, and the Lease, not the 2001 Certificate, is the authoritative document regarding S&R's obligations under the Lease.

S&R alters its estoppel argument from its opening brief in only two unavailing ways. First, it cites *Fuller v. Drenberg*, but that decision was about merger, not estoppel, and in any event involved only a purchaser's attempt to enforce a **purchase agreement** against the seller. 209 N.E.2d 417, 419 (Ohio 1965). Thus, *Fuller* did not involve a collateral agreement. Second, when setting out the relevant terms of the 2001 Certificate, S&R omits a key portion of one of the statements: **"To the best of the knowledge of the undersigned**, there has occurred no default under the Lease . . . ." Def.'s Opp'n Br., Ex. D (Dec. 2001 estoppel certificate) at 2 (emphasis added). As we have explained, this phrase makes clear that this statement constitutes a representation only as to Halle Cleveland's **knowledge**, not that there had not in fact been any

default.  Pl.'s Opp'n Br. at 16 n.13.  Accordingly, this statement cannot plausibly be understood to estop plaintiff from enforcing the gold clause according to the plain terms of the Lease.

## II.    The Lease Sets the Rent Amount at 1,693 Ounces of Pure Gold per Year.

Since at least 1868, the United States Supreme Court, lower federal courts, and state courts—including in Ohio—have had numerous occasions to consider gold clauses whose language was identical or substantially similar in relevant respects to the one at issue here.  In every one of those cases, the court adopted a view of the purpose and effect of the gold clause that is consonant with the view that we espouse.  For example, in *Freda*, the Ohio Court of Common Pleas considered a contract calling for $3600 to be paid "in gold coin of the United States of America of the present standard of weight and fineness."  32 Ohio N.P. (n.s.) at 65.  The court specifically rejected the argument advanced here by S&R, explaining: "The plaintiff in the instant case under the contract is entitled to have the obligation paid in lawful currency of the United States of America in a sum equal in value to the amount of gold called for in the note.  Any other construction, in our opinion, would destroy the contract."  *Id*. at 70-71.  The other decisions embracing our view of gold clauses are legion and without contradiction.[2]

---

[2] *See Bronson v. Rodes*, 74 U.S. 229, 246-47, 249-54 (1868); *Butler v. Horwitz*, 74 U.S. 258, 258-61 (1869); *Dewing v. Sears*, 78 U.S. 379, 379-80 (1872); *Trebilcock v. Wilson*, 79 U.S. 687, 694-98 (1871); *Gregory v. Morris*, 96 U.S. 619, 624-26 (1878); *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 292-94, 302 (1935); *Nortz v. United States*, 294 U.S. 317, 326 n.1, 328-29 (1935); *Perry v. United States*, 294 U.S. 330, 346-49 (1935); *Holyoke*, 300 U.S. at 333-36; *Guaranty Trust Co. v. Henwood*, 307 U.S. 247, 250, 257-58 (1939); *Trostel v. American Life & Cas. Ins. Co.*, 92 F.3d 736, 738 (8th Cir. 1996), 168 F.3d 1105, 1106-09 (8th Cir. 1999); *Fay Corp. v. BAT Holdings I, Inc.*, 646 F. Supp. 946, 948 (W.D. Wash. 1986), 682 F. Supp. 1116, 1118 (W.D. Wash. 1988), *aff'd*, 896 F.2d 1227 (9th Cir. 1990) (per curiam); *Emery Bird Thayer Dry Goods Co. v. Williams*, 107 F.2d 965, 969 (8th Cir. 1939); *In re Missouri P. R. Co.*, 7 F. Supp. 1, 2, 9-10 (E.D. Mo. 1934); *Nebel, Inc. v. Mid-City Nat'l Bank of Chicago*, 769 N.E.2d 45, 47, 54 (Ill. App. Ct. 2002); *Wells Fargo Bank, N.A. v. Bank of Am.*, 38 Cal. Rptr. 2d 521, 523-24 (Cal. Ct. App. 1995); *Grand Ave. Partners, L.P. v. Goodan*, 25 F. Supp. 2d 1064, 1066 (C.D. Cal. 1996), *aff'd*, 160 F.3d 580 (9th Cir. 1998); *Equitable Life Assurance Soc'y v. Grosvenor*, 426 F. Supp. 67, 68-69, 72 (W.D. Tenn. 1976), *aff'd*, 582 F.2d 1279 (6th Cir. 1978).

