**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| 216 JAMAICA AVENUE, LLC, | ) | Civil Action No. 06-1288 |
|  | ) |  |
| Plaintiff, | ) | (Judge Boyko) |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| S & R PLAYHOUSE REALTY CO., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**REPLY IN SUPPORT OF PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN OPPOSITION TO DEFENDANT'S SUPPLEMENT BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

As a preliminary matter, we wish to clarify for the Court the procedural posture in which this brief arises. On April 23, 2007, we moved for leave to file a supplemental brief as a result of our deposition of Patrick Lott under Federal Rule of Civil Procedure 30(b)(6). We attached our proposed supplemental brief to the motion as an exhibit. S&R did not oppose that motion and the Court has not ruled on that motion. Instead, S&R filed a brief on May 8 opposing our supplemental brief. Joined with its brief in opposition, S&R filed its own supplemental brief in support of its motion for summary judgment, which addressed S&R's deposition of Stuart Venner under Rule 30(b)(6). S&R did not seek leave to file its supplemental brief (though we would not have opposed such a request) and the Court has not granted S&R such leave. Below, we first reply to S&R's opposition to our supplemental brief and then respond to S&R's

supplemental brief in the event that the Court grants our motion for leave and grants S&R leave *sua sponte*.

## ARGUMENT

I. **Patrick Lott confirmed that S&R's arguments of estoppel by deed and merger by deed are meritless.**

In our supplemental brief, we explained that the testimony of Patrick Lott, S&R's designated witness under Rule 30(b)(6), confirmed that S&R's arguments of estoppel by deed and merger by deed are meritless. In response, S&R has not even addressed the substance of the argument we advanced in our supplemental brief, namely, that no matter the doctrinal category, the estoppel certificate cannot unilaterally alter the terms of the Lease to the extent that the certificate's terms vary from the Lease's.

    A. Invoking Federal Rule of Evidence 801(d)(2), S&R contends that the estoppel certificate is a binding admission by a party opponent as to the proper interpretation of the Lease's gold clause. *See* Supplemental Brief in Supp. of Def.'s Mot. for Summ. J. and Opposed to Pl.'s Supplemental Mot. in Supp. of Summ. J. ("S&R's Supplemental Br.") at 8-10. S&R's argument is incorrect for several reasons.

        1. The gold clause is unambiguous on its face and subject to only one plausible interpretation, namely, that the face amount of annual rent ($35,000) is to be converted to an amount of gold using the value of gold at the time the contract was formed, and then that amount of gold (1,693 ounces) is to be paid annually for the duration of the Lease. Mem. in Supp. of Mot. of Pl. for Summ. J. ("Jamaica's Opening Br.") at 3-5; Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Jamaica's Opposition Br.") at 2-5; Reply Mem. in Supp. of Mot. of Pl. for Summ. J. ("Jamaica's Reply Br.") at 5-11; *see Westfield Ins. Co. v. Galatis*, 2003 Ohio 5849, at ¶¶ 11-14 (2003) ("As a matter of law, a contract is unambiguous if it can be given a definite legal meaning."). Therefore,

extrinsic evidence, such as the estoppel certificate, is inadmissible to vary the Lease's terms. *See, e.g.*, *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 2004 Ohio 7102, at ¶ 23 (2004); *Westfield*, 2003 Ohio 5849, at ¶¶ 11-14; Jamaica's Opposition Br. at 9 & n.7 (collecting cases relating to inadmissibility of extrinsic evidence).

2. Federal Rule of Evidence 801(d)(2) "do[es] not dictate a binding result." *Flink/Vulcan v. United States*, 63 Fed. Cl. 292, 310 (2004). Rather, Rule 801(d)(2) specifies only the circumstances under which an out-of-court statement may be admitted as substantive evidence. Accordingly, where there is evidence that contradicts the statement admitted into evidence under Rule 801(d)(2), the fact finder has the discretion to determine how much weight to accord that statement and to make a factual determination as it sees fit. *See Walker v. Mulvihill*, 1996 U.S. App. LEXIS 14397, at *14 (6th Cir. 1996); *In re Hunt Energy Co.*, 1988 U.S. Dist. LEXIS 14295, at *19 (N.D. Ohio 1988); *Rowe v. Norfolk S. Ry. Co.*, 2007 U.S. Dist. LEXIS 28948, at *9 (E.D. Mich. Apr. 19, 2007). Thus, *if the gold clause were ambiguous*, the estoppel certificate could do no more than create a genuine issue of fact. But, because the gold clause is unambiguous, the certificate should be accorded no evidentiary weight to the extent it differs from the terms of the Lease.

