RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

216 JAMAICA AVENUE, LLC,

*Plaintiff-Appellant,*

v.

S & R PLAYHOUSE REALTY CO.,

*Defendant-Appellee.*

No. 07-3967

*FOR YOUR INFORMATION*

*1:06cv1288*
*CAB*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-01288—Christopher A. Boyko, District Judge.

Argued: June 12, 2008

Decided and Filed: August 27, 2008

Before: KEITH and SUTTON, Circuit Judges; ACKERMAN, District Judge.[*]

---

## COUNSEL

**ARGUED:** David H. Thompson, COOPER & KIRK, PLLC, Washington, D.C., for Appellant. Gary Lee Walters, THOMPSON HINE, LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** David H. Thompson, Charles J. Cooper, Dean J. Sauer, COOPER & KIRK, PLLC, Washington, D.C., for Appellant. Gary Lee Walters, Stephen D. Williger, THOMPSON HINE, LLP, Cleveland, Ohio, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. At stake in this case is the enforceability of a "gold clause" contained in a 1912 lease agreement.

### I.

In 1912, Salmon and Samuel Halle leased a parcel of land in downtown Cleveland from its owner, Realty Investment Corporation. The term of the lease was 99 years (through March 31, 2011), and the Halle brothers and their successors in interest retained the option of renewing the

---

[*] The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

1

Dockets.Justia.com

lease for another 25, 50 or 99 years (through as late as March 31, 2110). The lease agreement fixed the annual rent at $10,000 for the first two years, then increased the rent in periodic intervals until it reached $35,000 in the eleventh year, where it remained until the end of the lease. The lease also contained a "gold clause," which provided that "[a]ll of said rents shall be paid in gold coin of the United States of the present standard of weight and fineness." JA 125. At that time and up through the Depression, such clauses commonly appeared in long-term leases "as a sort of price-indexing mechanism to protect a lessor from the effects of inflation." *Trostel v. Am. Life & Cas. Ins. Co.*, 92 F.3d 736, 738 (8th Cir. 1996) (*Trostel I*), *vacated on other grounds*, 519 U.S. 1104 (1997), *reinstated by* 133 F.3d 679 (8th Cir. 1998) (*Trostel II*).

In the early 1930s, as part of a series of measures designed to implement the Roosevelt Administration's overhaul of American monetary policy, Congress withdrew gold from circulation and banned nearly all private ownership of it. *See id.* at 738; *see also* Kenneth W. Dam, *From the Gold Clause Cases to the Gold Commission: A Half Century of American Monetary Law*, 50 U. Chi. L. Rev. 504, 509–514 (1983). And in 1933, Congress passed a Joint Resolution that declared gold clauses to be "against public policy," barred their inclusion in any future contract and suspended the operation of existing gold clauses by allowing all contract obligations to be paid in paper currency instead. *See* Joint Resolution of June 5, 1933, § 1, 48 Stat. 112, 113 (originally codified at 31 U.S.C. § 463, recodified as amended at 31 U.S.C. § 5118(d)(2)) (providing that no gold clause "shall be contained in or made with respect to any obligation hereafter incurred" and that "[e]very obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts").

Four decades later, Congress changed course. It repealed the ban on private ownership of gold in 1975. And in 1977, it amended the 1933 Joint Resolution, providing that the resolution "shall not apply to obligations issued on or after" the amendment's date of enactment. Act of Oct. 28, 1977, Pub. L. No. 95-147, § 4(c), 91 Stat. 1227, 1229 (originally codified at 31 U.S.C. § 463 note, recodified as amended at 31 U.S.C. § 5118(d)(2)); *see also Trostel I*, 92 F.3d at 738–39. Although the amendment made clear that parties could include gold clauses in contracts formed after 1977, Congress's choice of words (authorizing "obligations issued . . . after" the amendment) generated a small stream of litigation regarding the amendment's effect on gold clauses contained in contracts made prior to 1977 but transferred after that date. *See, e.g., Trostel I*, 92 F.3d 736; *Grand Ave. Partners, L.P. v. Goodan*, 25 F. Supp. 2d 1064 (C.D. Cal. 1996), *aff'd*, 160 F.3d 580 (9th Cir. 1998); *Fay Corp. v. BAT Holdings I, Inc.*, 646 F. Supp. 946 (W.D. Wash. 1986), *aff'd sub nom. Fay Corp. v. Frederick & Nelson Seattle, Inc.*, 896 F.2d 1227 (9th Cir. 1990) (per curiam); *Nebel, Inc. v. Mid-City Nat'l Bank of Chicago*, 769 N.E.2d 45 (Ill. Ct. App. 2002); *Wells Fargo Bank, N.A. v. Bank of Am. NT & SA*, 38 Cal. Rptr. 2d 521 (Cal. Ct. App. 1995).

