# Exhibit D

*Maiden v. APA Transp. Corp.*, No. 00-883, 2002 U.S. Dist. LEXIS 8076 (S.D. Ohio May 6, 2002)

LEXSEE 2002 U.S. DIST. LEXIS 8076

**Paula J. Maiden, Plaintiff, vs. APA Transport Corporation, Defendant.**

Case No. C-1-00-883

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

*2002 U.S. Dist. LEXIS 8076*

**May 3, 2002, Decided
May 6, 2002, Filed**

**DISPOSITION:** [*1] Defendant's motion for partial summary judgment was granted in part and denied in part.

**COUNSEL:** For PAULA J MAIDEN, plaintiff: Marc David Mezibov, Michael N Budelsky, Christian A Jenkins, Sirkin Pinales Mezibov & Schwartz - 1, Cincinnati, OH.

For APA TRANSPORT CORPORATION, defendant: Stephen Sloan Eberly, Vorys Sater Seymour & Pease - 1, Cincinnati, OH.

For APA TRANSPORT CORPORATION, defendant: Richard L Moore, Rebecca J Brinsfield, Vorys Sater Seymour & Pease, Cincinnati, OH.

**JUDGES:** Sandra S. Beckwith, United States District Judge.

**OPINION BY:** Sandra S. Beckwith

**OPINION**

*ORDER*

This matter is before the Court on Defendant APA Transportation Corporation's Motion for Partial Summary Judgment (Doc. No. 11). For the reasons set forth below, Defendant's motion is **GRANTED IN PART AND DENIED IN PART.**

I. *Background*

Defendant APA Transportation Corporation ("APA") is a New Jersey-based trucking company that operates shipping terminals all over North America, including one located in Cincinnati. Plaintiff Paula Maiden began working for APA in September 1989 as a billing clerk in the Cincinnati terminal. By all accounts, Plaintiff for the most part fulfilled her duties as a billing clerk more than ably, and, on some [*2] occasions temporarily carried out the responsibilities of the terminal manager. Between her hire in September 1989 until about the middle of 1999, Plaintiff was never disciplined for any violation of company policy.

On several occasions, Plaintiff expressed to her supervisor, Michael Scott, her desire to advance within the company. One time Plaintiff told Scott that she wanted to move into sales. Maiden Dep. at 115. She also told Scott that she wanted to become a supervisor. *Id.* at 118. Plaintiff testified, however, that Scott tried to discourage her ambition by telling her that she really did not want to become a supervisor. *Id.* at 118-19.

In February 1998, an opening became available in the Cincinnati terminal for the position of supervisor trainee. Instead of selecting Plaintiff, however, APA hired Bob Suggs off the street. In October 1998, another supervisor trainee position opened up and APA hired Lenny Phillips instead of Plaintiff. *Id.* at 121. Plaintiff says that she complained to Scott about APA hiring Phillips instead of promoting her and that she was going to go to "the labor board." *Id.* at 123-24. According to Plaintiff, Scott responded, "You know how they [*3] [APA] feel [about women]. It's not going to happen." *Id.* Scott also told Plaintiff that "to do whatever she had to do" but that if she filed a complaint she "would never get

another job in the trucking industry." *Id.* at 98. Plaintiff did not file any contemporaneous discrimination complaints with respect to the hirings of Suggs or Phillips.

Plaintiff contends that after she threatened to file a discrimination complaint APA began retaliating against her. Plaintiff says that Scott began stuffing her personnel file with written criticisms. For instance, Scott began documenting when Plaintiff was tardy for work even though, according to Plaintiff, in the past being a few minutes late was not an issue because the work schedule was flexible. *See, e.g.*, Scott Dep. at 31. On another occasion, Scott recorded that Plaintiff was displeased when he changed her work schedule. *Id.* at 28-29. On yet another occasion, Scott documented a conversation in which he criticized Plaintiff's attitude toward work and commented that Plaintiff had a problem not knowing what her job duties were. *Id.* at 31-32. Scott in fact gave Plaintiff a letter putting her on notice of her alleged performance [*4] deficiencies. *See* Maiden Dep. Ex. 9. [1]

> 1 This letter, recited verbatim, states:
>
> On Friday, September 24, 1999, I had a meeting with you reguarding your tardiness and your lackluster work ethics.
>
> In the month of September, you were late four times, 9/3, 9/4, 9/16, and 9/24. The reasons being from traffic to oversleeping.
>
> In reguards to your work, you have not been holding your own. The amount of your work has not increased, but your hours have. The quality and attitude of completing your work in a timely manor seem to have ceased. Let this letter serve to warn that the tardiness is not exceptable nor will it be tolerated. Be advised that failure on your part to report to work on time and failing to improve from a performance stand point will result in a more severe manor up to, and including dismissal.

In June 1999, Scott cancelled an extracurricular contract that Plaintiff had with APA to provide after-hours cleaning services. According to Scott, he cancelled the contract because [*5] he believed that Plaintiff's APA-related performance was suffering and, also, that her cleaning service was no longer performing satisfactorily. Scott Dep. at 33-34. Plaintiff thinks, however, that this was just a way for Scott to retaliate against her for threatening to file a complaint about the hiring of Suggs and Phillips.

