# Exhibit L

*Hatry v. Painesville & Youngstown Ry. Co.,* 1 Ohio Cir. Dec. 238, 1886 Ohio Misc. LEXIS 23 (Ohio Cir. Ct. 1886)

LEXSEE 1 OHIO CIR. DEC. 238

AUGUST G. HATRY v. THE PAINESVILLE & YOUNGSTOWN RAILWAY CO.
ET AL.

[NO NUMBER IN ORIGINAL]

STATE OF OHIO, SEVENTH CIRCUIT, LAKE COUNTY

*1886 Ohio Misc. LEXIS 23*; *1 Ohio Cir. Dec. 238*; *1 Ohio C.C. 426*

**February, 1886, Decided**

**PRIOR HISTORY:** [*1] The facts are stated in the opinion.

Appeal from the Court of Common Pleas.

**DISPOSITION:** Decree entered, and case remanded.

**HEADNOTES**

1. In an action brought to determine the priority of liens on, and for the sale of, a railroad, neither lien-holders nor general creditors can question the legality of the incorporation of the railway company, or the validity of mortgages of such company upon the ground of such illegality.

2. Where in a mortgage the property is described as "all the railroad of the party of the first part, built and to be built" from F. to the city of Y., the mortgage will cover a part of the road subsequently built from the city limits to a point inside the city originally intended as the place for the depot at Y., as being within the termini named, although the road had been built and operated from F. to the point on the city line for several years before the mortgage was given; and the mortgagee will not be estopped, as against judgment creditors of the company, to show a resolution of the directors authorizing the execution of such mortgage, by reason of an erroneous recital of the resolution in the mortgage as authorizing the giving of the same upon the railroad then completed only.

3. A mortgage purporting to cover "all the railroad of the party of the first part, * * * * * together with all the tolls, * * * * * and all and singular the franchises of the party of the first part, all lands, * * * * * cars, rolling stock and apparatus, and property of every kind or description used in connection with said railroad," does not convey lands held by the railroad company, which have never been used in connection with such railroad.

4. But such mortgage does cover a steam-tug, used in connection with such railroad, and necessary for the transaction of the business of the company at the terminal point of such railroad on Lake Erie.

5. C., a stockholder of an insolvent railroad company, bought the unfinished road-bed of such company at judicial sale in foreclosure in 1869, and sold the same to F. & M. Before such judicial sale, S. obtained a money judgment against such company, which was a lien upon such unfinished road, and had commenced an equitable action against C., and other stockholders, to enforce their statutory individual liability, for the debts of such company. When C. sold to F. & M., they executed a bond to C. conditioned to pay, as part of the consideration, such debt to S., or at their option to defend his said action at their cost, and pay whatever judgment might be rendered therein against such stockholders. Thereafter F. & M. sold the road-bed to a railroad company, which company assumed, as part of the consideration, the obligation of F. & M. in their bond to C., completed the building of the road, and became insolvent, and the road was again sold in foreclosure proceedings in pursuance of a scheme of reorganization, and became the property and road of the reorganized company, the P. & Y. Ry. Co., defendant. The contract of reorganization provided that the reorganized company should indemnify F. & M. against their liability to S., and the deed to such company provided that such company should hold such road in trust to carry out the provisions of such contract of reorganization. S. was not a party to

Case: 1:06-cv-01288-CAB Doc #: 52-12 Filed: 11/10/08 3 of 15. PageID #: 1155

Page 2

1886 Ohio Misc. LEXIS 23, *1; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **

either of the proceedings in foreclosure. Neither F. & M., or either of said companies, made any defense to the action of S., and the latter railroad company refused to do so on application of the stockholders defendants therein, and in 1879 a decree was entered for S., finding the amount due upon his judgment, and referring the case to a master to report the amount to be contributed by each stockholder; but no hearing has yet been had before the referee. Since such decree was entered, and since the filing by S. of his cross-petition herein, the railway company procured a number of stockholders, who were not known to S. to be such, to become defendants to the suit of S., and who has set up the bar of the statute of limitations against their liability. *Held:* That S. has an equitable lien, in the nature of a vendor's lien, upon such railroad to the amount of his debt, superior to the mortgage of the railway company, notwithstanding his judgment became dormant. 2. That the administratrix of C. has such interest in the subject-matter as entitles her to maintain a cross-petition to have the debt of S. paid out of the proceeds of sale of such road, where F. & M. are non-residents of the state, and not parties to the proceeding.

6. Where a railroad company holds land for right-of-way not paid for, and which had been obtained by that company, or its predecessor, under contract with the owner, or by and with his consent, such owner has a lien upon the road of the railway company superior to that of a subsequent mortgage, for the contract price, or, if no price was fixed, for the compensation justly due such owner; and the same is a proper subject of adjudication in an action like the present one.

7. But where the land-owner alleges that the land was taken, and is held wrongfully, without his consent and against his protest, his only remedy for compensation for the land taken, and for injury to his other lands, is under section 6448, Rev. Stats. (69 O. L., 88, 95), to compel an appropriation.

8. Where land is taken by a railway company for right-of-way, and its road built thereon with the consent of the owner, the company is in possession under an equitable title, and cannot be compelled to legally appropriate the land under section 6448, Rev. Stats., although no price be agreed upon. The remedy of the land-owner in such cases is by suit to recover compensation, and which is a chose in action belonging to such owner, and does not pass to a subsequent vendee by a warranty deed of the tract of land through which the right-of-way runs, notwithstanding the right-of-way is neither noticed nor excepted in the deed.

9. The stockholders of the P. & Y. R. R. Co., to relieve themselves of their statutory liability for its debts, subscribed a loan to the company of $ 150,000 to pay the floating debt, which exceeded $ 200,000, upon condition that the same should include all unsecured obligations, claims for right-of-way adjusted or unadjusted, and for fencing, and should be scaled to equal the sum loaned, and obtained the consent of all recognized creditors thereto, and $ 130,000 of the loan was paid, and the money used as intended. Thereafter the company became insolvent and was reorganized under the name of the P. & Y. Ry. Co., and that company delivered, in compliance with the provisions of the contract of reorganization, the first $ 150,000 of its first mortgage bonds to a committee, to be distributed among the subscribing stockholders in proportion to the full amount of their subscriptions, to repay them therefor; and the subscriptions unpaid were to be and were paid to the committee to be used by it in paying the balance of the floating debt. Part of this fund, at the request of the railway company, was used by the committee in paying for lands held under temporary lease by the railroad company for right-of-way and other purposes, and subsequently bought by the railroad company, and for the construction of a bridge at the crossing of another railroad, which the railroad company had promised to build for mutual safety in the use of such crossing, but which promise could be enforced in no other way than by enjoining the crossing of such other road until such bridge was built, and the balance is still in the hands of the committee. Creditors, unrecognized as such at the time the loan was subscribed, subsequently established their claims against the railroad company, and the fund in the hands of the committee being insufficient to cancel the floating debt outstanding, thus increased, the committee refused to make further payment to the creditors, all of whom are parties hereto. *Held:* 1. Obligations of a money character only, and existing against such railroad company at the date of reorganization, including the cost of fencing the road could be legally paid out of this fund; that such fund is a trust fund for creditors, and the portion thereof thus misappropriated can be followed by them into the hands of such railway company, and an equitable lien exists in their favor, to the amount thereof, upon such railroad, superior to such first mortgage. 2. This right, as to some of the creditors, cannot be defeated by the fact that their

