# Exhibit O

Deposition of Patrick Lott

Dockets.Justia.com

Patrick Lott                                      February 23, 2007
                     Clevland, OH

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

216 JAMAICA AVENUE, LLC,

     Plaintiff,

     vs.                    Case No. 06-1288

S&R PLAYHOUSE REALTY CO.,

     Defendant.

           - - - - -

DEPOSITION OF PATRICK M. LOTT

FRIDAY, FEBRUARY 23, 2007

           - - - - -


     Deposition of PATRICK M. LOTT, a

Witness called by the Plaintiff for examination

under the Applicable Rules of Federal Civil

Procedure, taken before me, Cynthia A. Sullivan,

a Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant to

notice and stipulations of counsel  at the

offices of Thompson Hine, LLP, 3900 Key Center,

127 Public Square, Cleveland, Ohio, on the day

and date set forth above at 9:50 a.m.

           - - - - -

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                                    February 23, 2007
                          Clevland, OH

---

Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
3      Cooper & Kirk, by
4      DAVID M. LEHN, ESQ.
5      Suite 750
6      555 Eleventh Street, N.W.
7      Washington, D.C. 20004
8      (202) 220-9642
9
10 On behalf of the Defendant:
11     Thompson Hine, LLP, by
12     GARY L. WALTERS, ESQ.
13     STEPHEN D. WILLIGER, ESQ.
14     3900 Key Center
15     127 Public Square
16     Cleveland, Ohio 44114
17     (216) 566-5730
18         ----
19
20
21
22
23
24
25

---

Page 4

1              INDEX (CONTINUED)
2           DEPOSITION OF PATRICK M. LOTT
3
4  Plaintiff's Deposition
5  Exhibit 7 was marked.................... 52:22
6
7  Plaintiff's Deposition
8  Exhibit 8 was marked.................... 57:23
9
10 Plaintiff's Deposition
11 Exhibit 9 was marked.................... 59:6
12
13 Plaintiff's Deposition
14 Exhibit 10 was marked.................... 75:23
15
16 Plaintiff's Deposition
17 Exhibit 11 was marked.................... 85:16
18
19
20
21
22
23
24
25

---

Page 3

1                INDEX
2          DEPOSITION OF PATRICK M. LOTT
3
4  BY MR. LEHN:.............................. 5:7
5  BY MR. WALTERS:........................ 93:21
6  BY MR. LEHN:............................ 96:20
7
8  Plaintiff's Deposition
9  Exhibit 1 was marked.................... 11:7
10
11 Plaintiff's Deposition
12 Exhibit 2 was marked.................... 16:13
13
14 Plaintiff's Deposition
15 Exhibit 3 was marked.................... 33:21
16
17 Plaintiff's Deposition
18 Exhibit 4 was marked.................... 38:5
19
20 Plaintiff's Deposition
21 Exhibit 5 was marked.................... 40:6
22
23 Plaintiff's Deposition
24 Exhibit 6 was marked.................... 42:18
25

---

Page 5

1       PATRICK M. LOTT, of lawful age, called
2  for examination, as provided by the Federal
3  Rules of Civil Procedure, being by me first duly
4  sworn, as hereinafter certified, deposed and
5  said as follows:
6        EXAMINATION OF PATRICK M. LOTT
7  BY MR. LEHN:
8      Q.  Good morning.
9      A.  Good morning.
10     Q.  Mr. Lott, I'm David Lehn.  I'm here on
11 behalf of the plaintiff, 216 Jamaica Avenue.
12 Just some preliminary issues to go over.  Have
13 you been deposed before?
14     A.  Yes.
15     Q.  So you're familiar with the basic
16 procedure?
17     A.  Reasonably.
18     Q.  I'll just refresh your memory.  I'll
19 ask a question.  You'll answer it to the best of
20 your ability.  We'll try not to speak over each
21 other.  We'll try to speak slowly.  It's a
22 little bit artificial, but it helps the reporter
23 to get down the record.
24     A.  Okay.
25     Q.  If anything is not clear, please, just

---

                                        2 (Pages 2 to 5)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                                February 23, 2007
                          Clevland, OH

---

Page 6

1   ask me to clarify what I'm trying to ask.  If at
2   any point you want to take a break, it's
3   certainly fine.  If there's a pending question,
4   just answer that question, and we'll take a
5   break.
6       A.  Okay.
7       Q.  This deposition is a 30(b)6
8   deposition, so you are speaking on behalf of S&R
9   Playhouse.  So if I use the word you, I'm
10  referring to S&R or you in your capacity as a
11  representative of S&R here.
12      A.  Okay.
13      Q.  Could you tell me about the cases in
14  which you were deposed previously?
15      A.  There was a matter between a tenant
16  and ours here in Cleveland I'd say 10 or 12
17  years ago regarding a sublease opportunity the
18  facts of which kind of leave me.  There was a
19  suit in one of our projects in Pittsburgh.
20      MR. WALTERS:  I'm sorry to interrupt.
21  I want to be clear.  When you say our, you're
22  speaking for S&R, and I don't think that is the
23  case here.
24      THE WITNESS:  That is not the case.
25      Q.  That was for another entity with --

Page 7

1       A.  With another entity within Forest
2   City, yes.
3       Q.  The second one?
4       A.  Another entity, not S&R, regarding a
5   partnership issue.  I can't remember the facts
6   of that, either, frankly.  That was also about
7   ten years ago.
8       Q.  Is that it?
9       A.  There may have been one or two others
10  but further, longer ago than that.  Those are
11  the only two that stick in my mind.
12      Q.  The details of those you don't recall?
13      A.  No.
14      Q.  Can you just describe for me where you
15  fit in in the Forest City and S&R organization?
16      A.  I'm a senior vice president of Forest
17  City Commercial Group.  As such I have several
18  buildings totaling square footage maybe 6 or 7
19  million square feet under my purview all of
20  which are with either LLCs or limited
21  partnerships, and my job is to keep those
22  buildings full, S&R being one of them.
23      Q.  Well, how many LPs, is it a
24  substantial number?
25      A.  It's a substantial number.

Page 8

1       Q.  Can you give me sort of a resume?
2   Just walk me through your educational and
3   employment history after high school.
4       A.  BS Arizona State University.  IBM
5   corporation, '68 through '72.  That was after
6   graduation.
7       Q.  What did you do there?
8       A.  Office products sales.  1972 to 1977
9   Coldwell Banker commercial brokerage, office and
10  industrial broker.  '77 to '80, vice president
11  manager Sherman Oaks, California, office of CB,
12  Coldwell Banker.  1980 to 1984, vice president
13  resident manager Coldwell Banker, Dallas.  '84
14  to '87 senior vice president Rosewood
15  Properties, Dallas, Texas.  1987 to present,
16  senior vice president, Forest City Commercial
17  Group.
18      Q.  How did you prepare for this
19  deposition?
20      A.  Read the documents, met with lawyers,
21  met with our attorneys.
22      Q.  When you say the documents, which
23  documents?
24      A.  I believe everything that you've filed
25  and made available to us.  I couldn't enumerate

Page 9

1   exactly which ones they were.  I read them in
2   some detail.  I can't say I read every page.
3       Q.  You're referring to documents that we
4   filed with the court?
5       A.  Yes.
6       Q.  In the lawsuit?
7       A.  Yes.
8       Q.  Did you read the lease?
9       A.  I have read the lease, yes.
10      Q.  Did you read the 1982 Assignment and
11  Assumption?
12      A.  I believe I have, yes.
13      Q.  Do you recall reviewing any documents,
14  other than the ones we've just discussed, other
15  than the ones that were filed with the court,
16  the lease in 1982?
17      A.  I read the sheaf of documents that
18  were sent over to me.
19      Q.  Sent over to you by counsel?
20      A.  Yes.
21      Q.  Did you discuss this deposition with
22  anyone other than counsel?
23      A.  Yes.
24      Q.  Who was that?
25      A.  Neil Cawsey.

3 (Pages 6 to 9)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                        Clevland, OH

---

Page 10

1    Q. Can you spell his name?
2    A. C-A-W-S-E-Y.
3    Q. C-A-W-S-E-Y.  What is his job?
4    A. I believe Neil handles all of our
5  outside litigation.  He's a Forest City
6  employee.
7    Q. Is he inside counsel at Forest City?
8    A. He's actually not a lawyer, but he
9  does act as our liaison with outside counsel in
10  litigations.  I believe that's what Neil does.
11    Q. What was the content of your
12  discussion with him?
13    A. We discussed various aspects of your
14  suit.
15    Q. Such as?
16    A. I can't remember the specifics of it.
17  We've spoken once or twice.  I told him I was
18  meeting with our lawyers.  I told him we were
19  having a deposition preparation, just in general
20  keeping him aware of what was happening.
21    Q. So I want to talk about the lawsuit
22  for a minute just so that we have a common
23  understanding about what this lawsuit is about.
24  You understand the plaintiff is 216 Jamaica
25  Avenue, the defendant is S&R Playhouse, and the

---

Page 11

1  claim by Jamaica is that S&R has breached the
2  lease by paying an incorrect amount of rent?
3    A. Yes.
4    MR. LEHN:  I'd like to mark this as
5  Exhibit 1.
6    - - - - -
7    (Thereupon, Plaintiff's Deposition
8    Exhibit 1 was marked for purposes
9    of identification.)
10    - - - - -
11    Q. If you want to take a minute to look
12  this over, feel free.
13    A. Okay.
14    Q. Just for the record, can you identify
15  this document?
16    A. I've seen this document before, yes.
17    Q. What is it?
18    A. It is an assignment of lessee's rights
19  under the original ground lease.
20    Q. From whom to whom?
21    A. Well, I guess you can read it.
22    Q. Well, just for the record, it's
23  between Halle Brothers Company who assigned it
24  to?
25    A. S&R Playhouse Realty Company.

---

Page 12

1    Q. It's dated May 21st, 1982?
2    A. Correct.
3    Q. Through this transaction, this
4  document, S&R became the lessee under the lease?
5    A. Evidently, yes.
6    Q. When we say the lease, just for the
7  record, it's the 1912 lease on the property
8  currently owned by Jamaica?
9    A. Correct.
10    Q. Why did Halle Brothers Company assign
11  it to S&R?
12    A. Why did Halle Brothers Company assign
13  it to S&R?  We bought the property in 1982, and
14  obviously we had to assume the underlying ground
15  lease at the time we bought the improvements.
16    Q. The improvements meaning the building?
17    A. Yes.
18    Q. I'm sorry.  I think I interrupted.
19  Are you done?  Were you saying and the theme?
20    A. No.
21    Q. At the time that S&R acquired the
22  building, what was S&R's intention for the use
23  of the property?
24    A. To rehab an old department store into
25  an office building, a for-lease office building.