S&R admits that gold clauses can protect against inflation and currency depreciation, as it must in the face of these decisions. Def.'s Opp'n Br. at 8. But S&R hypothesizes that gold clauses may also "simply secure payment in gold," Def.'s Opp'n Br. at 8. S&R cites **no** support for this hypothesis. Indeed, there are **no** decisions finding that a gold clause merely secured payment in gold, and the Ohio Court of Common Pleas and the United States Supreme Court explicitly rejected such a view because it "would destroy the contract." *Freda*, 32 Ohio N.P. (n.s.) at 70-71; *Holyoke*, 300 U.S. at 335-36; *see also* Pl.'s Opp'n Br. at 5. S&R's efforts to distinguish every other gold clause decision are unavailing:

A.    S&R points out that "[n]owhere in the Lease is there any mention of inflation or any reference to potential fluctuations in the value of gold and how those fluctuations would affect the lessee's obligations to pay rent." Def.'s Opp'n Br. at 6. In almost all of the gold-clause cases just cited, however, the contract was similarly silent about the purpose and effect of the gold clause, and yet the courts uniformly adopted the view of the gold clause that we propound here. *See also* Pl.'s Opp'n Br. at 3.

B.    S&R contends that "[n]or is there any mechanism provided [by the Lease] for the establishment of current gold values or for the resolution of disputes about valuations," that is, a "specific[] provi[sion for] how and when the price of gold will be measured over time." Def.'s Opp'n Br. at 6. Again, the gold clause in most of the gold clause cases just cited was no more elaborate than the one at issue here. Moreover, as we have explained previously, the gold clause itself completely settles all questions about valuation. Pl.'s Opp'n Br. at 3-4; Pl.'s Opening Br. at 1, 3-4, 6 & nn.6, 7.

Nonetheless, S&R points to the gold clause at issue in *Butler* as an example of such a "mechanism" because, according to S&R, that gold clause "provides that the weight and price of

gold will be measured 'at their present established weight and rate according to act of Assembly, on the 1st day of January in each and every year during the continuance of the present demise.' " Def.'s Opp'n Br. at 6-7 (quoting *Butler*, 74 U.S. at 258). S&R understands this language to provide for a "specific **annual measure** for the price of the lease," Def.'s Opp'n Br. at 7 (emphasis added). But the *Butler* gold clause provides for specific annual **payment**, **not measurement**, of the rent on January 1 of each year. The amount of gold due under the *Butler* lease was fixed at the time that the lease was formed and remained constant for the duration of the lease pursuant to terms identical in relevant respects to the gold clause at issue here and in all of the other gold clause cases, as quotation of the *Butler* gold clause in full reveals: "Yielding and paying therefor to the said Daniel Bowly, his heirs and assigns, **the yearly rent or sum of £15**, current money of Maryland, **payable in** English golden guineas, weighing five pennyweights and six grains, at thirty-five shillings each, and other **gold and silver at their *present* established weight and rate** according to act of Assembly, on the 1st day of January in each and every year during the continuance of the present demise." *Butler*, 74 U.S. at 258 (emphasis added). Indeed, **no** gold clause could protect against currency fluctuations if it called for the "specific annual measure for the price of the lease" imagined by S&R. As the Eighth Circuit said in *Trostel*, "[t]his protection would be meaningless if the baseline value of gold were revised anytime the lessee transferred the leasehold interest to a new obligor. The only way for the gold clause to serve its function to protect the lessors against inflation is to use the 1917 value of gold." 168 F.3d at 1109; *see* Pl.'s Opening Br. at 3-6; Pl.'s Opp'n Br. at 3-4.

In any event, S&R's discussion of *Butler* does nothing to distinguish the many other decisions addressing gold clauses that are identical to the one at issue here.

C.      S&R attempts to distinguish "inflation" from "currency depreciation" or

"devaluation." Def.'s Opp'n Br. at 7-8. Because S&R insists mistakenly that the gold clause at issue here protects against neither inflation nor currency depreciation, it is not at all evident why S&R believes that this distinction is important to this case. In fact, the distinction is wholly irrelevant.