B. S&R says that we have "misleadingly point[ed] away from the real issue," which is, presumably, that the "Lease and the 2001 estoppel certificate both state that the rent under the Lease is $35,000 per year." S&R's Supplemental Br. at 10-11. But we have stated quite clearly that the terms of the estoppel certificate are perfectly consistent with the plain terms of the Lease. *See, e.g.*, Jamaica's Opposition Br. at 15-16; Jamaica's Reply Br. at 4. The point in our supplemental brief was that *if* the terms of the estoppel certificate differed from the terms of the Lease, the certificate could not vary the Lease and the Lease would control with respect to the rent.

3

C. S&R asserts that, insofar as the estoppel certificate differs from the Lease, "the 2001 estoppel certificate demonstrates that Jamaica's reading of the lease is not clear and is not unambiguous." S&R's Supplemental Br. at 11. S&R then contends that the fact finder must "determine the meaning of an ambiguous provision." S&R's Supplemental Br. at 11. This is a particularly confused and incorrect argument. The pertinent question in the context of interpreting a contract, such as the Lease, is not whether a party's interpretation is ambiguous, as S&R says, but rather whether the terms of the contract are ambiguous. As we noted above and elsewhere repeatedly, the Lease is unambiguous on its face. Extrinsic evidence—including the estoppel certificate—cannot be used to vary the Lease's terms.

D. S&R claims that Mr. Lott's testimony regarding the significance of the estoppel certificate is entitled to no weight because Mr. Lott was not "involved with S&R at the time of the 1982 Assignment and thus had no firsthand knowledge of that assignment." S&R's Supplemental Br. at 8. S&R's argument is both factually and legally irrelevant.

1. We relied upon Mr. Lott's testimony not to establish a point pertaining to the 1982 Assignment and Assumption, but rather one pertaining to the estoppel certificate, which was signed in 2001. Mr. Lott has been an executive at S&R and its parent, Forest City Enterprises, since 1987. Dep. of Patrick M. Lott ("Lott Dep.") at 8.

2. Regardless of whether Mr. Lott has firsthand knowledge of these issues, he was competent to testify on these issues on behalf of S&R because S&R designated Mr. Lott to be its witness pursuant to Rule 30(b)(6). Such a witness "shall testify as to matters known or reasonably available to the organization." Rule 30(b)(6); *see PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894-95 (7th Cir. 2004) (Rule 30(b)(6) witness may "testify not only to matters within his personal knowledge but also to matters known or reasonably available to the

4

organization." (quotation marks omitted)). Without quoting the pertinent 30(b)(6) notice of deposition at all, S&R attempts to evade the import of Rule 30(b)(6) by asserting that the "line of questioning" that prompted Mr. Lott's testimony as to the significance of the estoppel certificate "certainly exceeded the scope of plaintiff's 30(b)(6) notice of deposition." S&R's Supplemental Br. at 8. On the contrary, however, the 30(b)(6) notice unambiguously covered Mr. Lott's testimony that the estoppel certificate could not vary the terms of the Lease. The 30(b)(6) notice called for a witness to testify as to the following topics, among others: "Estoppel certificates provided by former owners of the leased property to S&R's present, former, and potential lenders relating to the Lease, the 1982 Assignment and Assumption, or the Halle Building, including but not being limited to the meaning and preparation of the certificates"; "Representations made to … current, former, and potential lenders to S&R …"[1]; and "The lease … , including but not being limited to … the meaning, exercise, or performance of S&R's and the lessor's rights and obligations thereunder from the date on which S&R acquired the leasehold to the present." *See* Ex. A (Pl.'s Notice of Dep. of Def. Pursuant to Fed. R. of Civ. P. 30(b)(6) (Dec. 13, 2006)).

E. S&R also claims that Mr. Lott's testimony regarding the significance of the estoppel certificate is entitled to no weight because Mr. Lott "was not offered as an expert and is not a lawyer." S&R's Supplemental Br. at 8. Rather, S&R says, he "was presented as a fact witness on behalf of S&R pursuant to Fed. R. Civ. P. 30(b)(6)." S&R's Supplemental Br. at 11. Mr. Lott's testimony, however, illustrates the custom relating to estoppel certificates and establishes the significance they are ordinarily accorded. If the Court finds that the gold clause is ambiguous, such evidence of custom may be considered as an aid in interpreting the Lease. *Thomas v. Guarantee Title & Trust Co.*, 91 N.E. 183, 185 (Ohio 1910). Moreover, there is no need to qualify Mr. Lott as

---

[1] HSBC, the recipient of the estoppel certificate, is one of S&R's lenders. As Mr. Lott testified, estoppel certificates are prepared "for a lender's benefit." Lott Dep. at 77.