In an effort to clarify the matter, Congress passed a law in 1996 saying that owners could enforce pre-1977 gold clauses only if the parties to a new obligation issued after 1977 "specifically agree[d] to include a gold clause" in their new agreement. Economic Growth and Regulatory Act of 1996, Pub. L. No. 104-208, § 2609, 110 Stat. 3009, 3009-475 (Sept. 30, 1996). Just over a year later, however, Congress repealed the 1996 statute. *See* Treasury and General Government Appropriations Act of 1998, Pub. L. No. 105-61, § 641, 111 Stat. 1272, 1318 (Oct. 10, 1997).

So far as the record is concerned, the gold clause in this contract never attracted anyone's attention or at least never generated any disputes during the first 90 years of its existence. Since 1982, when the current lessee, S&R Playhouse Realty, assumed the lease, it has paid annual rent of $35,000 in American currency. And there is no indication in the record that either the original lessees, the Halle brothers or the other lessees prior to S&R paid more than $35,000 in the preceding 70 years. Nor is there any indication that the previous owners ever demanded more than $35,000.

That changed in 2006, when the current owner, 216 Jamaica Avenue, purchased the land for $845,000, then sought to enforce the gold clause, demanding rent equivalent to the value of 35,000 1912 gold dollar coins. The current lessee, S&R, balked at the prospect of paying several multiples of what it had been paying, prompting 216 Jamaica Avenue to file this breach-of-contract action in federal court premised on diversity jurisdiction. After the parties filed cross-motions for summary judgment, the district court ruled for the lessee, refusing to enforce the clause.

## II.

The parties share considerable common ground about how to resolve this dispute. They agree that the question at hand is whether the gold clause constitutes an "obligation[] issued . . . after" October 1977. Act of Oct. 28, 1977, § 4(c), 91 Stat. at 1229. They agree (or at least do not seriously dispute) that a gold clause may be an "obligation[] issued . . . after" 1977 either because it is part of a contract written and signed after that date or because it is part of an earlier contract incorporated into a new contract formed after that date. They agree that the previous owner assigned the underlying lease to the current lessee in 1982. They agree (or at least do not seriously dispute) that an assignment under state law by itself ordinarily would not suffice to make the gold clause enforceable. And they agree that an assignment combined with a novation, which substitutes a new agreement for a prior one and releases the obligations of the prior lessee, would suffice to satisfy the obligation-issued-after requirement. What the case boils down to, then, is whether the 1982 transfer of the lessee's interest to S&R amounted to a novation.

Under Ohio law, "[a] contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 994 (6th Cir. 2007) (internal quotation marks omitted, alteration in original); *see also Lexford Prop. Mgmt., LLC v. Lexford Prop. Mgmt., Inc.*, 770 N.E.2d 603, 607 (Ohio Ct. App. 2001). The party invoking a novation (here, the current owner, 216 Jamaica) bears the burden of establishing its existence. *See Chicago Title*, 487 F.3d at 994.

Neither party disputes that the 1982 assignment amounted to a valid new contract supported by adequate consideration. What divides them is whether the owner at that time agreed to release the prior lessee (Halle Bros. Co.) from its obligations under the lease and to substitute the new lessee (S&R) in its place. Under Ohio law, the parties' consent to a novation need not be express, *see McGlothin v. Huffman*, 640 N.E.2d 598, 601 (Ohio Ct. App. 1994), but may be implicit "from the circumstances or a party's conduct," *id.*

The key piece to the puzzle, it seems to us, is that the underlying 1912 lease agreement lays out the rules by which the owner agrees in advance to permit the substitution of a new lessee under the contract for the old lessee—the central benchmark of a novation. *See Hunter v. BPS Guard Servs., Inc.*, 654 N.E.2d 405, 411 (Ohio Ct. App. 1995); *Miller v. C.K.L., Inc.*, No. 84-CA-26, 1985 WL 9401, at *2 (Ohio Ct. App. July 19, 1985); *Restatement (Second) of Contracts* § 280 cmt. d (1979). Under the agreement, the lessee may "assign or transfer" the lease in one of two ways: either by obtaining the owner's written consent or by satisfying four conditions: (1) paying all rents and charges then due and satisfying all other relevant promises under the lease; (2) establishing that the new lessee has "expressly assume[d] the lessee's engagements" under the lease; (3) recording the instrument of assignment in the appropriate recorder's office; and (4) "plac[ing] in the hands of the lessor for inspection during a period of ten (10) days a legal and sufficient instrument of assignment and acceptance." JA 127. If the existing lessee satisfies one of these two routes for assigning the lease, the underlying agreement not only *allows* the assignment, but it also expressly *releases* the prior lessee from its obligations. "[A]ll personal liability of the lessees upon this lease and for the performance of the covenants herein contained," it says, "shall cease and determine upon