Scott did other things which Plaintiff claims were retaliatory in nature. For instance, Scott switched the shifts of the day dispatcher, with whom she got along well, and the night dispatcher, whom she did not like, so that she now had to work with night dispatcher. Maiden Dep. at 57-59. Plaintiff admitted, however, that switching the shifts of the dispatchers did not affect her work. *Id.* at 59. In addition, along with the switch in supervisors, Scott began allowing the new day dispatcher to smoke in the office even though heretofore the office had always been non-smoking. Plaintiff says that she complained to Scott about the smoke but that he dismissed her complaints out of hand, telling her simply to close the window to her office. *Id.* at 59-60. Plaintiff also stated that Scott began giving her the cold shoulder and would only talk to her when necessary [*6] to conduct business.

Things did not really come to a head, however, until October 1999. On Friday, October 22, 1999, Plaintiff was scheduled to work in the afternoon but had eye surgery that morning. Due to the sedatives she was given, Plaintiff had her daughter call in sick for her. *Id.* at 65-66. Scott says that neither Plaintiff nor her daughter called to inform him that Plaintiff would be missing work that afternoon. Scott Dep. at 46. On Monday, October 25, 1999, Plaintiff missed work due to a family emergency involving her sister. Maiden Dep. at 66-67. Plaintiff apparently did not call Scott to inform him that she would be missing work until sometime in the evening of October 25 when she left a message with the night dispatcher. *See id.* at 67; Scott Dep. at 46.

Plaintiff finally spoke with Scott personally on the morning of Tuesday, October 26. At that time, at Scott's request, Plaintiff agreed to sub for the second-shift biller, who was going on to be on vacation Wednesday, October 27 through Friday, October 29. Maiden Dep. at 68-69. On Wednesday October 27, Scott gave Plaintiff a letter regarding her recent two-day absence from work:

> On Friday October 22, 1999, you [*7] were scheduled to work after having a 9:30AM doctor's appointment. At noon and again at 4:00PM I called your home and left messages looking for your whereabouts.
>
> On Monday October 25, 1999, your daughter called to say that you were attending to a family problem. That evening at approximately 11:30PM you called and left a message that you would call me at 9:30AM to let me know what was going on.
>
> On Tuesday at approximately 11:30AM you finally reached me and told me that you had to take off the last two (2) days of work as a no call.
>
> I explained to you that you had recently received a letter (9/30/99), for your tardiness and your work ethic and once again you made no improvements. I told you that you were going to be suspended and that future employment was in jeopardy.

Maiden Dep. Ex. 10. Plaintiff was to report to work for her turn as the substitute night biller at 3:00 p.m. She was on time the first two days, but on Friday, October 29, she overslept and did not call in until about 3:20 p.m. Scott verbally terminated Plaintiff's employment during her call in and then later sent her a termination letter. 2

2 Plaintiff's termination letter is also dated October 27, 1999 even though she was not officially fired until Friday October 29. Recited here verbatim, the letter states:

> You have been warned, having a pending suspension yet you still fail to report to work as required.
>
> Since you have failed to respond to previous counseling sessions and warnings, you have left this company no alternative but to terminate your employment.
>
> Accordingly, this letter will serve as a written confirmation of your verbal discharge for excessive absenteeism, tardiness, and overall poor work performance.
>
> You are no longer an employee of this company, and your name has been removed from the employee rooster.

Maiden Dep. Ex. 11.

[*8] In addition to the alleged acts of retaliation and discrimination recounted above, Plaintiff claims that she was passed over for the supervisor trainee program yet a third time at around the time of her termination. It should be further noted, that at one point, Scott did offer Plaintiff a position as a supervisor trainee in order to make her complaint "go away." Plaintiff, however, rejected the offer because it involved a pay cut from the position she already held. Furthermore, there was no guarantee that she would become a supervisor upon completing the program because there was no guarantee that any supervisor positions would be available. APA says, though, that it offered Plaintiff the supervisor training program under the same terms and conditions as Suggs and Phillips.

Following her termination, Plaintiff did not seek employment of any kind for two months. At the end of that period, rather than seek employment with an established employer, Plaintiff opened her own store called "Paula's Attic." The nature of Plaintiff's business is not evident on this record, but Plaintiff admitted in her deposition that her store is not open regularly because she spends many days caring for [*9] her sick mother.

On April 27, 2000, Plaintiff filed a complaint of sex discrimination with the Equal Employment Opportunity Commission. *See* Complaint Ex. A. In pertinent part, the particulars section of Plaintiff's EEOC complaint alleges:

> I was hired in September of 1989 as a billing clerk at the Cincinnati Terminal. During my ten years of employment, I held a variety of positions at the Cincinnati Terminal including OS&D clerk and secretary. I was fired on October 29, 1999. I believe I was fired for voicing my desire to bring charges against the

company for its discriminatory practices.