Case: 1:06-cv-01288-CAB Doc #: 52-12 Filed: 11/10/08 4 of 15. PageID #: 1156

Page 3

1886 Ohio Misc. LEXIS 23, *1; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **

claims were not taken into account by such subscribing stockholders in estimating the amount of the floating debt to be paid, nor by showing that such creditors did not then, nor do they now, propose to scale their claims as other creditors did, because they take the fund coupled with the condition upon which it was subscribed, *i. e.* that it should cancel their claims. But at all events a prior mortgagee of the railroad company cannot be heard to make such defense. 3. The defendant creditors are entitled to a decree against the members of the committee who are parties hereto, for the balance of the fund in their hands; and the aggregate amount herein realized for the benefit of these creditors must be divided among them *pro rata*, including those who hold claims against the railroad company for right-of-way as herein found.

**COUNSEL:** A. W. Jones, for plaintiff.

A. L. Tinker, for J. D. Hill, trustee; Burrows & Jerome, and Boynton & Hale, for bondholders, railway company, and committee; E. J. Estep, for Uri Seelye; Alvord & Alvord, for Crams' administratrix; P. Bosworth, Alvord & Alvord, Durfee & Stevenson, Hathaway & Osborn, for creditors of old company; A. W. Jones, C. Hine, O. P. Farr, H. Stewart, Alvord & Alvord, for the other defendants.

**JUDGES:** BEFORE JUDGES LAUBIE, FRAZIER AND WOODBURY.

**OPINION BY:** LAUBIE

**OPINION**

[**429] LAUBIE, J. *

* Stenographic report of oral opinion, revised, and head notes furnished, by Judge Laubie.

This case comes into this court by appeal, and it is brought to settle the priority of liens upon, and to have a sale of the Painesville & Youngstown Railway, which has been for a long time in the hands of R. R. Paige as receiver. There are two mortgages upon the railway, the first one of which only [*2] will be noticed, as all the controverted questions in the case arise in connection with, and as against this mortgage. This mortgage was executed immediately upon the organization of the company to John D. Hill, trustee, to secure [**430] the bonds of the company to the amount of $ 400,000.00, and the claim of the plaintiff, and such of the defendants as set up liens against, or right to payment out of the proceeds of the sale of the railway, superior to that of the trustee under this mortgage, will be noticed, with the facts in regard thereto, in their order. Having already held during the trial of the case, that the parties hereto cannot, in this proceeding, question the legality of the organization of the railway company, or the validity of its mortgages, no further notice will be taken thereof in this opinion.

1. As to the claims made by the plaintiff, Hatry. Hatry recently obtained judgment against the railway company, and caused execution to be levied, and claims a superior lien over the mortgage, on what is called in the case the "Youngstown Extension," upon the ground, first, that this mortgage covers only the road of the Painesville & Youngstown Railway Company that was [*3] built at the date of the mortgage, and that this extension into the city of Youngstown was made by the railway company subsequently to that date.

The charter under which the company operates the road authorized the construction of a road from Fairport Harbor, on Lake Erie, southward through certain named counties, to the city of Youngstown, in Mahoning county, and the road was completed and operated, at the date of the mortgage, just to the corporate limits of the city of Youngstown, on Mill Creek, and the so-called extension was built from Mill Creek into the city of Youngstown to a point on Mahoning Avenue, subsequently to the execution of the mortgage.

The charter was obtained by the Painesville & Youngstown Railroad Company, the predecessor of the present company, and the evidence shows that that company contemplated building this "extension," and had taken steps to obtain the right-of-way to Mahoning Avenue, at which point it had purchased lands for, and intended to establish its depot. So that the road was expected to be completed to Mahoning Avenue, but it was not so completed at the date of the execution of the mortgage.

In support of plaintiff's claim on this point, counsel [*4] rely somewhat upon the contract of re-organization of December 26, 1878, but mainly upon the mortgage itself.

[**431] The contract referred to was one between the bondholders and stockholders of the Painesville & Youngstown Railroad Company, entered into for the

Case: 1:06-cv-01288-CAB  Doc #: 52-12  Filed: 11/10/08  5 of 15.  PageID #: 1157

Page 4

1886 Ohio Misc. LEXIS 23, *4; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **431

purpose of reorganizing that company into the Painesville & Youngstown Railway Company, under and by virtue of a judicial sale of that road in the United States court, and of the proceedings set out in this contract, with the intention of maintaining and operating the road of the bankrupt company from Fairport, on Lake Erie, to the city of Youngstown; and it provided among other things, that certain mortgages should be issued by the new company, for purposes mentioned, upon the road aforesaid, and referring to the road as a completed road.

The first mortgage made by the present company in pursuance of that contract is the one in suit, and it recites that "by resolution of the board of directors, duly authorized by its stockholders, the party of the first part has determined to issue its bonds, to be negotiated from time to time, as required, in amount not exceeding $ 400,000.00, upon its railroad now completed from Fairport [*5] Harbor, on Lake Erie, to the city of Youngstown."

And again, it is covenanted in the mortgage that "there shall not be issued by the party of the first part an amount greater than or to exceed in the aggregate $ 400,000.00 upon said railroad now constructed, nor exceeding, in addition thereto, $ 6,500.00 per mile of said railroad hereafter actually built."

It is upon this recital and covenant in the mortgage, and the provision therefor in the contract of reorganization, that the plaintiff relies to show that the mortgage did not cover the "Youngstown Extension."

When we look to the mortgage itself, where it describes the premises that are granted, we see that the mortgage, whether rightfully or wrongfully, covers more than the completed road, and is designed to cover more, the description, in part, being, "all the railroad of the party of the first part built and to be built, extending from Fairport Harbor, on Lake Erie, in the township of Painesville, county of Lake and state of Ohio, through, etc., to the city of Youngstown," together with all property "thereafter to be acquired," by said company. So [**432] that the mortgage purports to convey to the mortgagee not only the [*6] road then completed, but such parts as should be built thereafter, at least between these points; and when recorded, was notice to all the world; and if the officers of the company had power and authority to execute it upon the future acquired property, or road to be thereafter built, the mortgage would cover that part of the road between these points when built, unless the doctrine of estoppel would require a different holding.

It is true that the mortgage contains also a notice that the resolution of the directors authorized its officers to execute a mortgage only upon its *completed* road; and the recital does not square with the granting clause.