---

Page 13

1    Q. Now, in S&R, the S, does that refer to
2  Jerome Schottenstein?
3    A. I believe so.  I was not here at the
4  formation of that partnership.
5    Q. Do you know whether Jerome
6  Schottenstein owned the Halle Brothers Company?
7    A. I don't know that.
8    Q. Do you have any idea why the Halle
9  Brothers Company couldn't rehab the building
10  into an office building?
11    A. I have an idea.  It's supposition on
12  my part.  Schottenstein is not an office
13  developer.  He's a retail developer.  I believe
14  that he determined that he either couldn't or
15  didn't want to do it himself, and we were
16  brought in, I believe, to develop the building
17  because we had an office background.
18    Q. When you say we, you're referring to?
19    A. Forest City/S&R.  S&R is obviously the
20  vehicle by which we bought the building.
21    Q. S&R didn't really exist before this?
22    A. Absolutely not.
23    Q. The R in S&R refers to?
24    A. My guess is it's Ratner, but again, I
25  wasn't here when the formation was done or was

---

4 (Pages 10 to 13)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                        February 23, 2007
                        Clevland, OH

Page 14

1  made.
2      Q. You don't know which Ratner it is?
3      A. There's a lot of them.
4      Q. That's why I'm asking.
5      A. No. I don't know that.
6      Q. After becoming a lessee, S&R obtained
7  a number of redevelopment loans; is that
8  correct?
9      A. Again, I was not here. I joined the
10  company in 1987, so my knowledge of the
11  underlying financial structuring of the building
12  is vague. So, yes, there is some development
13  public, public moneys involved, but again, I
14  couldn't give you the details on it.
15      Q. Do you know who could speak to that
16  within the FCE or the S&R organization?
17      A. No, I really can't. It was '82. The
18  original developer of the building has since
19  retired. The lawyer who put it together I
20  believe has passed away. I don't really know
21  who could give you the background on it.
22      Q. Was this an issue that you
23  investigated at all in preparation for your
24  deposition today?
25      A. I didn't.

Page 15

1      Q. Do you know if somebody else did?
2      A. I'd ask my lawyers if they did.
3      Q. You have no knowledge yourself?
4      A. I have no knowledge.
5      Q. Are there any loans that are currently
6  outstanding on the property that S&R is the
7  debtor on?
8      A. Yes.
9      Q. What are those loans?
10      A. Again, my role within this company and
11  the building is to lease the building, not
12  really to mind its financial underpinnings. I'm
13  aware there is an HSBC loan, I believe. I
14  believe that's the first mortgage on the
15  building, but again, that's not really my
16  purview. We have a finance department.
17      Q. Do you know how the assignment came
18  about, how Halle Brothers Company and S&R got
19  together in the first place?
20      A. No, I do not.
21      THE WITNESS: Can I have a two minute
22  break to get some coffee?
23      (Brief recess.)
24      Q. Do you know anything about the
25  conversations or negotiations surrounding the

Page 16

1  1982 assignment of the property?
2      A. Nothing.
3      Q. Have you spoken to anyone who does
4  know about --
5      A. No.
6      Q. -- the actual assignment, not the text
7  of it, but the discussions or the negotiations?
8      A. No.
9      Q. Let's put this aside for a minute.
10      MR. LEHN: This is going to be
11  Exhibit 2.
12          - - - - -
13      (Thereupon, Plaintiff's Deposition
14      Exhibit 2 was marked for purposes
15          of identification.)
16          - - - - -
17      Q. If you want to take a minute to look
18  this over, feel free. I don't expect you to
19  read the whole thing because we're only going to
20  talk about a couple of pieces of it, but as long
21  as you're familiar.
22      A. I've seen this document before, yes.
23      Q. Just for the record, this is what
24  document?
25      A. I believe this is part of the original

Page 17

1  ground lease.
2      Q. The 1912 lease?
3      A. Yes.
4      Q. It's between The Realty Investment
5  Company, they were the owners of the property,
6  and the lessees are Salmon Halle and the other
7  Halle brother whose name escapes me; is that
8  correct? Do you agree with that?
9      MR. WALTERS: Objection. The document
10  speaks for itself.
11      Q. Well, it says on the top, The Realty
12  Investment Company to Salmon P. Halle et al.;
13  correct?
14      A. It appears to be part of the original
15  ground lease.
16      Q. If we turn to page 2, about two-thirds
17  of the way down there's a sentence that says,
18  all of said rents shall be paid --
19      A. I can't find it.
20      MR. WALTERS: I'm going to help, if
21  you don't mind. See where it starts here
22  (indicating)?
23      THE WITNESS: Got it.
24      A. May I underline this?
25      Q. Of course.

5 (Pages 14 to 17)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                      Clevland, OH

---

Page 18

1    A. Gotcha. Thank you.
2    Q. It says, all of said rents shall be
3 paid in gold coin of the United States of the
4 present standard of weight and fineness by
5 depositing it to the credit of the lessor, its
6 successors or assigns, with the Citizens Savings
7 & Trust Company of Cleveland, Ohio, or in such
8 other place in the City of Cleveland as the said
9 lessor, its successors or assigns, may from time
10 to time designate.
11      We're just going to refer to this as
12 the gold clause for today.
13    A. Okay.
14    Q. Do you have any knowledge as to
15 whether this clause was discussed by anyone at
16 S&R in the course of preparing the 1982
17 assignment?
18    A. No, I do not.
19    Q. You have no knowledge?
20    A. I have no knowledge.
21    Q. Do you know whether prior to the
22 initiation of this litigation anyone at S&R ever
23 discussed this clause with anyone?
24    A. No. I know I didn't. I would have no
25 way of knowing if anybody else that were

Page 19

1 officers of S&R might have.
2    Q. No one ever spoke to you about it?
3    A. No.
4    Q. Do you know whether anyone ever
5 prepared an analysis of this clause?
6    A. No.
7    Q. No, it was never prepared, or no, you
8 don't know?
9    A. No, I don't know.
10    Q. Just to make sure we're clear on
11 things, the way that the plaintiff contends that
12 this clause should be understood is the
13 following. You take the face amount of the
14 rent, and if you back up a couple sentences on
15 this page we can see what the face amount is.
16 Probably the easiest way to find this is to just
17 look for the $35,000.
18    A. I see it.
19    Q. It says, for the remainder of said
20 term, to wit 89 years, the sum of $35,000 per
21 year. Plaintiffs contention is that you take
22 $35,000 and you ascertain how many ounces of
23 gold were in $35,000 in gold coin of the
24 standard of weight and fineness in 1912. That's
25 defined by statute.

Page 20

1      So that gives you a particular number
2 in eventually ounces. You have to convert the
3 units. You get a number of ounces of gold.
4 It's approximately 1,693. This amount stays
5 constant for the duration of the lease. And the
6 effect of that is as the price of gold varies,
7 the value of the rent varies.
8      The contention of the defendant is
9 that the rent is simply $35,000 payable in
10 currency.
11    A. I don't know that that's our
12 contention, but go ahead.
13    Q. What do you understand your contention
14 to be?
15      MR. WALTERS: Objection. Just
16 understand that everything that Mr. Lehn has
17 just said is his representation of the parties'
18 contentions. You don't have to accept any of
19 that as true.
20      THE WITNESS: I don't accept the last
21 part of the statement.
22      MR. WALTERS: I'm assuming he's
23 prefacing a question here.
24    Q. Could you tell me what your
25 understanding of what the rent is?

Page 21

1    A. $35,000 a year.
2    Q. Period?
3    A. Period.
4    Q. You could pay it, the $35,000, in one
5 dollar bills?
6    A. Or gold coins. It's still $35,000.
7    Q. How would you calculate how many gold
8 coins to pay?
9    A. Fewer as the price of gold went up,
10 obviously.
11    Q. It would be the number of gold coins
12 at the price or valued on the day that you paid
13 it that was necessary to equal $35,000 in cash?
14    A. Of course.
15      MR. WALTERS: Objection. The question
16 is confusing, and Mr. Lott, please allow him to
17 finish the complete question so that the record
18 is clear at the end of this.
19      THE WITNESS: Okay.
20      MR. WALTERS: Thanks.
21    Q. We'll do this in pieces. Is it your
22 understanding of the way that the rent is to be
23 paid under the lease is that you determine the
24 price of gold on the date that you're going to
25 tender the payment, and then the amount of gold

6 (Pages 18 to 21)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                     February 23, 2007
                        Clevland, OH

---

Page 22

1  that would be necessary to equal $35,000 at that
2  price of gold is the amount of gold that you
3  would owe under the lease?
4        MR. WALTERS:  Objection, confusing.
5  Answer it if you can.
6        A.  It could be done that way, as I
7  understand the language.  I don't know anybody
8  in 30 years of real estate that still pays in
9  gold, but the language to me is clear that the
10  rent is $35,000.
11      Q.  What is your understanding then of the
12  purpose of this gold clause?
13      A.  My opinion of it is within the context
14  of the time it was written, 1912, where you had
15  certain people that didn't trust the currency,
16  and this clause was inserted to have an
17  alternative method of paying in gold coin if the
18  lessor so preferred.
19        So that you could pay in gold coin if
20  you desired, or you could pay in currency, but
21  it was still $35,000 for the term of the lease
22  other than in those first years where it was
23  escalated.
24      Q.  Have you ever encountered a gold
25  clause in any other properties that you've

Page 23

1  worked on?
2        A.  No.
3        Q.  When I say other properties, I'm
4  including not just properties you manage at S&R
5  but your entire history.
6        A.  In 30 years in the real estate
7  business, I've never noticed this clause nor
8  dealt with it in any business setting.
9        Q.  When did you first become aware of
10  this gold clause?
11      A.  When you filed your lawsuit.
12      Q.  If we assume that the gold clause
13  means what you just said it means, how does that
14  actually protect the lessor against currency
15  problems?
16      A.  I'm not sure it was designed to.  I
17  mean, it was merely a rent.  I mean, there are
18  plenty of leases that don't escalate based on
19  indexing, cost of living, or anything else.
20  It's a fixed number.
21      Q.  Just approximate --
22      A.  Go ahead.
23      Q.  I'm sorry.  Please, continue.
24      A.  No.  That's fine.
25      Q.  Could you give me an approximate

Page 24

1  number?  I'm not going to hold you to this.
2  Just for purposes of conversation here, if you
3  were the owner of the property that Jamaica owns
4  and you were going to lease that ground today,
5  approximately --
6        A.  Assuming there was no building on it?
7        Q.  Assuming there's no building on it,
8  what would you lease it at?
9        MR. WALTERS:  Objection.
10      A.  I have no idea.  In Cleveland, Ohio,
11  right now I wouldn't lease it.
12      Q.  If there was a building on it, what
13  would you lease it for?
14        MR. WALTERS:  Objection.
15      A.  I have no idea.
16      Q.  Does S&R have any properties where it
17  is the lessor or sublessor and the duration of
18  the lease is somewhere around 100 years?
19      A.  No.
20      Q.  What is the longest lease that S&R is
21  a part of as lessor?
22      A.  Well, if you include that S&R owns a
23  portion of the Halle Building, obviously we
24  write leases in the building to tenants who use
25  the space.  A typical long term lease in an

Page 25

1  office building would be 10 to 15 years.  Most
2  leases in office space are five, five to ten.
3        Q.  When S&R writes those leases, does it
4  determine the rent based on approximately market
5  value at that time?
6        A.  Yes.
7        Q.  Do any of those leases hold that value
8  constant for the duration of the lease?
9        A.  I'm not sure I understand your
10  question.
11      Q.  Do any of the leases for which S&R is
12  the lessor specify a rent amount and then keep
13  that rent amount constant for the duration of
14  the lease?
15      A.  Define rent.
16      Q.  Well, the amount that the lessee pays
17  to the lessor on a periodic basis or sublessee.
18      A.  The rent very often will stay
19  constant.  Now, there are other charges,
20  utilities, tax increases, et cetera, that the
21  tenant might be responsible for which we call
22  call escalations or pass throughs.  So what that
23  tenant may pay us in rent would very definitely
24  be constant for five years.  If it's longer than
25  five years, we might try to get an increase say

7 (Pages 22 to 25)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                          February 23, 2007
                        Clevland, OH

Page 26

1   after the fifth year.
2       There might be charges to the tenant
3   for these operating expenses or tax expenses
4   which could escalate every year, but I'm not
5   sure that's really rent.  That's a pass on.
6   That's an expense that we get from the city,
7   from our vendors, from our cleaning agencies, et
8   cetera.  Those contracts are usually year to
9   year, and they might increase every year, and we
10  pass those increases on to our tenants year to
11  year on a prorated basis as does every other
12  landlord, office landlord, that I'm aware of.
13      Q.  Let's consider those pass throughs and
14  not rent for purposes of this discussion.  So if
15  the lease term is longer than about five years,
16  then typically S&R will provide for the rent to
17  be increased after five years?
18      A.  I'm not sure typically is correct, but
19  on occasion we will, yes.  But we will also
20  write leases longer than five years with a
21  specific flat rent.
22      Q.  Do you know what the longest lease is
23  right now that S&R has?
24      A.  I'd have to check.  I don't really
25  know.