Courts have long understood that the value of currency is not stable. *See, e.g.*, *Holyoke*, 300 U.S. at 335-36. Thus, a land owner entering a long-term lease would justly be concerned that, for example, the $35,000 he will receive in the ninety-ninth year of the lease will have less economic value than it had in the first year. The value of gold, however, remains relatively constant over time.[3] By calling for payment of rent in a medium whose value does not decline over time—namely, gold—a lessor could stabilize the value of the rent payments received over the duration of the lease.

Courts have sometimes spoken of the currency instability that is combated by gold clauses as being a matter of "depreciation," *see, e.g.*, *Norman*, 294 U.S. at 302; *Henwood*, 307 U.S. at 257, and sometimes as a matter of "inflation," *see, e.g.*, *Trostel*, 168 F.3d at 1106-07; *Fay*, 646 F. Supp. at 948. Similarly, the leading commentator on gold clauses, former Deputy Secretary of the Treasury and of State Ken Dam, has used "depreciation" and "inflation" interchangeably when describing gold clauses. *Compare* Kenneth W. Dam, *From the* Gold Clause Cases *to the Gold Commission: A Half Century of American Monetary Law*, 50 U. CHI. L. REV. 504, 518 (1983) (gold clauses were "solemn promises that had been bargained for with the very eventuality in mind that led to their invalidation—the depreciation of the currency in terms

---

[3] The price of an ounce of gold at the time the Lease was formed was $20.67. In terms of buying power, $20.67 in 1913 (the first year for which statistics are available) is approximately equivalent to $421.33 in 2006. Inflation Calculator, U.S. Dep't of Labor, Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/cpicalc.pl. The actual average price of an ounce of gold in 2006 is approximately $600. Kitco, Historical Gold Chart, at http://www.kitco.com/charts/historicalgold.html.

of gold"), *with id*. at 523 ("the inclusion of a gold clause . . . protected the creditor, albeit quite imperfectly, against inflation").

Thus, courts have not placed any significance on the particular label for the decline in the value of currency because the import of the gold clause is the same regardless: to stabilize the value of rent payments in the face of currency fluctuations. As the Supreme Court has said, "[t]he call is for gold that shall be as heavy and as fine as a stated number of gold dollars . . . . [T]he gold is seen to be a standard with which to stabilize the value of the dollar; the dollar not a yardstick with which to measure the quantity of the gold. To read the leases otherwise is to permit the realities of the transaction, its substance and essential purpose, to be obscured by forms and phrases. . . . Here what was intended was to assure the payment of a money debt in dollars of a value as constant as that of gold." *Holyoke*, 300 U.S. at 335-36; *see also Perry*, 294 U.S. at 348 ("The 'present standard of value' stood in contradistinction to a lower standard of value. The promise [of a gold clause] obviously was intended to afford protection against loss."). Because the gold clauses at issue in all of the gold clause cases cited above were substantially the same, and because the gold clause at issue here is identical or substantially similar in relevant respects to those other gold clauses, it is simply incoherent to say, as S&R does, that some gold clauses protect against currency depreciation, that others protect against inflation, and that the one at issue here protects against neither.[4]

D.      S&R also attempts to distinguish *Perry* on the ground that there, the party subject to the gold clause was the United States government, which "had the ability to do what a private party could not do—devalue the dollar." Def.'s Opp'n Br. at 7-8. But the point of gold clauses

_____

[4] We have tended to speak in terms of inflation, but that tendency should in no way be understood to imply that the Lease's gold clause does not protect against all currency fluctuations regardless of the label, including depreciation.

was to stabilize the value of payments in the face of currency fluctuations, irrespective of the cause of such fluctuations.[5]  In *Perry*, the government's status as a defendant was not relevant to the meaning of the gold clause, but was instead relevant to the Court's analysis of the constitutionality of the Joint Resolution.[6]

  E.  S&R attempts to distinguish *Trostel* on two grounds.  First, S&R notes that "in *Trostel*, there was no dispute as to the gold clause's purpose."  Def.'s Opp'n Br. at 8.  Specifically, "there [was] no dispute that the purpose of gold clauses is to protect a lessor against inflation."  *Trostel*, 168 F.3d at 1109.  The parties' positions in *Trostel*, however, reflected the well-established understanding of gold clauses adopted by the Supreme Court and all other courts.