5

an expert to give such testimony because the testimony relates to a topic that not only was within the scope of the 30(b)(6) deposition notice, but also was within Mr. Lott's considerable experience in the commercial real estate industry and his substantial responsibilities for S&R. *See* Lott Dep. at 7-8; *see, e.g.*, *First Annapolis Bancorp, Inc. v. United States*, 72 Fed. Cl. 204, 206-08 (2006).

## II. Stuart Venner's testimony does not conflict with Jamaica's claim.

On December 14 and 15, 2006, S&R deposed Stuart Venner in his capacity as Jamaica's designated witness pursuant to Rule 30(b)(6). Mr. Venner is the managing member of Jamaica. In its May 8 supplemental brief, S&R contends that Mr. Venner's testimony "reveal[ed] not only Mr. Venner's unabashed greed, but also the implausibility of plaintiff's claims in this action." S&R's Supplemental Br. at 5. Specifically, S&R claims that Mr. Venner's testimony establishes that there was no meeting of the minds between the parties to the 1982 Assignment and Assumption as to the gold clause and therefore there was no novation of the Lease. S&R's Supplemental Br. at 2-7. We have addressed previously various arguments that S&R has made as to the absence of a meeting of the minds and need not recite them here. *See* Jamaica's Opening Br. at 10-15; Jamaica's Reply Br. at 11-14; Pl.'s Surreply Mem. in Opp'n to Def.'s Mot. for Summ. J. at 1-4. As for the arguments that S&R advances in its supplemental brief, not only do they lack merit, but some of them are also entirely inappropriate *ad hominem* attacks on Mr. Venner.

A. Under venerable principles of Ohio law, "[t]he intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Medical Life Ins. Co.*, 509 N.E.2d 411, 413, 31 Ohio St. 3d 130 (1987); *Ignazio v. Clear Channel Broad., Inc.*, 2007 Ohio 1947, at ¶ 12 (2007) . The language of the Lease and the 1982 Assignment and Assumption is, as we have explained repeatedly, crystal clear that the 1982 Assignment and Assumption effected a novation of the Lease and that the Lease of novation includes the gold clause as understood by Jamaica. *See* Jamaica's Opening Br. at 10-15; Jamaica's Reply Br. at 11-14; Pl.'s

Surreply Mem. in Opp'n to Def.'s Mot. for Summ. J. at 1-4. We reiterate the following key points:

    1.    The Lease requires unambiguously as a condition of assignment that the assignee assume all obligations of the Lease, one of which is, of course, the gold clause: "lessees further covenant and agree not to assign or transfer this lease at any time without the consent of the lessor in writing, *unless . . . the assignee shall expressly assume the lessees['] engagements hereunder*." Lease at 4 (emphasis added). Further, the Lease provides unambiguously that all of its terms, one of which is the gold clause, shall bind assignees just as they bound the original lessee: "assigns . . . shall become such in accordance with the terms and conditions hereof, with like force and effect in all respects as the same accrue to and are binding upon said original . . . lessees." Lease at 6.

    2.    In accordance with the requirements of the Lease, the 1982 Assignment and Assumption stated unambiguously that S&R agreed to be bound by all of the terms of the Lease, one of which is, of course, the gold clause: S&R "assumes and agrees to perform each and all of the covenants, obligations, and engagements" under the Lease, and takes the rights under the Lease "subject, nevertheless, to the payment of the rents and the observance of all and singular the covenants, conditions, terms, and agreements in said Lease contained." 1982 Assignment and Assumption at 2.