an assignment hereof." *Id.* A permitted assignment, the contract makes clear, also operates as a permitted novation.

No doubt, an assignment under Ohio law by itself normally would not establish that a novation occurred. A lessee might sublet a property and still remain obligated under the original lease, acting in effect as a surety or guarantor of the underlying lease obligations. *See House of LaRose Cleveland, Inc. v. Lakeshore Power Boats, Inc.*, No. 60904, 1992 WL 140074, at \*4 (Ohio Ct. App. June 18, 1992). That is not a novation. But here we have a lease agreement that prohibits *any* assignment unless it satisfies certain criteria, and the agreement establishes that an assignment that meets these criteria not only is permitted but also serves to release the original lessee from its obligations under the contract. What we have in other words is a lease agreement that prohibits an assignment unless it is a novation.

Neither party, unsurprisingly, takes the position that the 1982 transaction did not amount to a permitted assignment. S&R does not say that its acquisition of this lease interest 26 years ago was invalid, and it does not say that the prior lessee remains obligated to make the lease payments or to guarantee them. And 216 Jamaica, like its predecessor lessor, repeatedly has accepted the validity of the 1982 assignment and declined to contest its validity. Because the 1912 lease authorized the 1982 assignment, the assignment also served to release the prior owner from its obligations under the contract—or, in the words of the agreement, to terminate "all personal liability" of the assignor under the contract. JA 127.

In reaching a contrary conclusion, the district court reasoned that 216 Jamaica had not shown that the 1982 assignment was valid. There was no evidence that the prior lessor had consented in writing to the assignment, it observed, and it appeared that only three of the four other prerequisites for an assignment had been established. Namely, while the 1982 assignment agreement and surrounding documentation indicated that the lessee was current on payments, that the proposed new lessee had agreed to accept all of the obligations under the 1912 agreement and that the assignment was recorded, 216 Jamaica did not show that the pre-1982 lessee provided the assignment instrument to the lessor for the ten-day inspection period required by the lease. In the absence of evidence by 216 Jamaica that this condition had been satisfied, the court concluded that there could not be a novation. But these four requirements go not to whether there was a novation but to whether there was a permitted assignment. And all agree, one way or another, that an assignment occurred—which is why, ever since 1982, all parties to the agreement have accepted the validity of the assignment that occurred that year and why, in accordance with the underlying agreement, no one takes the position that S&R's predecessor in interest remains on the hook for the lease payments or for any other obligation under the lease.

The box in which S&R finds itself is that the only permissible assignment under this lease was a novation. Either there was a valid assignment (and novation) or there was not, because the underlying lease offered no middle ground. And given the release of the prior lessee's obligations, the company cannot tenably maintain that a novation under this agreement is somehow just an assignment.

S&R, moreover, offers no reason why it ought to be able to challenge the validity of the 1982 assignment at this late date, and we can think of none. At this point, surely any interest in enforcing the 10-day review period has come and gone, and the provision at any rate was designed to benefit the lessor, nor the lessee (S&R), and neither 216 Jamaica nor its predecessor in interest has ever sought to enforce it. *Cf. Finkbeiner v. Lutz*, 337 N.E.2d 655, 658 (Ohio Ct. App. 1975). If, in short, the 1982 assignment was valid or if any potential objections to it have long been waived by the party with a right to waive them, that leaves us with a 1912 lease agreement that treats any such assignment as having the characteristics of a novation—most pertinently that the lessor releases the

old lessee in return for accepting the new lessee as the party responsible for meeting the lease obligations.

The 1912 agreement also defeats the argument that one cannot establish a novation merely by showing that the lessor has accepted payments from the new lessee. *See Wenner v. Marsh USA, Inc.*, No. 01AP-1211, 2002 WL 826021, at *3 (Ohio Ct. App. May 2, 2002) (concluding that no novation occurred where the only evidence of an obligee's consent to assignment and release of the original obligor was its acceptance of payment without objection from the assignee). The key point here is not that 216 Jamaica's predecessor in interest accepted lease payments from the new lessee, S&R, after 1982; it is that the 1912 agreement permitted just one kind of assignment, one that released the prior lessee from its obligations and one that thus established a novation.