. . .

From April of 1997 to the present, I am aware of three managerial or managerial training positions in operations available in the Cincinnati Terminal, the most recent of which occurred in September/October of 1999. I felt I was qualified for each of these positions and informed the company of my interest in them. In each situation, the position was filled by a man with no more or even less experience than me. In approximately February of 1999, in fact, I was informed by terminal manager Mike Scott that I would never receive a promotion to such a position. I was told, "you [*10] know how they feel," which was a clear reference to APA's negative attitude towards females in management positions.

*Id.* at 2. On July 25, 2000, the EEOC issued Plaintiff a right-to-sue letter finding no violation had been committed based on the information provided. Complaint Ex. B.

On October 23, 2000, Plaintiff filed a complaint against APA for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.*, and the Ohio Civil Rights Act, *Ohio Rev. Code § 4112.99*. With respect to her sex discrimination claims, the complaint alleges specifically that Plaintiff sought and was denied supervisor positions in February 1998 and October 1998. *See* Complaint P 11. In contrast to her EEOC complaint, the complaint filed in this case makes no claim that Plaintiff was discriminatorily denied a managerial position in September or October of 1999.

Following the close of discovery, APA filed a motion for partial summary judgment (Doc. No. 11) which raises a number of issues, but which in any event will not be not dispositive of the entire case. APA first argues that summary judgment is appropriate on [*11] Plaintiff's retaliation claims because there is no causal connection between the protected activity and the decision to terminate her employment. Specifically, APA argues that the temporal proximity between the two events is too great to establish the requisite connection. In any event, APA argues, it had a legitimate, non-retaliatory reason for terminating Plaintiff's employment - her alleged excessive tardiness and absenteeism. APA next argues that Plaintiff's Title VII sex discrimination claims based on the failure to promote in February 1998 and October 1998 are untimely because Plaintiff failed to file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory event. [3]

> 3 APA admits for purposes of this motion only that there are factual issues which preclude summary judgment on Plaintiff's claims for sex discrimination under the Ohio Civil Rights Act.

APA then argues that even if Plaintiff can establish claims for discrimination and retaliation, she is not entitled to backpay, [*12] front pay, or punitive damages. APA contends that Plaintiff is not entitled to backpay or front pay because she failed to mitigate her damages by failing to conduct an active job search and because she turned down APA's unconditional offer of the same position she claims she was discriminatorily denied. In addition, during discovery APA learned that prior to being hired, Plaintiff had two felony drug convictions which she failed to disclose on her application form. APA argues that had Plaintiff disclosed these convictions on her application, it would not have hired her. Therefore, APA argues that the after-acquired evidence doctrine bars Plaintiff's claims for front pay and backpay. Finally, APA moves for summary judgment on Plaintiff's claim for punitive damages, arguing that there is no evidence that it acted with malice toward Plaintiff.

For her part, Plaintiff admits that she failed to make timely complaints of discrimination with the EEOC with respect to the claims for failure to promote in February and October 1998. With respect to the claim that APA failed to promote her in September or October 1999, Plaintiff argues that this complaint was timely filed and that APA was on [*13] notice of the claim by virtue of her EEOC charge even if she did not include that alleged violation in her complaint. Even so, Plaintiff contends that now she ought to be able to amend her complaint to include this claim. With respect to her retaliation claim, Plaintiff argues that there is plenty of evidence to create a factual issue both as to the causal connection and whether the reason proffered by APA is a pretext for discrimination.

Furthermore, Plaintiff argues that her claims for damages should not be limited at this point. With regard

to mitigation, Plaintiff contends that self-employment was a reasonable method to mitigate damages. Plaintiff also argues that it was not unreasonable for her to reject APA's subsequent offer of the supervisor training program because the offer involved a cut in pay and did not include a guarantee of future employment as a supervisor. Additionally, Plaintiff argues that the after-acquired evidence doctrine does not bar her claims for front pay and backpay because although APA said it would not have *hired* her because of her felony convictions, it did not say that it would have *fired* her upon learning of those convictions. Finally, Plaintiff [*14] argues that any attempt to limit her claims for punitive damages at this point is premature.

APA's motion for partial summary judgment has been fully briefed and is now ready for disposition.

II. *Summary Judgment Standard of Review*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. *United States v. Diebold, Inc., 369 U.S. 654, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)*. "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*(emphasis in [*15] original).