In other words, the record would show that the officers of the company were conveying more property than by the resolution, *as recited in the mortgage*, they were authorized to convey.

Shall the trustee, under these circumstances, be estopped by the recital of the resolution in the mortgage, from showing what, in fact, was the resolution? We think not. The doctrine of estoppel does not apply, and the only question is, did the officers, in fact, have the authority? If they did, that seems to us to end the question. Creditors could [*7] not have been misled to their injury. They were put upon inquiry by the state of the record in regard to the resolution, and where a party is put upon inquiry by reason of notice, he is chargeable with all the knowledge that reasonable diligence would bring. But however this may be, certainly no estoppel would arise in favor of a creditor who was not misled by the state of the record, and the plaintiff makes no claim that he was so misled. The case is lacking in all the elements that go to make an estoppel *in pais*, and certainly there is no estoppel by deed. There is no privity either in law or estate, between a judgment creditor and his debtor. The creditor, by force of statutory law, may obtain a lien upon the lands of his debtor, but their relations are antagonistic, and he acquires no interest thereby in the lands that makes him privy in estate with the debtor. *Waters's Appeal, 35 Pa. 523*. Besides, estoppels by deed are mutual. Would the plaintiff, Hatry, be estopped by [**433] this recital to show that the directors had not given any authority to execute a mortgage on the bond? No one, I think, will claim that he would be.

The resolution, as actually [*8] passed by the directors, as shown by their record, is as follows:

"Therefore, resolved, that this company execute its first mortgage to John D. Hill, of New York, upon all the property now owned and subsequently to be acquired, and the income thereof, to be executed in due form of law."

The resolution therefore, in fact, is broader than that

Case: 1:06-cv-01288-CAB Doc #: 52-12 Filed: 11/10/08 6 of 15. PageID #: 1158

Page 5

1886 Ohio Misc. LEXIS 23, *8; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **433

recited in the mortgage, and did authorize the officers to execute a mortgage to John D. Hill, the trustee, to cover not only the property that the company then owned, but all that it might subsequently acquire; and this, therefore, fully authorized the officers to execute the mortgage in question.

The covenant in the mortgage above recited, is a covenant against other and future mortgages, and has no bearing upon the point in question; nor is there anything in the contract of reorganization that could in any manner prevent the stockholders and directors of the new company from giving such mortgage.

Secondly, it is claimed that the mortgage does not cover the extension from Mill Creek to Mohoning Avenue, because it only purports to convey the line of the road from Fairport Harbor on Lake Erie, to the city of Youngstown, and that at the time [*9] of the execution of the mortgage, the road was built and in operation to the city of Youngstown, and that that part constructed thereafter to Mahoning Avenue was beyond the southern terminal point. This is placing a very narrow and strict construction upon the preposition "to" in this sentence "from Fairport Harbor on Lake Erie *to* the city of Youngstown," and especially is this so when we take into consideration the facts disclosed by the evidence, that the old company had purchased rights-of-way over the greater part of the distance from the corporate limits of the city at Mill Creek to Mahoning Avenue, and had surveyed and located the line, and intended to establish its depot there, lands for which it had bought at that point. That was the condition of affairs when the present company took title, and when the [**434] mortgage was made, and it is immaterial that the present company, as claimed by the plaintiff, changed the line to a route nearer the river afterward. Whatever may be the rule in fixing the boundary lines of land from calls in a deed, it would be entirely too narrow a construction of an authority to build a railroad "from Fairport Harbor, on Lake Erie, to the [*10] city of Youngstown," to say that the railroad company could not build into the city, but must stop at the city limits. The terminal point on the south was the city of Youngstown, and the railroad company had a right to build into any part of the city that it chose, and over which it could obtain the right-of-way, and still be within its charter limits, still be within the description of the road extending southward to Youngstown; and the authority would not be exhausted because the company saw fit to stop the construction of its road, for the time being, at a point on the city line.

Thirdly, the plaintiff claims that the lots which were purchased by The Painesville & Youngstown Railroad Company for the "Youngstown Extension" were in the name of Paul Wick; that Wick held the legal title, and that his, plaintiff's, levy gave him a lien superior to that of this mortgage, because there was no legal title in the company which it could convey.

It seems from the evidence that Paul Wick, who is a party to this suit, held the legal title to these lots, in trust for the Painesville & Youngstown Railroad Company. The money of the Painesville & Youngstown Railroad Company had been paid for the [*11] lots, and Wick was a trustee of the naked legal title. In the foreclosure proceedings at Cleveland, where the property and line of the road of the Painsville & Youngstown Railroad Company was sold, Paul Wick was not made a party, and therefore the legal title did not pass to the purchasers under the sale. But Wick had no interest in the premises. He was the holder, as I have said, of the naked legal title only. All the interest was vested in the *cestui que trust*, the railroad company, and that interest was sold in the proceedings in the United States court, and passed to the purchasers under that sale, and from those purchasers by deed to the present railway company. So that this railway company, at [**435] the time it became the owner of the road of the Painesville & Youngstown Railroad Company, became also the owner in equity of all the lots from Mill Creek to Mahoning Avenue which stood in the name of Paul Wick.

A mortgage is just as good upon an equitable title as it is upon a legal title. A judgment is not, perhaps. A judgment takes effect as a lien upon legal titles. But a conveyance by way of mortgage is perfectly good for all the interest that the mortgagor has in [*12] the land, whether it be a legal or an equitable one, and when placed upon record is notice to all the world, that whatever interest the mortgagor may have is conveyed by the mortgage. So that this mortgage, having been executed and placed upon record long prior to the levy of the execution of the plaintiff, takes precedence.

The plaintiff claims also a lien as against this mortgage on certain other lands on which he caused a levy to be made; and bases this claim upon the construction to be given to the mortgage in this, that the mortgage, by its terms, covers only such real estate as was used in connection with the railroad, and that the

Case: 1:06-cv-01288-CAB  Doc #: 52-12  Filed: 11/10/08  7 of 15.  PageID #: 1159

Page 6

1886 Ohio Misc. LEXIS 23, *12; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **435

lands here in question were not so used. Among these lands are two lots on the hill at Fairport, a quarter of a mile away from the line of the road, which were purchased at the time the dock lots were purchased, and in order to obtain the dock lots. Also, a lot at Girard of some four or five acres of land, along the eastern border of which the line of right-of-way runs, and which right-of-way is fenced; the rest of the land, with a house upon it, the evidence shows, is rented to track men. And also some property in the city of Warren, notably one [*13] property known as the Taylor property, upon which is a dwelling-house, within a few feet of one corner of which the iron rails are laid. These three properties especially are pointed out by the plaintiff as lands upon which his levy is the only lien, for the reason above mentioned.