Page 27

1       Q.  Approximately.
2       A.  Ten years would be the longest lease
3   that we would typically write, but I don't think
4   we've -- we made a ten year lease about two
5   years ago which would now have about eight years
6   to run, but we would rarely write anything
7   longer than ten years.
8       Q.  Do you know whether your ten year
9   lease held the rent amount constant for all ten
10  years?
11      A.  I can't remember.
12      Q.  If you were going to make a 99 year
13  lease, would you hold the rent constant for 99
14  years?
15          MR. WALTERS:  Objection.
16      Q.  You can answer.
17      A.  In 30 years I've never made a 99 year
18  lease.
19      Q.  But if you were going to make one?
20      A.  I wouldn't.
21      Q.  You wouldn't make a 99 year lease?
22      A.  No.
23      Q.  Why not?
24      A.  I don't know many companies that have
25  been around for 99 years.  I would expect that

Page 28

1   there would be a default, a purchase, a
2   bankruptcy.  We don't think in terms of that
3   long for office building leases.
4       Q.  Did you think it was a wise thing to
5   do for the lessor, assuming this is what the
6   lessor did in this case, to lease this property
7   for $35,000 a year for 99 years?
8           MR. WALTERS:  Objection.
9       A.  No idea.
10      Q.  Do you think that $35,000 today will
11  have the same value 99 years from now?
12          MR. WALTERS:  Objection.
13      A.  No idea.
14      Q.  Do you think it likely to be more
15  valuable or less valuable?
16      A.  That $35,000 would have the same
17  value?
18      Q.  Yes.
19      A.  I think it would have exactly the same
20  value.  I don't think it would have the same
21  purchasing power.
22      Q.  When I say value, if you want to
23  understand that as purchasing power, then let's
24  do that.
25      A.  I have no idea what $35,000 would be

Page 29

1   worth 99 years from now, less or more.  We have
2   inflation, and we have deflation.
3       Q.  If the plaintiff's view of this gold
4   clause is correct and you're supposed to be
5   paying an amount up to 1,693 ounces of gold coin
6   a year -- strike that.
7           Since S&R became the lessee in 1982,
8   is it correct that it has paid $35,000 in
9   currency every year?
10      A.  I believe so.
11      Q.  Do you have any reason to believe that
12  they have paid a different amount?
13      A.  No.
14      Q.  If the plaintiff's understanding of
15  the gold clause is correct, then for the past 24
16  years S&R has had a pretty good deal?
17          MR. WALTERS:  Objection.
18      A.  Pretty good deal, I would say, no,
19  they have not had a pretty good deal.
20      Q.  Why is that?
21      A.  Because the building has lost money
22  all but a few years since we built it.
23      Q.  If you had to pay -- I'll use the
24  term gold adjusted amount to refer to the rent
25  according to plaintiff's understanding of the

8  (Pages 26 to 29)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                                February 23, 2007
                              Clevland, OH

---

Page 30

1  gold clause just so we have a simple way of
2  referring to it.
3       A. Okay.
4       Q. If you had had to pay the gold
5  adjusted amount of rent since 1982 when you
6  became the lessee, your losses would have been
7  much larger than --
8       A. Yes, they would have.
9           MR. WALTERS: Objection. Foundation.
10 For the record, there's been no establishment of
11 Mr. Lott's knowledge of the rise and fall of the
12 price of gold.
13      Q. You can answer the question. You were
14 saying yes.
15      A. If we had paid the adjusted value, was
16 that your question?
17      Q. Yes.
18      A. Of gold, then yes, our losses would
19 have been greater had we paid it.
20      Q. So to the extent that you were paying
21 the unadjusted amount instead of the adjusted
22 amount, if plaintiff is correct, then you got a
23 benefit --
24          MR. WALTERS: Objection.
25      Q. -- for having paid the unadjusted

---

Page 31

1  amount?
2       A. I suppose based on the way you've
3  constructed the question, yes.
4       Q. I mean, I'm assuming plaintiff is
5  correct. Obviously, if defendant is correct,
6  then you paid what you were supposed to pay.
7       A. Yes. I answered your question.
8           MR. WALTERS: David, when you get to a
9  short break, if we could take just a couple
10 minutes.
11          (Brief recess.)
12      Q. Do you know what the price of gold is
13 today approximately?
14      A. Not a clue.
15      Q. I'll stipulate to you that it's about
16 $675 an ounce.
17          MR. WALTERS: He'll represent to you.
18          MR. LEHN: Either way.
19      Q. And I'll represent to you that the
20 gold adjusted amount of rent is approximately
21 $1.1 million a year. Do you agree that if --
22 let's assume that S&R is going to lose
23 $4 million this year on the property. Do you
24 agree that if S&R paid the gold adjusted amount
25 instead of the amount that S&R contends that it

---

Page 32

1  should pay that its losses would be even
2  greater?
3       A. Let me make a comment on the line of
4  questioning because I think it's so hypothetical
5  that you're getting into the realm of the
6  ridiculous. The building has lost over its
7  history somewhere each year, at best I think we
8  might have had three or four years, this is
9  again the objective and it will occasionally
10 cash flow, but we've lost millions of dollars on
11 this building. I believe two years ago we lost
12 $5 million on the building.
13          We couldn't have, S&R could not have
14 paid any more than the $35,000. If it was the
15 kind of number that you're speculating by your
16 calculation of the price of gold, we would never
17 have paid it. We would have gone into default,
18 and we would allow the building to go back to
19 the lender or to the ground lessor. There is no
20 way that S&R could pay that kind of ground lease
21 payment.
22      Q. You'd be in breach of the lease if you
23 did that; is that right?
24      A. I'm not a lawyer, but I would guess
25 that we would be, yes.

---

Page 33

1       Q. Do you know what S&R is going to do
2  with the property if Jamaica wins this lawsuit?
3           MR. WALTERS: Objection. Calls for
4  speculation.
5       A. No.
6       Q. You agree with me in principle, don't
7  you, that if S&R did pay the gold adjusted
8  amount, its loss would be greater than if it
9  doesn't pay the gold adjusted amount for this
10 year let's say?
11      A. Yes, but --
12      Q. Significantly by about a million
13 dollars?
14      A. It is so hypothetical the way you
15 constructed the question that the answer would
16 be yes, but it's a situation where there's not
17 the money to pay it.
18      Q. Okay. Let's go to another document,
19 Exhibit 3.
20          - - - - -
21      (Thereupon, Plaintiff's Deposition
22      Exhibit 3 was marked for purposes
23          of identification.)
24          - - - - -
25      Q. Take a minute to look this over.

---

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                February 23, 2007
                    Clevland, OH

Page 34

1    A. Okay.
2    Q. Have you ever seen this document
3  before?
4    A. Yes.
5    Q. What is it?
6    A. It could be called an offset or
7  something like that that basically confirms the
8  lease being in effect at the time of the
9  transfer.
10    Q. I'm sorry, which part are you
11  referring to?
12    A. The document that you just gave me. I
13  believe that's what it is. It was executed
14  between Halle Cleveland, LLC, and Jamaica
15  Avenue, LLC, your client.
16    Q. I understand this to be a deed that
17  conveys the title in the property.
18    A. Okay. Excuse me. If this is the
19  deed, that's fine.
20    Q. Do you agree with that?
21    A. Fine. Yes, I agree.
22    Q. When did you become aware that Jamaica
23  purchased the property at issue?
24    A. At the time I learned of your lawsuit.
25    Q. Prior to that you had no idea the

Page 35

1  property had been sold?
2    A. No idea.
3    Q. So S&R was not apprised of any sale
4  before it happened or after?
5    A. I was not. There are other officers.
6  There are officers of S&R that could have been.
7    Q. You don't have any knowledge as to
8  whether they were?
9    A. No.
10    Q. Did you have any dealings with Halle
11  Cleveland while they were the owner?
12    A. No.
13    Q. Who at S&R did deal with them?
14    A. I don't know.
15    Q. So S&R is not a party to this
16  transaction that's represented in the deed that
17  we're looking at; correct?
18      MR. WALTERS: The document speaks for
19  itself.
20    A. It appears that they are not, no.
21    Q. When did you first -- well, let me
22  back up. Let's turn to page 3 of this document.
23    A. That's the Schedule A?
24    Q. Schedule A, and then there's point 3.
25  It says, subject to: Estoppel certificate dated

Page 36

1  December blank, 2001 made to grantor HSBC bank
2  USA. Had you ever noticed this provision before
3  today?
4    A. No.
5    Q. Do you know if anyone at S&R was aware
6  of this provision before today?
7    A. No.
8    Q. Do you think that matters that this is
9  in here from your perspective, from S&R's
10  perspective? Does it affect anything that you
11  do?
12    A. I don't know. Does it affect anything
13  that I do?
14      MR. WALTERS: Objection. If you want
15  to talk about the estoppel certificate, then he
16  should see the estoppel certificate.
17    Q. You can answer the question.
18    A. I don't know.
19    Q. Did you ever look at the deed by which
20  Halle Cleveland became the owner of the
21  property?
22    A. No.
23    Q. Do you know if anyone at S&R ever
24  looked at it?
25    A. No.

Page 37

1    Q. No, they didn't, or no, you don't
2  know?
3    A. No, I don't know.
4    Q. Is it typical for S&R to look at the
5  deed by which -- let me rephrase this. For the
6  properties for which S&R is the lessee, is it
7  typical for S&R to look at the deed of the
8  property?
9    A. I don't know of any other properties
10  in which S&R is a lessee.
11    Q. This is the only one as far as you
12  know?
13    A. As far as I know.
14    Q. Is S&R the lessor of any properties
15  other than -- I believe that there are two
16  parcels that S&R owns that are contiguous with
17  this parcel, and the Halle Building sits on all
18  of those; is that correct?
19    A. I believe so.
20    Q. So S&R is the lessor on those
21  properties?
22    A. Correct.
23    Q. Are there any other properties that
24  S&R is the lessor of?
25    A. I don't believe so. I believe S&R is

10 (Pages 34 to 37)

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                        Clevland, OH

---

Page 38

1  a single asset corporation, as far as I know.
2       Q. Put that aside.
3          MR. LEHN: I think this is Exhibit 4.
4          - - - - -
5       (Thereupon, Plaintiff's Deposition
6        Exhibit 4 was marked for purposes
7           of identification.)
8          - - - - -
9       Q. Are you familiar with this?
10      A. I don't believe I've seen this copy
11  before, no.
12      Q. Do you ever see the -- well, this is a
13  copy of a rent check that was delivered to
14  Jamaica. Does that square with what it appears
15  to be to you?
16      A. Yes. It appears to be a quarterly
17  payment.
18      Q. Who writes the checks?
19      A. I believe this comes out of our
20  payables department. I don't.
21      Q. You see the check is from an entity
22  called Forest City Commercial Management, Inc.?
23      A. Yes.
24      Q. You were saying you were the senior
25  vice president of Forest City Commercial Group?