  Second, S&R argues that whereas the gold clause at issue in *Trostel* required payment in gold coin " 'of *or equal to* the present standard of weight and fineness,' " the absence of the phrase "equal to" from the gold clause at issue here "evidenc[es] that this gold clause is not one designed to hedge against inflation."  Def.'s Opp'n Br. at 8 n.3 (quoting *Trostel*, 92 F.3d at 738) (emphasis supplied).  S&R makes no effort, however, to explain how the phrase "equal to" relates to protecting against inflation but the word "of" standing alone does not.  There is, of

_____

[5] If S&R is suggesting that gold clauses protect against "depreciation" only when the obligated party is the United States government, *see* Def.'s Opp'n Br. at 8, such a suggestion is directly contradicted by the Supreme Court's numerous discussions of **private** gold obligations in terms of "depreciation."  *See Bronson*, 74 U.S. at 246; *Norman*, 294 U.S. at 302; *Henwood*, 307 U.S. at 257.

[6] "There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers."  *Perry*, 294 U.S. at 350.  Thus, the Supreme Court held that the Joint Resolution effected a taking of property requiring just compensation when applied to government obligations but not when applied to private obligations.  *Compare id.* at 354 (Joint Resolution as applied to government gold obligation effected taking), *and Nortz*, 294 U.S. at 328 (same), *with Norman*, 294 U.S. at 316 (Joint Resolution as applied to private gold obligation did not effect taking).

course, no basis for such a distinction. In *Norman*, the Supreme Court addressed two gold clauses, one calling for payment in gold coin "of or equal to" the standard of weight and fineness and one merely calling for payment in gold coin "of" the standard of weight and fineness. 294 U.S. at 293. The Supreme Court noted that "in the reference to the standard of weight and fineness, the words 'equal to' are said to be synonymous with 'of.' " *Id.* at 298. The Supreme Court then sensibly described both gold clauses as protecting against currency fluctuations, without reference to this clearly insignificant variation in language. *See id.* at 302; *see also Freda*, 32 Ohio N.P. (n.s.) at 65, 71 (gold clause at issue did not contain "equal to" phrase, but court nonetheless followed decision of another court addressing a gold clause containing "of or equal to" phrase). Moreover, S&R's attempted distinction of *Trostel* is directly inconsistent with numerous decisions describing a gold clause as protecting specifically against "inflation" even though the gold clause contained only the word "of" and not the phrase "equal to." *See Fay*, 646 F. Supp. at 948, 682 F. Supp. at 1118, *aff'd*, 896 F.2d 1227; *Wells Fargo,* 38 Cal. Rptr. 2d at 523-24; *Equitable Life*, 426 F. Supp. at 68-69, 72, *aff'd*, 582 F.2d 1279.

## III. The Gold Clause Is Valid and Enforceable Against S&R.

We showed previously that the gold clause issued against S&R as a result of the 1982 Assignment and Assumption for three independent reasons: novation of the Lease; privity of contract; and privity of estate. Pl.'s Opening Br. at 7-20. S&R initially denied that there was a novation on the grounds that the Lease released the assignor of only "personal liability" and that S&R assumed only future obligations. Def.'s Opening Br. at 7. We demonstrated in our opening brief that S&R's arguments lack merit, Pl.'s Opening Br. at 11-14, 16, and S&R has offered nothing in response. Neither of the two principal arguments that S&R now advances for why the gold clause did not issue in 1982 is availing:

A.      S&R contends that it did not assume the gold clause obligation because the

assignor was not subject to that obligation on the date of the 1982 Assignment and Assumption

and S&R assumed only the obligations to which the assignor was subject.  Def.'s Opp'n Br. at 9-

11.[7]  According to S&R, this undermines our novation argument and our privity-of-contract

argument, Def.'s Opp'n Br. at 9; S&R does not suggest that this undermines our privity-of-estate

argument, nor could it, since the obligations to which an assignee is subject by virtue of being in

privity of estate do not depend on which obligations were assumed by contract, *see* Pl.'s Opening