    3.    As we established above, the gold clause is unambiguous on its face and subject to only one plausible interpretation, namely, that the face amount of annual rent ($35,000) is to be converted to an amount of gold using the value of gold at the time the contract was formed, and then that amount of gold (1,693 ounces) is to be paid annually for the duration of the Lease.[2]

---

[2] S&R asserts without any support whatsoever that "no party to the Lease has ever read" the gold clause in the manner plaintiff reads it. S&R's Supplemental Br. at 5. In the text above, we address the parties' conduct after 1982. With respect to the parties' conduct prior to 1982, we

4. Therefore, it as plain as day that the lessor and S&R agreed that S&R would be bound by the gold clause.

B. If S&R were correct that there was no meeting of the minds as to the gold clause, then the decisions in *Trostel v. American Life & Cas. Ins. Co.*, 92 F.3d 736 (8th Cir. 1996), 168 F.3d 1105 (8th Cir. 1999), *Fay Corp. v. Frederick & Nelson Seattle, Inc.*, 896 F.2d 1227 (9th Cir. 1990), *Wells Fargo Bank v. Bank of Am.*, 38 Cal. Rptr. 2d 521 (Cal. Ct. App. 1995), and *Nebel, Inc. v. Mid-City Nat'l Bank of Chicago*, 769 N.E.2d 45 (Ill. App. Ct. 2002), which we have discussed throughout our briefs, *see, e.g.*, Jamaica's Opening Br. at 8-10, would be wrong because the relevant facts in those cases were the same and the courts there nonetheless held that the assignee was bound by the gold clause as written. Indeed, the Eight Circuit in *Trostel* rejected any reliance upon "affidavits to the effect that [the defendant-assignee] did not intend to assume an obligation to pay rent in gold" because, as here, the defendant's "intent . . . to be bound" by the terms of the lease it assumed—"which included an explicit gold clause" almost identical to the one at issue here—was "expressed in clear and unambiguous language." 92 F.3d at 742-43 (explaining that "unless there is ambiguity, intent is determined by what the contract itself says" and concluding that "the contract thus should be enforced as written").

C. S&R attempts to support its contention that there was no meeting of the minds as to the gold clause not by reference to the express language of the Lease and the 1982 Assignment and Assumption, but by reference to several pieces of extrinsic evidence. Specifically, S&R points to (1) that "the parties [to the Lease] from 1982 to 2006 (when Jamaica acquired the Halle Building)

---

have explained at length why, even if the lessee paid only $35,000 in annual rent, and even if S&R had evidence as to that conduct—which it does not—that conduct would not afford any indication as to the meaning of the gold clause. In short, paying $35,000 in annual rent was equivalent to complying with the gold clause from 1912 to 1933 and was all that was required under the Joint Resolution from 1933 to 1982. Jamaica's Reply Br. at 1 n.1.

8

consistently paid and accepted without complaint the $35,000 rent"; (2) that the "cap rate" at which Jamaica purchased the property underlying the Lease was based upon a rent of $35,000 per year; (3) and that enforcement of the gold clause as written would "utterly destroy the reasonable commercial underpinnings of the 1982 Assignment and Assumption." S&R's Supplemental Br. at 1, 3-7. This evidence cannot vitiate the validity of the gold clause for several reasons.

   1. Because the terms of the Lease and the 1982 Assignment and Assumption are unambiguous as to the gold clause, the extrinsic evidence that S&R adduces is inadmissible, as noted above.

   2. For purposes of the pending summary judgment motions, we do not challenge S&R's contention that it paid and the prior lessor accepted $35,000 in annual rent between 1982 and 2006. But that course of dealing establishes—at most—that the prior lessor waived its right to enforce the gold clause during that period. And as we have explained elsewhere, that waiver could not bind Jamaica (or the prior lessor, for that matter) in the future. Jamaica's Opposition Br. at 17-20; Jamaica's Reply Br. at 15.

   3. S&R overstates the significance of the cap rate. The broker who sold the property to Jamaica calculated the cap rate as 3.911%, which, as S&R says, reflects annual cash flow of $35,000. Presumably, the broker did so because the prior lessor was charging only $35,000 in annual rent at the time. Thus, the cap rate is merely a byproduct of the course of dealing between S&R and the prior lessor, which, as we just noted, establishes at most a waiver that cannot and does not bind Jamaica. Moreover, the broker's representations as to the rent are certainly not binding upon Jamaica or capable of altering the terms of the Lease. Thus, to the extent that the broker's description of the rent amount differs from what the Lease explicitly requires, the broker's description is irrelevant.