S&R objects that the 1912 agreement cannot establish the lessor's consent to the assignment because that consent was not *contemporaneous* with the novation. But why that is so is never explained or supported. There is nothing exceptional about permitting two parties to a contract to establish ahead of time the ground rules for consenting to the substitution of one party to the contract for another. And with respect to long-term contracts, that may well be the most efficient and fair way to do business: What long-term lessee would prefer to give the lessor a long-term veto power over any requests to be released from the lease? Why not permit the parties to negotiate up front the rules for permitting the lessee to be released from its obligations under the lease?

The parties to a contract are free to structure it however they wish, so long as they do not offend a constitutional, statutory or common-law prohibition. Yet S&R offers no constitutional or statutory reason why the original parties were prohibited from drawing up the 1912 lease in this way, and none of the common-law cases upon which it relies turns on this point, much less establishes such a restrictive principle. In *Bahner's Auto Parts v. Bahner*, No. 97-CA-2538, 1998 WL 470494 (Ohio Ct. App. July 23, 1998), the court held that no novation occurred because the parties never extinguished their obligations under the prior agreement, *see id.* at *7–8. In *Scioto Savings Ass'n v. Porter*, No. 77AP-788, 1978 WL 216705 (Ohio Ct. App. Mar. 2, 1978), the court held that no novation occurred because the transfer at issue did not release the previously obligated party, *see id.* at *1–2. And in *Baker v. All States Life Insurance Co.*, 96 N.E.2d 787 (Ohio Ct. App. 1950), the court held that no novation occurred because the agent who signed the second agreement lacked authority to do so, *see id.* at 793. S&R offers no other case—and we have identified none—in which an Ohio court has embraced this proposed requirement.

The authority we have found all goes the other way. The commentary to the provision in the *Restatement (Second) of Contracts* dealing with novations observes that "[i]t is not necessary . . . that all of the parties to the novation manifest their assent simultaneously nor that they all be in the same place," so long as "their manifestations of assent . . . have reference to one another." *Id.* § 280 cmt. c; *see Rockwell Int'l Corp. v. Reg'l Emergency Med. Servs. of Nw. Ohio*, 688 F.2d 29, 31 n.1 (6th Cir. 1982) (relying on *Restatement (Second)* § 280); *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 128 (Ohio 2006) (relying on the *Restatement (Second)*). Williston and Corbin come to the same conclusion. *See* 30 R.A. Lord, *Williston on Contracts* § 76:18 (4th ed. 1990) (noting that contracting parties may provide advance consent to a novation); 13 Joseph M. Perillo, *Corbin on Contracts* § 71.3 (rev. ed. 2003) (noting that advance consent is permissible).

Several cases have addressed the issue in this precise context—alleged novations stemming from an agreement containing a gold clause and a previously negotiated method for releasing an original obligee to the contract. All of them permitted the novation. *See Trostel I*, 92 F.3d at 741 n.8 (concluding that the terms of a pre-1933 lease established the owner's consent to a post-1977 transfer and sufficed to establish a novation); *Fay Corp.*, 646 F. Supp. at 951–52 (finding prior consent in the lease sufficient for a novation); *Wells Fargo*, 38 Cal. Rptr. 2d at 525 (noting that advance consent in the underlying contract may suffice to authorize a subsequent novation).

The terms of the 1982 assignment agreement answer another objection raised by S&R: How could the assignment resuscitate the 1912 gold clause, which no party to the lease had been able to enforce since 1933? In accordance with the express terms of the 1982 assignment agreement, S&R "assume[d] and agree[d] to perform each and all of the covenants, obligations, and engagements of the Assignor and lessee under said Lease *and all other terms and provisions thereof on the part of lessee to be observed and performed after the date hereof.*" JA 132 (emphasis added). The agreement also clarifies that the assignment was made "subject . . . to the payment of the rents *and the observance of all and singular the covenants, conditions, terms and agreements in said Lease contained.*" JA 132 (emphasis added). The assignment agreement, in short, says it all: It explicitly incorporates all of the terms of the 1912 lease, including the gold clause.