The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson, 477 U.S. at 250*. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.*

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472, 7 L. Ed. 2d 458, 82 S. Ct. 486 (1962)*. "The issue of material fact required by *Rule 56(c)* . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." *First National Bank v. Cities Service Co., 391 U.S. 253, 288-89, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)*. [*16]

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, *Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979)*, the United States Supreme Court has stated that the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id. at 323*; *Anderson, 477 U.S. at 250*.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case [*17] and on which that party will bear the burden of proof at trial." *Celotex Corp., 477 U.S. at 322*. Significantly, the Supreme Court also instructs that the "the plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. *Id.; Anderson, 477 U.S. at 250*. *Rule 56(e)* requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.*

Further, there is no express or implied requirement in *Rule 56* that the moving party support its motion with affidavits or similar materials negating the opponent's claim. *Id. Rule 56(a)* and *(b)* provide that parties may

move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

III. *Analysis*

A. *Timeliness of Plaintiff's Title VII Sex Discrimination Claims*

[*18] As indicated above, the complaint alleges that APA denied Plaintiff promotions in February 1998 and October 1998 on the basis of sex. Under the procedural requirements set forth in Title VII, in a deferral state, like Ohio, a plaintiff must file a complaint of discrimination with the EEOC within 300 days of the alleged unlawful employment practice as a prerequisite to filing a lawsuit. *See Amini v. Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)*; *42 U.S.C. § 2000e-5(e)(1)*. In this case, Plaintiff did not file a complaint with the EEOC with respect to the first two incidents where APA failed to promote her until well after the expiration of 300 days after the event. [4] Indeed, Plaintiff admits in her brief that her discrimination complaint was not timely on these two claims. *See* Doc. No. 13, at 17. Accordingly, APA's motion for summary judgment with respect to Plaintiff's Title VII claims for failure to promote in February 1998 and October 1998 is well-taken and is **GRANTED.** Those two claims are **DISMISSED WITH PREJUDICE**.

> 4  As noted, Plaintiff filed her complaint of discrimination and retaliation in April 2000. Thus, her complaint with respect to the February 1998 denial of promotion was late by over one year. Her complaint on the October 1998 failure to promote was late by about seven months.

[*19] APA also points out that to the extent that Plaintiff now claims that APA violated Title VII by denying her a promotion in September or October 1999, that claim should be dismissed for failure to file a lawsuit on this complaint within 90 days of receiving her right-to-sue letter. Plaintiff appears to acknowledge that she failed to formally include this claim in her complaint but argues that APA was put on notice of it by her EEOC charge. Plaintiff further states that if required, she will file an amended complaint to include this claim. APA opposes any attempt by Plaintiff to amend her complaint at this late date.

As APA correctly recites, Title VII requires a plaintiff to file suit on his or her discrimination claims within 90 days of receiving a right-to-sue letter from the EEOC. *42 U.S.C. § 2000e-5(f)(1)*. In this case, Plaintiff clearly omitted from her complaint any allegation that APA discriminated against her on the basis of sex when it failed to promote her in September or October 1999. At this point (May 2002), Plaintiff is well beyond 90 days past the receipt of her right-to-sue letter (July 2000) for filing a lawsuit on this claim.

The Court [*20] observes that the 90-day filing requirement is not jurisdictional, but rather is similar to a statute of limitations and, therefore, is subject to waiver, estoppel, and equitable tolling. *Truitt v. County of Wayne, 148 F.3d 644, 646-47 (6th Cir. 1998)*. Plaintiff does not, however, contend that any of these doctrines excuse the untimely filing of a lawsuit on this claim. Rather, Plaintiff states that APA was on notice of this claim or, alternatively, suggests that granting leave to amend would be appropriate. The Court disagrees with both contentions.

First, the Court disagrees that the inclusion of this claim in her EEOC complaint was sufficient to put APA on notice of it. If anything, the inclusion of the September/October 1999 incident in her EEOC charge followed by its specific exclusion or omission from Plaintiff's federal complaint tends to indicate abandonment of that claim in this particular forum. Moreover, if mere mention of a claim in an EEOC complaint is considered sufficient to put an employer on notice of such claim in a federal lawsuit, there would be little reason for Congress to have included a 90-day filing requirement in Title VII at all. Plaintiff [*21] in effect asks the Court to consider her EEOC complaint to be a substitute for a properly filed complaint under the Federal Rules of Civil Procedure. Plaintiff's argument, however, flies in the face of the decision in *Baldwin County Welcome Center v. Brown, 466 U.S. 147, 80 L. Ed. 2d 196, 104 S. Ct. 1723 (1984)*, in which the Court held that the mere filing of a right-to-sue letter with the district court is insufficient to satisfy the 90-day filing requirement. *See id. at 148-52*. The Sixth Circuit has extended the *Brown* Court's rationale, albeit in an unreported decision, to situations where the plaintiff has filed only the right-to-sue letter and a copy of the administrative charges with the district court. *See*

*Coleman v. John Thomas Batts, Inc., 188 F.3d 506, 1999 WL 645420*, at **1-**2 (6th Cir. 1999). Accordingly, the Court concludes that inclusion of an alleged incident of discrimination within the EEOC charge is insufficient, in and of itself, to put an employer on notice of a claim in a Title VII lawsuit, nor does the filing of the administrative charges and the right-to-sue letter satisfy *§ 2000e-5(f)(1)*'s 90-day **[*22]** filing requirement.