The mortgage itself, of course, must determine this question. It provides that "the party of the first part has bargained, sold, etc., and hereby bargains, sells and conveys all the railroad of the party of the first part built and to be built, * * * * together with all the tolls, income, earnings and profits thereof, and all and singular the franchises of the party [**436] of the first part, all lands, railroad tracks, sideways, rights and privileges, station houses and grounds, depots, depot grounds, machine shops and machinery used in or in connection therewith, engines, cars, rolling stock and apparatus, and property of every kind or description used in connection with the said railroad." Now, the query is, do the words, "used in connection with the said railroad," limit or qualify the words, "all lands?" If they do, the proposition of the plaintiff is correct, and some of the lands, which I will [*14] call attention to hereafter, are not covered by this mortgage, as they were not and cannot be said ever to have been used, so far as the evidence shows, in connection with the railroad. That this must be the construction we think admits of no doubt. The sentence would be, in a manner, incomplete without the concluding part of it in this, that the words, "all lands" would stand without limitation, and the lands without special designation. For these qualifications reference must be had to the succeeding portion of the sentence, and it is to be read the same as if it had been written "together with all lands used in connection with the said railroad," and the true sense of it will permit its being read in no other way. So that upon this point we think the claim of the plaintiff is well taken, so far as it refers to any lands owned by the company which were not used in connection with the railroad. Nobody claims that the two lots on the hill at Fairport were ever used in connection with this railroad, and on those lots the plaintiff, as between himself and the mortgagee, has the only lien, and so of the land at Girard. That part of the land at Girard which is outside of the right-of-way, [*15] has never been used in connection with this railroad, nor devoted to the same use, but is property held aside from the road, and rented the same as any ordinary land-owner would rent out his premises. So far as the property in Warren is concerned, there is none of it, as we gather from the evidence, that is of this character. All the land there is used and has been used in connection with this railroad, and therefore is covered by the mortgage. The Taylor lot is the only one of which anything could be said, and, as I have already stated, the evidence shows that the rails are laid within three or four feet of the house on those [**437] premises, and that, as Mr. Paige testified, the right-of-way at its regular width there would take in the house. The most of this lot, and the most valuable part of it, is a portion of the right-of-way itself, and therefore we hold that the lien of the mortgage is good upon that as against the judgment.

This, I believe, embraces all the claims of plaintiff for priority of lien.

II. In this connection may be noticed the claim of the general creditors as to the steam tug. The principal business of this railway company has been the transportation of [*16] coal and iron ore in connection with sailing vessels on Lake Erie, and at the harbor at Fairport it was necessary to have a steam tug to tow these vessels from the lake to the company's docks, and *vice versa*. There was no private tug at that harbor, and the railway company was compelled to buy one, for without such tug vessels could not be induced to enter the harbor to receive or discharge cargoes at the company's docks. This tug was, therefore, necessary to the operation of the road, and was a species of property, or apparatus used in connection with the road, within the terms of the mortgage, and is covered thereby.

III. I now turn my attention to the claim made by the administratrix of Uri Seelye. It seems that Seelye had a claim against the Painesville & Hudson Railroad Company, which, as the facts show, was the original owner of that part of the line of this road which lies between Painesville, in Lake county, and Chardon, in Geauga county. He obtained judgment in about 1868 against that company in Lake county, and had a lien upon

Case: 1:06-cv-01288-CAB Doc #: 52-12 Filed: 11/10/08 8 of 15. PageID #: 1160

Page 7
1886 Ohio Misc. LEXIS 23, *16; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **437

the part of the road lying in that county. As soon as he obtained his judgment he commenced a proceeding in the Court of Common Pleas of Cuyahoga [*17] County against the Painesvillo & Hudson Railroad Company and its stockholders, for the purpose of enforcing against the stockholders a duplication, as it is termed, of their stock. Shortly thereafter the Painesville & Hudson Railroad, no part of which had been finished, was sold at judicial sale, in a proceeding pending at the time Seelye recovered his judgment, and was bought in by one Harvey Cram. Cram sold the unfinished road (which he purchased in the interest of the bondholders of the Painesville [**438] & Hudson R. R. Co.) to John B. Ford and Christopher Meyer, very soon after his purchase, and they bought in the interest of the parties who were then about to organize the Painesville & Youngstown Railroad Company, conveyed title to that company, and that company completed the building of the road. At the time of their purchase, and in pursuance of the terms thereof, they executed a bond to Cram, which provides that Ford and Meyer "shall pay at their option or defend at their cost and expense the claim, not now exceeding $ 6,000 of Uri Seelye, now in suit pending in the Court of Common Pleas of Cuyahoga County, Ohio, against the stockholders of said railroad company and others; [*18] that they shall pay to said Seelye his said claim, not as of this date over $ 6,000, or shall defend such claim now in suit, and keep harmless and indemnify the said Cram from all costs, charges, fees and expenses, as well as the stockholders of said railroad company, by reason of the further defense of such suit, and pay whatever judgment may be finally rendered and adjudged therein against said stockholders."

In the agreement of reorganization of The Painesville & Youngstown Railroad Company of December 26th, 1878, we find a reference to the Seelye claim, and a provision in regard to it. It is the eighth paragraph or clause of that contract, and is as follows:

"It is mutually agreed between the signers of this agreement, that the new company which is here proposed to be organized, shall save and hold harmless John B. Ford and Christopher Meyer from any and all loss whatever which may come upon them or either of them through or by reason of a certain bond of indemnity given by them to Harvey Cram, of Painesville, Ohio, by which the stockholders of the Painesville & Hudson Railroad Company were to be held harmless against a claim made by one Seelye for some $ 6,000, with interest [*19] and costs, be the same more or less, said bond of indemnity being part of the consideration paid for the road-bed of the present Painesville & Youngstown Railroad Company between Painesville and Chardon; and upon the transfer of all right, title and interest of said Ford and Meyer in the above road-bed to the Grand River Improvement Company and the [**439] Painesville & Youngstown Railroad Company the said companies assumed the obligation of the bond of indemnity, and relieved said Ford and Meyer from all liability for and on account thereof, and also guaranteed said Ford and Meyer from and against loss on said bond of indemnity."

Ford and Meyer continued to be stockholders of the company to the time of this reorganization, and bondholders, and were largely instrumental in effecting such reorganization, and it was but natural that they should seek protection from the companies they were instrumental in organizing against their liability upon this bond, and it seems they got it. This contract of reorganization was introduced in evidence, without objection, and we take it for what it is worth. It embraces, indeed, a great many of the parties to this suit, and it shows that on the [*20] organization of the Painesville & Youngstown Railroad Company that company assumed the obligations of Ford and Meyer on the bond to Cram, as a part of the consideration for that part of the unfinished road lying between Painesville and Chardon, and whatever obligation, therefore, rested upon Ford and Meyer to Cram under that bond, and to Seelye, rested upon the Painesville & Youngstown Railroad Company, by virtue of this assumption. Further, the deed of the purchasers at the judicial sale of the Painesville & Youngstown Railroad to the corporators of the Painsville & Youngstown Railway Company, refers to this contract of reorganization of December 27, 1878, and recites that the deed is made to those corporators for the purpose of carrying out the provisions of that contract, and they take and hold the property, as expressly provided in the *habendum* clause, for the purpose specified in that contract. So that the deed itself--the only deed of this road or of these lands that the present company has or can lay claim to--for no conveyance was made from the corporators to the company itself--is made in trust to carry out the provisions of this contract, which provides for the payment [*21] of Seelye's claim.