Page 39

1       A. Yes.
2       Q. Is that a different entity?
3       A. Yes.
4       Q. What is Forest City Commercial
5  Management?
6       A. They are the company that manages I
7  believe all of our real estate.
8       Q. Our here means Forest City
9  Enterprises?
10      A. Yes. Let me clarify. Forest City
11  Commercial Management manages all of our
12  commercial properties as differentiated from our
13  apartment properties or our land developments.
14  This would be shopping centers and office
15  buildings primarily.
16      Q. Do you know why the rent payment came
17  from Forest City Commercial Management instead
18  of from S&R?
19      A. No.
20      Q. Is there any agreement between S&R and
21  Forest City Commercial Management of who would
22  pay?
23      A. I assume there is, yes.
24      Q. You would assume that pursuant to that
25  agreement --

Page 40

1       A. Sure.
2       Q. -- they are sending these checks?
3       A. Yes.
4          MR. LEHN: The next exhibit will be 5.
5          - - - - -
6       (Thereupon, Plaintiff's Deposition
7        Exhibit 5 was marked for purposes
8           of identification.)
9          - - - - -
10      A. Okay.
11      Q. So this is it looks like another
12  quarterly rent payment?
13      A. Uh-huh.
14      Q. Well, it was actually paid to Halle
15  Cleveland, but I'll represent to you that it was
16  forwarded to Jamaica.
17      A. Uh-huh.
18      Q. At the top it lists what appear to be
19  four different account numbers. Do you know
20  what these entities are?
21      A. Yes.
22      Q. So one is Halle Office, and then it's
23  B-U-I-L, Building, I take it?
24      A. Yeah.
25      Q. Then there are three S&R Playhouse

Page 41

1  entities?
2       A. Correct.
3       Q. Are those different legal entities?
4       A. Yes.
5       Q. Can you tell me the full name of each
6  of them?
7       A. Well, I'll do my best. Halle Office
8  Building Partnership, S&R Playhouse, Limited, I
9  believe, and S&R Playhouse -- I believe it's all
10  S&R Playhouse Limited, but I couldn't absolutely
11  tell you for sure.
12      Q. When you say it's all S&R Playhouse
13  Limited, you mean the three?
14      A. The three, yes.
15      Q. They are distinct entities?
16      A. Distinct from Halle Office Building,
17  yes. I can't read the whole description here on
18  the stub, so I don't know exactly.
19      Q. But you don't know if they are
20  distinct from each other?
21      A. I don't know.
22      Q. Is there more than one entity under
23  the Forest City umbrella called S&R something?
24      A. I don't know that. I've never heard
25  it being referred to as anything other than S&R

11 (Pages 38 to 41)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                         Clevland, OH

Page 42

1  Playhouse Limited.
2      Q.  You've never had another entity being
3  referred to as S&R something?
4      A.  No.
5      Q.  Halle Office Building, why are they
6  sending or why are they listed as one of the
7  payees here or payers here?
8      A.  I believe that this is how we code
9  these payments to the two entities that actually
10 own the improvements.
11     Q.  Those two entities are?
12     A.  Halle Office Building Limited and S&R
13 Playhouse.  So I assume that these numbers were
14 actually debited to the various accounts or two
15 accounts to make up the total of 8,750.
16     Q.  All right.  That's it for that.
17     - - - - -
18     (Thereupon, Plaintiff's Deposition
19     Exhibit 6 was marked for purposes
20         of identification.)
21     - - - - -
22     Q.  I don't expect you to read the whole
23 thing right now.
24     A.  Good.
25     Q.  But maybe if you can just get familiar

Page 43

1  with what it is, and then I'll point you to
2  certain places.
3      A.  Okay.  All right.
4      Q.  Have you ever seen this document?
5      A.  I don't believe I've seen this one.
6      Q.  Do you know what it is?
7      A.  I could read it.
8      Q.  It says, deed from S&R Playhouse
9  Realty Company to --
10     A.  I can read that.
11     Q.  -- Halle Office Building Limited
12 Partnership?
13     A.  Yes.
14     Q.  I just want to if we go to the second
15 page --
16     A.  This one (indicating)?
17     Q.  Yes.  At the bottom it says JAM 01473.
18     A.  Yes.
19     Q.  Toward the bottom of that page, it
20 says, whereas, the four parcels of real estate
21 which are included within the premises consist
22 of, and let's skip to B, one parcel in which S&R
23 holds the leasehold estate (hereinafter referred
24 to as Parcel No. 3) created by the virtue of an
25 indenture of lease dated March 15, 1912, between

Page 44

1  The Realty Investment Company, as lessor, and
2  Salmon P. Halle and Samuel H. Halle, as lessees,
3  filed for record, et cetera.
4      Let's skip to, which leasehold estate
5  was assigned to S&R --
6      A.  You lost me.  Where?
7      Q.  I'm skipping about three or four
8  lines.
9      A.  Okay.
10     Q.  There's a parenthesis, Parcel No. 3
11 Lease, close parenthesis.
12     A.  Got it.
13     Q.  Which leasehold estate was assigned to
14 S&R by the Assignment and assumption dated
15 May 21, 1982, and filed for record, et cetera.
16     So am I correct that Parcel No. 3 is
17 the property that Jamaica owns?
18     A.  I believe so.  I'm assuming that
19 that's it.
20     Q.  Then let's go to the bottom of that
21 page.  Whereas, it is the intention of S&R to
22 convey to Halle Office Building Limited
23 Partnership (HOB), a certain portion of the
24 premises on which is located what is commonly
25 known as the fifth, sixth, seventh, eighth,

Page 45

1  ninth, tenth, and eleventh floors of building,
2  as further described hereinafter, that's defined
3  as the fifth through eleventh floors, together
4  with certain easements and other rights
5  appurtenant thereto, but subject to all
6  easements, restrictions, covenants, and
7  reservations contained herein (the fifth through
8  eleventh floors and said other easements and
9  rights being hereinafter collectively referred
10 to as HOB's interests.)
11     And if we turn the page -- actually,
12 we need to go back to get the piece of this just
13 one page.  This is JAM 01475.  There's a
14 heading, granting clauses.
15     A.  Okay.
16     Q.  It says, now, therefore, S&R in
17 consideration of one dollar and other good and
18 valuable consideration received to its
19 satisfaction from HOB does hereby give, grant,
20 bargain, sell, assign, transfer, and convey to
21 HOB, its successors and assigns forever, and now
22 let's flip the page, under part B, the leasehold
23 portion of HOB's interests more particularly
24 described as all of S&R's right, title, and
25 interest in and to the Parcel 3 lease.  Are you

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                February 23, 2007
                        Clevland, OH

---

Page 46

1  with me?
2       A. I'm with you.
3       Q. So am I right that the effect of this
4  document was basically to create a sublease
5  between S&R and HOB for the fifth through
6  eleventh floors of the building?
7       A. Is it a sublease or is it a deed? I
8  mean, it appears to be a conveyance between S&R
9  and HOB.
10      Q. My understanding is that the deed with
11 respect to -- if we skip up to the second page
12 of the document, the second whereas clause,
13 whereas, the four parcels of real estate which
14 are included within the premises consist of (a)
15 two parcels which S&R owns in fee simple by
16 virtue of a deed dated May 21, 1982.
17      A. Right.
18      Q. I assume that the deed part of this is
19 with respect to the properties S&R owns in fee
20 simple?
21      A. Right.
22      Q. And that Parcel 3 is a lease?
23      A. That's fine. I'm not really familiar
24 with the documents.
25      Q. So HOB has an interest in basically

---

Page 47

1  the top roughly half of the building?
2       A. Correct.
3          MR. WILLIGER: Could you read the last
4  question back?
5          (Record read.)
6       Q. Can we turn to the page that's stamped
7  1483, JAM 01483?
8       A. Okay.
9       Q. It says at the bottom, there's a
10 paragraph (b), HOB's share unless specifically
11 agreed otherwise -- skip a little bit and turn
12 the page -- means 60 percent.
13      A. I don't see the 60 percent.
14      Q. At the top of the page.
15         MR. WALTERS: It's blurred. The very
16 first line.
17      A. Okay.
18      Q. It is a bit blurry. But if you turn
19 to page 1486, it defines S&R's share, and I
20 believe it defines it as 40 percent?
21      A. Right.
22      Q. I'm inferring that's a 60 percent for
23 HOB.
24      A. Right.
25      Q. So HOB is responsible for paying

---

Page 48

1  60 percent of the rent each month; is that
2  right?
3       A. I believe so, yes.
4       Q. It doesn't pay it directly. It pays
5  it directly to the lessor, or does it pay it to
6  S&R and then S&R forwards it?
7       A. Again, I don't know. I'm not part of
8  Forest City Commercial Management. Frankly,
9  that's the first check stub that I've seen that
10 has anything to do with this building. It
11 appears that it's a 60/40 proration between S&R
12 and HOB.
13      Q. HOB, is that a Forest City entity?
14      A. Yes.
15      Q. Is there a difference in the way the
16 building is used? Is there a difference in the
17 way that HOB uses its interest in the building
18 and S&R uses its interest in the building?
19      A. I don't understand the question.
20      Q. Do they both use it for the same
21 purpose? Do they both use it for commercial
22 office rental?
23      A. Yes.
24      Q. Is that every floor is used in that
25 fashion?

---

Page 49

1       A. No.
2       Q. What floors are not used in that
3  fashion?
4       A. The lobby, and we have a downstairs
5  basement level food court, mostly vacant I might
6  add. In the lobby, there is some retail in it,
7  mostly vacant, and the upper floors two and
8  above are office space.
9       Q. Do you know anything about how the tax
10 laws are structured for the Halle Building?
11         MR. WALTERS: Objection. Vague.
12      A. Do I know anything about it? Some.
13      Q. Do you know whether S&R's interest
14 under the lease is its own tax lot or is part of
15 a larger tax lot that includes the rest of S&R's
16 interest in the Halle Building?
17      A. I don't really know.
18      Q. Who would be able to speak to the way
19 in which the tax lots are structured for the
20 Halle Building and the properties underneath
21 them?
22      A. Layton McCown, another associate of
23 mine in the building. He's chief financial
24 officer for the commercial group.
25      Q. Could you spell his name?