Br. at 19.  S&R's reasoning fails for at least three reasons:

1.      The Lease is absolutely clear that assignment is prohibited "unless the

assignee shall expressly assume the lessees['] engagements hereunder."  Lease at 4.  The gold

clause was, of course, one of those engagements.  Thus, in order to become the lessee by

assignment, one must assume the gold clause obligation.  S&R has repeatedly represented to the

Court that it is the lessee under the Lease.  *See, e.g.*, Answer to Am. Compl. ¶ 6 ("S&R

Playhouse admits that with respect to real estate that it is the subject of this action it became a

lessee by assignment of a 1912 lease in 1982."); Def.'s Opening Br. at 2 ("S&R succeeded to the

rights of the prior lessee under the Lease when the Halle Brothers Company assigned the

leasehold estate to S&R in 1982 . . . .").  For S&R to now contend that it did not assume the gold

clause is to contradict these explicit representations.

2.      The 1982 Assignment and Assumption makes clear in two ways that S&R

did in fact assume not only the obligations to which the assignor was subject but also all

---

[7] S&R says that we "deceptively" omitted the phrase "of the Assignor" when quoting the 1982
Assignment and Assumption in our opening brief.  Def.'s Opp'n Br. at 11 (citing Pl.'s Opening
Br. at 15).  Our quotation was not deceptive.  First, for reasons explained in the text, that phrase
has no material impact on whether S&R is subject to the gold clause.  Second, we had already
quoted that phrase twice in our brief.  *See* Pl.'s Opening Br. at 2, 11.

obligations contained in the Lease, which includes the gold clause.  First, S&R expressly agreed

that the assignment of the rights to the property was "subject, nevertheless, to the payment of the

rents and the observance of **all** and singular the covenants, conditions, terms, and agreements **in**

**said Lease** contained."  1982 Assignment and Assumption at 2 (emphasis added).  Second, S&R

expressly "assume[d] and agree[d] to perform **each and all** of the covenants, obligations, and

engagements **of the** Assignor and **lessee** under said Lease."  1982 Assignment and Assumption

at 2 (emphasis added).  As S&R's discussion of *Trostel* reveals, the term "lessee" as used in the

1982 Assignment and Assumption refers to the **original** lessee, who, just like the original lessee

in *Trostel*, was unquestionably subject to the gold clause.[8]  Consequently, S&R's express

assumption of all of the obligations of the "lessee under [the] Lease" included the gold clause.

        3.      Even if S&R assumed only the obligations of the assignor and not of the

original lessee, S&R would still have assumed the Lease's gold obligation because the assignor

was subject to the gold obligation on the date of the 1982 Assignment and Assumption.  By its

express terms, the Joint Resolution in 1933 did not remove gold clauses from leases; it merely

required lessees to discharge their continuing gold obligations through an alternative (and, but

for the Joint Resolution, wholly inadequate) performance: "**An obligation** issued containing a

---

[8] In an effort to blunt the force of *Trostel*'s holding that the assignee was subject to the gold clause by virtue of a novation of the lease, S&R asserts that the Eighth Circuit "expressly found that the defendant there did not argue that the 'transaction was anything other than a novation.' " Def.'s Opp'n Br. at 10 (quoting *Trostel*, 92 F.3d at 741).  In fact, the defendant argued "that there was no novation as to the gold clause itself because the parties did not intend to incorporate it into the new lease."  *Trostel*, 92 F.3d at 741; *see also id*. at 740 (Defendant "states in its briefs that the 1990 transaction was not a novation.").  The Eighth Circuit construed the defendant's argument to "involve[] how to interpret the terms of the existing contract, not whether a novation took place."  *Id*. at 741; *see also Grand Avenue*, 160 F.3d at 581-82, *quoted in* Def.'s Opp'n Br. at 10 n.5.  We have demonstrated conclusively that, under Ohio law, the 1982 Assignment and Assumption effected a novation of the Lease, and S&R has offered no response.  *See* Pl.'s Opening Br. at 10-16.  Rather, S&R now challenges our claim on the ground that S&R did not assume the gold clause in particular.  Thus, S&R is in much the same profile as the defendant in *Trostel* was.

gold clause or governed by a gold clause **is discharged** on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment." 31 U.S.C. § 5118(d)(2) (emphasis added). Thus, even after 1933, the gold clause continued to bind the lessee, and specifically continued to bind the lessee who assigned the Lease to S&R in 1982.