4. It is hardly clear that paying rent at the amount required by the gold clause would destroy the commercial underpinnings of the 1982 Assignment and Assumption. S&R claims that it has been losing money on the Halle Building. S&R's Supplemental Br. at 2. Notably, however, S&R has borrowed millions of dollars against the property. *See, e.g.*, Ex. B (Collateral Mortgage Modification Agreement, Dec. 19, 2001) at JAM 01072; Ex. C (Collateral Assignment of Leases and Rents, Feb. 15, 1995) at JAM 00819-21. S&R's "losses" *include the cost of its debt servicing*. *See* Lott Dep. at 92. S&R's business decisions regarding how to finance its purchase, renovation, and operation of the Halle Building cannot and should not impose upon the lessor any particular rent or interpretation of the gold clause. If S&R made unwise business decisions, it alone must bear the consequences. Moreover, it appears that S&R has almost *never* made money on the Halle Building, despite evidently paying only $35,000 in annual rent from 1982 to 2006. *See* Lott Dep. at 29 ("the building has lost money all but a few years since we built it"). This suggests that the real value to S&R of the Halle Building lay not in cash flows but in something else, such as tax shelters. *See, e.g.*, Ex. D (Confidential Memorandum No. 48, Sept. 17, 1984) at FCID 0424-26, 0450-84.

D. S&R expends a great deal of energy and space attacking Mr. Venner for his "unabashed greed" and "opportunistic behavior." S&R's Supplemental Br. at 1, 3, 5-6. S&R even suggests that by not disclosing to Jamaica's predecessor Jamaica's intention to enforce the gold clause as written, Mr. Venner somehow violated a duty of "good faith [and] fair dealing." S&R's Supplemental Br. at 6-7. For a range of reasons, these arguments have no place in this case.

1. S&R's *ad hominem* invective obviously has no legal or factual significance in this case. This is a straightforward breach-of-contract case, and the only issues in dispute relate to the meaning of certain contractual provisions. The circumstances under which Jamaica became

the lessor and Mr. Venner's motive in orchestrating that transaction have no bearing on those issues.

2. Jamaica has not acted in bad faith at any point. Jamaica had absolutely no duty to disclose to its predecessor its plans for the property. That Jamaica may have valued the property differently from its predecessor is simply an ordinary part of business, as S&R and its parent, Forest City Enterprises, "currently the nation's largest publicly traded commercial real estate development company," surely know. Forest City Ratner Companies, *Company Overview*, at http://www.fcrc.com/compview.asp; *see also* Forest City Enterprises website, at http://www.forestcity.net/about.asp.

3. S&R insists that enforcement of the gold clause will provide Jamaica with a "windfall," which, S&R says, is "in essence, an unjust enrichment." S&R's Supplemental Br. at 5 n.7. This is preposterous. Jamaica simply seeks to enforce the terms of the Lease as written against a very powerful and sophisticated tenant. Jamaica has every right to do that, and thus there is nothing unjust about it. Furthermore, if the Court finds for Jamaica, then S&R will necessarily have paid substantially less in annual rent than the prior lessor could have required it to pay from 1982 to 2006. In this way, S&R will have obtained a windfall. (This is not to say that S&R's windfall was unjust or wrongful; if the prior lessor waived its rights, then that was its decision and S&R benefited fairly from it.) That S&R has consistently lost money on the Halle Building does not change this result, for, as Mr. Lott conceded, S&R at a minimum would have lost substantially more money had the gold clause been enforced as written, and thus it has saved the difference. *See* Lott Dep. at 33.

## CONCLUSION

For the foregoing reasons and the reasons stated in our previous briefs, the Court should grant Jamaica's motion for summary judgment and deny S&R's motion for summary judgment.

| | |
|---|---|
| May 22, 2007 | Respectfully Submitted, |
| | /s/ Charles J. Cooper |
| James B. Niehaus (0020128) | Charles J. Cooper |
| jniehaus@frantzward.com | ccooper@cooperkirk.com |
| Christopher G. Keim (0067117) | David H. Thompson |
| ckeim@frantzward.com | dthompson@cooperkirk.com |
| FRANTZ WARD LLP | David Lehn |
| 2500 Key Center | dlehn@cooperkirk.com |
| 127 Public Square | COOPER & KIRK, PLLC |
| Cleveland, Ohio 44114-1230 | 555 Eleventh Street NW |
| 216-515-1660 | Suite 750 |
| 216-515-1650 (fax) | Washington, DC 20004 |
| | (202) 220-9600 |
| | (202) 220-9601 (fax) |
| | *Attorneys for Plaintiff* |

## **CERTIFICATE OF SERVICE**

       I hereby certify on May 22, 2007, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this through the Court's system.

/s/ Charles J. Cooper
_____
Charles J. Cooper
COOPER & KIRK, PLLC
555 Eleventh Street NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com