S&R insists that the 1982 assignment could not revive the gold clause because it had lain "dormant" since 1933. Appellee Br. at 2, 22–24. Whether S&R means to argue that it agreed to take on only the obligations performed by the most recent assignor or that the 1933 Joint Resolution operated to erase the gold clause from the lease, it is mistaken either way. As to the first possibility, S&R expressly took on responsibility for all of the lessee's obligations specified in the original lease, gold clause and all. One of the four requirements for an assignment under the 1912 lease (absent written consent from the lessor) was that the assignee accept all of the lessee's obligations under the 1912 agreement, not merely those obligations then being performed by the lessee. Nor can S&R deny that it was on notice of this requirement, as the entire paragraph from the 1912 lease agreement setting forth those four requirements was reprinted verbatim in the 1982 assignment. Other appellate courts faced with this issue have come to the same conclusion. *See Trostel II*, 133 F.3d at 682; *Wells Fargo*, 38 Cal. Rptr. 2d at 528–29.

As to the second possibility, the 1933 federal statute did not purport to, and did not in effect, delete the gold clause permanently from the lease agreement. The law, sure enough, made existing clauses unenforceable by providing obligors an alternative route for satisfying gold-denominated obligations, by declaring them to be against public policy and by forbidding their inclusion in *future* contracts. *See* Joint Resolution of June 5, 1933, § 1, 48 Stat. at 113. But it stopped short of voiding or invalidating existing gold clauses, and it did nothing to prevent parties from reviving those clauses after the 1977 amendment. As the Eighth Circuit correctly explained, "[t]he 1933 act did not magically erase the gold clause from the [pre-1933] lease." *Trostel I*, 92 F. 3d at 742.

Fine, S&R responds: But even if the 1933 Joint Resolution did not remove the gold clause from the 1912 agreement, the several-decades bar on enforcing the clause precluded the parties to the 1982 assignment agreement from having any meeting of the minds over this obligation. No one contemplated the possibility, it explains, that a lease establishing a flat $35,000 in annual rent secretly obligated S&R to pay many times that figure, permitting the current owner to spin this paper obligation into gold at S&R's unforeseen and unintended expense. But to many a law student's confusion, the meeting-of-the-minds formulation often requires far less than it suggests. As in most jurisdictions, Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time. What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous. *See Nilavar v. Osborn*, 711 N.E.2d 726, 733 (Ohio Ct. App. 1998); *cf. Kreller Group, Inc. v. WFS Fin., Inc.*, 798 N.E.2d 1179, 1186 (Ohio Ct. App. 2003). Here, the parties entered into an assignment agreement under which S&R *expressly* took on all of the original lease obligations for the next three (and, at its option, up to thirteen) decades, and the written instrument not only refers to and incorporates the underlying lease but quotes it at length. That clarity precludes S&R from establishing that the parties failed to have an objective meeting of the minds. Were the 1982 assignment agreement unclear, that would be another matter, one that might permit them to introduce extrinsic evidence of their intent in signing the contract. But there is nothing unclear about the relevant terms of this contract.

As a final matter, it is worth addressing the parties' respective efforts to cast themselves as victims in this nearly century-long saga. As S&R sees things, it took on a lease obligation of $35,000 a year and now is being asked to pay several multiples of that. As 216 Jamaica sees things, S&R had every reason to know this risk. The 1977 legislation permitted gold clauses to be enforced; the 1912 agreement contained a gold clause; the 1982 assignment required S&R to accept each of these obligations; and S&R chose not to condition acceptance of the assignment on removing the gold clause. And, what is more, S&R wishes to pay $35,000 per year for space that is worth multiples of that and wants that option not just through 2011 but presumably for 99 more years—through 2110. The record does not say how much comparable space rents for in Cleveland, but one can certainly assume that it is more valuable than it was in 1912 without having to accept the truth of 216 Jamaica's assertion that it is worth more than 75 times what S&R currently pays for it. Reply Br. at 3–4 & n.2. As a matter of sheer economics, it is hard to say which party has the sharper elbows.

Either way, in light of this ruling, the parties now know one of the effects of the 1982 assignment. By March 31, 2011, S&R will decide whether it wishes to exercise its option to renew the lease. In the interim, the case needs to be remanded to the district court. Because the court found that the gold clause was not enforceable under the 1933 statute, it did not reach the question of the gold clause's effect on the rent owed under the lease. Because we conclude that the clause is enforceable, we thus remand the case to the district court to interpret the clause, to determine the obligation it imposes on S&R and to address any other defenses the district court has not yet had an opportunity to address in the first instance, including S&R's estoppel-by-deed and waiver defenses.

III.

For these reasons, we reverse and remand for further proceedings.