In addition, the Court finds that granting Plaintiff leave to amend her complaint to include a claim of discrimination based on the September/October 1999 failure to promote would not be appropriate. Under *Rule 15(a) of the Federal Rules of Civil Procedure*, leave to amend a pleading "shall be freely given when justice so requires." The Sixth Circuit has explained the factors that a district court should consider when deciding whether to grant leave to amend:

> Several elements may be considered in determining whether to permit an amendment. Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Head v. Jellico Housing Auth., 870 F.2d 1117, 1123 (6th Cir.1989)* (quoting *Hageman v. Signal L.P. Gas, Inc., 486 F.2d 479, 484 (6th Cir.1973))*. **[*23]** In a case with a similar procedural history, the Sixth Circuit held that the district court did not abuse its discretion in denying plaintiff leave to amend where the plaintiff failed to file a discrimination claim within 90 days of receiving a right-to-sue letter. *Wade v. Knoxville Utilities Bd., 259 F.3d 452, 458-59 (6th Cir. 2001)*. In *Wade*, as in this case, the plaintiff waited until after the close of discovery and after the defendant filed a motion for summary judgment on the claims actually asserted in the complaint to move for leave to amend his complaint to assert a discrimination claim on which he had received a right-to-sue letter but failed to include in his original complaint. The plaintiff in *Wade*, like the plaintiff in this case, offered no justification or explanation for his failure to move for leave to amend earlier. In addition, the district court in *Wade* found that the defendant would be unfairly prejudiced by granting leave to amend because significant discovery had taken place and would have to re-opened in order to allow for a proper defense of the new claim. In that circumstance, the Court found that the district court appropriately **[*24]** denied plaintiff leave to amend. *See id. at 459*.

As indicated, this case is procedurally indistinguishable from *Wade*. As evidenced by her EEOC complaint, Plaintiff was aware at the time she initiated this lawsuit that she had a failure to promote claim from September/October 1999. Moreover, as further suggested above, Plaintiff's complaint was insufficient to put APA on notice that that particular incident was at issue in this case. Consequently, as APA points out, discovery has closed without any discovery on the claim and would have to be reopened to permit APA to defend the claim. In addition, Plaintiff has not proffered any explanation or justification for delaying moving for leave to amend until after APA filed its motion for partial summary judgment. In fact, Plaintiff has been quite dilatory in attempting to assert a claim based on this incident. Thus, for the reasons just stated, APA would suffer significant prejudice if Plaintiff were permitted to assert this claim now. Under the circumstances present here, as was the case in *Wade*, justice does not require granting Plaintiff leave to amend. Accordingly, to the extent that Plaintiff moves for leave **[*25]** to amend the complaint, Plaintiff's motion for leave to amend is not well-taken and is **DENIED**.

In summary, Plaintiff failed to file a complaint of discrimination with the EEOC within 300 days of APA's alleged discriminatory decision not to promote her in February 1998 and October 1998. Therefore, Plaintiff's Title VII claims based on these incidents are not cognizable, as she now admits. Accordingly, APA's motion for summary judgment on these two claims is well-taken and is **GRANTED**. In addition, Plaintiff failed to file a lawsuit within 90 days of receiving a right-to-sue letter on her claim that APA discriminatorily failed to promote her in September or October of 1999. Accordingly, to the extent that Plaintiff now asserts such a claim, APA's motion for summary judgment is well-taken and is **GRANTED**. To the extent that Plaintiff moves for leave to amend to assert such a claim, Plaintiff's motion is not well-taken and is **DENIED** for

the reasons stated above.

B. *Retaliation*

Plaintiff claims that APA retaliated against her for threatening to file a complaint over its failure to promote her by terminating her employment. In order to establish a prima facie [*26] case of retaliation, a plaintiff must establish that: (1) she engaged in activity protected by the discrimination statutes; (2) the exercise of her civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Harrison v. Metropolitan Gov't, 80 F.3d 1107, 1118 (6th Cir. 1996)*. To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not participated in protected activity. *See EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997)*; *Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 377 (6th Cir. 1984)*. Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly-situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *See Moon v. Transport Drivers, Inc., 836 F.2d 226, 230 (6th Cir. 1987)*. [*27] Temporal proximity alone, however, is insufficient to establish the causal connection needed to prove a retaliation claim. *See Nguyen v. City of Cleveland, 229 F.3d 559, 566-67 (6th Cir. 2000)*. The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met. *See Avery, 104 F.3d at 861*.

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate, non-retaliatory reason for the adverse employment action. *Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1082 (6th Cir. 1994)*. If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are but a pretext for retaliation. *Id.* However, the burden of persuasion remains with the plaintiff at all times. *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*.

The plaintiff may prove pretext in three ways: 1) by showing that the defendant's reasons had no basis in fact; 2) by showing that the proffered reasons did not actually motivate the defendant; [*28] or, 3) by showing that the proffered reasons were not sufficient for the defendant to act as it did. *Kline v. Tennessee Valley Authority, 128 F.3d 337, 346 (6th Cir. 1997)*. When the plaintiff proves pretext by the first or third methods, the fact finder may infer discrimination and the plaintiff need not produce any additional evidence of discrimination. *Id.* In the second situation, the factual basis for the defendant's actions is not challenged; therefore, the plaintiff must adduce additional evidence of discrimination in order to prevail. *Id. at 346-47*.