Seelye was not a party to the forclosure suit wherein the railroad-bed of the Painesville & Hudson Railroad was sold to Cram; nor to the action wherein the road of

Case: 1:06-cv-01288-CAB  Doc #: 52-12  Filed: 11/10/08  9 of 15.  PageID #: 1161

Page 8

1886 Ohio Misc. LEXIS 23, *21; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **439

the Painesville & Youngstown Railroad Company was sold, and [**440] therefore, was not bound by such sales, nor by the other transfers. The obligation of Ford and Meyer to Cram, as we have seen, was to pay Seelye's claim, or, at the option of the makers of the bond, to defend the suit, and ultimately to pay whatever judgment was rendered. In this suit, pending in court from 1869, a decree was rendered in 1879 in favor of the plaintiff, Seelye, against the stockholders, finding the amount due upon his judgment, and referring the cause to a master named in the decree to ascertain and report the amount to be contributed by each stockholder to the payment of the claim; but no hearing has been had before the master. So that the Seelye claim did pass into judgment, in that case, within the meaning of the condition of that bond. The decree was conclusive of the liability of the stockholding defendants for the debt, and all that remained to be done was to ascertain the amount each was to contribute to its [*22] payment. No further defense could be made in that case against the claim upon its merits by any defendant to the proceeding, and it gave them the right, under the terms of the bond, to call upon the obligees to pay it at once. Indeed, the evidence shows that the stockholders sued applied to the P. & Y. R. R. Co. to defend, and it refused to do so.

The facts in regard to this claim show substantially a direction by Cram, the seller, to Ford and Meyer, the purchasers, and a promise by them, to pay that amount of the purchase-money to Seelye, substituting Seelye for Cram as vendor to that extent; and the Painesville & Youngstown Railroad Company assumed all the obligations which rested upon Ford and Meyer by virtue of that bond and promise to pay the debt, as a part of the consideration of its purchase from Ford and Meyer. There can be no question, therefore, that in the sale from Cram to Ford and Meyer, and from Ford and Meyer to The Painesville & Youngstown Railroad Company, the Seelye claim was regarded and treated as a part of the consideration which the purchasers agreed to pay. This, in equity, gave a lien to Seelye upon the lands in question, which is superior to the lien of this [*23] mortgage, as the mortgagee is chargeable with notice of the whole transaction. The title deeds, through which he must trace his title, [**441] show that it was a part of the consideration money, agreed to be paid as such, and he is bound by that which is contained in the title deeds of the property which he assumes now to be a purchaser of by virtue of his mortgage.

Authorities are not wanting to show that where, in sales of real estate, the vendor provides that the vendee shall pay, or the vendee promises the vendor to pay, a portion of the purchase money to a third person on a debt due from the vendor, such third person, for the amount of the debt, has, in equity, a lien upon the property; and Cram stood in the relation of debtor to Seelye, for Cram was one of the stockholders of the Painesville & Hudson Railroad Company; and Ford and Meyer, in their turn, became the debtors of Seelye, by reason of their promise to pay the debt contained in their bond to Cram.

The precise point is expressly decided in *Vanmeter's Ex'rs* v. *Vanmeter, 44 Va. 148, 3 Gratt. 148, 162*; *Tyson* v. *Wabash Ry. Co. et al.*, 16 Cent. Law J. (U. S. C. C. Ind.), 251; [*24] *Perkins v. Gibson, 51 Miss. 699.*, *Mitchell* v. *Butt.*, 45 Geo., 162; *Pinchain v. Collard, 13 Tex. 333*; *Nichols v. Glover, 41 Ind. 24*; *Latham et al. v. Staples, 46 Ala. 462*; *Hamilton* v, *Gilbert, 49 Tenn. 680, 2 Heisk. 680*. See also 2 *Jones on Mortg.*, § 214; 2 Pom. Eq., § 1254 note 3.

This lien is not strictly speaking a vendor's lien, but is an equitable lien of a similar character. It arises in favor of the person to whom the vendee is to pay, according to the terms of the purchase, the whole or a part of the purchase price, and exists because of that promise, and independently of the lien of the vendor. It is raised in favor of such person because by virtue of such promise he is made and becomes a party to the contract of sale itself, and is therefore entitled to all the rights incidental thereto.

This is well illustrated by the well established principle, that where a testator conveys land by devise, and at the same time directs that the devisee shall pay certain legacies, the legatees have a lien in equity on the lands devised to the amount of such [*25] legacies, although the testator may not have expressly made their payment a charge on the lands; and the reason is because it is implied in such cases that the testator means that the devisee shall pay the legacies as a consideration [**442] for the lands, and it would be against equity and good conscience that he should take and hold the lands without paying the consideration money. *Clyde v. Simpson, 4 Ohio St. 445, 462*; 7 Paige Ch. 421.

But were it otherwise--conceding it to be an attempt upon the part of a third person to enforce the lien of the vendor--the result is the same.

Case: 1:06-cv-01288-CAB  Doc #: 52-12  Filed: 11/10/08  10 of 15.  PageID #: 1162

Page 9

1886 Ohio Misc. LEXIS 23, *25; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **442

The rule that a vendor's lien is not assignable, is bounded within very narrow lines in this state. Whatever may be the *dicta*, the decisions have gone no further than to hold that an assignment of the purchase-money notes will not transfer the vendor's lien to the assignee. Indeed, in none of the cases, unless it be *Taylor* v. *Foot's adm'r*, Wright's Reports, 356, did the vendor have a lien to assign, because he had retained the legal title himself. But conceding the decisions are to the effect stated, the case at bar is, as we have seen, not a case of that [*26] character, and is as clearly outside of that principle as any of the well recognized exceptions thereto.

"That a vendor's lien can be enforced only by the vendor, may be true as a general rule; but it is undoubtedly subject to exceptions. On the death of the vendor, such lien may be enforced by his personal representatives." Story's Eq. J., Secs. 789, 1227, and cases there cited. Such lien may be enforced by creditors and legatees in marshaling the assets of the vendee. 4 Russ. 366; 9 Ves. Jr. 209; 15 Ves. 339; 6 Johns. Ch. 402. We can see no reason why the same may not be done by a judgment creditor of the vendor, in an action to subject purchase-money due the latter to the payment of the judgment. The equitable right of the judgment creditor is to have the claim due from the purchaser to his debtor subjected to the payment of his judgment. An essential element in the value of such claim is the security held for its payment." *Edwards v. Edwards et al., 24 Ohio St. 402, 412*. And a legatee of the debt may enforce the vendor's lien. *Tiernan v. Beam, 2 Ohio 383*.