---

13 (Pages 46 to 49)

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                    Clevland, OH

---

Page 50

1    A. L-A-Y-T-O-N, M-C-C-O-W-N.
2    Q. What is his job?
3    A. He's chief financial officer for the
4  commercial group, I believe. Or perhaps one of
5  our lawyers, our in-house. Layton probably,
6  though.
7    Q. Do you know how the building is
8  classified for tax purposes?
9    A. No.
10   Q. Do you know whether it's possible to
11 combine a leasehold and a fee simple into a
12 single tax lot?
13   A. No.
14   Q. You don't know?
15   A. I don't know.
16   Q. Do you know whether it's possible to
17 split a leasehold in the air?
18   A. I'm not sure I understand. When you
19 say split, what do you mean?
20   Q. To let's say assign a lease, a portion
21 of a lease, and the way that the portion is
22 determined is by basically the height off the
23 ground, in other words.
24   A. I think you could describe it as such.
25 I don't know that you could get a separate

---

Page 51

1  parcel or a lot split. But, again, it's a
2  little out of my field. I'm not a lawyer.
3    Q. But in your experience?
4    A. In my experience you could apportion
5  the responsibility for the payment as we've done
6  here as an accounting provision as to who pays
7  what, but I have no knowledge of whether you
8  could actually get a lot split or a separate tax
9  parcel.
10   Q. HOB is not the lessee under the lease;
11 right?
12   A. It appears not.
13   Q. S&R is the lessee?
14   A. I believe so.
15   Q. Just to be clear, for the entire lease
16 including the part that is assigned to HOB?
17   A. For the entire lease.
18   Q. Including the portion that is defined
19 as HOB's interest?
20   A. Well, I believe -- rephrase that,
21 would you, or ask it again. I may be getting
22 confused. I'm not sure where you're heading
23 with this.
24   Q. If we look at Exhibit 6 for a second,
25 this is the deed from S&R Playhouse to Halle

---

Page 52

1  Office Building?
2    A. Right.
3    Q. It's dated 1984 at the bottom. This
4  is defined on the third page of the document.
5  It defines HOB's interest as being the fifth
6  through eleventh floors. Do you follow that?
7    A. Yes.
8    Q. I'm just asking, HOB is not the
9  lessee?
10   A. I don't believe they are, no.
11   Q. For that interest?
12   A. Correct.
13   Q. Do you know why the fifth through
14 eleventh floors were assigned to HOB, why S&R
15 didn't just keep them?
16   A. I believe it was because of a
17 syndication we did for the upper floors of the
18 building which was entitled HOB. Again, this
19 was done before I arrived on the scene.
20   Q. Let's do another document.
21                - - - - -
22    (Thereupon, Plaintiff's Deposition
23     Exhibit 7 was marked for purposes
24        of identification.)
25                - - - - -

---

Page 53

1    Q. You don't have to read that entire
2  document. Have you ever seen this document
3  before?
4    A. I don't believe I have, no.
5    Q. It says at the top, confidential
6  memorandum?
7    A. Uh-huh.
8    Q. Halle Office Building Limited
9  Partnership. Do you know whether this document
10 -- well, let's find a date on this thing. Would
11 you turn to the third page, FCID 0395?
12   A. Yes.
13   Q. It says the date of this considerable
14 memorandum is September 17, 1984?
15   A. Right.
16   Q. Do you know whether this document was
17 related to the syndication of the upper floor
18 that you were just talking about?
19   A. I don't know. It appears that it is.
20   Q. Let's go to page 51 of the document
21 which is FCID 0450.
22   A. Right.
23   Q. You see the heading federal income tax
24 consequences?
25   A. Okay.

---

14 (Pages 50 to 53)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                          February 23, 2007
                        Clevland, OH

Page 54

1    Q. You see there's several pages. If you
2 flip to page 58, it says, in the opinion of
3 counsel, this is toward the top, neither the
4 partnership nor any partner will be personally
5 liable for repayment of the First Mortgage loan
6 and the UDAG loan and such loans more likely
7 than not constitute non-recourse obligations of
8 the partnership.
9    A. Uh-huh.
10    Q. The partners will be entitled to
11 include in their adjusted basis their allocable
12 share (determined in accordance with their
13 interest in partnership profits) of such
14 indebtedness. Do you see that?
15    A. Yes.
16    Q. Let's turn the page once to page 59.
17 There's a carryover paragraph at the top, and
18 the last sentence of it says, the partnership
19 intends to elect to claim cost recovery
20 deductions with respect to the portion of the
21 project constituting 18-year real property over
22 an 18-year period in accordance with the
23 straight line method. The deduction allowable
24 for any given year is limited to the number of
25 months the project is actually in service during

Page 55

1 the year.
2    Are you familiar with any of these tax
3 issues?
4    A. Vaguely. Tax is not my field of
5 expertise.
6    Q. If you go to the next paragraph, the
7 expenditures incurred with respect to a
8 certified rehabilitation of a certified historic
9 structure will add value to and prolong the life
10 of the project and therefore will be added to
11 the recoverable basis of the project. The
12 partnership also intends to claim cost recovery
13 deductions with respect to such rehabilitation
14 expenditures over the applicable recovery period
15 applying the straight line method.
16    So it appears that there were certain
17 tax consequences. We don't have to go through
18 all of them, but there were certain tax
19 consequences to this transaction?
20    A. Sure.
21    Q. Do you know whether these tax
22 consequences were a factor in the decision to
23 assign or partially assign the lease to HOB?
24    A. Well, no, I don't know that.
25    Q. If we go to page 60, the first full

Page 56

1 paragraph, it says, it is not anticipated that
2 the partnership will be treated as related to
3 any entity that owned the project during 1980
4 nor will the project be leased to any person or
5 entity that owned the project during 1980 or any
6 person related to any owner.
7    Do you know why this is relevant?
8    A. Let me read it again.
9    Q. Okay. Let me ask the question
10 differently. What is the relevance of this
11 sentence to the placement memorandum?
12    MR. WALTERS: Objection. The witness
13 has said that he's never seen this before.
14    A. I don't know what the relevance is.
15    Q. Let's go to page 47.
16    A. Okay.
17    Q. Toward the bottom there's a heading,
18 ground leases, and it says, a portion of the
19 building is situated on parcels which are
20 subject to the following ground leases:
21    A. Indenture of lease dated March 15,
22 1912, by and between The Realty Investment
23 Company, as lessor, and Salmon P. Halle and
24 Samuel H. Halle, as lessees. S&R is successor
25 to the interest of Salmon and Samuel. This is

Page 57

1 referring to the lease at issue in this lawsuit?
2    A. Uh-huh.
3    Q. It says, the Halle lease is for an
4 initial term expiring March 31, 2011. If you
5 want to just take a minute and read the
6 remainder of that paragraph?
7    A. Under the Halle lease?
8    Q. Yes. Basically, the two paragraphs
9 under point A.
10    A. Okay.
11    Q. It doesn't make any reference to the
12 gold clause; does it?
13    A. No.
14    Q. Do you know whether the investors in
15 HOB were ever apprised of the existence of a
16 gold clause?
17    A. No.
18    Q. You don't know the answer?
19    A. I don't know the answer.
20    Q. Let's get a new exhibit.
21    MR. LEHN: This is 8.
22    - - - - -
23    (Thereupon, Plaintiff's Deposition
24    Exhibit 8 was marked for purposes
25    of identification.)

                              15  (Pages 54 to 57)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
Clevland, OH

Page 58

1           - - - - -
2       A.  Okay.
3       Q.  Have you ever seen any of these
4   documents?
5       A.  No.
6       Q.  If you turn to the page marked FCID
7   0062?
8       A.  Okay.
9       Q.  It says, limited partners roster for
10  Halle Office Building Limited Partnership?
11      A.  Uh-huh.
12      Q.  Then you can turn a couple of pages,
13  and the roster goes on for a while, maybe five
14  pages.
15      A.  Okay.
16      Q.  Do you know whether these are the
17  limited partners in Halle Office Building?
18      A.  I don't know that, but it appears that
19  they are.
20      Q.  You don't know whether any of them was
21  ever informed about the existence of the gold
22  clause?
23      A.  I do not know.
24      Q.  Do you know who would know that?
25      A.  No.  As I said before, the original

Page 59

1   developer of the building has retired, and the
2   lawyer that was involved since passed away.  I
3   don't know of anyone else who would know.
4       Q.  Let's put that aside then.
5           - - - - -
6           (Thereupon, Plaintiff's Deposition
7           Exhibit 9 was marked for purposes
8             of identification.)
9           - - - - -
10      Q.  Mr. Lott, would you like to take a
11  break?
12      A.  No.  I just need some water.
13          MR. WALTERS:  I'll tell you what,
14  let's go off the record for a minute.
15          (Brief recess.)
16      Q.  Are you familiar with this document?
17      A.  No.
18      Q.  Let's go to, well, it's the third
19  physical page.  It's marked FCID 0135.
20      A.  Okay.
21      Q.  It says, amended and restated general
22  partnership certificate of S&R Playhouse Realty
23  Company.  It says, the undersigned hereby
24  certificate that:  Playhouse Square Investment,
25  and Forest City Rental Properties Corporation

Page 60

1   are the sole partners doing business under the
2   name of S&R Playhouse Realty Company.  Did you
3   follow that?
4       A.  Yes.
5       Q.  Is that true that Playhouse Square
6   Investment and Forest City Rental are the only
7   partners of S&R?
8       A.  As of this date they were.
9       Q.  What about today?
10      A.  I have no idea.
11      Q.  Let's turn a couple more, I guess two
12  more pages to FCID 0139.  The heading is general
13  partnership agreement of S&R Playhouse Realty
14  Company.
15      A.  Uh-huh.
16      Q.  This partnership agreement is made and
17  entered into this 21 day of May 1982.  This is
18  the same day as the assignment?
19      A.  Yes.
20      Q.  If we flip this page over, Article 3,
21  there's a little table, a column for partner and
22  a column for amount.  Are these the original
23  partners of S&R?
24      A.  I don't know.  There's a lot of
25  Schotts.

Page 61

1       Q.  Am I right that you have no knowledge
2   as to whether they were ever informed about the
3   gold clause?
4       A.  I have no idea.
5       Q.  All right.  Well, that's it for that
6   one.  Have any of the current subtenants in the
7   Halle Building been informed of the existence of
8   a gold clause?
9       A.  By subtenants you mean the office
10  tenants in the building?
11      Q.  Correct.
12      A.  I don't believe they have.  I have not
13  informed any of them of it.  It wouldn't affect
14  them.
15      Q.  Why is that?
16      A.  A Ground lease payments are not a part
17  of operating expenses of the building.
18      Q.  Does it affect, and when I say it, the
19  gold clause, does the gold clause affect HOB?
20      A.  If you were to win, I guess it would.
21      Q.  Because pursuant to Exhibit 6, HOB is
22  responsible for 60 percent of the rent; correct?
23      A.  Correct.
24      Q.  Let's go back to actually Exhibit 6.
25  Let's go to the page that's marked JAM 1493.