B.    S&R disputes our two "privity arguments" on the ground that they are "novel." Def.'s Opp'n Br. at 11. Obviously, that is not a reason to find that they are incorrect—both *Fay* and *Nebel* involved theories for why the gold clause was reactivated that were, at the time, novel, and yet both courts agreed with those theories (as have all subsequent courts to consider them). The courts in *Fay* and *Trostel* had no occasion to address privity arguments since both courts enforced the gold clause in light of the novation of the leases. Nothing in those decisions is inconsistent with our privity arguments.

S&R suggests mistakenly that only a novation of a lease or a brand new lease causes an obligation to "issue" within the meaning of the amended Joint Resolution. See Def.'s Opp'n Br. at 12. Nothing in the amended Joint Resolution confines itself to novation and brand new contracts; rather, the amended Joint Resolution merely requires that an obligation "issue," or, as S&R has recognized, be "entered into," after 1982. *See* Pl.'s Opening Br. at 17-18; Def.'s Opening Br. at 7. Indeed, the Illinois Appellate Court has held that regardless of whether there was a novation, a material amendment of a lease coupled with a " 'reaffirm[ation]' [of] all terms and provisions in the Lease" constituted an obligation issuing, or being entered into, under the amended Joint Resolution. *Nebel*, 769 N.E.2d at 53. Thus, we did not, as S&R asserts, "beg[] the question" by demonstrating that S&R came into privity of contract and privity of estate with the lessor in 1982. Def.'s Opp'n Br. at 12. The point of our discussion was to show that when S&R came into privity of contract and privity of estate, various obligations—and specifically the

gold clause—issued against it.  That is, by coming into privity of contract and privity of estate with the lessor, S&R entered into the gold clause obligation.  Consequently, at that moment, the gold clause became a valid and enforceable obligation to which S&R is subject.

## IV.     Plaintiff's Claim Is Not Barred by Waiver.

S&R also repeats, once again largely verbatim, its argument that plaintiff has waived its claim because Halle Cleveland accepted $35,000 in rent each year without protest.  As we demonstrated previously, this argument lacks merit for many reasons.  Pl.'s Opp'n Br. at 17-20. First, because the gold clause is self-executing, Halle Cleveland's failure to demand full payment cannot be taken as an act of waiver.  Second, even if Halle Cleveland's actions were construed to waive the right to enforce the gold clause with respect to past obligations, the plain terms of the Lease make clear that any past waiver does not constitute a waiver of subsequent breaches of the gold clause.  Third, even if Halle Cleveland's actions did constitute a prospective waiver, plaintiff has plainly rescinded that waiver and placed S&R on notice that it will again require strict compliance with the gold clause.  Finally, S&R could not enforce any waiver of the gold clause because it has failed to establish that it either offered any consideration for or changed its position in reliance on the alleged waiver.  In its opposition brief, S&R offers no additional authorities and no new analysis in support of its waiver argument.  Accordingly its waiver argument should be rejected for the reasons summarized above and stated more fully in our opposition brief.

<u>CONCLUSION</u>

For the foregoing reasons and the reasons stated in our opening and opposition briefs, plaintiff's motion for summary judgment should be granted and defendant's motion for summary judgment should be denied.

November 27, 2006

Respectfully Submitted,

/s/ Charles J. Cooper

_____

James B. Niehaus (0020128)
jniehaus@frantzward.com
Christopher G. Keim (0067117)
ckeim@frantzward.com
FRANTZ WARD LLP
2500 Key Center
127 Public Square
Cleveland, Ohio 44114-1230
216-515-1660
216-515-1650 (fax)

Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
David Lehn
dlehn@cooperkirk.com
COOPER & KIRK, PLLC
555 Eleventh Street NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify on November 27, 2006, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this through the Court's system.

/s/ Charles J. Cooper
_____

Charles J. Cooper
COOPER & KIRK, PLLC
555 Eleventh Street NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com