In this case, APA argues that Plaintiff cannot establish a causal connection between her protected activity and her termination because the temporal proximity between the two events is too great. APA notes that the latest Plaintiff engaged in any protected activity was October 1998 whereas no adverse employment action was taken against her until July or August 1999. On the other hand, Plaintiff essentially contends that right after she complained about not being promoted, APA, and specifically Michael Scott, began a campaign of harassment which culminated in her termination approximately one [*29] year later.

Were this case a simple matter of an eight month gap between the protected activity and the adverse employment action, as APA suggests this case presents, the Court would be inclined to agree that a causal connection could not be established as a matter of law. On the other hand, as Plaintiff points out, Scott did a number of things, which singularly may be innocuous, but when considered collectively could be construed as retaliatory harassment by a reasonable person. The Sixth Circuit has recognized that harassment not culminating in a true tangible employment action, as the Supreme Court now defines that term, [5] can still be retaliatory in nature. For instance, in *Harrison v. Metropolitan Gov't of Nashville, 80 F.3d 1107 (6th Cir. 1996)*, the Court found retaliatory harassment where "the plaintiff's activities were scrutinized more carefully than those of comparably situated employees" and "defendants took every opportunity to make [plaintiff's] life as an employee unpleasant." *Id. at 1119*. In *Moore v. KUKA Welding Sys., 171 F.3d 1073 (6th Cir. 1999)*, the Court found that the record supported retaliatory harassment [*30] where the plaintiff was isolated, was frequently written up for trivial matters, and his work was unfairly criticized. *Id.*

*at 1080*. Like the plaintiffs in *Harrison* and *Moore*, a juror could find that Scott subjected Plaintiff to a series a petty annoyances as a retaliatory gesture. Scott changed Plaintiff's shifts around, split up her working friendships, changed the office smoking policy and ignored Plaintiff's subsequent complaints, and apparently treated Plaintiff with aloofness except when he absolutely had to speak with her. In addition, for the first time Scott began documenting Plaintiff's actions and reactions to information or incidents, suggesting perhaps that she was under increased scrutiny. Thus, while as stated, none of these acts are in themselves a tangible employment action, a reasonable person could view them as a thread or theme connecting her complaints with her terminations. Accordingly, the Court finds that there is sufficient evidence of a causal connection to withstand summary judgment on this issue.

> 5   "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Ind. v. Ellerth, 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)*.

 [*31] APA also argues that there is no evidence to rebut its legitimate, non-retaliatory reason for terminating Plaintiff's employment - here alleged excessive absenteeism and tardiness. In so far as tardiness as a reason goes, Plaintiff testified that her hours were flexible and that she had never been warned about tardiness prior to her complaint. In other words, even though APA had a tardiness policy in effect, it apparently had not been very rigorously enforced. Even Scott admitted that there was some flexibility in regards to tardiness. 6 Thus, a juror could view the proffer of tardiness as a reason for Plaintiff's termination as a pretext for retaliation. With respect to excessive absenteeism, there is no question that at least just prior to her termination, Plaintiff missed several days of work and was not particularly diligent about keeping her employer up to date on her status. On the other hand, a juror might question whether Plaintiff's absenteeism was truly excessive given the reasons for her absence (eye surgery and family emergency). Moreover, given the alleged pattern of harassment to which Plaintiff was subjected, a juror might view Plaintiff's absences as convenient excuses [*32] to terminate her for retaliatory purposes. In other words, a reasonable person might find that Plaintiff's tardiness and absenteeism did not really motivate APA to terminate her employment. Thus, in summary, the Court finds there is sufficient evidence of pretext to withstand a motion for summary judgment.

> 6   In his deposition, Scott testified as follows:
>
> > A. We had a good working relationship and there was times she gave a little on the front and we helped out on the back end of things.
> >
> > Q. You're saying that if Paula was late coming in some morning, she would stay late, then, in the afternoon?
> >
> > A. If needed, yes.
>
> Scott Dep. at 31.

Accordingly, for the reasons just stated, APA's motion for partial summary judgment on the issue of retaliation is not well-taken and is **DENIED.**

C. *After-Acquired Evidence*

During discovery in this case, APA learned that Plaintiff had prior felony convictions for drug trafficking and drug possession which she failed to disclose on her initial employment [*33] application. Relying on the testimony of regional manager Les Seltzer, APA says that had it known of these convictions at the time of Plaintiff's application, it would not have hired her. Therefore, according to APA, the after-acquired evidence doctrine bars Plaintiff's claims for front pay and reinstatement, and that her claim for back pay is limited to the period from the alleged unlawful discharge to the date the new information was discovered. *See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 361-63, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995)*. Plaintiff argues that *McKennon* is applicable only when an employer proves that it would have *terminated* the plaintiff had it learned of the evidence sooner. Plaintiff argues that *McKennon* is not applicable in this case because APA has only demonstrated that it would not have *hired* her because of her felony convictions. Plaintiff apparently believes that, all other things being equal, APA cannot demonstrate that it would have terminated her even upon discovering she had felony convictions because of her pretty good twelve year work history with the company.