In New York and Maryland, a [*27] vendor's lien will not pass by an assignment of the purchase-money notes, yet it is held that a surety on the notes, if obliged to pay them, may be subrogated to the vendor's right of lien, and enforce it. 6 Paige Ch. 621; [**443] 4 Md. Ch. 280. See, also, 2 Bland 199; 1 Perry on Trusts, § 238.

In Arkansas an assignment of the lien as collateral security is permitted. *32 Ark. 258*; and, as is shown by the authorities, *ante*, in Mississippi and Alabama the right of lien here contended for is sustained, although in those states an assignment of the purchase-money notes will not transfer the vendor's lien to the assignee.

Although the case of *Tyson* v. *Wabash Ry. Co., ante*, was reversed (*114 U.S. 577*), it was reversed solely upon the facts, because the evidence did not show a promise to pay the bonds, and because part of the property sold was personal property upon which a vendor's lien could not arise, as that lien arises only upon sales of lands. In the case at bar there was a promise to pay, and the sale was of land only, and we think, upon principle and upon authority, that Seelye, or his personal representative, [*28] has an equitable lien upon the land sold, in the nature of, and similar to a vendor's lien, superior to the mortgage.

The case of *Ogle v. Ogle, 41 Ohio St. 359*, is a case of considerable suggestive power upon the proposition in question. In that case Feebach sold to Mrs. Emeline Ogle some land supposing her to be a single woman, and took from her a mortgage upon the land to secure the purchase-money notes. It turned out that she was married, and the mortgage was void as the husband had not joined in executing it. Feebach transferred the notes to Ogle, who brought suit to subject the land to their payment. While the court say that a vendor's lien is not assignable, it held that Mrs. Ogle held the land in trust to pay the consideration money, and that the plaintiff having succeeded to the rights of Feebach by assignment of the notes, might maintain the action and subject the land to their payment.

That is a pretty broad case, and is to be commended as breaking away from the totally indefensible (upon principle) doctrine that a vendor of land cannot sell his lien thereon, although it is property, as much so as the notes which it secures, and frequently is the only [*29] thing which gives value to such notes. Call it a vendor's lien, and Ogle could not enforce [**444] it; but call it a trust, and he may. In equity the vendee holds the lands in trust for the vendor, to the extent of the unpaid purchase-money. The lien arises out of, and is founded upon, an equitable trust. *31 Ohio St. 503, 505*. It would seem as if the right to relief in such cases should depend upon the facts and not upon a name. Is it material whether such right be denominated a vendor's lien, a trust, or (properly), an equitable lien? The principle established in the Ogle case, applies, it seems to us, to the case at bar, and justifies us in holding that Seelye's representative has an equitable lien upon this railroad; and if so, it is good undoubtedly against all parties with notice.

But it is urged by counsel, that Seelye could not sue in his own name upon this bond, and, therefore, as a corollary, that he could not sue in equity the bondsmen, or their successors in interest, to establish a lien upon the road in their hands; and some cases have been referred to on this point by counsel, which we do not regard as of

Case: 1:06-cv-01288-CAB Doc #: 52-12 Filed: 11/10/08 11 of 15. PageID #: 1163

Page 10

1886 Ohio Misc. LEXIS 23, *29; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **444

authority in this state. In Ohio it is settled [*30] beyond all question, that in a case of this character the party for whose benefit the promise is made may sue on it, even although it be a bond under seal, and even although he be not named directly in the bond. *4 Ohio St. 333*; *9 Ohio St. 467*; *38 Ohio St. 543*; *42 Ohio St. 82*.

The case of *Emmitt v. Brophy, 42 Ohio St. 82*, is one of peculiar significance. The Scioto Bridge Company sold its bridge to the Commissioners of Pike county. Emmitt was the controlling stockholder in the bridge company, and he received the consideration, $ 18,000, that was paid by the commissioners for the bridge. He executed to the State of Ohio a bond, for the use of the county, conditioned that he would save the commissioners harmless from and pay all judgments and liens upon the bridge. Brophy and his partner had obtained a judgment against the company, and had levied upon the bridge just prior to its sale to the commissioners, and had, at that time, a lien upon the bridge for the amount of their judgment; and they subsequently brought suit against Emmitt on the bond. The court held, that they had a right to maintain an action upon the [*31] bond, although they were not named in it; that the promise to pay off the liens was a part of the consideration, [**445] and to that extent was a fund left in Emmitt's hands for payment of their debt, which they had a right to compel him to apply to its payment. There would be no difficulty, therefore, in this State, in Seelye's maintaining suit upon the bond against Ford and Meyer, and the Painesville & Youngstown Railroad Company which assumed the obligation.

But in addition to all this we have in the case at bar the further proposition that Cram, or rather his administratrix with the will annexed, is in court as one of the parties to this suit, setting up this bond, the liability of Cram's estate upon the decree rendered in Cleveland against Cram and other stockholders of the Painesville & Hudson Railroad Company, and asking the court to protect the estate by ordering this debt to be first paid out of the proceeds of the sale of the road.

So that we have the personal representative of the original vendor himself here asking for the proper appropriation of this fund, with all the parties in interest in court, and all with notice of the trust.

The remark of the court (page [*32] 412) in *Edwards v. Edwards et al., 24 Ohio St. 402*, seems to be applicable here: "In such action, the vendor and vendee both being parties, it appears to us that the lien of the vendor should be enforced for the benefit of the judgment creditor to the same extent that it would be enforced if the action had been brought by the vendor himself against the vendee for the enforcement of the lien." The condition of the bond was broken. Its condition was that the obligees would pay the Seelye claim, or defend against it, and pay the judgment which should be awarded in favor of Seelye in the suit, and they did neither. True it is that Ford and Meyer, being residents of New York, were not made parties to that suit, and many resident stockholders were not made parties, not being known to Seelye to be such, and who, after the decree, at the instance of the railway company, were made parties on their own motion, and pleaded the bar of the statute of limitations against liability on their part. But that does not alter the case; the decree went in favor of Seelye against Cram and against the great body of stockholders, and against his and their liability this bond was provided, [*33] to save them harmless and to pay whatever judgment might be rendered [**446] against them. It is immaterial that all the stockholders were not in court. The obligees neither paid nor defended for those who were in court, and they would not defend when applied to, or at least their successor in the obligation, The Painesville & Youngstown Railroad Company, would not.

Upon the question of the right of Cram's representative to intervene, the case of *Wilson v. Stilwell, 9 Ohio St. 467*, is also in point.