16  (Pages 58 to 61)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                      February 23, 2007

Clevland, OH

---

Page 62

1     A. Okay.
2     Q. Part eight, assumption of leases, the
3  second sentence, each party agrees, and each
4  party here refers to HOB and S&R, each party
5  agrees with the other to take all steps
6  necessary to exercise any and all renewal
7  options under the Parcel 3 lease for the maximum
8  periods permitted thereby.
9     A. Uh-huh.
10    Q. Are you familiar with the renewal
11 option in the lease?
12    A. Only that part that I just read in the
13 document you handed to me previously.
14    Q. In the lease itself?
15    A. Yes.
16    Q. Or was it in a different document?
17    A. It was in one of these documents.  I
18 noticed there were a series of renewal options
19 that we hold at the same rent for varying
20 periods of years at our option.
21    Q. Let's go to I think it was Exhibit 2
22 which was the lease.
23    A. Exhibit 2?  Okay.
24    Q. Page 5.  Roughly in the middle of the
25 page you'll see there's a slash that somebody

---

Page 63

1  wrote in, and then it begins it looks like Roman
2  numeral XII, the lessor for itself.  Do you see
3  that?
4     A. Yes.
5     Q. Why don't you just take a minute and
6  read everything between that slash and the next
7  slash which is about 12 or so lines down.
8     A. Okay.  I thought I saw a time quote
9  here.  Okay.
10    Q. So this clause of the lease is giving
11 S&R a right to renew the lease?
12    A. Right.
13    Q. If S&R elects to renew the lease at
14 all, it can elect a 25 year, a 50 year, or a 99
15 year renewal period?
16    A. That's the way I read it, yes.
17    Q. In order to exercise this option, S&R
18 has to provide to the lessor written
19 notification of its intention; correct?
20    A. It appears that way.
21    Q. That notice has to specify whether
22 it's electing the 25, 50, or 99 year period?
23    A. Right.
24    Q. The notice is due somewhere between
25 March -- excuse me -- April 1, 2009, and

---

Page 64

1  March 31, 2010?
2     A. Right.
3     Q. So we're not there yet?
4     A. We're not there yet.
5     Q. Do you know whether S&R intends to
6  renew the lease?
7     A. No, I do not.
8        MR. WALTERS:  Objection.
9     Q. Have there been any discussions about
10 the renewal of the lease?
11    A. No, there have not.  Not with me.
12    Q. Who would participate in that
13 decision?
14    A. Myself, Dave LaRue.
15    Q. Can you spell that, please?
16    A. L-A capital R-U-E, president of the
17 commercial group; Jim Ratner, chairman of the
18 commercial group; and there might be some
19 others, but those would be the primary ones.
20    Q. Let's go back to that page.  I think I
21 asked you to stop reading at the second slash.
22    A. Uh-huh.
23    Q. Let's go to the second sentence after
24 that.
25    A. In the event of?

---

Page 65

1     Q. Yes.  Just take a minute to read that
2  sentence.
3     A. Okay.
4     Q. Let's read it.  This is the last
5  sentence I'm going to ask you.  This one is the
6  following one after Roman XIII.
7     A. Whenever this lease?
8     Q. Whenever this lease or renewal
9  thereof, just because there's some words that
10 aren't clear -- whenever this lease or any
11 renewal thereof shall expire without election on
12 the part of lessees to renew, then the lessees
13 shall vacate said premises at the termination of
14 this lease or any renewal thereof as the case
15 may be and surrender possession thereof to the
16 lessor, its successors and assigns.  The copy is
17 just not very good.
18    A. I see it.
19    Q. So if S&R does not elect to renew the
20 lease, then it has to vacate the premises; is
21 that right?
22    A. That's what it says.
23    Q. Does S&R have a right to holdover?
24    A. I haven't read this entire ground
25 lease.  I have no idea if there's holdover

---

17 (Pages 62 to 65)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                      February 23, 2007
                        Clevland, OH

Page 66

1  provisions or not.  I don't believe it says so
2  here.
3       Q.  If S&R does elect to renew the lease,
4  it basically gets a new lease for 25, 50, or 99
5  years?
6       A.  That's my understanding.
7       Q.  Nothing requires S&R to renew the
8  lease?
9       A.  I don't believe -- in what I've read
10  that you had asked me to read, it's an option.
11       Q.  This might be a little bit difficult
12  to find, but if you recall the sentence that
13  begins after the slash, in the event of such
14  renewal?
15       A.  Yes.
16       Q.  If we go up about, let's see, three
17  lines, it says, and the lessor and the lessees
18  shall thereupon execute such further instruments
19  and agreements that may at such time be proper
20  or necessary for the full protection of the
21  respective rights of the said parties during
22  such extension of the original term thereof.
23       A.  Uh-huh.
24       Q.  Do you have any idea what further
25  instruments or agreements might be necessary?

Page 67

1       A.  I have an idea.  I would guess it
2  would be some kind of formal amendment that
3  would renew the lease.
4       Q.  Beyond the notice?
5       A.  Well, that's interesting.  I thought I
6  read above when we were reading something that
7  it said all you had to do was notify and it
8  would automatically be renewed.  Didn't I read
9  that someplace?
10       Q.  I think you did.  Let's back up a
11  couple of lines.  It says, well, if we go about
12  five or six lines, there's a sentence.
13       A.  Above?
14       Q.  Do you see the word on the left is
15  periods?  That's the word that's flush with the
16  left margin.
17       A.  How far up?
18       Q.  From where we were it's about six
19  lines.
20       A.  Got it.
21       Q.  In the event that the lessees shall
22  elect to exercise such option for any such
23  extension of this lease, the lessees shall
24  within the period that we've already discussed
25  notify the lessor in writing of lessees'

Page 68

1  election and intention?
2       A.  Right.
3       Q.  And then if we continue down, and
4  after the service of said notice upon the
5  lessor, such extension and renewal shall become
6  effectual for all purposes.
7       A.  Right.
8       Q.  That's what you're referring to?
9       A.  Right.
10       Q.  The notification has the effect of
11  renewing the lease?
12       A.  It sounds like it to me.  The lessee
13  can say, yes, we're renewing, and it wouldn't be
14  necessary for a mutually executed document.
15       Q.  So then the question is, where it
16  refers to such further instruments and
17  agreements, do you have any idea what those
18  might be?
19       A.  I have no idea.
20       Q.  There's nothing that comes to mind
21  that you think S&R would need?
22       A.  Supposition on my part, I would guess
23  that it appears that that language might be in
24  somewhat of a conflict, but I would guess that
25  the two parties would probably feel better if

Page 69

1  they mutually executed something, but that's
2  just my opinion.
3       Q.  So let's flip back for a second to the
4  1984 document between HOB and S&R.
5       A.  Which document is that?
6       Q.  This was Exhibit 6.
7       A.  Okay.
8       Q.  We were looking at paragraph 8.
9       A.  What page?
10       Q.  Jam 01493.
11       A.  93 did you say?
12       Q.  Yes.
13       A.  Okay.
14       Q.  Paragraph 8, in the last sentence of
15  that, each party agrees with the other to take
16  all steps necessary to exercise any and all
17  renewal options under the Parcel 3 lease for the
18  maximum periods permitted thereby.  The maximum
19  period under this lease is 99 years?
20       A.  Correct.
21       Q.  So this is an agreement between S&R
22  and HOB by which S&R is agreeing to renew the
23  lease for 99 years?
24       A.  That's the way it reads to me, yes.
25       Q.  But there's been no discussions of

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                     Clevland, OH

Page 70

1   whether or not you're going to renew?
2       A.  No.
3       Q.  If S&R does not renew the lease at
4   all, does that affect S&R's subtenants in the
5   building?
6       A.  That calls for a legal opinion, and
7   I'm not sure I'm qualified.  I would assume it
8   would, yes, I mean if we have to abandon the
9   premises.  Again, though, somebody has got to
10  own it.  Those leases would run with the land.
11          Would they affect the tenants in the
12  building?  Maybe not.  You know, there is -- I'm
13  not sure they would, actually.  Somebody has got
14  to own it.  The leases would run to whomever
15  would own it, and perhaps they wouldn't be.
16      Q.  Do any of the current subtenants of
17  S&R have a sublease that extends beyond 2012?
18      A.  Yes.
19      Q.  Yes?
20      A.  Yes.
21      Q.  At this point in time S&R has no right
22  to be on the property beyond 2012; is that
23  right?
24      A.  Until such time as we would extend the
25  term, I would guess, yes.

Page 71

1       Q.  To make the record clear, 2012 is when
2   the current lease expires?
3       A.  Yes.
4       Q.  So right now you have no right to stay
5   beyond 2012.  You have to exercise your renewal
6   option?
7       A.  Well, I would say we have the right
8   because the renewal option is fairly explicit.
9   So, again, I'm not sure exactly technically if
10  we haven't given our notification that we're
11  extending the term of the lease, if you assume
12  that means no rights beyond that date, then
13  you're correct.
14          The fact that we hold an option for
15  beyond that date would tell me that we have
16  rights.  If we had no option, then we would have
17  no rights.  But we have an option, so clearly we
18  could contract beyond the date assuming we
19  assume the option.
20          And if we don't, again, that lease may
21  still be in force and effect because someone
22  would own the building, and I believe those
23  leases would still be good.
24      Q.  Okay.  Let's go back to the lease for
25  a second, page 5.

Page 72

1       A.  The same document?
2       Q.  Exhibit 2.  Toward the bottom, this is
3   Roman XIII, I think we read this a minute ago,
4   whenever this lease or any renewal thereof --
5       A.  Wait a second.  I haven't found it on
6   page 2.
7       Q.  I'm sorry, page 5, the fifth line from
8   the bottom.
9       A.  Got it.  Yes.
10      Q.  Whenever this lease or any renewal
11  thereof shall expire without election on the
12  part of lessees to renew, then the lessee shall
13  vacate said premises at the termination of this
14  lease or any renewal thereof.
15      A.  Okay.
16      Q.  So if you don't exercise your renewal
17  option, then you have to vacate; right?
18      A.  Right.
19      Q.  Because you haven't yet exercised your
20  renewal option, you don't right now have the
21  right to stay after 2012?
22          MR. WALTERS:  Objection.  Calls for a
23  legal conclusion.
24      A.  Are you asking me to answer?
25      Q.  Yes.

Page 73

1       A.  Based on my --
2       Q.  Based on your experience.
3       A.  Well, I think we've already answered
4   the question.  Do you want to restate it?
5       Q.  If you could restate it for me because
6   we have a lot of questions.
7          MR. WALTERS:  He asked and answered
8   that.
9       A.  Restate the question.
10      Q.  The question is right now because you
11  have not yet exercised any option to renew, you
12  have no right to stay on the property after
13  2012?
14          MR. WALTERS:  Objection.  Asked and
15  answered.
16      A.  I answered the question.  My opinion
17  is we have rights because the renewal is fully
18  explained.  If there was no option to renew,
19  then we would have no rights.  The right is in
20  itself the option to extend the term.
21      Q.  If you don't renew, then you have no
22  right to stay on the property after 2012?
23      A.  I believe that's correct.
24      Q.  Do you know of any situation in which
25  S&R has been able to sublease a property even

19 (Pages 70 to 73)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                    Clevland, OH

Page 74

1  though S&R is not the owner of the property or
2  the lessor of the property?
3      A.  I don't understand your question.
4      Q.  Can S&R sublease a property where the
5  property is not owned by S&R or S&R is not the
6  lessor of the property?
7      A.  Because there's two ownerships in the
8  building, let me -- you need to qualify.  You
9  need to clarify because there's two owners in
10  the building.  Are you asking --
11     Q.  Who are the two owners of the
12  building?
13     A.  S&R and HOB.  So if it's on the fifth
14  floor or above -- I'm honestly not sure.  I
15  believe that the contract that Forest City
16  Commercial Management has with S&R and HOB
17  allows us to make leases in either of those two
18  entities' favor without regard for the actual
19  ownership, the split between the floors.
20        So to the extent that you're asking
21  the question could S&R sublease properties that
22  they don't own -- was that your question?
23     Q.  That they don't own or they are not
24  the lessor of.
25        MR. WALTERS:  Objection.  Calls for a

Page 75

1  legal conclusion.
2      A.  Again, I'm not sure I'm qualified.
3      Q.  Within your experience you're
4  responsible for.
5        MR. WALTERS:  Same objection.
6      A.  No, they could not.
7      Q.  If S&R does not exercise its renewal
8  option, then Halle Office Building has to also
9  vacate the top seven floors --
10        MR. WALTERS:  Objection.
11     Q.  -- of the portion of the building that
12  sits on the property that Jamaica owns?
13        MR. WALTERS:  Objection.  Calls for a
14  legal conclusion.
15     Q.  You can answer.
16     A.  I believe so.
17     Q.  We're in the 1984 document.  This is
18  Exhibit 6.
19     A.  What page?
20     Q.  1494.  Actually, you know what, let's
21  not do that.  Let's put that document aside.
22        - - - - -
23        (Thereupon, Plaintiff's Deposition
24        Exhibit 10 was marked for purposes
25            of identification.)