In *McKennon*, the Court did hold that after-acquired [*34] evidence bars claims for front pay and reinstatement and limits recovery of backpay in the manner just stated. However, the burden is on the employer to demonstrate that "the wrongdoing was of such severity that the employee would have been terminated on those grounds alone if the employer had known of it at the time of discharge." *See id. at 362-63*. Some case law supports Plaintiff's argument that *McKennon* is applicable only when the employer demonstrates that it would have fired, and not would not have hired, the plaintiff because of the misrepresentation on the employment application. *See Mardell v. Harleysville Life Ins. Co., 65 F.3d 1072, 1073-74 (3rd Cir. 1995); Shattuck v. Kinetic Concepts, Inc., 49 F.3d 1106, 1108-09 (5th Cir. 1995)*. Although the *McKennon* Court spoke in terms of termination, this Court notes that the Sixth Circuit has employed the *McKennon* after-acquired evidence analysis, albeit without question, in a case in which the employer claimed that it would not have hired the plaintiff because of alleged misrepresentations on his employment application. *See Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1168 (6th Cir. 1996)*. [*35] Other courts have reached the conclusion that *McKennon* is applicable where the employer demonstrates that it would not have hired the plaintiff because of a misrepresentation, *See, e.g., Red Deer v. Cherokee County, Iowa, 183 F.R.D. 642, 648 (N.D.Iowa 1999)*. In addition to applying *McKennon* in a "would not have hired" context in *Thurman*, the Sixth Circuit has stated that nothing in *McKennon* undercuts the dim view it takes toward resume fraud. *See Moos v. The Square D Co., 72 F.3d 39, 43 n.3 (6th Cir. 1995)*. Therefore, the Court finds that the after-acquired evidence doctrine is applicable in the "would not have hired" context.

Having said that, however, the burden still remains on APA to demonstrate that it would not have hired Plaintiff if it knew at the time that Plaintiff had prior felony convictions. As proof that it would not have hired Plaintiff, APA relies on the testimony of regional manager Les Seltzer, who testified simply that APA has a policy of not hiring any one with a felony conviction. *See* Seltzer Dep. at 24. In determining whether the employer has met its burden on this issue, some courts require the employer to [*36] actually prove that it would have fired or not hired the applicant as a routine matter or that the policy is firmly settled. *See Frazier Ind. Co., Inc. v. NLRB, 341 U.S. App. D.C. 393, 213 F.3d 750, 760-61 (D.C. Cir. 2000); Welch v. Liberty Mach. Works, Inc., 23 F.3d 1403, 1406 (8th Cir. 1994), overruled on other grounds, McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995).* [7] An employer might meet this burden by, for instance, submitting employment records which show that the policy had been consistently enforced in the past. While this Court would not go so far as to say that such evidence is required in this case or any other case, Seltzer's bald statement that APA would not have hired Plaintiff because of her felony convictions, without more, largely creates a credibility issue to be resolved by a jury.

> [7] *McKennon* only overruled *Welch* to the extent that *Welch* held that after-acquired evidence was a complete bar to recovery if the employer proves that it would have terminated the plaintiff.

[*37] Accordingly, APA motion for summary judgment on the issue of after-acquired evidence is not well-taken and is **DENIED.**

D. *Failure to Mitigate Damages*

APA seeks to limit Plaintiff's claims for backpay and front pay on the grounds that she unreasonably failed to mitigate damages by finding another job and because she turned down an unconditional offer for the position she claims she was denied because of discrimination. A plaintiff in a Title VII case has a duty to mitigate damages by seeking suitable employment with reasonable diligence. *Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1168 (6th Cir. 1996)*. If the employee suffers a willful loss of earnings, the employer's liability for backpay is tolled. *Id. at 1168-69*. The burden is on the employer to demonstrate failure to mitigate. *Id. at 1169*.

APA first argues that its backpay and front pay liability should be tolled because following her termination, Plaintiff did not seek employment of any kind for two months and then started a business which is only open sporadically. APA submits its expert's report to show that there were a number of jobs comparable to her former [*38] position in the Cincinnati area which Plaintiff could have obtained. Plaintiff contends that it was appropriate for her to start her own business after being terminated. Despite APA's suggestion otherwise, it was not necessarily inappropriate for Plaintiff to start a new business in lieu of obtaining a position similar to the one she held at APA. *See, e.g., Ford v. Nicks, 866 F.2d 865, 873 (6th Cir. 1989)* (plaintiff left teaching to become

a real estate agent). Even accepting APA's proposition, the plaintiff's duty to mitigate extends only to positions which are substantially equivalent to the job from which she was discriminatorily fired. *See id.* As Plaintiff correctly points out, none of the available jobs identified by APA's vocational expert paid reasonably near the $ 13.04 per hour Plaintiff was making when she was terminated. Most of the jobs identified by the vocational expert paid between $ 6 and $ 8 per hour. *See* Doc. No. 11, Ex. D. Even if Plaintiff should have taken one of these jobs, as she correctly argues, she would still be entitled to the difference. Finally, although Plaintiff did take a two month "vacation" and her business is only open periodically, **[*39]** Plaintiff did testify that she closes the business when she has to take care of her sick mother. Under those circumstances, a reasonable person might find Plaintiff's failure to better mitigate damages neither unreasonable nor willful.