IV. There are in this case a number of parties who claim liens superior to all others for the price or value of lands sold to or taken by the companies for right-of-way, and it is conceded, and cannot be gainsaid, that these parties, where the lands are held upon contract, or where the company entered with the assent of the land-owner, have liens superior to the mortgage; and they are John R. Davis, Daniel Harrington, Ezekiel Moore, Philip Moser, Henry A. Houghton and the Leadville Coal Company.

These claims equally with Seelye's, will be paid out of the proceeds of the sale of the road in preference to the mortgage. The road must be sold as an entirety, and [*34] cannot be apportioned among the lienholders, and especially as there is no question but that the particular part of the road out of which each lien arises is worth more than the amount of the lien.

V. It is different, however, as regards the claims of Henry Wick, Joseph B. Perkins, Owen Wilson, Thomas J.

Case: 1:06-cv-01288-CAB Doc #: 52-12 Filed: 11/10/08 12 of 15. PageID #: 1164

Page 11

1886 Ohio Misc. LEXIS 23, *34; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **446

Dow, James Ford, Stephen Matthews, Harris Gould, Mrs. Thomas, John L. Thomas and Martha C. Walker. These parties present claims for lands taken for right-of-way, but they are of a character that cannot be enforced or regarded in this case. Some are for lands which were taken by the company, as alleged by the parties respectively, without legal proceedings, and without the assent and against the protest of the landowners, and wherein they assert the company was and still is a trespasser. Resort must be had in such cases by the landowner to other proceedings than this to determine the question of compensation, and wherein a jury may be called to assess the damages. Where the land itself may be recovered because the company has neither a legal nor equitable right to possession, the sole remedy of the land-owner for compensation [**447] and damages for taking the land, where objection [*35] is made by the company, as here, is to compel appropriation under section 6448, Revised Statutes (69 O. L., 88, 95); *Railroad Company v. Robbins, 35 Ohio St. 531*. This applies to all, with the exception, perhaps, of the Thomases and Martha C. Walker. As to these parties, they have no claim whatever, because they were not owners of the land at the time when the railway company entered upon the lands and appropriated them. In each instance it was done with the assent of the then owner of the land, and consequently the lands could not afterwards be recovered, nor could the company be treated as a trespasser, and the only remedy would be one for compensation; but that compensation would be a chose in action belonging to the person who then owned the land, and would not pass with a deed of the land. All that the deed would carry, in such case, would be the legal title to the land incumbered with the road, and which would entitle the grantee to the possession of the land in case it should revert; but the chose in action would belong to the vendor. As to all of these parties, however, that I have named, the decree may be entered without prejudice to their rights.

VI. [*36] I come now to the claim of the general creditors of the Painesville & Youngstown Railroad Company. It appears that there was a provision made in the reorganization agreement of December 26, 1878, for the payment or purchase in of the unsecured debts of the Painesville & Youngstown Railroad Company; and in that agreement reference is made to a certain other agreement which had been executed in 1876 by the stockholders and others interested in the Painesville & Youngstown Railroad Company, for the "cancellation and retirement" of this floating debt; and it is upon these agreements, and the provision of the mortgage itself with reference thereto, that these floating debt creditors claim a lien on, or right to be paid out of the proceeds of the sale of the road, for certain misapplications which they say were made of the fund provided for by these contracts for their benefit. The original contract referred to of 1876, between the Ohio parties, as they are termed, and the New York parties, provided that the Ohio parties should subscribe and loan the sum of $ 60,000.00 [**448] and the New York parties the sum of $ 90,000.00 to the Painesville and Youngstown Railroad Company for the cancellation [*37] and liquidation of the floating debt of that company, including therein all claims for rights-of-way, whether adjusted or unadjusted, and for fencing. That contract was in existence and had been largely performed at the time of the reorganization in 1878, and the reorganization contract referred to it and provided that its provisions should be carried out in good faith, and that of the $ 400,000,00 of the first mortgage bonds to be issued by the new company, $ 150,000.00 should be delivered to certain persons as a committee to take charge of and distribute the same among the parties who had subscribed to that fund, *pro rata*, upon payment to the committee by the subscribers of any amount not yet paid by them, and which the committee were to disburse in the purchase (payment) of the floating debt still outstanding. The money due upon the subscriptions was paid to the committee, and the bonds distributed.

It is claimed upon the part of the floating debt creditors, that a large part of this fund has been misappropriated by the committee and used for the purpose of buying property for the railway company, and in enhancing the value of the road covered by the mortgage. We may notice [*38] on the threshold the claim made by counsel for the mortgagees, that this was a contract or proposition which had never been accepted by some of the floating debt creditors, defendants, and that they are not therefore entitled to any part of the fund. The debts were assumed to be, and were in fact, in excess of $ 200,000.00, while the fund to be appropriated for their payment was $ 150,000.00, and the contract was that the debts should be scaled to $ 150,000.00, so that the fund subscribed should cancel the whole. Upon that condition these subscriptions were made. It is said that the debts never were scaled to that figure, and that consequently the proposition of the parties was not accepted by the creditors, or at least that some of the defendants did not, that they did not then, nor do they now offer to scale their

Case: 1:06-cv-01288-CAB Doc #: 52-12 Filed: 11/10/08 13 of 15. PageID #: 1165

Page 12

1886 Ohio Misc. LEXIS 23, *38; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **448

claims. If the question rested solely upon the contract of 1876, and that contract was still unexecuted, that would be a good answer [**449] to the claim of these creditors. But it has passed beyond that stage; it has become an executed contract so far as the subscribers are concerned, and the fund has been paid in and is exhausted, with the exception of a few thousand [*39] dollars. The subscribers to this fund employed parties to see, and they did see, aside from some of the defendants hereto, every person who was supposed to be, and recognized by them as, an unsecured creditor, and who agreed to the scaling, and the subscribers acted upon the presumption that the $ 150,000,00 would be sufficient for the purpose contemplated in their contract. But afterwards defendants herein, who were not recognized as creditors, established their claims against the company, and so increased the amount of the unpaid floating debt, that the money paid to the committee was insufficient to pay it if scaled according to the basis agreed upon, and the committee refused to make further payment.

In reliance, however, upon the sufficiency of the sum for the purpose, the Ohio parties had, prior to the contract of reorganization, paid their $ 60,000 and it had been applied to the discharge of the debts, scaled according to the agreement with the creditors, and about $ 70,000 had been paid by the New York parties, and applied in the same way; and by the reorganization agreement the parties completed the whole matter, and treated it as an accomplished fact so far as they were [*40] concerned, by an absolute provision that the first $ 150,000 of bonds should be used to reimburse the subscribers for the money advanced and to be advanced, for the satisfaction of the floating debt; all which was done, and the $ 20,000 due upon the subscriptions was paid to the committee, and it is too late now to question the matter. Besides, to interpose such a proposition now would leave that portion of the fund in the hands of the committee available to nobody. Who would be entitled to it if these floating debt creditors are not? And what right has the trustee in this mortgage to make this objection? It is the money of the defunct and insolvent Painesville & Youngstown Railroad Company, and is a trust fund for its creditors, as well under the law as under the contract, and it is those creditors who are following it here. If this fund goes to the payment of the [**450] floating debt by this proceeding, it will relieve the stockholders of that company from the very thing which that contract was originally entered into to relieve them from--a duplication of their stock; because if these creditors take this fund and its benefit, they must take it trammeled with the condition upon [*41] which it was subscribed, i.e., that it should cancel their claims.