Page 76

1        - - - - -
2      Q.  Take a minute to look this over.
3      A.  Yes.
4      Q.  Have you ever seen this document
5  before?
6      A.  I don't believe I've seen this one,
7  no.
8      Q.  It's titled certificate, and the first
9  sentence says, this certificate is dated as of
10  December 20, 2001.
11     A.  Right.
12     Q.  This is an example of something
13  commonly known as an estoppel certificate?
14     A.  Yes.
15     Q.  Have you seen other estoppel
16  certificates on behalf of S&R or relating to
17  this property?
18     A.  No, I have not.
19     Q.  Do you know who prepares the estoppel
20  certificate?
21     A.  Well, an estoppel is typically
22  prepared by the lender, but I'm not sure who
23  prepared this.
24     Q.  So the lender will draft it and
25  forward it to the lessor; is that correct?

Page 77

1        MR. WALTERS:  Objection.
2  Mischaracterizes the testimony.
3      A.  In -- well, estoppels basically
4  confirm documents for a lender's benefit that
5  all documents are in place, leases, deeds, et
6  cetera.  So your question was did the lender
7  prepare this for the lessee?
8      Q.  I know you said you don't know.
9  You're not that familiar with the document in
10  particular?
11     A.  No, I'm not.
12     Q.  But typically when an estoppel
13  certificate is prepared?
14     A.  Yes.  I'm familiar with estoppels.
15     Q.  In a typical case the lender prepares
16  the estoppel certificate?
17     A.  Sometimes.  Sometimes it's the
18  borrower's form that a lender might have
19  approved, but an estoppel is typically to the
20  best of my knowledge prepared by a lender.
21     Q.  Then the lender will typically forward
22  it to the lessor?
23     A.  Uh-huh.
24     Q.  And the lessor will sign it and return
25  it to the lender?

20 (Pages 74 to 77)

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                        Clevland, OH

Page 78

1    A. I believe so, yeah.
2    Q. Have you seen any of the estoppel
3  certificates relating to this property, the
4  Jamaica property?
5    A. No.
6    Q. Does S&R receive a copy of the
7  estoppel certificates when they are executed?
8    A. I don't know if S&R has received a
9  copy of this, no.
10   Q. If the lessor didn't sign it, what
11  would happen to S&R?
12      MR. WALTERS: Objection. Foundation.
13   A. I don't know.
14   Q. The purpose of this certificate is
15  what?
16   A. Typically or this?
17   Q. This one in particular.
18   A. I don't know. I've never seen it
19  before.
20   Q. Typically what is the purpose?
21   A. To confirm various things that a
22  borrower, or in this case a borrower would have
23  represented to a lender being factual, leases
24  that are in place, the amount of rent, the
25  expiration date, et cetera. Those are signed by

Page 79

1  us as basically underwriting that what we've
2  told a lender is true.
3    Q. If something in an estoppel
4  certificate is inaccurate, does it affect --
5  let's say something in here is inaccurate in
6  this document. Let's say, for example, on
7  page 2, paragraph C, it says the base annual
8  rent under the lease --
9    A. Okay. I'm reading it.
10   Q. Let's say instead of what it actually
11  says, let's say it said the base annual rent
12  under the lease is $1 billion per year.
13   A. Okay.
14   Q. Would S&R then be obligated to pay
15  $1 billion a year in rent?
16      MR. WALTERS: Objection. Calls for a
17  legal conclusion.
18   Q. You can answer. In your experience?
19   A. No idea.
20   Q. Does S&R look at those documents after
21  they are signed?
22      MR. WALTERS: Objection. Calls for
23  speculation.
24   A. No idea.
25   Q. Do you know who would know the answer

Page 80

1  to that question?
2    A. Do we look at them after they are
3  signed?
4    Q. Yes.
5    A. The lawyer that was involved in the
6  loan or the mortgage loan officer within our
7  company. The guy that works for our finance
8  department who dealt with the lender to
9  refinance or put a new loan on the property
10  would know, I presume. I wouldn't look at it.
11   Q. You wouldn't look at it?
12   A. No.
13   Q. Would anyone who was responsible for
14  managing the property look at it?
15   A. The property manager; is that your
16  question?
17   Q. Anyone who is responsible for managing
18  the property.
19   A. I don't know. I would guess. I mean,
20  you would look at it at the time it was issued
21  by the lender, of course. We're signing off on
22  it, so we would look at it. Would we look at it
23  after the fact? I have no idea.
24   Q. In your experience are estoppel
25  certificates ever used to alter the rights of a

Page 81

1  lessee?
2      MR. WALTERS: Objection. Calls for
3  legal conclusion and foundation.
4    A. In my experience would estoppels be
5  used to modify an underlying agreement?
6    Q. Yes.
7    A. No.
8      MR. WALTERS: Same objection.
9    A. In my experience, no, they do not.
10  That's not between the parties. I mean, how
11  could it be?
12   Q. It's not between the parties to the
13  lease?
14   A. Sure.
15   Q. So then it can't modify the rights?
16   A. In my experience.
17   Q. Again, you're not a lawyer.
18   A. In my experience, no.
19      MR. LEHN: Can we take a couple
20  minutes?
21      MR. WALTERS: Sure.
22      (Brief recess.)
23   Q. I just want to pull out the deed
24  again. This was Exhibit 3, the conveyance
25  between Halle Cleveland and Jamaica. On the

21 (Pages 78 to 81)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                                                February 23, 2007

Clevland, OH

Page 82

1   third page, point 3, it says, subject to:
2   Estoppel certificate dated December 2001?
3        A. Uh-huh.
4        Q. Am I right that prior to this lawsuit
5   S&R was not aware that Jamaica had acquired the
6   property?
7        A. I said I was not aware of it. S&R
8   could have been.
9        Q. You're speaking in your capacity of
10  S&R.
11       MR. WALTERS: Objection. He doesn't
12  purport to know everything that S&R knows.
13       Q. If the deed had said under subject to
14  estoppel certificate dated December 2001, and
15  the estoppel certificate had said the base
16  annual rent under the lease is $1 billion a
17  year, would you understand the deed to be
18  modifying your rent, S&R's rent, to be
19  $1 billion a year?
20       MR. WALTERS: Objection. Asked and
21  answered.
22       MR. LEHN: It was not asked and
23  answered.
24       Q. You can answer the question.
25       A. If I was reviewing this as a lender

Page 83

1   having -- I mean, who exactly -- I don't
2   understand your question.
3        Q. Well, you're S&R here?
4        A. Yes.
5        Q. And you have a lease with Jamaica, and
6   it says $35,000 payable in gold coins, and we
7   disagree about the meaning of that clause, but
8   that's what it says. Then let's say Halle
9   Cleveland when it executed this estoppel
10  certificate in December of 2001 had specified
11  that the base annual rent was $1 billion a year.
12       A. Uh-huh.
13       Q. And then in February of 2006 this deed
14  was executed, and it said subject to the
15  estoppel certificate dated December 2001, and in
16  my hypothetical question, the estoppel
17  certificate says that the base annual rent is
18  $1 billion a year. Would that have the effect
19  of making the rent $1 billion a year?
20       MR. WALTERS: Objection. Calls for a
21  legal conclusion.
22       Q. You can answer.
23       A. I would consider it a mistake. It's a
24  ludicrous inclusion. Obviously, it would have
25  to be a mistake. I can't form a conclusion as

Page 84

1   to whether it would modify it because the
2   hypothetical question is so ridiculous.
3        Q. What if it said --
4        A. It would be nothing. If I were to
5   read it coming back from the grantor, I would
6   read it as a mistake.
7        Q. What if it said $40,000 a year instead
8   of $35,000?
9        MR. WALTERS: Objection. Calls for a
10  legal conclusion.
11       A. The same because I would have known it
12  was $35,000. If it's anything other than
13  $35,000, I would consider it a mistake. It's
14  clear in the lease in my opinion it's $35,000.
15       Q. And it's the lease that defines the
16  rent for you?
17       A. Yes.
18       Q. Not what's in the deed --
19       MR. WALTERS: Objection. Calls for a
20  legal conclusion.
21       Q. -- between Halle Cleveland and
22  Jamaica?
23       MR. WALTERS: I didn't mean to
24  interrupt.
25       A. The lease calls for $35,000 a year.

Page 85

1   If the estoppel came back with anything other
2   than $35,000, I would not consider it amended.
3   The lease would be the underlying document. I
4   would consider it a mistake.
5        Q. And you would give the same answer
6   with respect to the deed? If the deed said the
7   rent was $1 billion a year, you would consider
8   that a mistake and not an amendment of the
9   lease?
10       MR. WALTERS: Objection. Calls for a
11  legal conclusion.
12       A. Yes. I would consider it a mistake.
13       Q. I think this is the last exhibit I
14  have.
15           - - - - -
16       (Thereupon, Plaintiff's Deposition
17       Exhibit 11 was marked for purposes
18           of identification.)
19           - - - - -
20       A. Okay.
21       Q. Have you ever seen a page like this
22  before?
23       A. Yes.
24       Q. What is it?
25       A. It is a listing by CB Richard Ellis

22  (Pages 82 to 85)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                    Clevland, OH

---

Page 86

1   who is our broker on the building of various
2   vacancies in the building.
3       Q.  In the Halle Building?
4       A.  In the Halle Building.
5       Q.  In the bottom right-hand corner, you
6   can see it's cut off, but it appears to be dated
7   1-4-2006?
8       A.  Yes.
9       Q.  Just as an example, the first listing,
10  Suite 105, space available, it says 1,626.
11  That's square feet, I take it?
12      A.  Yes.
13      Q.  It's priced at 15.50 per square foot
14  per year?
15      A.  Yes.
16      Q.  Are these rental rates approximately
17  what the current rental rates are?
18      A.  Approximately.
19      Q.  What proportion of the building is
20  vacant now?
21      A.  You mean unleased?
22      Q.  Unleased.
23      A.  20 -- I believe about 20 percent.
24      Q.  Is vacant?
25      A.  Yes.