A closer question is presented by APA's contention that Plaintiff failed to mitigate damages by refusing to accept an unconditional offer for a position as a supervisor trainee. Plaintiff refused the offer because it involved a pay cut and there was no guarantee of becoming a supervisor upon completion of the program. Plaintiff contends, therefore, that APA's offer of employment was not truly unconditional. A Title VII plaintiff forfeits her right to backpay if she refuses a job substantially equivalent to the one she was denied. *Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32, 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982).* Although Plaintiff argues that APA's job offer was not bona fide, there is no evidence in the record that other supervisor trainee applicants were paid more than Plaintiff was offered or received guarantees of promotion to supervisor upon completion of the program. In other words, Plaintiff did not want the same opportunity **[*40]** that was offered to other applicants, she wanted a position with better terms and conditions than was being offered to others. While it might have been entirely reasonable for Plaintiff to reject a job that paid less than she was already making, APA was not required to offer Plaintiff a position on more favorable terms. Consequently, the Court agrees with APA that Plaintiff unreasonably rejected APA's offer of placement in the supervisor trainee program. Accordingly, APA's motion for summary judgment on this issue is well-taken and is **GRANTED.**

E. *Punitive Damages*

Finally, APA argues that summary judgment on the issue of punitive damages is appropriate because there is no evidence that it acted with malice or reckless indifference to Plaintiff's rights. Punitive damages are recoverable in a Title VII case upon a demonstration by the plaintiff that the employer engaged in "discriminatory practices with malice or reckless indifference to the federally protected rights of an individual." *42 U.S.C. § 1981a(b)(1).* Under this standard, although a demonstration of egregious conduct would be sufficient, at a minimum the plaintiff must show that the employer **[*41]** discriminated in the face of a perceived risk that its actions will violate federal law. *Kolstad v. American Dental Ass'n, 527 U.S. 526, 536, 144 L. Ed. 2d 494, 119 S. Ct. 2118 (1999).* APA argues that under *Kolstad* the plaintiff must demonstrate that an APA employee had knowledge of the relevant federal or state law and that such employee perceived a risk that his conduct might violate that law. Because there is no evidence that any APA employee knew of any statute prohibiting retaliation or discrimination, APA argues that Plaintiff cannot recover any punitive damages.

First, even accepting APA's interpretation of *Kolstad*, there is some evidence, albeit minimal, that terminal manager Michael Scott had a general awareness that his conduct might violate federal law. Scott testified that after he hired Lenny Phillips as a supervisor trainee, Plaintiff told him that she might make a complaint to the EEOC. *See* Scott Dep. at 23. Plaintiff's statement ought to have alerted Scott that there was an agency charged with investigating discrimination complaints. Scott's testimony implicitly acknowledges an awareness of the EEOC's function. Therefore, while there is **[*42]** no evidence that Scott knew of the specifics of Title VII, certainly there was some evidence that Scott knew that discriminatory employment practices are illegal. Moreover, as Plaintiff points out, a juror could find that APA's conduct was egregious even if there was no specific awareness or perceived risk that its conduct violated federal law. In addition to the evidence which could demonstrate a pattern of retaliatory harassment discussed above, a juror could find that Scott implied that Plaintiff would be blacklisted in the trucking industry for complaining about discrimination. *See* Maiden Dep. at 98 ("He also told me that if I filed charges of or if I did anything, that I would never get another job in the trucking industry."). Plaintiff also attributed to regional manager Les Seltzer a number of stereotypical comments regarding a woman's place in the work force. Therefore, the Court cannot conclude as a

matter of law that APA's conduct was not egregious.

Accordingly, APA's motion for summary judgment on the issue of punitive damages is not well-taken and is **DENIED**.

*Conclusion*

In conclusion, APA's motion for partial summary judgment on Plaintiff's Title VII claims **[*43]** for sex discrimination is well-taken and is **GRANTED**. Those claims are **DISMISSED WITH PREJUDICE**. APA's motion for partial summary judgment on Plaintiff's claims for retaliation is not well-taken and is **DENIED**. APA's motion for partial summary judgment on after-acquired evidence is not well-taken and is **DENIED**. APA's motion for partial summary judgment on failure to mitigate damages by unreasonably failing to seek alternate employment is not well-taken and is **DENIED**. APA's motion for partial summary judgment on failure to mitigate by refusing to accept an unconditional offer of employment is well-taken and is **GRANTED**. APA's motion for partial summary judgment on the issue of punitive damages is not well-taken and is **DENIED**.

**IT IS SO ORDERED**

**Sandra S. Beckwith**

**United States District Judge**

Date May 3, 2002