It is averred by these creditors that there has been a misappropriation of this fund in paying for the Warren bridge. The contract provided, as I have stated, that the fund should be used in paying all claims for rights-of-way, and all debts and obligations of the company. At the time of entering into this contract, and subsequently, at the date of the organization of the present company, at the point on the railroad where the Warren bridge now stands, there was a trestle over the Ashtabuia & Pittsburgh Railway Company's track and right-of-way, upon which the rails of the Painesville & Yuongstown Railroad Company were laid. The latter company used that trestle for its track, and when the bridge was built by the present company it was paid for as a legitimate obligation of the Painesville & Youngstown Railroad Company, out of this old debt fund.

It appears that the Painesville & Youngstown Railroad Company brought suit against the Ashtabula & Pittsburgh Railroad Company, to restrain that company from interfering with the trestle work in question; and a cross-petition was filed in the action by the Ashtabula & Pittsburgh [*42] Railway Company against the Painesville & Youngstown Railroad Company to restrain it from the use of the trestle; and the result was a compromise and settlement between the two railroad companies, and the Pennsylvania company, operating the Ashtabula & Pittsburgh Railway Company, by which it was agreed that within a certain designated time the Painesville & Youngstown Railroad Company would remove the trestle and build a bridge of specified dimensions and height, etc., over which its track should be laid, crossing over the right-of-way of the Ashtabula & Pittsburgh Railway Company. This agreement lay thus in force, without performance until the organization of the Painesville & Youngstown Railway [**451] Company, when an action was commenced on the part of the Pennsylvania Company, and the Ashtabula & Pittsburgh Railway Company, to compel specific performance by that company of the agreement to build this bridge, and there was a decree entered restraining the Painesville & Youngstown Railway Company from the use of the trestle, and of that part of its road, until it made specific performance of the agreement. Under that decree the railway company, after the execution of the mortgage,

Case: 1:06-cv-01288-CAB  Doc #: 52-12  Filed: 11/10/08  14 of 15.  PageID #: 1166

Page 13

1886 Ohio Misc. LEXIS 23, *43; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **451

**[*43]** went forward and built the bridge, and the cost was paid out of this old debt fund, upon the ground stated. Was this an obligation, or debt within the meaning of the contract of 1876? We think not. There was no money obligation of any character resting upon the Painesville & Youngstown Railroad Company in regard to the bridge. It might be restrained from crossing the track of the A. & P. R. R. Co. until it built the bridge, but in no other way could it be compelled to build it. All that the parties to that contract were providing for was a payment of the floating debt, and the object it seems was to relieve the stockholders from a duplication of their stock. The contract provided solely for debts of a money character--something that had to be paid by the railroad company--and for fencing the road, that *that* should be included in the term "obligations;" but it provided for nothing like this.

If the creditors undertook to enforce a duplication of the stock of the stockholders of the Painesville and Youngstown Railroad Company, there could be no duplication, by reason of that decree or that agreement, for the building of the bridge. The company that succeeded to the rights of the **[*44]** railroad company, and became the owner of the right-of-way, would have to build the bridge at its own cost and expense. It was the debt, therefore, of the Painesville & Youngstown Railway Company, and not the debt of the Painesville & Youngstown Railroad Company, and should not have been paid out of this fund.

Without going into an extended discussion of the question in regard to the Fairport lots, I will say that the court has arrived at the same conclusion in regard to them. There was no debt resting upon the Painesville & Youngstown Railroad **[**452]** Company for these lots or any of them. It held no rights-of-way over these lots except what it held under lease. There was no contract for the purchase of these lots shown to have existed, prior to the reorganization, out of which any debt could arise against the Painesville & Youngstown Railroad Company, nor any occupation of any lot except under a lease. So that the payment for the Fairport lots was the payment of a debt against the Painesville & Youngstown Railway Company, contracted by that company, and not a debt of the Painesville & Youngstown Railroad Company; and the payment was, as in the case of the Warren bridge, a misapplication **[*45]** or misappropriation of the old debt fund for the benefit of the mortgagee, of which these creditors have a right to complain. It was a trust fund for their benefit, and was wrongfully invested in this road, increasing its value at their expense, and which the prior mortgagee is not entitled to the benefit of as against them; and these *cestuis que trust* have an equitable lien upon the road to the amount thus invested, superior to that of the mortgage. The amount of these two items, as found by the referee, will be paid out of the proceeds of the sale of the road in this case in preference to the payment of the mortgage.

So far as the fencing is concerned, what I have already said is sufficient to indicate the opinion of the court in regard to that, and therefore whatever was paid for the fencing of the track was paid rightfully out of the old debt fund, and was not a misapplication of it. There is, perhaps, some difficulty in arriving at what was paid for new fencing and what was paid for repairs, but the amount, as found by the referee, may be taken as correct.

There remains now the old debt fund in the hands of Christopher Meyer, unexpended, as found by the referee, some seven **[*46]** thousand and odd dollars. It is shown by the evidence that Meyer was the president of the Painesville & Youngstown Railway Company, and that, either by an arrangement with the committee into whose hands this fund should have passed, or by the tacit consent of that committee, a portion of it was paid to Meyer, and he disbursed it, at the request and instance of the committee, in the payment of the old debts. **[**453]** So that he became the agent of the committee, in regard to the fund, and legally it is to be regarded as in the hands of the committee. Some members of that committee are parties to this case, and the floating debt creditors by cross-petition ask that they be compelled to account for the balance of the fund in Meyer's hands, and a decree may be taken against them for the amount. The amount of this fund misappropriated, *i. e.*, the amount paid for the Warren bridge and for the Fairport lots, must be paid out of the proceeds of the sale of this road in preference to the mortgage, and together with that portion of the fund in the hands of the committee as heretofore found shall be divided among the floating debt creditors *pro rata*, including the parties whose claims **[*47]** for rights-of-way have been allowed herein, except the Leadville Coal Company, whose claim is against the railway company only.

A decree will be entered in accordance with this opinion, and the case be remanded to the court of

1886 Ohio Misc. LEXIS 23, *47; 1 Ohio Cir. Dec. 238;
1 Ohio C.C. 426, **453

common pleas for execution; and the account of the receiver for the legitimate debts which he has contracted in the operation of this road, and for costs, expenses and allowances, will be settled on the execution of the decree by the common pleas court, and in that court.