---

Page 87

1       Q.  So about 80 percent --
2       A.  It's a little bit of a misnomer.  We
3   have one tenant that will be going out still in
4   occupancy, but the space is for lease.  They
5   have given their notice, but they still have
6   about a year and a half to go.  So we know that
7   will be coming available, but we are marketing
8   it.  We're still receiving rent from it.
9   Including that, I believe the building would be
10  about 85 percent occupied.
11      Q.  When you say the building, we're
12  talking about the entire building on all four
13  parcels?
14      A.  Correct, of course.
15      Q.  Not just S&R's portion of the
16  building?
17      A.  The building in its entirety.
18      Q.  If you had 100 percent occupancy at
19  the rates or at the approximate rates that are
20  listed here, would the building be profitable?
21          MR. WALTERS:  Objection.
22      A.  Would it cash flow above debt service?
23      Q.  Yes.
24      A.  Barely, yes.  It would cash flow.  It
25  would be above water.  However, to reach

---

Page 88

1   100 percent occupancy we would have to spend
2   about $40 a square foot for each of these square
3   footages in the year these vacancies were leased
4   which would mean in that particular year the
5   building would be under water.  It would not
6   meet debt service because we're expensing tenant
7   improvements.
8           And so for any given year, eventually
9   by making these deals, two or three years later
10  after the money had been spent to put the
11  tenants in it would cash flow.  It's good
12  news/bad news.  When you make a deal, you get a
13  tenant, but the bad news is you have to spend
14  $40 a foot to put them in.  With the rents of
15  $17, you can see it takes a few years to get
16  back.
17      Q.  Do you have to spend that money -- is
18  that because any new tenants want changes in the
19  space?
20      A.  Most.
21      Q.  It's not because there's some kind of
22  defect in the space right now?
23      A.  No.
24      Q.  Who is the property manager for the
25  Halle Building?

---

Page 89

1       A.  The person or --
2       Q.  Is there an entity that is considered
3   the property manager?
4       A.  Forest City Commercial Management.  It
5   was for some time -- you have an invoice here,
6   and CB Richard Ellis was the property manager
7   for some period, but we've taken the property
8   back.  We manage it.
9       Q.  Who is the individual who is
10  responsible?
11      A.  That's a good question.  I believe it
12  is now Steve Bir, B-I-R.
13      Q.  What does it mean to be the property
14  manager?
15      A.  He's responsible for managing the
16  property, collecting the rents, maintenance of
17  the building, janitorial, repairs and
18  maintenance, so everything that happens within
19  the building, the physical building.
20      Q.  He doesn't deal with the lease?  He
21  doesn't deal with the owner of the property
22  underneath the building; does he?
23      A.  What do you mean deal with?
24      Q.  Would he have any occasion to
25  communicate with either Jamaica or Jamaica's

---

23  (Pages 86 to 89)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                February 23, 2007
Clevland, OH

---

Page 90

1  predecessor, Halle?
2      A.  No.
3      Q.  Who are the people within the Forest
4  City organization who have occasion to interact
5  with the owner of the ground?
6      A.  I don't think there's been any
7  interaction before this lawsuit with you on the
8  ground.
9      Q.  Going back since 1982?
10     A.  I never have.  There may be somebody
11 that talks with you under the ground.  We send
12 out the ground lease payments, and that's it.
13     Q.  That's it?
14     A.  Sure.
15     Q.  The ground lease payments, you said
16 there's an accounts payable department?
17     A.  Right, of our commercial.  You saw the
18 checks.  It would come out of I guess accounts
19 payable.  I'm not sure where the checks come
20 from frankly.
21     Q.  If today you could exercise your
22 renewal option, of course you can't because the
23 lease provides that you have to do it in 2009, I
24 think?
25     A.  Uh-huh.

---

Page 91

1      Q.  If today you could do it, who would be
2  the person that would handle that?
3      A.  I think you asked that question
4  before, and the answer was Dave LaRue, Jim
5  Ratner, and myself.
6      Q.  I think the question I asked before
7  was who would decide whether to renew.
8      A.  Wasn't that your question now?
9      Q.  My question is, who would actually
10 communicate with the lessor about the renewal?
11     A.  I don't know.  In-house lawyers is my
12 guess.  Jimmy and Dave and I presumably would
13 communicate with a lawyer that would pull the
14 file and make the formal notification of our
15 decision.
16     Q.  I believe you testified before that
17 S&R has been losing money on the property.
18     A.  The building has been losing money.
19     Q.  The building has been losing money?
20     A.  Yes.
21     Q.  So just so I understand how this is
22 determined, your income is basically the rent
23 that you generate?
24     A.  Yes.
25     Q.  From your tenants?

---

Page 92

1      A.  Uh-huh.
2      Q.  And your expenses are property
3  management, the rent that you pay to Jamaica or
4  Halle Cleveland before, the taxes, things like
5  that?
6      A.  Uh-huh.
7      Q.  When all that stuff is added?
8      A.  Utilities, janitorial, repairs, and
9  maintenance, all of those things.
10     Q.  When all of that stuff is added up,
11 you have lost money?
12     A.  After debt service.  We have a loan on
13 the building.  So whatever net income, what we
14 call NOI, is left after you pay the expenses of
15 the building is left over for debt service.  We
16 pay the debt service, and what's left over after
17 that, if there is anything left over after that,
18 you have a cash flow.
19     Q.  Do you know when the last time was you
20 had a positive cash flow?
21     A.  I haven't looked at it before coming
22 over here.  I believe it was -- I believe it was
23 a couple years ago, but I couldn't swear to it
24 one way or another honestly.
25     Q.  Why has the cash flow been negative?

---

Page 93

1      A.  Well, Cleveland is a depressed office
2  market.  The building itself would be
3  characterized as a class B building.  It's
4  located on Euclid Avenue which has been
5  deteriorating over the past ten years.  We lost
6  a couple big tenants, one to bankruptcy, one to
7  a move out.  The building has substantial
8  vacancies, and obviously if the building is
9  substantially vacated, your gross income isn't
10 enough to pay expenses and debt service and
11 leave you with cash flow.
12         But overall, I mean, the city of
13 Cleveland suffers from an over 20 percent
14 vacancy downtown.  This building is not one of
15 the premier buildings in town.  That's why it
16 hasn't done it.
17         MR. LEHN:  I think I'm all set.  Did
18 you have any questions?
19         MR. WALTERS:  Yes.  Just a very few.
20         EXAMINATION OF PATRICK M. LOTT
21 BY MR. WALTERS:
22     Q.  Mr. Lott, we talked a little bit today
23 about the various floors in the Halle Building
24 itself.  Is it possible to split the tenancies
25 between the leasehold and the fee?

24  (Pages 90 to 93)

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                    February 23, 2007
                        Clevland, OH

---

Page 94

1    A. Horizontally?
2    Q. Horizontally.
3    A. On each floor, no, absolutely not.
4    Q. But physically do tenants at present
5 occupy space in both the leasehold and the fee?
6    A. Absolutely.
7    Q. Describe physically what that looks
8 like in the building.
9    A. We lease these floor, as does every
10 other owner, floor by floor. Occasionally you
11 have full floor tenants, and occasionally you
12 have multitenants on one floor. No
13 acknowledgment is made of where the invisible
14 line between the leasehold and the fee property
15 underneath the building is made.
16    So when we lease a full floor tenancy
17 or a partial floor tenancy, that line which
18 extends from the center of the earth to infinity
19 could fall between and would fall between a
20 tenant's on each floor's space. So there would
21 be no way of demising, once the tenant was in,
22 between the leasehold and the fee as it appears
23 in the plan.
24    Q. Thank you. With respect to ingress
25 and egress in the Halle Building, does Jamaica

---

Page 95

1 have full ingress and egress in the Halle
2 Building with the portion of the building they
3 own?
4    A. In its -- specifically for Jamaica,
5 that portion?
6    Q. Yes.
7    A. I believe that on their portion of the
8 plan, yes, there is an entrance on the ground
9 floor.
10    Q. There is an entrance?
11    A. I believe so.
12    Q. What about with respect to elevators?
13    A. There's a freight elevator on their
14 side. I'm not sure exactly where the line
15 falls, whether the main bank of elevators is on
16 the Jamaica side or on the fee side.
17    Q. Okay. Thank you. You've been asked a
18 lot of questions today by Mr. Lehn with respect
19 to payment of rent, if it were $1 million or
20 $1.1 million. If rent were to be increased, and
21 I'm asking you this question on behalf of both
22 HOB and S&R, could HOB and S&R pay the increase
23 in rent?
24    A. No, absolutely not.
25    Q. What is the result if the rent is

---

Page 96

1 increased 30 fold?
2    A. My opinion of what the result would
3 be, is that what you're asking?
4    Q. Yes.
5    A. We would default on the ground lease
6 because there's no money to pay it.
7    Q. Thank you. There's been some
8 questions today about estoppel certificates, and
9 putting aside the notion of whether or not
10 estoppel certificates modify anybody's rights,
11 is it in your experience with estoppel
12 certificates that information that's listed in
13 the estoppel certificate be true and accurate?
14    A. Yes.
15    Q. And in fact, that is a very important
16 question?
17    A. We take them very seriously.
18    MR. WALTERS: That's all I have.
19    FURTHER EXAMINATION OF PATRICK M. LOTT
20 BY MR. LEHN:
21    Q. You had never seen the estoppel
22 certificate before, though; had you?
23    A. You know, I'll be honest with you. I
24 could have seen it in one of our prep sessions.
25 I didn't recall this morning seeing it, but I

---

Page 97

1 could have. We've viewed a lot of documents, so
2 I may have seen it.
3    Q. When you said you take estoppel
4 certificates very seriously, why is that?
5    A. Because it's our representation to a
6 lender or to anybody else that requires an
7 estoppel that those facts enumerated in the
8 document are true when we sign it. So obviously
9 we take it seriously.
10    Q. I believe you testified earlier that
11 you weren't sure whether anyone at S&R looks at
12 the estoppel certificates after they are
13 executed?
14    A. I'm not sure, no.
15    Q. But before they are executed someone
16 would review it?
17    A. Clearly, sure, of course.
18    MR. LEHN: I don't have anything
19 further.
20    MR. WALTERS: I don't, either. We
21 will sign.
22    -----
23    (Deposition concluded at 12:40 p.m.)
24    (Signature not waived.)
25    -----

25 (Pages 94 to 97)

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669

Patrick Lott                                         February 23, 2007
                        Clevland, OH

Page 98

```
 1          CERTIFICATE
 2
 3   State of Ohio,      )
 4                  ) SS:
 5   County of Cuyahoga. )
 6
 7       I, Cynthia A. Sullivan, a Notary Public
 8   within and for the State of Ohio, duly
 9   commissioned and qualified, do hereby certify
10   that the within named PATRICK M. LOTT was by me
11   first duly sworn to testify to the truth, the
12   whole truth and nothing but the truth in the
13   cause aforesaid; that the testimony as above set
14   forth was by me reduced to stenotypy, afterwards
15   transcribed, and that the foregoing is a true
16   and correct transcription of the testimony.
17
18       I do further certify that this deposition
19   was taken at the time and place specified and
20   was completed without adjournment; that I am not
21   a relative or attorney for either party or
22   otherwise interested in the event of this
23   action.  I am not, nor is the court reporting
24   firm with which I am affiliated, under a
25   contract as defined in Civil Rule 28(D).
```

Page 99

```
 1       IN WITNESS WHEREOF, I have hereunto set my
 2   hand and affixed my seal of office at Cleveland,
 3   Ohio, on this 26th day of February 2007.
 4
 5
 6
 7
 8
 9
10       Cynthia A. Sullivan, Notary Public
11       Within and for the State of Ohio
12
13   My commission expires October 17, 2011.
14
15
16
17
18
19
20
21
22
23
24
25
```

26 (Pages 98 to 99)

Alderson Reporting Company
1-800-FOR-DEPO

4104ccfc-48b8-485d-9049-2837c9a86669