# EXHIBIT F

Dockets.Justia.com

# HARVARD
# LAW REVIEW

Vol. XLVIII       MAY, 1935       No. 7

## THE GOLD CLAUSE IN UNITED STATES BONDS

THE earliest, and not the least pointed, commentary upon the majority opinion in the Liberty Bond gold clause case[1] was made by the Associated Press, when it announced that the Government had "lost". That first plain misreading of the opinion, and the more discriminating bewilderment of succeeding dispatches, called attention to what is perhaps the single most significant aspect of the decision. For what was confusing to the reporter at the first reading is even more so to the commentator at the hundredth. Few more baffling pronouncements, it is fair to say, have ever issued from the United States Supreme Court.

The attack upon the constitutionality of the gold legislation of 1933 and 1934[2] was destined from the beginning to furnish a memorable episode in the history of the Court. Seldom has a

---

[1] Perry v. United States, 294 U. S. 330 (1935). Mr. Chief Justice Hughes wrote the opinion, Mr. Justice Stone concurring specially. *Id.* at 358. Justices McReynolds, Van Devanter, Sutherland, and Butler dissented in an opinion written by Mr. Justice McReynolds and directed also to the decisions in the Nortz and Norman cases, *infra* notes 4, 5. *Id.* at 361.

[2] There were five cases before the Court, argued and decided at the same time. Three cases presented the question of the effect of the recent legislation upon the rights of holders of private bonds containing gold clauses. Norman v. Baltimore & Ohio R. R., and United States v. Bankers Trust Co. (two cases), 294 U. S. 240 (1935). The fourth case concerned the position of holders of gold certificates. Nortz v. United States, 294 U. S. 317 (1935).

In the gold clause cases, public and private, the attack was aimed primarily at the constitutionality of the Joint Resolution of June 5, 1933. See note 8, *infra*. Other measures relating to the currency, however, were in some degree involved; and in the gold certificate case were solely involved. The Emergency Banking Relief Act of March 9, 1933, 48 Stat. 1, 12 U. S. C. A. § 95a (1934), (1) empowered the President to regulate or prohibit "transactions in foreign exchange, transfers

legal controversy been touched with ramifications so various and so extensive.[3] So much the more astonishing, therefore, is the Delphic character of the Court's utterance in the most difficult of the cases before it. While the positions of holders of gold certificates [4] and of private bonds containing gold clauses [5] were de-

---

of credit between or payments by banking institutions, . . . and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency"; and (2) authorized the Secretary of the Treasury to require all persons to deliver to the Treasurer " any or all gold coin, gold bullion, and gold certificates " owned by them in return for " an equivalent amount of any other form of coin or currency . . . of the United States." Sundry executive orders carried these powers into effect. Executive Orders, No. 6073, March 10, 1933, 12 U. S. C. A. § 95n.; No. 6102, April 5, 1933, *id.* § 248n.; No. 6111, April 20, 1933, and No. 6260, Aug. 28, 1933, *id.* § 95n.; No. 6261, Aug. 29, 1933; No. 6359, Oct. 25, 1933, *id.* § 248n.; No. 6556, Jan. 12, 1934; No. 6560, Jan. 15, 1934, *id.* § 95n. The Agricultural Adjustment Act of May 12, 1933, § 43, 48 STAT. 51, 31 U. S. C. A. § 821 (1934), authorized the President to reduce the gold content of the dollar to any amount within 50 per cent of its then weight; and provided (1) that the " gold dollar, the weight of which is so fixed, shall be the standard unit of value, and all forms of money . . . shall be maintained at a parity with this standard and it shall be the duty of the Secretary of the Treasury to maintain such parity "; and (2) that " all . . . coins and currencies heretofore or hereafter coined or issued by or under the authority of the United States shall be legal tender for all debts public and private." The Gold Reserve Act of Jan. 30, 1934, § 12, 48 STAT. 342, 31 U. S. C. A. § 821 (1934), confirmed orders issued under the two preceding statutes, and with respect to the authority of the President to fix the weight of the gold dollar provided that it should not be fixed " in any event at more than 60 per centum of its present weight." On Jan. 31, 1934, the President issued a proclamation declaring that he fixed " the weight of the gold dollar to be 15 5/21 grains nine tenths fine." Executive Proclamation No. 2072, Jan. 31, 1934, 31 U. S. C. A. § 821n.

  [3] For a valuable discussion of the international implications of the problem (implications outside the scope of this paper), see Nussbaum, *Comparative and International Aspects of American Gold Clause Abrogation* (1934) 44 YALE L. J. 53.

  [4] Nortz v. United States, 294 U. S. 317 (1935). The former holder of gold certificates to the nominal value of $106,300 brought suit in the Court of Claims to recover an additional $64,334.07 in present currency. He asserted that he had been compelled to surrender the certificates to the Treasury in return for legal tender of the same nominal amount, that he had done so under protest, and that under the Fifth Amendment he was entitled to recover just compensation for the value, at the time of surrender, of the gold coin represented by the certificates. The Court, speaking through Mr. Chief Justice Hughes, held in effect that just compensation was what the gold coin would have been worth to the plaintiff if he had received it, and that, since the gold dollar had not yet been devalued at the time of surrender and since all legal tender was then at a parity, the coin would have been worth no more than the currency which in fact he did receive. See pp. 1076–77, *infra*. The Court of Claims not being authorized to entertain actions for nominal damages, it concluded that the plaintiff could recover nothing. See note 9, *infra*.

  [5] Norman v. Baltimore & Ohio R. R., 294 U. S. 240 (1935). A railroad bondholder brought suit upon a coupon, relying upon the gold clause which promised

fined with reasonable precision, that of holders of United States gold clause obligations was left shrouded in doubt. Almost the only thing which it is possible to say with assurance is that the plaintiff in the particular suit did not recover.

What does the opinion mean? This question stands at the threshold of every other speculation concerning the case: its bearing upon monetary policy, its economic and political implications, its relation to the main structure of American constitutional law. An examination of the possible answers to it will be the primary concern of this paper.

The bare bones of the case may be briefly stated. One Perry, the holder of a United States bond which had been called for redemption, sued in the Court of Claims to recover 1.69 dollars in present legal tender [6] for every gold dollar expressed in the bond. He insisted that the gold clause in the bond [7] gave him that right, and challenged the validity of the Joint Resolution of June 5, 1933,[8] which purported to take it away. The Supreme Court held, on questions certified to it, that the Joint Resolution was

---

payment of so many dollars "in gold coin of the United States of the present standard of weight and fineness". The weight of the gold dollar having been reduced from 25 8/10 grains of gold nine-tenths fine to 15 5/21 grains (see note 2, *supra*) he demanded 1.69 dollars in present currency for every dollar expressed in the bond. The Court, again through Mr. Chief Justice Hughes, held that the provisions of the Joint Resolution of June 5, 1933 (see note 8, *infra*), forbidding such payment, were constitutional as applied to such an obligation, and denied recovery.

[6] See note 5, *supra*.

[7] The gold clause in United States bonds is a promise to pay so many dollars "in United States gold coin of the present standard of value". Compare the terms of the conventional gold clause in private bonds, *supra* note 5.

[8] 48 STAT. 112, 31 U. S. C. A. § 463 (1934). The essential provisions are as follows: "That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

"(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable

*HARVARD LAW REVIEW* [Vol. 48

invalid as applied to the gold clause in a United States bond, but that the aggrieved bondholder was entitled to recover only for the " actual damage " which he had suffered. It found that no such damage had been proved, and, since the Court of Claims is not authorized to entertain actions for nominal damages,[9] decided that the action could not be maintained.

Seemingly the most explicit and yet ultimately the most puzzling part of the opinion is that in which the Joint Resolution is declared unconstitutional. It is desirable at the outset to deal with this question in the terms in which the Court apparently dealt with it.[10] The next and the critical question is why — if as applied to this bond the Joint Resolution is indeed unconstitutional — the bondholder has suffered no damage.[11] The conflicting answers to this question which find apparent support in various parts of the opinion will lead eventually to a reconsideration of the original problem as to the invalidity of the Resolution.[12]

## I. Constitutionality of the Resolution

The best approach to the constitutional discussion in the public bond case is by way of the constitutional decision in the private bond case.

The private gold clause, construed so as to entitle the investor under present circumstances to be paid in a ratio of 1.69 to 1,[13]

---

in money of the United States; and the term ' coin or currency ' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations."

As to § 2 of the Resolution, see notes 75, 141, *infra*.

[9] Grant v. United States, 7 Wall. 331, 338 (U. S. 1868) ; Marion & R. V. Ry. v. United States, 270 U. S. 280, 282 (1926).

[10] See pp. 1064–69, *infra*.

[11] See pp. 1069–89, *infra*.

[12] See pp. 1089–94, *infra*.

[13] So the bondholder contended the clause should be construed, and so the Court, at least for purposes of deciding the constitutional question, construed it. See note 106, *infra*. Various constructions of such clauses are possible, and, under varying circumstances, various ones have been taken. See, for a comprehensive discussion, Nebolsine, *The Gold Clause in Private Contracts* (1933) 42 Yale L. J. 1051. (1) The clause may be treated as calling for delivery of gold as a commodity. See Bronson v. Rodes, 7 Wall. 229, 250 (U. S. 1868), note 16, *infra*; cf. Butler v. Horwitz, 7 Wall. 258 (U. S. 1868); Dewing v. Sears, 11 Wall. 379 (U. S. 1870). Such a construction may succeed in hitching the value of the obligation to the value

was an effort by the parties to establish their own standard or measure of the obligation. It was a contract entered into in order to avoid the consequences of an exercise by Congress of its power to regulate the currency. The obligation was made solvable in dollars, but not in a fixed number of whatever Congress might have provided, at the time of payment, should constitute a dollar. The parties sought, in an uncertain world, the reputed security of gold.[14]

---

of gold, although it must run the gauntlet of uncertain doctrines as to the effect of impossibility of performance in the event that gold bullion as well as gold coin is unavailable. But it disregards the obvious nature of the obligation as a money contract. The Court in the Norman case specifically rejected it. See 294 U. S. at 301, disapproving the dictum in the Bronson case, *supra*. *Cf.* Nortz v. United States, 294 U. S. at 326–27. (2) The clause may be treated, more accurately, as a *money* contract, but as a single obligation to pay only in the particular kind of money specified. Trebilcock v. Wilson, 12 Wall. 687 (U. S. 1871); American Chicle Co. v. Somerville Paper Box Co., 50 Ont. L. R. 517 (1921); *In re* Société Intercommunale Belge d'Électricité, 49 T. L. R. 8 (Ch. D. 1932), *aff'd*, [1933] Ch. 684 (Ct. App.) (reversed by the House of Lords; see below). Such a construction, however, renders the clause inoperative whenever gold coin becomes legally unobtainable — one of the precise circumstances, it may be argued, in which it was intended to operate. See note 14, *infra*. *Cf.* Trebilcock v. Wilson, *supra*, in which, gold coin being obtainable and at a premium, the Supreme Court gave a *money* judgment, but a judgment in gold coin as specified. (3) The clause may be treated (as in the Norman case) as specifying the *measure* rather than the *mode* of payment, and thus as overriding the nominal number of currency units stated in the obligation. Feist v. Société Intercommunale Belge d'Électricité, [1934] A. C. 161; Cases of Serbian and Brazilian Loans, Pub., P. C. I. J., Series A, Nos. 20/21 (1929); *cf.* Gregory v. Morris, 96 U. S. 619, 624, 625 (1877). Given a flexible application, such a construction will operate in the widest possible variety of circumstances. Measure by weight can be used to determine equivalence between gold coins of different content, measure by value to determine equivalence between gold coin and other legal tender. Measure by value, it is true, ceases to have meaning when there is no longer a free market for gold. And measure by weight becomes a mathematical rather than a physical process when gold coin is withdrawn and the gold content of the currency is only a book content. But the Supreme Court in the Norman case did not on this account object that it was improper.

[14] It may be urged that the clause was designed primarily to afford protection against the post-Civil War type of inflation in which two kinds of currency circulated side by side. This, it is true, was the American experience against the background of which the clause first appeared. And this intention can be given effect by construing the clause to require payment in gold coin, if gold coin is available, and no more. See note 13, *supra*. But the silver controversy and the European World War experience suggest a broader intention. The cult of gold regards with equal horror any kind of tampering with the metallic medium, and the gold clause is an aspect of that cult. Probably the understanding of the investment market will be most faithfully reflected by viewing the clause as designed, in addition, to guar*d*

*HARVARD LAW REVIEW*

Is it within the power of Congress to defeat such a contract? This question strikes at the roots of ideas concerning the nature and function of money.[15] And the Court gave it a definitive answer. It held, in effect, that parties are free to contract only in terms of the currency provided by law.[16] Freedom of contract in a money economy thus suffers the most decisive of all possible setbacks. The intellectual framework in which this momentous determination was clothed is simple and, unless attacked at its foundations,[17] impregnable. Congress has specific power under the Constitution " to coin Money, [and] regulate the Value thereof."[18] It has a broader power, collected by the Court from that and cognate grants, " to provide a ' sound and uniform currency. . . .' "[19] Congress, therefore, has power to authorize the devaluation of the dollar. This is the major premise.[20] The minor premise is that it has power also to remove any obstacles to the effective use of that power; private contracts cannot be permitted to interfere with the exercise of constitutional authority.[21] And gold clauses do so interfere:

against depreciation of the single unit of currency (with or without withdrawal of gold from circulation) — as designed, in other words, to indicate both the mode of payment and/or the measure.

[15] See, for an extended discussion, Eder, *The Gold Clause Cases in the Light of History* (1935) 23 Geo. L. J. 359.

[16] The Court distinguished the post-Civil War gold clause cases on the ground that " ' there were two descriptions of money in use at the time. . . , both authorized by law, and both made legal tender in payments.' " 294 U. S. at 300. See Nebolsine, *supra* note 13, at 1061-69. Presumably the gold clause might again operate if that situation again prevailed.

[17] As it is, for example, in the dissenting opinion of Mr. Justice McReynolds, 294 U. S. at 361, and in Zelkowich, Note (1935) 29 Ill. L. Rev. 1058. Both these discussions, either by assertion or historical argument, in effect sterilize in the name of freedom of contract the constitutional grant of power to regulate the value of money. This Mr. Zelkowich does with notable candor when he marks as a prime step in the evil cycle which led to the Perry decision the act of Congress of June 28, 1834, c. 95, 4 Stat. 699, which made a slight reduction in the gold content of the dollar in order to restore the parity with silver. *Id.* at 1070-72.

[18] Art. 1, § 8, cl. 5.

[19] See the Chief Justice's review, 294 U. S. at 303-06, of the Legal Tender Cases: Knox v. Lee, 12 Wall. 457, 544, 545 (U. S. 1870); Juilliard v. Greenman, 110 U. S. 421, 438-40, 447, 448 (1884); *cf.* Veazie Bank v. Fenno, 8 Wall. 533, 548 (U. S. 1869).

[20] It was largely an unspoken premise. See note 23, *infra*.

[21] " Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." 294 U. S. at 308. The

"It requires no acute analysis or profound economic inquiry [said the Court] to disclose the dislocation of the domestic economy which would be caused by such a disparity of conditions in which, it is insisted, those debtors under gold clauses should be required to pay one dollar and sixty-nine cents in currency while respectively receiving their taxes, rates, charges and prices on the basis of one dollar of that currency." [22]

Enforcement of the gold clause after devaluation would produce, in other words, a dual monetary system; and Congress has undertaken to establish a unitary system.[23] That choice, the Court

"radiating potencies" of this proposition deserve intensive study of a sort not possible here. It is evident that the proposition, if permitted to declare itself absolute to its logical extreme, is capable of fairly devouring the "impairment of the obligation of contracts" clause and corresponding due process limitations upon federal action. *Cf.* Home Bldg. & Loan Ass'n v. Blaisdell, 290 U. S. 398, 435–42 (1934). Freedom *to contract*, in effect, becomes the whole of freedom *of contract*. Yet so near is it to being an axiom of political necessity in modern government that direct attack upon it is never easy. So, in this case, critics of the majority opinion are driven back, in seeking tenable ground, to denying the propriety of devaluation in the first instance. *Cf.* note 17, *supra*. For a variety of applications of the general canon, see (1) Involving federal action: Knox v. Lee, 12 Wall. 457, 550, 551 (U. S. 1870); Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 229, 230 (1899); Atlantic C. L. R. R. v. Riverside Mills, 219 U. S. 186, 202 (1911); Louisville & Nashville R. R. v. Mottley, 219 U. S. 467, 485, 486 (1911); Philadelphia B. & W. R. R. v. Schubert, 224 U. S. 603, 615 (1912); Calhoun v. Massie, 253 U. S. 170, 175, 176 (1920); New York v. United States, 257 U. S. 591, 601 (1922); United States v. Village of Hubbard, 266 U. S. 474, 477 (1925); see De Laval Steam Turbine Co. v. United States, 284 U. S. 61, 73 (1931); Sproles v. Binford, 286 U. S. 374, 390, 391 (1932); Texas v. United States, 292 U. S. 522, 531 (1934); (2) Involving state action: Long Island Water Supply Co. v. Brooklyn, 166 U. S. 685, 692 (1897); Manigault v. Springs, 199 U. S. 473, 480 (1905); Atlantic C. L. R. R. v. Goldsboro, 232 U. S. 548, 558 (1914); Chicago & A. R. R. v. Tranbarger, 238 U. S. 67, 76–77 (1915); Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 372, 376 (1919); Producers Transp. Co. v. Railroad Comm., 251 U. S. 228, 232 (1920); Thornton v. Duffy, 254 U. S. 361, 369 (1920); Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 198 (1921); Dillingham v. McLaughlin, 264 U. S. 370, 374 (1924); Sutter Butte Canal Co. v. Railroad Comm., 279 U. S. 125, 138 (1929); Stephenson v. Binford, 287 U. S. 251, 276 (1932).

[22] 294 U. S. at 315–16. This statement, together with the sentence which succeeds it in the text, contains the gist of the Court's explanation why the gold clause did constitute an interference with the constitutional authority of Congress. *Cf.* note 23, *infra*. In addition, the Court referred to the volume of outstanding gold clause obligations, and to the effect of their enforcement upon the declared policy of Congress in control of actual gold coin and bullion. *Ibid.* As pointed out hereafter, however, the gold clause might still stand, despite the invalidation of so much of its provisions as called for payment of actual coin. See pp. 1071–76, *infra*.

[23] 294 U. S. at 316. The incompatibility of the gold clause with the legal tender and parity provisions of law would only be apparent after devaluation; the reliance

held, is within the currency power,[24] and no notion of freedom of contract drawn from the Fifth Amendment can be invoked to thwart it.[25]

Now, said the Government, if all this is true of gold clauses in private contracts, why is it not equally true of gold clauses in United States bonds? It was a persuasive contention. For as a practical matter it is clear that settlement of all the Government's outstanding gold clause obligations in dollars of the former standard would have embarrassed the present monetary program scarcely less than similar settlement of private gold clause obligations.[26]  Had the Court ordered such settlement, there would

---

upon it in the opinion, therefore, assumes the validity of devaluation. See note 20, *supra.*  This being so, it is surprising that the Court did not use the more direct argument against the gold clause: that its enforcement — by reason of the same threat·of economic dislocation — would have prevented the dollar from being devalued. (The argument against the gold clause, of course, is not confined to its relation to devaluation, actual or prospective. There may be additional reasons for forbidding, in any event, payment of physical coin. See pp. 1071–72, *infra.*  But the principal ground of objection to "gold value" clauses lies in the embarrassments to devaluation to which they give rise.)  Nor did the opinion explore the case for devaluation itself, which as a matter of constitutional law is an impressive one, whatever it may be as a matter of economics.  It may appeal, of course, not only to the currency power, but to the power over interstate and foreign commerce, international relations, and foreign exchange.  Had devaluation been directly forbidden, or had it been indirectly defeated by enforcement of the gold clause, the United States would have been deprived of what may reasonably be deemed its most effective weapon for redressing the balance both of the internal debt structure and of foreign exchange.

[24] But *cf.* Nussbaum, *supra* note 3, at 58–59.

[25] *Cf.* McReynolds, J., dissenting, 294 U. S. at 375–76.

[26] So far as concerns the power of Congress to protect the currency reserves and to regulate the use of physical gold, in bullion and coin, the interference brought about by the Liberty Bond gold clause would be identical.  But see note 22, *supra.*  Payment under such clauses at the ratio of 1.69 to 1 in present legal tender would have instituted a dual monetary system in the same sense as similar payment under private gold clauses, albeit a dual system confined to a preferred group of government creditors.  The United States would have been embarrassed by the necessity of accepting receipts on a $1 basis while paying debts on a basis of $1.69 in almost the same way as a private corporation, and in exactly the same way as a state or municipal government — to which the Norman decision was expressly declared applicable.  See 294 U. S. at 306.  This embarrassment, and the preference of gold clause creditors to other creditors at the expense of taxpayers, would have operated as a practical deterrent upon Congress in the formulation of a monetary policy in the same fashion as the more widespread economic dislocation which would have followed upon enforcement of both private and public gold clauses.  The Government further pointed out the damaging possibilities of a flight from private to

have been the same pressure of circumstances forcing, or tending to force, modification of existing currency regulations. In point of fact this *was* a contract fettering the exercise of governmental powers in precisely the same sense, if not altogether in the same degree, as the private contract.

Does the fact that the United States was a party to the contract prevent its agreement from being subject to the same " congenital defect " [27] to which agreements between private parties are subject: namely, to the possibility of being defeated by an exertion of paramount governmental authority? The cases upon which the Chief Justice relied in the *Norman* case [28] are paralleled by cases upon which he might have relied in the *Perry* case.[29] The parallel, it is true, is not perfect. It has long been settled that a state *can* bind itself contractually not to exercise the taxing power,[30] and so also can the United States.[31] But the Supreme Court has doubted the wisdom of this determination,[32] and when other gov-

Government investments (particularly during the interval between adoption of the Resolution and devaluation) which would have attended invalidation only of private gold clauses. Invalidation of gold clauses in future issues of United States bonds but not in outstanding issues, whether accompanied by invalidation only of outstanding private clauses or of both outstanding and future private clauses, would have embarrassed subsequent financing, both governmental and private. See Brief for the United States 27–35, Perry v. United States.

[27] See Holmes, J., in Madera v. Madera Water Works Co., 228 U. S. 454, 456 (1913).

[28] See note 21, *supra*.

[29] See note 33, *infra*.

[30] The earliest case was New Jersey v. Wilson, 7 Cranch 164 (U. S. 1812), which Chief Justice Marshall disposed of shortly, under the impairment of the obligation of contracts clause, without consideration of the power of the state to bind itself to such an obligation. Compare his language, throwing doubt upon the earlier decision, in Providence Bank v. Billings, 4 Pet. 514, 561 (U. S. 1831). See also Parker, C. J., in Brewster v. Hough, 10 N. H. 138, 143–47 (1839). The validity of the contract was put beyond controversy, however, in Gordon v. Appeal Tax Court, 3 How. 133 (U. S. 1845); Piqua Branch of State Bank v. Knoop, 16 How. 369 (U. S. 1853); Dodge v. Woolsey, 18 How. 331 (U. S. 1855). In each of the last two cases, three Justices dissented. *Cf.* note 32, *infra*.

[31] Choate v. Trapp, 224 U. S. 665 (1912); Carpenter v. Shaw, 280 U. S. 363 (1930); United States v. Board of Comm'rs, 6 F. Supp. 401, 403 (W. D. Okla. 1934); *cf.* Chase, C. J., dissenting, in Van Allen v. Assessors, 3 Wall. 573, 588, 593, 594 (U. S. 1866).

[32] See Field, J., in The Delaware R. R. Tax, 18 Wall. 206, 226 (U. S. 1874): " If the point were not already adjudged it would admit of grave consideration, whether the legislature of a State can surrender this power, and make its action in this respect binding upon its successors any more than it can surrender its police power or its

*HARVARD LAW REVIEW* [Vol. 48

ernmental powers were in question has frequently held that they could not be bargained away.[83] Impressive reasons may be advanced why contracts by the United States not to exercise the currency power should be brought within this latter group of decisions. For the currency power to a peculiar degree has to do with *relations*; it has to do with the medium of exchange which enters into the most pervasive of all relationships. A regulation of the currency applicable to everyone works the least possible alteration in the existing relational scheme. An *exemption* from such regulation, in a sense not true of any other kind of exemption, is almost sure to operate arbitrarily and unequally. So would it have done in this case; and the Government put great stress upon the point.[84] Post-devaluation dollars would buy as much as pre-

---

right of eminent domain." See also Wilmington R. R. v. Reid, 13 Wall. 264, 267 (U. S. 1872). The new climate of opinion with respect to such grants, which this observation suggests, ultimately manifested itself, although not in outright denial of the power to make the grant, in the development of doctrines of extraordinarily strict construction. See Hart, *State Taxation of Shares of Stock* (Unpublished Thesis in the Harvard Law School Library, 1931) 33–52.

[83] Most of the cases deal with contracts by *states* bargaining away their powers. The *validity* of contracts suspending regulatory powers over public utilities has been recognized, but with the qualification that the contract be limited to "a definite term, not grossly unreasonable in time". St. Cloud Pub. Serv. Co. v. St. Cloud, 265 U. S. 352, 355 (1924); Home Tel. & Tel. Co. v. Los Angeles, 211 U. S. 265, 273, 274 (1908). But a policy of strict construction prevails, similar to that in tax exemptions. Railroad Comm. v. Los Angeles Ry. Corp., 280 U. S. 145, 152 (1929). See also Dartmouth College v. Woodward, 4 Wheat. 518 (U. S. 1819); Curran v. Arkansas, 15 How. 304 (U. S. 1853); New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650 (1885). Contracts bargaining away a wide variety of other powers, however, have been declared *invalid*. E.g., West River Bridge Co. v. Dix, 6 How. 507, 531 (U. S. 1848) (eminent domain); Butler v. Pennsylvania, 10 How. 402, 416 (U. S. 1850) (appointment to office); Beer Co. v. Massachusetts, 97 U. S. 25, 33 (1877) ("police power"); Newton v. Commissioners, 100 U. S. 548 (1879) (agreement as to location of county seat); Stone v. Mississippi, 101 U. S. 814, 818 (1879) (privilege of operating lottery); Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 750–53 (1884) (exclusive privilege to run slaughterhouse); Illinois Cent. R. R. v. Illinois, 146 U. S. 387, 454–56 (1892) (grant of harbor rights); Chicago & A. R. R. v. Tranbarger, 238 U. S. 67, 76–77 (1915). The same principle has been applied to contracts by the *United States*. North American Commercial Co. v. United States, 171 U. S. 110, 137 (1898) (regulation of seal fisheries); Horowitz v. United States, 267 U. S. 458, 460 (1925); *cf.* United Shoe Mach. Corp. v. United States, 258 U. S. 451, 463, 464 (1922); see Knox v. Lee, 12 Wall. 457, 551, 552 (U. S. 1870); Lynch v. United States, 292 U. S. 571, 579, 580 (1934), cited note 42, *infra*.

[84] The contention reappears throughout the Government's brief, although the use made of it is diffuse and not always apt. See Brief for the United States 27–30, 48–49, 60–61, Perry v. United States. It is admirably put on page 27: "In a dollar

devaluation dollars used to buy before they were devalued.[35]  To enforce the gold clause would be, not to prevent the bondholder from being put in a worse position as a result of the monetary regulations of which he was complaining, but to put him in a better position.

The Court rejected the Government's argument for the purpose for which it was offered, to establish the constitutionality of the Joint Resolution, only to accept it for another purpose.[36]  It rejected it for the original purpose because it thought that another argument had greater force: *the argument that the United States ought not to be free to repudiate its own obligations.*

It is of the essence to observe that this is to say that the contracts of the United States have a *peculiar* sanctity.  There are documentary reasons for deciding that this is so.  The Liberty Bond holder, like the holder of private bonds, could appeal to the Fifth Amendment; it has been squarely held that the due process clause binds the Government to its own contracts.[37]  But other provisions of the Constitution are also relevant.  A Liberty Bond is a borrowing contract; and the Constitution, in express words, confers upon Congress the power to borrow money upon the credit of the United States.[38]  How, it can be urged, can the credit of the United States be maintained if the Government can itself alter the character of its own obligations? [39]  A Liberty Bond is part of the public debt, and the fourth section of the Fourteenth Amendment, embodying a part of the Civil War settlement, declares that

---

economy, the gold content of the dollar can be increased or decreased with equal justice to debtors and creditors, provided the increase or decrease is made applicable to all alike.  The moment the application is limited, relative discrepancies necessarily follow. . . ."

[35] *Cf.* 294 U. S. at 357–58.

[36] In measuring damages.  See pp. 1077–78 *et seq., infra.*

[37] Lynch v. United States, 292 U. S. 571 (1934), cited note 42, *infra*; United States v. Northern Pac. Ry., 256 U. S. 51, 64 (1921); see Sinking-Fund Cases, 99 U. S. 700, 718, 719 (1878); United States v. Central Pac. R. R., 118 U. S. 235, 238, 240 (1886).

[38] Art. I, § 8, cl. 2.

[39] " By virtue of the power to borrow money ' *on the credit of the United States,*' the Congress is authorized to pledge that credit as an assurance of payment as stipulated, as the highest assurance the Government can give, its plighted faith.  To say that the Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise; a pledge having no other sanction than the pleasure and convenience of the pledgor."  294 U. S. at 351.

" the validity of the public debt of the United States authorized by law . . . shall not be questioned." [40]   There was at least some justification for arguing that a refusal to honor a gold clause in a public obligation was a questioning of the validity of the public debt.[41]

It is unnecessary to labor the point that neither of these two provisions necessarily foreclosed the question.  The question was whether " punctilious fulfillment of contractual obligations " [42] of the United States is more important than the freedom of Congress to exercise its regulatory powers in whatever manner it deems to be in the public interest.  This was an open question under the Constitution and under the prior decisions of the Supreme Court.  There were ample materials for a decision either way.[43] Whether or not one agrees with the choice which the Court made, it is impossible not to recognize that it was a legitimate choice. Maintenance of the credit of the United States may easily be regarded as of paramount importance, of such paramount importance that Congress should be free to offer to prospective lenders any inducement whatever.  A contrary decision would have meant that this particular inducement could not be offered.

---

[40] For varying views as to the effect of this section, see Eder, *A Forgotten Section of the Fourteenth Amendment* (1933) 19 CORN. L. Q. 1; Nussbaum, *supra* note 3, at 85; BURDICK, THE LAW OF THE AMERICAN CONSTITUTION (1922) § 228; DUNNING, ESSAYS ON THE CIVIL WAR AND RECONSTRUCTION (1898) 118.

[41] " While this provision was undoubtedly inspired by the desire to put beyond question the obligations of the Government issued during the Civil War, its language indicates a broader connotation.  We regard it as confirmatory of a fundamental principle which applies as well to the government bonds in question. . . .  Nor can we perceive any reason for not considering the expression ' the *validity* of the public debt ' as embracing whatever concerns the integrity of the public obligations."  294 U. S. at 354.

[42] Quoted by the Chief Justice from Lynch v. United States, 292 U. S. 571, 580 (1934).  The quotation, however, was taken from a much more limited context, the substance of which was that, while considerations of mere economy cannot justify the failure to fulfill contractual obligations punctiliously, such failure may be justified in the exercise of " the federal police power or some other paramount power."  See note 33, *supra*.

[43] For discussions of the general problem of gold clauses and constitutional power, see Post and Willard, *The Power of Congress to Nullify Gold Clauses* (1933) 46 HARV. L. REV. 1225; Hanna, *Currency Control and Private Property* (1933) 33 COL. L. REV. 617; Collier, *Gold Contracts and Legislative Power* (1934) 2 GEO. WASH. L. REV. 303; King, *The Gold Clause — Can It Constitutionally Be Abrogated by Legislation?* (1934) 2 *id.* 131; Barry, *Gold* (1934) 20 VA. L. REV. 263.  See also Nebolsine, *supra* note 13; Nussbaum, *supra* note 3.

Upon one point only is it possible to speak with entire assurance. The case did *not* involve the question whether obligations of the United States can be repudiated altogether. And it is of first importance to note that the Chief Justice seemed to treat it as if it did. For he said,

" The Government's contention thus raises a question of far greater importance than the particular claim of the plaintiff. On that reasoning, if the terms of the Government's bond as to the standard of payment can be repudiated, it inevitably follows that the obligation as to the amount to be paid may also be repudiated. The contention necessarily imports that the Congress can disregard the obligations of the Government at its discretion, and that, when the Government borrows money, the credit of the United States is an illusory pledge." [44]

Mr. Justice Stone did not construe the Government's contention so broadly; [45] nor does the Government's brief itself appear to support such a construction. [46] But whether or not the Government made its contention clear, the result stated by the Chief Justice — " that the obligations as to the amount to be paid may also be repudiated " — surely was not " inevitable ". The whole tradition of Anglo-American law stands as testimony that a distinction could have been drawn. As we shall see, distinctions much more subtle the Chief Justice himself was soon to draw in the course of this very opinion.

## II. The " Constitutional " Interpretation

Starting, then, with the proposition that the United States has made a valid contract and broken it, we turn to confront the puzzling fact that the wronged party has suffered no damage from the breach. This is the crucial question raised by the decision. Precisely why is it that the bondholder has suffered no damage?

One possible answer, surprisingly enough, is that the bondholder suffered no damage because Congress had power to defeat

---

[44] 294 U. S. at 350.

[45] "I do not understand the Government to contend that it is any the less bound by the obligation than a private individual would be, or that it is free to disregard it except in the exercise of the constitutional power ' to coin money ' and ' regulate the value thereof '. In any case, there is before us no question of default apart from the regulation by Congress of the use of gold as currency ". 294 U. S. at 359.

[46] See, especially, Brief for the United States 62, 78–80, Perry v. United States.

the contract. For the Joint Resolution was not the only legislation whose constitutionality was in issue. The Chief Justice discussed the legislation placing restrictions upon the use of gold,[47] and he appeared to say that it was within the power of Congress to enact.[48] What bearing has this legislation upon the issue of damages? This question has to be considered in two aspects: first, the bearing of the legislation upon the bondholder's right to demand the promised gold coin in specie; [49] and, second, its bearing upon his right to an alternative or substituted performance.[50]

Before inquiring into these matters attention must be called to the equally important and equally difficult problem of construction of the gold clause itself.[51] The gold clause in United States bonds is in terms a promise to pay a certain number of dollars " in United States gold coin of the present standard of value." [52] The one thing clear about this clause is that " present " for the purposes of the bonds in suit means 1918, the year in which the bonds were issued.[53] But what does " standard of value " mean? What did the Court decide that it means? It may have decided that it means " standard of weight and fineness," the same thing which the gold clause in private bonds says in so many words.[54] Or it may have decided that it means " standard of value in terms of commodities," in other words, purchasing power. Not the least

---

[47] See note 2, *supra.*

[48] See notes 62, 67, *infra,* and accompanying text.

[49] See pp. 1071–72, *infra.*

[50] See pp. 1072–77, *infra.*

[51] See notes 13, 14, *supra.*

[52] Second Liberty Bond Act, Sept. 24, 1917, 40 STAT. 288; see Treas. Dep't Circ. No. 121, Sept. 28, 1918. The Government's brief states that such a phrase seems first to have been used in the Refunding Act of July 14, 1870, 16 STAT. 272 (" coin of the present standard value "). The sole reference to the phrase in the debate over that bill indicates a desire to encourage subscriptions for the bonds abroad. See statement of Congressman Butler of Massachusetts, in CONG. GLOBE, 41st Cong., 2d Sess. (1870) 5019. The brief points out that " claimant's bond, like every security of the United States outstanding on June 5, 1933, forms part of a domestic issue ". It points out further that the last discussion in Congress concerning the gold clause was a trivial exchange between two senators in 1910. See Brief for the United States 8–12, Perry v. United States.

[53] But *cf.* note 99, *infra.*

[54] The conventional gold clause in private bonds is a promise to pay so many dollars " in gold coin of the United States of the present standard of weight and fineness ". As to this and similar clauses, see Nebolsine, *supra* note 13, at 1051; Post and Willard, *supra* note 43, at 1225.

remarkable feature of the opinion is that it is impossible to determine to a certainty just which of these two interpretations the Court intended to adopt.[55]

It will be convenient for the present to assume that the Court intended to adopt the first interpretation. There can be no mistake that the private gold clause means " standard of weight and fineness," and the Chief Justice certainly did not say that he was construing the public gold clause differently.[56]  A further ambiguity in the clause may likewise be passed over temporarily. The clause may be what is known as a " gold value " clause, namely, a device for establishing a measure, in terms of gold, of the number of legal tender dollars to be paid.  Or it may be taken literally as a simple promise to pay so many dollars in gold coin, and nothing else.[57]  It is not clear that anything important turns on the distinction.[58]  But we may adopt the latter view for the time being.  We shall treat the clause, in other words, as a promise to pay, in specie, so many dollars in United States gold coin of the 1918 standard of weight and fineness.

## A

We return, then, to the question why the bondholder cannot get this physical gold coin which has been promised him.  The answer must be, because Congress has power under the Constitution to forbid its payment.

The reasons for supposing that this must be so are fairly overwhelming.  If the depression has taught us nothing else, it has demonstrated the absolute necessity, in a complex modern economy, that the Government have power to protect the nation's physical reserves of coin and bullion.  The existence of such power, indeed, the Supreme Court recognized many years ago.[59]

---

[55] The evidence bearing upon the question is discussed in detail, *infra* pp. 1081–86.       [56] See p. 1086, *infra.*

[57] A third possibility of treating such clauses as commodity contracts has been earlier discussed. See note 13, *supra.* The Chief Justice did not expressly negative this construction in the Perry case as he did in the Norman and Nortz cases.  But the omission seems to be without significance.

[58] See pp. 1074–76, 1079–81, *infra.*

[59] Ling Su Fan v. United States, 218 U. S. 302, 310, 311 (1910), upholding the prohibition of the *export* of silver from the Philippine Islands.  See also Woolsey, J., in Campbell v. Chase Nat. Bank, 5 F. Supp. 156, 168, 169 (S. D. N. Y. 1933).

Hardly less evident than the necessity of the power is the fact that its exercise would be defeated if gold coin were permitted to go into the hands of any group of private persons, even of United States bondholders.[60]   There were outstanding in June, 1933, more than $20,000,000,000 of United States bonds containing gold clauses, as against approximately $4,000,000,000 of gold in the country.[61]   To permit United States bondholders to hoard so much of this gold as they can get their hands upon, or to export it, or to dispose of it free from restrictions in the domestic market would be to put it in their power to upset the entire monetary system of the country.  It is scarcely thinkable that these bondholders have a constitutional right to do any of those things.

Nor is the *Perry* case to be taken as deciding that such a right exists.  On the contrary, the Chief Justice made it perfectly clear that Congress has power to withdraw the physical gold coin from circulation altogether.[62]   If Congress can compel such coin to be turned into the Treasury, it must follow that it can forbid it from being paid out.  It must follow accordingly that the Joint Resolution itself, so far as it simply forbade such payment, in substance [63] is constitutional.[64]   To understand this is the first step, and the single sure step, toward understanding the opinion.

## B

The second, and much more difficult, branch of the question proposed above [65] relates to the effect of the legislation restricting the use of gold upon the bondholder's right to an alternative or

---

[60] *Cf.* note 22, *supra.*

[61] See Brief for the United States 13, Perry v. United States; Brief for the United States 41, United States v. Bankers Trust Co.

[62] " Before the change in the weight of the gold dollar in 1934, gold coin had been withdrawn from circulation. . . .  That action the Congress was entitled to take by virtue of its authority to deal with gold coin as a medium of exchange." 294 U. S. at 355–56.  See also *id.* at 313, 328.  The emphasis throughout this section of the opinion (obscured by excision) is upon the use of gold coin for export or foreign exchange purchases.  But the language extends to the control of coin for domestic uses.  The contrary emphasis seems sufficiently explained by the fact that it is the foreign uses which would be presently profitable.

[63] But see pp. 1090–94, *infra.*

[64] In spite of the fact that the Chief Justice stated flatly, " We conclude that the Joint Resolution . . . , insofar as it attempted to override the obligation created by the bond in suit, went beyond the congressional power." 294 U. S. at 354.

[65] See p. 1070, *supra.*

substituted performance. Has the admitted power of Congress over the physical gold coin any bearing in computing the bondholder's *damages* for not getting the coin?

The Chief Justice seems to say that it has:

> " In considering what damages, if any, the plaintiff has sustained by the alleged breach of his bond, it is hence inadmissible to assume that he was entitled to obtain gold coin for recourse to foreign markets or for dealings in foreign exchange, or for other purposes contrary to the control over gold coin which the Congress had the power to exert, and had exerted, in its monetary regulation. . . .
>
> " Plaintiff demands the ' equivalent ' in currency of the gold coin promised. But ' equivalent ' cannot mean more than the amount of money which the promised gold coin would be worth to the bondholder for the purposes for which it could legally be used." [66]

If this language be taken at its face value, the case is settled. For it is incontestable that the only *legal* use to which 10,000 pre-devaluation gold dollars can be put is to surrender them to the Treasury in return for current legal tender of the same nominal amount.[67] So much the bondholder has already been offered, and so much the United States is still willing to pay.

This may indeed be the final explanation of the decision. But there are at least two reasons for doubting it. One of them is that the Chief Justice himself did not seem to treat it so, but went on to make further statements indicating that he was disposing of the case on quite different grounds. This aspect of the matter will be discussed later in connection with those further statements.[68] The other reason must be dealt with at once. The Chief Justice's language, so understood, is difficult to reconcile with his earlier language declaring the abrogation of the gold clause itself unconstitutional.

The ordinary measure of damages for not getting the promised gold coin would undoubtedly be the amount which the coin would

---

[66] 294 U. S. at 357.

[67] The emphasis, of course, must be on the word " legal," meaning " permissible under the applicable statutes." The *statutes* require the coin to be surrendered, and they provide that the bondholder shall be given in return legal tender at the pre-devaluation parity. See note 2, *supra*. As pointed out in the text immediately ensuing, the first provision may be constitutional and the second not. The Chief Justice did not make clear just how much he intended the word " legally " to cover.          [68] See pp. 1076–89, *infra*.

*HARVARD LAW REVIEW* [Vol. 48

be worth to the promisee if he could get it. But this is not an ordinary case. We have to deal with the apparent paradox that Congress both can and cannot refuse to pay gold coin. To say that there has been a breach because Congress *cannot* but no damage because it *can* is arrant nonsense. The latter half of the statement, moreover, is palpable bootstraps. This will appear plainly when it is recalled that the grounds for upholding the power of Congress related only to the *physical coin.* Those grounds add up to the conclusion that Congress can take the promised coin away from the bondholder altogether, and hence that it can refuse to pay it to him in the first place. They do not, however, add up to any conclusion as to what compensation the United States must give the bondholder when it takes the coin, or when it refuses to pay it. For the United States can give the bondholder a number of legal tender dollars in excess of that stated in the bond without the slightest embarrassment to its program for impounding the physical coin. The considerations which prompted the denial of specific performance, that is to say, have no necessary bearing upon the scope of the remedy of substituted performance.[69] It is true that the substituted performance which the bondholder demands may embarrass the Government's program in other respects.[70] But these embarrassments have already been considered in discussing the power of Congress to outlaw the gold clause altogether, and dismissed. To turn around and give weight to them now would be to stultify that original conclusion.

The same point may be made, with greater clarity, if the clause be regarded, not as a contract calling only for payment of gold coin in specie, but as a gold value contract calling either for coin or for a number of legal tender dollars measured thereby. To take this view of the clause does not change the reasons why, under present circumstances, the bondholder cannot get the physical

---

[69] There is in this conclusion, it should be noted, no inconsistency with the conclusion reached in notes 13, 14, *supra,* as to the effect of the withdrawal of gold from circulation upon a "gold coin" clause in *private* contracts. The private obligor (assuming the validity of the withdrawal) may plead impossibility. He has committed no wrong; his creditor may at most claim restitution. But the public obligor, the Court said, has committed a wrong. So saying, it denied, in effect, the defense of impossibility.

[70] See note 26, *supra.*

*THE GOLD CLAUSE*

coin. But it strengthens, if possible, the reasons why that fact should not control the amount which he can recover in legal tender.

For now the bondholder's demand for an additional payment springs not alone from the remedial law but from the contract itself. The Joint Resolution violates the contract both in denying payment in gold and in denying payment otherwise than dollar for dollar. Indeed, we may well ask with Mr. Justice Stone what statutory justification there is, other than the Joint Resolution, for rejecting the bondholder's claim for the second form of payment.[71] The only available answer is Section 43 of the Agricultural Adjustment Act [72] which, after authorizing the President to devalue the dollar, provides, first, that the "gold dollar, the weight of which is so fixed, shall be the standard unit of value, and all forms of money . . . shall be maintained at a parity with this standard ",[73] and, second, that "all coins and currencies, heretofore or hereafter issued by or under the authority of the United States shall be legal tender for all debts public and private." [74] Assuming that these provisions accomplished the result which the Joint Resolution sought unsuccessfully to make doubly

---

[71] "Moreover, if the gold clause be viewed as a gold value contract, as it is in Norman v. Baltimore & Ohio R. Co., *supra*, it is to be noted that the government has not prohibited the free use by the bondholder of the paper money equivalent of the gold clause obligation; it is the prohibition, by the Joint Resolution of Congress, of payment of the increased number of depreciated dollars required to make up the full equivalent, which alone bars recovery. In that case it would seem to be implicit in our decision that the prohibition, at least in the present situation, is itself a constitutional exercise of the power to regulate the value of money." 294 U. S. at 360–61.

[72] 48 STAT. 51 (1933), 31 U. S. C. A. § 821 (1934); see note 2, *supra*.

[73] This provision simply reënacts the provision of the Gold Standard Act of March 14, 1900, c. 41, 31 STAT. 45. *Cf.* Act of Nov. 1, 1893, c. 8, 28 STAT. 4. See also Federal Reserve Act of Dec. 23, 1913, c. 6, § 26, 38 STAT. 251, 274.

[74] This provision, of course, marks a development of the utmost importance in the monetary policy of the United States. Its only earlier analogue was the Legal Tender Act of Feb. 25, 1862, 12 STAT. 345, and its successors, which provided that the notes therein authorized should be "lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest" on bonds and notes of the United States. It was this provision which in Bronson v. Rodes, 7 Wall. 229 (U. S. 1868), and succeeding cases, was held, by construction, inapplicable to obligations containing gold clauses. For a summary of the legal tender qualities of various forms of money outstanding in the United States at the time of the adoption of § 43, see Nebolsine, *supra* note 13, at 1053.

sure,[75] we still have the question why they are valid.  Congress has provided that the equivalent of one pre-devaluation gold dollar shall be one post-devaluation legal tender dollar.  But the contract itself provides for a different equivalent, determined by the gold content of the old and the new dollars.  The question is why the contract, which prevailed against the Joint Resolution, does not still prevail.  None of the special reasons for recognizing the power to withdraw physical gold coin from private possession will help here.  Surely no reason of substance can be given why Congress can constitutionally frustrate the contract by the Agricultural Adjustment Act which does not argue equally for the constitutionality of the Resolution.[76]

A collateral reason for doubting whether the Chief Justice is to be understood as disposing of the case on this ground is furnished by the decision in the gold certificate case.[77]  That decision deals with a somewhat similar problem, namely, the power of Congress to require the holder of a certificate redeemable in gold coin to surrender it in return for legal tender not so redeemable.  If Congress has power to compel such a holder, *after* devaluation, to accept a number of legal tender dollars no greater than that to which he would have been entitled *before* devaluation, we have at least the foundation, although only a foundation,[78] for an argument that it likewise has power to compel the recipient of gold

---

[75] There is strong basis for believing that the Resolution was indeed adopted simply out of abundance of caution.  See SEN. REP. No. 99, 73d Cong., 1st Sess. (Committee on Banking and Currency 1933) 1: "By the Thomas amendment [§ 43] currency was intended to be made legal tender for all debts.  However, due to the language used doubt has arisen whether it has been made legal tender for payments on gold clause obligations, public and private.  This doubt should be removed."  See also the Treasury memorandum of May 26, 1933 (Brief for the United States 26, 27, United States v. Bankers Trust Co.), referring to the Resolution as "designed to clarify the effect of recent legislation upon the status of the 'gold clause' in public and private obligations".  *Cf.* Irving Trust Co. v. Hazlewood, 148 Misc. 456, 265 N. Y. Supp. 57 (Sup. Ct. 1933).  Nor are the grounds upon which the provisions of the Legal Tender Act were construed to be inapplicable to gold clauses, available in the application of § 43.  See note 16, *supra*.  The legal tender provision of § 43 was amended and substantially reënacted in § 2 of the Joint Resolution.  It is an extraordinary circumstance that the Chief Justice in the Perry case gave no express consideration to the question of the construction or constitutionality either of the original or the amended provision.

[76] See pp. 1090–94, *infra*.

[77] Nortz v. United States, 294 U. S. 317 (1935); see note 4, *supra*.

[78] The gold certificate contained no such express promise as the Liberty Bond.

coin under a gold clause to turn it in and receive a similar num-
ber of legal tender dollars. There may be some significance in
the fact that the Chief Justice in the gold certificate case re-
frained from putting the decision squarely upon that ground. In-
stead, the decision appears to turn upon the particular circum-
stance that the holder of the gold certificate was required to turn
it in *before* devaluation.[79] The only constitutional question
clearly determined, therefore, was that a holder of legal tender
redeemable in gold coin could be compelled to surrender it, at a
parity long established and still established, for legal tender not
so redeemable.[80]

### III. The " Damages " Interpretation

The Chief Justice, as before pointed out,[81] did more than to
imply that gold coin, by means within the power of Congress, had
been rendered of no special value to the bondholder, and to assert
that the " equivalent " to which the bondholder was entitled could
be no more than the " value " of the coin. He went on to give a
further reason why the bondholder had suffered no damage:

---

*Cf.* 294 U. S. at 327. The bond is a borrowing contract in a sense in which currency
is not.

[79] " . . . it is sufficient to point out that on January 17, 1934, the dollar had not
been devalued. . . . The currency paid to the plaintiff for his gold certificates was
then on a parity with that [pre-devaluation] standard of value. It cannot be said
that, in receiving the currency on that basis, he sustained any actual loss." 294 U. S.
at 329; see notes 2, 73, *supra.*

[80] It should be noted, however, that while thus expressly limiting the decision,
the Chief Justice did give reasons which might have a wider application. 294 U. S.
at 329–30. See, especially, the statement that, " Had plaintiff received gold coin
for his certificates, he would not have been able, in view of the legislative inhibition,
to export it or deal in it," and the reliance upon Ling Su Fan v. United States, 218
U. S. 302 (1910), cited *supra* note 59, both of which would have been equally per-
tinent if the certificates had been called after devaluation. The indicated limitation,
moreover, is a tenuous one. Although there had been no formal devaluation on Jan.
17, 1934, there had been practical devaluation. The price of gold in terms of dollars
had risen on the world market, and it had done so in consequence of the action of
the United States Government in bidding up that price. Nor is it easy to believe that
the rights of holders of gold certificates would ultimately be held to depend upon the
particular order of events pursued by Congress. Congress, if it can call in the cer-
tificates at all, should be able to do so after as well as before devaluation, and to do
so at the pre-devaluation parity, since otherwise that very hoarding would be en-
couraged which it is the object of the action to prevent.

[81] See p. 1073, *supra.*

" Plaintiff has not shown, or attempted to show, that in relation to buying power he has sustained any loss whatever." [82] We are here confronted with a major dilemma. What difference would it have made, upon the reasoning which has been under discussion, if the plaintiff *had* suffered a loss in buying power, even a grievous loss? He still could not have spent his gold coin. The " equivalent " provided for by the gold clause would still be no more than the " value " of the coin. The value of the coin would still be the nominal number of legal tender dollars which the United States has offered to pay, and which the plaintiff has received.

It is not easy to dismiss the reference to purchasing power as an idle observation designed to show the rough equity of a result which the Chief Justice was going to reach anyway. For it is an integral part of the opinion. Two full paragraphs are devoted to the point.[83] If those paragraphs are accepted as meaning what they say, moreover, the meaning of other parts of the opinion is affected. New and radically different interpretations both of the gold clause itself and of the opinion are suggested.

Once again it will be convenient if at first we assume that the clause is a specie and not a gold value contract. What then has purchasing power to do with the measure of damages for failure to get gold coin in specie? The explanation, it may be suggested, is something like the following:

To determine damages according to the value of the coin *in the absence of a free gold market* is not satisfactory for the very reasons which have just been considered; the value of the coin cannot be made to depend upon the actual market, since the market is under the control of the promisor.[84] But the bondholder is asking the Court to go to the other extreme: to determine damages *as if there were a free gold market*. Such a course, it can be urged, is open to different but equally serious objections. To figure damages upon that hypothetical basis would be unjustly to enrich the bondholder.[85] For there *is* no free market for gold, and it is precisely because of that fact that gold coin *would be* worth so much

---

[82] 294 U. S. at 357.　　　　　　　[83] Quoted *infra* p. 1084.

[84] *Cf.* note 69, *supra*.

[85] *Cf.* 294 U. S. at 358: " . . . in view of the adjustment of the internal economy to the single measure of value as established by the legislation of the Congress, and

*if there were* such a market! As a result of the Government's monetary program, in other words, the price of gold in terms of dollars has been artificially kited. It has been decided that the Government cannot by its power to restrict the market for gold coin cause *injury* to the bondholder. But the restriction being otherwise lawful (and this is perhaps the point of the puzzling language which seemed to conclude the question of damages) [86] there seems to be no good reason for permitting it to work to his *benefit*. We may say, in effect, that the Chief Justice struck a rough compromise. He sought to protect the bondholder against injury and at the same time to keep him from getting a windfall. He gave him what the gold coin would have been worth, not in terms of devalued dollars, but in terms of commodities, the difference, that is to say, between the purchasing power of the dollar *immediately before devaluation* and its purchasing power at the time of breach.[87]

The major difficulty with such a solution of the case, if indeed it *is* the solution, is that it neglects the possibility that the bondholder contracted for more than protection against injury, that he contracted — under such circumstances as the present — for the very windfall now denied him. This the bondholder certainly did if the words, "present standard of value," in the clause mean "present standard of weight and fineness." He was promised 10,000 gold dollars each containing 25.8 grains of gold .9 fine. Unless Congress has power to defeat that promise otherwise than by refusing to pay the actual gold coin, he is entitled to the full value of the coin. It is no answer to say that the value has been enhanced by action of Congress. The bondholder took that chance and should have the benefit of it, as he would have had the burden if the value had been diminished.

The point is the same whether the clause be treated as a specie or as a "gold value" contract. But it can be made to appear more clearly if we revert to the latter supposition. If the bondholder has been promised *in terms* a number of legal tender dollars (at his option in gold) *measured by* the 1918 standard of weight

---

the universal availability and use throughout the country of the legal tender currency in meeting all engagements, the payment to the plaintiff of the amount which he demands would appear to constitute, not a recoupment of loss in any proper sense, but an unjustified enrichment."

[86] See p. 1073, *supra.*      [87] See note 99, *infra.*

*HARVARD LAW REVIEW* [Vol. 48

and fineness, that is incontrovertibly what he is entitled to. By all the known rules of contract law, the measure of damages upon breach is the difference between what the injured party was promised and what he got. A simple mathematical computation fixes the amount of recovery in this case at 1.69 dollars in present legal tender for every gold dollar expressed in the bond. There is no question of *unjust* enrichment; certainly there is no question of " loss " in the tort sense. Promises in contracts are not subject to defeat simply because they turn out to be to the advantage of the promisee. A contract is a bargain for enrichment, or for some other anticipated advantage, a bargain presumably made for satisfactory consideration. It is not too much to say that the ordinary rule for determining damages for breach of contract is inseparable from the very idea of contract.[88] To incorporate into the remedial law for the purposes of this case a different and novel rule is to defeat the contract in almost the same way, *and for almost the same reasons*,[89] as the Joint Resolution defeated it. It is in effect to say that the United States cannot enter into borrowing contracts which contemplate such an enrichment, but to say it in terms of the law of damages rather than of the law of the Constitution.

It is no easier, as has just been said, to escape from this conclusion on a specie interpretation of the gold clause than it is on a " gold value " interpretation. In the event that anyone should be inclined to seize upon the distinction, however, it should be pointed out how tenuous and unsatisfactory it is. There can be little question that the gold clause in the private bond case was construed as a gold value contract.[90] Whatever the differences in wording between the two clauses, they furnish no shadow of jus-

---

[88] *Cf.* Gardner, *An Inquiry Into the Principles of the Law of Contracts* (1932) 46 HARV. L. REV. 1, 26.

[89] In the absence of any received doctrine of remedial law dictating the application of such a rule of damages, it would seem that the innovation could only have been prompted by a view of the practicalities of the situation essentially the same as that of Congress. It is of course true that the damages rule saves something of the contract. The clause continues to furnish theoretical protection against *any* loss in purchasing power resulting from changes in governmental monetary policy, and practical protection against substantial loss resulting from runaway inflation. See pp. 1096–97, *infra.* Only to the extent that the Court thought such protection desirable could it have been motivated by different considerations than Congress. See p. 1095, *infra.*     [90] *Cf.* note 106, *infra.*

tification for a different interpretation in this respect.[91]  Independently, moreover, it must be clear that the gold value interpretation is the more natural and reasonable one.  Gold clauses were not inserted in bonds, public or private, because investors wanted gold *per se*.  They were inserted because they wanted the protection afforded by gold.[92]

### IV. The "Contract" Interpretation

There is of course an easy escape from these difficulties.  It lies in abandoning the assumption which has been adhered to from the beginning that "present standard of value" means "standard of weight and fineness."  The possibility has already been suggested [93] that it means, rather, "present standard of purchasing power," in terms of commodities.  The manner in which apparent inconsistencies and obscurities in the Chief Justice's language yield to the solvent touch of this interpretation is remarkable.  It is worth while reviewing the opinion at some length to demonstrate it.

### *A*

The opening section of the opinion, headed *"The Import of the Obligation"*, begins with this enigmatic statement:

> "The bond in suit differs from an obligation of private parties, or of States or municipalities, whose contracts are necessarily made in subjection to the dominant power of Congress.  Norman v. Baltimore & Ohio R. Co. . . . , decided this day.  The bond now before us is an obligation of the United States. . . ."[94]

This statement may have been intended simply as a preface to the discussion of the constitutional issue in the succeeding section.  Or it may refer to an intended difference in construction between gold clauses of public and private bonds.  The next sentence

---

[91] Neither clause makes any reference to an equivalent; each furnishes equal justification or lack of justification for reading in the idea of equivalence.  Some gold clauses provide for payment "in gold coin . . . of or *equal to* the present standard of weight and fineness".  So placed, however, the words of equivalence add nothing to the literal meaning.  See Lord Russell in Feist v. Société Intercommunale Belge d' Electricité, [1934] A. C. 161, 170, 171.

[92] See note 14, *supra*.

[93] See p. 1070, *supra*.

[94] 294 U. S. at 348.

*HARVARD LAW REVIEW* [Vol. 48

simply says, with irony advertent or inadvertent, that "the terms of the bond are explicit." There follow unhelpful quotations from an act of Congress and the Treasury circular under which the bonds were issued.[95] Then comes a critical paragraph:

> "This obligation must be fairly construed. The ' *present* standard of value ' stood in contradistinction to a *lower* standard of value. The promise obviously was intended to afford protection against loss. That protection was sought to be secured by setting up a standard or measure of the Government's obligation. We think that the reasonable import of the promise is that it was intended to assure one who lent his money to the Government and took its bond that he would not suffer loss through depreciation in the medium of payment." [96]

This is all that the Court ever said, in so many words, concerning "the import of the obligation". Literally taken, the language reads the requirement of gold payment out of the clause altogether. But it is scarcely to be so understood; the Court seems rather to be describing a "gold value" contract.[97] But a gold value contract of what kind? The language might conceivably be understood as describing a "weight and fineness" clause.[98] But it is more easily understood as describing a clause which assures payment only in dollars of a certain standard of purchasing power. Nor would this necessarily be the 1918 standard. Probably it would not be. The design is to protect the bondholder against loss through *depreciation*, *i.e.*, governmental manipulation of the currency. Many changes in purchasing power since 1918 are not attributable to governmental action at all; the parties could scarcely have intended to assure against all fluctuations in the price level, whatever their causes.[99] As applied to the present

---

[95] See note 52, *supra*.     [96] 294 U. S. at 348-49.

[97] *Cf.* notes 13, 14, *supra*.

[98] Such a clause would plainly "afford protection against loss", although it might also cause enrichment. The question is whether there is a negative pregnant.

[99] The absurdity of a contrary supposition is self-evident. Yet difficulties are created with the word "present" when the clause is made to read "present standard of purchasing power". And *cf.* Brief for United States, Perry v. United States, 294 U. S. at 344. The point is obviously of critical importance in forthcoming proceedings to test the meaning of the Perry decision. It is not at all unlikely that loss in purchasing power relative to the low 1933 price levels could be proved, now or in the near future. See Dickinson, *The Gold Decisions* (1935) 83 U. OF PA. L. REV. 715, 723. It is exceedingly unlikely that any such loss could be proved relative to the high 1918 levels.

situation, the clause, so construed, would amount to an insurance policy against loss through depreciation resulting from the Roosevelt monetary program.

Passing over the second section to the third, which deals with *"The Question of Damages"*, we find much to confirm this interpretation of the opinion — this interpretation, that is to say, of the Chief Justice's interpretation of the gold clause. The section begins with this statement:

"The action is for breach of contract. As a remedy for breach, plaintiff can recover no more than the loss he has suffered and of which he may rightfully complain. He is not entitled to be enriched. Plaintiff seeks judgment for $16,931.25, in present legal tender currency, on his bond for $10,000. The question is whether he has shown damage to that extent, or any actual damage. . . ."[100]

It is difficult to understand, for reasons already given,[101] how such a statement could have been made (at least without further explanation) if the clause is a value of gold coin of the 1918 standard of weight and fineness clause. If, however, the clause be construed as promising no more from the beginning than protection against loss in purchasing power, the statement becomes perfectly understandable.

So does most of the rest of the section about damages. "The question of actual loss," says the Chief Justice, "cannot fairly be determined without considering the economic situation at the time the Government offered to pay him the $10,000, the face of his bond, in legal tender currency."[102] It is clear that it cannot be. "The case is not the same as if gold coin had remained in circulation." This statement is a little disconcerting (unless indeed the Chief Justice is simply referring to the situation under a dual system of currency), and so is all the talk which follows about the restricted foreign and domestic market "which the Congress had lawfully established."[103] But it can be explained if we recall that the bondholder has been promised not only dollars of undepreciated purchasing power, but, at his option, gold dollars. The Chief Justice has to answer the objection that he has not been given gold. But we are not to understand him, if this interpretation be

---

[100] 294 U. S. at 354–55.
[101] See pp. 1079–80, *supra.*

[102] 294 U. S. at 355.
[103] *Id.* at 354–57. See p. 1073, *supra.*

accepted, as implying that if the bondholder *could* get gold coin it would necessarily be gold coin of the pre-Roosevelt standard of weight and fineness. It would only be gold coin of the pre-Roosevelt standard of purchasing power.[104] And the " equivalent ", it follows, need only be an equivalent of the same standard. Under this view the statements at the close of the section, which were once so hard to understand, take their place with perfect logic and appropriateness:

" And in view of the control of export and foreign exchange, and the restricted domestic use, the question of value, in relation to transactions legally available to the plaintiff, would require a consideration of the purchasing power of the dollars which the plaintiff has received. Plaintiff has not shown, or attempted to show, that in relation to buying power he has sustained any loss whatever. On the contrary, in view of the adjustment of the internal economy to the single measure of value as established by the legislation of the Congress, and the universal availability and use throughout the country of the legal tender currency in meeting all engagements, the payment to the plaintiff of the amount which he demands would appear to constitute not a recoupment of loss in any proper sense but an unjustified enrichment." [105]

## *B*

If we are to look only within the four corners of the opinion, this interpretation of it is perhaps the most satisfactory at which we can hope to arrive. Taking other considerations into account, however, it is probably the least defensible of all possible interpretations.

*First.* The interpretation is irreconcilably at war with the apparent construction of the gold clause in the private bond case. To be sure, this objection loses some of its force in the presence of the fact that any interpretation of the opinion is to some degree at war with the decision in the private bond case. It is tolerably certain how the private gold clause was construed. It was construed as a " gold value " contract and as a " standard of weight and fineness " contract.[106] If we conclude that the public gold

---

[104] See pp. 1086–87, *infra; cf.* note 117, *infra.*

[105] 294 U. S. at 357–58.

[106] It is in terms a " weight and fineness " contract, and the Chief Justice in terms stated that the consequences of its enforcement would be payment by gold clause debtors on the basis of $1.69 to $1. See the quotation on p. 1063, *supra.* On the

clause was construed *in the same way*, we have to face the difficulty that the rule of damages which it adopts was likewise applicable in the private bond case. Not only did the Chief Justice give no indication that this was so, but he disposed of the case upon a constitutional issue which was not presented if it were so.[107] If on the other hand, we conclude that the public gold clause was construed *differently*, we have to face the double difficulty, first, that its wording does not seem to justify a difference, and, second, that the Chief Justice said nothing to make clear that he intended a difference. The objections to supposing that the result in the public bond case turns upon a distinction between a specie contract and a gold value contract have already been mentioned.[108] The objections to supposing that it turns upon a distinction between a " weight and fineness " contract and a " purchasing power " contract are no less serious.

For the latter distinction there is, of course, a verbal justification in the less exact phraseology of the Liberty Bond draftsman. But it is tenuous indeed. Surely such a distinction has small basis in the common understanding of language. If investors pay any attention to gold clauses at all, they do not make discriminations so nice as this, discriminations which remain obscure even after one contemplates them for hours. There is statutory authority, moreover, for the use of the phrase " standard of value " to mean " standard of weight and fineness ".[109] And the Chief Justice himself in the private bond case used it in exactly that sense.[110]

---

second question, the Chief Justice was less explicit. He said that even " if the clauses are treated as ' gold value ' clauses, that is, as intended to set up a measure or standard of value, we think they are still hostile to the policy of Congress ". 294 U. S. at 314; see also *id.* at 302. Note Mr. Justice Stone's statement quoted in note 71, *supra.*

[107] The private clause, the Court held, was unconstitutional because it interfered with the power of Congress over the currency; and that interference, the Chief Justice said expressly, resulted from the requirement of payment under present circumstances of 1.69 currency dollars for every gold dollar named in the bond. See p. 1063, *supra.*

[108] See pp. 1080–81, *supra.*

[109] Act of March 14, 1900, c. 41, 31 STAT. 45, providing " that the dollar consisting of twenty-five and eight-tenths grains of gold nine-tenths fine . . . shall be the standard unit of value, and all forms of money issued or coined by the United States shall be maintained at a parity of value with this standard. . . ."

[110] *E.g.,* in the statements referred to in note 106, *supra,* and on p. 1086, *infra.* See also 294 U. S. at 315.

*HARVARD LAW REVIEW* [Vol. 48

To suppose that the Chief Justice actually intended to draw a distinction between the two clauses, which — apart from the constitutional question — would have been decisive of a difference in result between the two cases, would be to convict him of an extraordinarily misleading use of words. The opinion furnishes only one important piece of evidence which points in that direction.[111] In the private bond case the Chief Justice said that the gold clause was " intended to afford a *definite* standard or measure of value ".[112] But in the otherwise substantially identical statement of the meaning of the public gold clause the word " definite " was omitted.[113] One wonders how much hangs on the omission. Evidently the " purchasing power " interpretation of the gold clause is anything but definite. Yet it is not easy to believe that the Chief Justice would make so important a distinction, and so difficult a one, so obscurely. Certainly a convincing explanation why Liberty Bond buyers consider definiteness less important than private bond buyers would be far to seek.

*Second.* The " purchasing power " interpretation of the gold clause is difficult to reconcile with what the Chief Justice said about gold coin and foreign exchange.[114] That language is most readily understood as meaning that, if a free market for gold were restored at the present parity, holders of Liberty Bonds could recover large sums in damages. Mr. Justice Stone so understood it;[115] and it is plain that the Administration at least feared that it was to be so understood.[116] The clear implication was that the gold clause promised to such holders gold dollars of the 1918 standard of weight and fineness. For if it promised only gold dollars of an earlier standard of purchasing power, it is problematical whether, upon restoration of a free gold market, any

---

[111] Compare the introductory statement in the Perry case that " the bond in suit differs from an obligation of private parties." See p. 1081, *supra.*

[112] 294 U. S. at 302 (italics supplied).

[113] *Id.* at 348–49, quoted at p. 1082, *supra.*

[114] See pp. 1083–84, *supra.*

[115] " I am not persuaded that we should needlessly intimate any opinion which implies that the obligation may so operate, for example, as to interpose a serious obstacle to the adoption of measures for stabilization of the dollar, should Congress think it wise to accomplish that purpose by resumption of gold payments. . . ."

[116] This was the inference from many newspaper dispatches immediately following the decision. See, *e.g.*, N. Y. Times, Feb. 19, 1935, at 1; *id.* Feb. 20, 1935, at 1; *id.* Feb. 24, 1935, § 2, at N11; *id.* March 4, 1935, at 1.

damages at all could be recovered. Restoration at the present parity might affect purchasing power, or it might not;[117] certainly the United States would not automatically assume a heavy burden of liability.

The Chief Justice could scarcely have been unaware of the bearing which his words would have upon future determinations of monetary policy; indeed, it was because of that bearing that Mr. Justice Stone thought that those words ought never to have been uttered.[118] It is difficult to suppose that in a matter of such moment he would have allowed himself to be misunderstood as intimating a future consequence which he did not intend to intimate at all.

*Third.* To construe the gold clause in the manner suggested would be to make a mockery of it. For the burden of proof of breach is upon the bondholder; and the burden of proof of breach of such an obligation would be outrageously severe. By what evidence is the investor to establish that he has suffered " loss through depreciation in the medium of payment "? Only, if at all, by data of the most intricate sort, cumbersome and expensive to collect and to present. We have no single authoritative index of changes in price levels; and, if we had, it would be of only limited assistance. What constitutes " loss through *depreciation* "? It has already been suggested that the bondholder must prove not only that his dollars are worth less, but that they are worth less *because* of action by the government " depreciating " the currency.[119] Here is a problem to baffle statisticians. What constitutes "*loss* through depreciation"? Is " loss " to be determined by indices to hypothetical averages? Or is it to be determined according to the bondholder's individual situation? A bondholder of small means may be seriously affected, for example, by an increase in the price of foodstuffs, and a bondholder of large means much less so. An increase in the price of luxuries would turn the tables. May each bondholder, then, establish a personal loss, if he has suffered it? Or *must* he, if he has not suffered it?

---

[117] It would, it is true, affect power to purchase gold by weight. But presumably, if this factor could be taken into account at all, it would only be one of many elements entering into a price index. See the succeeding text.

[118] See note 115, *supra*.

[119] See note 99, *supra*, and accompanying text.

The Chief Justice speaks of loss of buying power in relation to " the internal economy " of the country.[120] The reasons for thus confining the issue are elusive.[121] What of buying power in terms of foreign currency? Of foreign commodities? Suppose that the bondholder travels abroad? Lives abroad? Suppose he is an importer? Once again, must he, or can he, establish the loss which he himself has suffered? If so, must he do it in terms of money actually spent? Or of money which *would* have been spent? Or do his rights depend upon some hypothetical index? Changes in purchasing power in foreign markets depend as much on the monetary policies of foreign governments as on that of our own; they are a function of the two. Must the bondholder attempt a separation of causal forces?

It is clear that these fantastic burdens of proof will beset every bondholder afresh each time he brings suit, each time he wishes to recover upon a single coupon.[122] Such an undertaking may be within the means of large bondholders seeking payment either of principal or interest. The necessity of it, however, can only mean the practical exclusion of the small bondholder from the benefit of the gold clause. It is unnecessary to gloss the absurdity of assuming any such consequences to have been within the contemplation of the parties to the contract.

*Fourth,* and lastly. This interpretation of the opinion means that the charges of bad faith therein solemnly levelled at Congress were, to say the least, somewhat more narrowly bottomed upon the Constitution than has commonly been supposed. For so far as the purpose of the gold clause was simply to protect the bondholder against loss, there being no evidence that the bondholder has yet suffered loss, neither is there any evidence that the United States has yet broken its promise. That the mere refusal to pay in gold coin can scarcely have been an invalid repudiation we have already seen, for the Chief Justice himself, in effect, sanctioned the constitutionality of that action.[123] Thus the Joint Resolution, *in its application to the particular situation presented to the Court,* apparently simmers down to nothing worse than an unconstitu-

---

[120] See quotation in note 85, *supra.*
[121] See Dickinson, *supra* note 99, at 723, 724.
[122] The gold clause in Liberty Bonds is applicable to principal and interest.
[123] See p. 1072, *supra.*

tional attempt, an effort by the United States to break some promise which it thought it had made but which in fact it had not made at all.

But this objection, like the first, cannot be weighted too heavily, and for the same reason. For, to say the truth, it is sufficiently difficult, under any interpretation of the opinion, to determine wherein the Joint Resolution was unconstitutional, and why. A reconsideration of this question forms the final problem of this paper.

## V. The Joint Resolution Again

Three explanations of the opinion, broadly speaking, have so far been suggested. The first two assume that the gold clause is a " weight and fineness " clause, the third that it is a " purchasing power " clause. Under the first explanation (the " constitutional " explanation [124]) we are to attribute the bondholder's failure to recover to the fact that *Congress*, by legislation other than the Joint Resolution, has constitutionally thwarted him, a reason which denies to purchasing power any relevance whatever. Under the second explanation (the " damages " explanation [125]) we are to attribute the bondholder's failure not to Congress but to the *Court*; he has been defeated by the application of what can only be called an unorthodox rule of damages, a rule which measures " loss " in terms of changes in purchasing power. The third explanation (the " contract " explanation [126]) attributes his failure not to Congress nor (directly) to the Court but to the *contract* which he himself has made, a contract which furnishes protection only against a diminished purchasing power.

Each of these three explanations raises its own peculiar problems as to the unconstitutionality of the Joint Resolution. But each has to deal in one way or another with the same basic difficulties. It is obvious that the bondholder has only two possible grounds of substantive complaint against the Resolution: he has not been paid in gold coin, and he has not been paid in legal tender in an amount in excess of the number of dollars stated in the bond. It is necessary to account for the Court's holding that, despite the

---

[124] See pp. 1069–77, *supra*.        [125] See pp. 1077–81, *supra*.
[126] See pp. 1081–89, *supra*.

fact that he is not entitled in this suit to compel payment in either of these two ways, the Resolution is nevertheless unconstitutional.

The problem of discovering why that part of the Resolution is unconstitutional which denies payment in the physical gold coin is common to all three explanations. Under no one of them does it seem possible that the Resolution, in the substance of what it did to the bondholder in that respect, really exceeded the power of Congress.[127] Each explanation, however, gives a special turn to the problem of discovering why the Resolution is unconstitutional in denying payment otherwise than dollar for dollar. But of the three, the second explanation (the "damages" explanation) alone permits us to suppose that the substance of the Resolution, in this respect either, was invalid.[128] And that explanation permits us to do so only at the price of supposing also that the Court, after condemning Congress for passing an unconstitutional statute, would turn about and accomplish precisely the same result in the particular situation, by adopting an unorthodox and seemingly unjustifiable rule of damages.[129]

Under any view of the decision, the question is acutely presented whether there is not some means of reconciling the Chief Justice's condemnation of the Joint Resolution with the rest of his opinion. It will be recalled that, in discussing the Resolution,

---

[127] See pp. 1071-72, *supra*.

[128] As to the "contract" explanation, see p. 1088, *supra*. The same conclusion that the substance of the Resolution was valid follows even more directly under the first explanation, which achieves its result by upholding the constitutionality of legislation other than the Joint Resolution which did exactly the same thing to the bondholder.

[129] The last difficulty might be avoided under a fourth explanation, which may be mentioned for the sake of completeness, although the opinion furnishes no explicit sanction for it. By adopting a middle view of the power of Congress, it might be possible to save the "weight and fineness" interpretation, explain the references to purchasing power, and vindicate, in some degree, the orthodoxy of the Court's decision. The hypothesis may be advanced that Congress has power to defeat the obligation of the gold clause, *so long as it does not cause loss through depreciation in the medium of payment*; if purchasing power must be brought into the case, it can perhaps be brought in more artistically in the guise of constitutional law than in the guise of the law of damages or of the construction of contracts. With respect to the particular problem under consideration, however, such an hypothesis brings us back to the situation under the first and third explanations. For once again the evidence which fails to prove damage fails also to prove an unconstitutional act; once again the Resolution, in the substance of what it did to this bondholder, must be constitutional.

the Chief Justice was particularly concerned to emphasize " the binding quality of the obligations of the Government ".[130]   The possibility suggests itself that his remarks were designed *only* to demolish the notion that the United States is free to disregard those obligations at will, that they were directed not at all, in other words, toward the Resolution in its application to this case.

So put, the suggestion creates as many difficulties as it solves. For the Chief Justice clearly stated the Government's more limited contention, and rejected it;[131] he clearly asserted the invalidity of the Resolution as applied to this case.[132]   It is not lightly to be assumed that the Court would so egregiously violate the conventions of constitutional decision as, first, to talk about a case which was not before it, and, much more seriously, to do so while appearing to talk about the case which was before it.[133]

The suggestion, however, may perhaps be modified so as to provide some nexus between the Resolution and this bondholder. Heretofore it has been taken for granted, as indeed appears, that when the Chief Justice proclaimed the inviolability of the public faith he was dealing with an issue of substance. Perhaps, however, he was dealing with an issue of form. Perhaps, in other words, the Resolution was invalid not because of what it did to the bondholder but because of the way in which it did it.

There is ground to urge that it is one thing for the United States to repudiate its own obligations directly and quite a different thing for it to accomplish the same result indirectly, by an exercise of regulatory power generally applicable to all persons similarly situated. The United States, it may be said, acts in two capacities and it should keep the capacities distinct. As a promisor it is bound as all promisors are bound. As a regulator it may affect

---

[130] See pp. 1067-69, *supra*.

[131] " The argument in favor of the Joint Resolution, as applied to government bonds, is in substance that the Government cannot by contract restrict the exercise of a sovereign power. But the right to make binding obligations is a competence attaching to sovereignty. . . ." 294 U. S. at 353.

[132] " We conclude that the Joint Resolution of June 5, 1933, insofar as it attempted to override the obligation created by the bond in suit, went beyond the congressional power." *Id*. at 354.

[133] Compare Matthews, J., in Liverpool, N. Y. & P. S. S. Co. v. Commissioners, 113 U. S. 33, 39 (1885). See also Chicago & G. T. Ry. v. Wellman, 143 U. S. 339, 345 (1892).

its own promises as all promises are affected.[134]  But the existence of this power of regulation furnishes no excuse for wanton breach of contract.

One may concede the validity of this proposition while questioning its applicability, to this effect, in this case.  Indeed, it is the very proposition which the Government urged in support of the Resolution,[135] inverted so as to condemn it.  The inversion is accomplished by assigning to the Resolution a character which it does not seem properly to bear.  Plainly the United States cannot purport to regulate when it is not really regulating.  Plainly it cannot single out its own situation for special treatment while arbitrarily excluding similar situations.  The United States, for example, ought not to be able to use its regulatory powers in justification of a refusal to pay its own obligations in gold coin, while under general law such coin was still obtainable and while it was still due and payable on other obligations.  But that case is not this case.  The Joint Resolution was made to apply evenhandedly to all obligations.[136]  It had, to borrow a phrase from the law of evidence, that circumstantial guarantee of trustworthiness which comes from such application.  In no substantial sense can it be said that in the passage of the Resolution the United States was acting only as a defaulting promisor.  It purported to act as a regulator; it acted with every appearance of a regulator; and in the private bond case the Court explicitly recognized that it was so acting.[137]

A further turn in the argument, however, may strengthen the contention to the contrary.  The Joint Resolution was in terms applicable not only to the circumstances of the present suit but to the circumstances of all future suits.  It forbade the insertion of gold clauses in subsequent contracts.  It struck out for all time gold clauses in existing contracts, regardless of the existence of a

---

[134] *Cf.* Horowitz v. United States, 267 U. S. 458, 461 (1925).

[135] See notes 33, 34, *supra.*

[136] Not only is the Resolution applicable to gold clauses in both public and private contracts, but it is applicable to gold clauses in obligations *to* the United States as well as in obligations *of* the United States.  *Cf.* Nussbaum, *supra* note 3, at 77–78.

[137] Compare the rejected contention, urged by the four dissenters in the private bond case, that the Joint Resolution was in reality a regulation of contracts and not of the value of money.  294 U. S. at 369.

free market for gold or of changes in the gold content of the dollar. Can it perhaps be said that in thus foreclosing future situations the Joint Resolution was operating, in a special and reprehensible sense, upon the promise, albeit upon public and private promises at the same time?

It is difficult to understand how this can be said. So far as the suggestion implies that the Court could properly declare a statute invalid because of its application to circumstances which not only were not before it but which were not even in existence, it only substitutes, once again,[138] one difficulty for another. The Court did not in the *Norman* case on such an account decline to uphold the Resolution. Nothing is plainer than that constitutional objections, once rejected, may be renewed when circumstances change.[139] Nor is it easy to draw the objection more finely so as to render the Resolution in some respect invalid *in praesenti*, and not merely *in futuro*. It may be suggested that the Resolution was somehow tainted by its separate position in the statute book, apart from any integrated scheme of currency regulation. Perhaps the difficulty was that in such separate position the Resolution might survive that scheme. Perhaps the mere fact of separate position, together with all the other circumstances, communicated to the Court some inference of evil intent. How slender the point is appears from the stating. Statutes in *pari materia* it is customary to construe together; the Court has many times found grounds for sustaining an enactment by reference to provisions of law outside its four corners.[140] The various restrictions upon the use of

---

[138] See p. 1091, *supra*.

[139] *Cf.* Nashville, C. & St. L. Ry. v. Walters, 55 Sup. Ct. 486 (1935), decided a few weeks after the gold decisions. See also Hamilton v. Kentucky Distilleries Co., 251 U. S. 146, 162 (1919); Chastleton Corp. v. Sinclair, 264 U. S. 543, 547–48 (1924); Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 162 (1930); Abie State Bank v. Bryan, 282 U. S. 765, 772 (1931). *Cf.* Perrin v. United States, 232 U. S. 478, 487 (1914), in which a prohibition of the sale of liquor upon a ceded Indian reservation was attacked on the ground that it was in terms perpetual, without regard to the presence or status of the Indians. Said Mr. Justice Van Devanter, " The fact that the conditions may become so changed in the future as to render the prohibition inoperative affords no reason for condemning it now." See also Holmes, J., in Noble State Bank v. Haskell, 219 U. S. 104, 112 (1911); Sutherland, J., in Euclid v. Ambler Realty Co., 272 U. S. 365, 397 (1926). But *cf.* Worthen Co. v. Thomas, 292 U. S. 426, 431–34 (1934).

[140] *Cf.* Hughes, C. J., in Gregg Dyeing Co. v. Query, 286 U. S. 472, 479–80 (1932): " But appellants question the right to invoke other statutes to support the

gold which Congress had established were part of an organic scheme to which the Joint Resolution belonged and in the light of which, surely, its constitutionality should have been determined.[141]

## VI. Conclusion

Whatever conclusions may emerge from a study of the decision, a conviction as to what it means is not among them. It is possible to say only what it *may* mean. Not only is it impossible to determine what meaning the Court in fact intended, but it is impossible to be satisfied with any meaning which independent speculation suggests might have been intended. It is impossible, that is, on the assumption that effect should be given to all parts of the opinion and that the opinion in all its parts should withstand rigorous analysis.

Giving over the effort to make the Court's statement of what it was doing hold logical water, however, it is not difficult to arrive at a loose but reasonably satisfactory understanding of what happened. What happened was that the Court made two inconsistent decisions, one on an abstract question of public morality and the other on a concrete question of private justice. The basic constitutional question was taken as posing an issue of the integrity of the public credit, of the inviolability of the public faith. Facing such an issue, it was not easy to come out baldly and announce that the public credit has no integrity, that the public faith is not inviolable. The Court accordingly did not do so. When it turned, however, to the concrete question of what judgment ought to be given in this litigation, different considerations solicited its judgment. Patently this bondholder was seeking a profit, and the Court rejected his claim, announcing that such

---

validity of the Act assailed. To stand the test of constitutionality, they say, the Act must be constitutional ' within its four corners,' that is, considered by itself. This argument is without merit. The question of constitutional validity is not to be determined by artificial standards." *Cf.* United States v. Central Pac. R. R., 118 U. S. 235, 240, 241 (1886) ; and see the Norman case, 294 U. S. at 297.

[141] It is worthy of note that an important part of the monetary regulations in question — the legal tender and parity provisions of the Agricultural Adjustment Act § 43, notes 73, 74, *supra*, were themselves incorporated in § 2 of the Joint Resolution. See note 75, *supra*. In stating the provisions of the Resolution in the Perry opinion the Chief Justice referred only to § 1, at least permitting the inference that § 2 was excluded from his condemnation. See 294 U. S. at 349.

actions would be entertained only in cases of bondholders who had suffered "injury".

One wonders why a close consideration of what has been called the concrete decision did not lead to reconsideration of what has been called the abstract. The Court's decision, whatever its grounds, was of its own making. Judgment, uncoerced by authoritative materials, was necessarily guided by considerations which were relevant to the validity of the substance of what the Joint Resolution did. Although there is doubt as to what the Court thought the gold clause meant, there is none as to what the Congress that passed the Joint Resolution thought it meant. It thought it meant that after devaluation of the dollar the bondholder would be entitled to payment either in gold coin of the former content or in legal tender to an amount correspondingly greater than that specified in the bond. And it thought that he ought not to be so paid. The remarkable fact is that the Supreme Court, despite its judgment of unconstitutionality, reached exactly the same conclusion. This judicial confirmation of the legislative judgment is the most persuasive argument that can be found in favor of the validity of the Resolution as applied in the present case. That the Court, having reached this conclusion, should not have deemed that its preliminary constitutional issue needed to be restated, if not to be decided differently, will to the outsider long remain a mystery.[142]

But however this may be the conclusion seems inescapable that the Court should have abstained, in any event, from a declaration that the Resolution is invalid. This is true whether the invalidity of the Resolution lies in the substance of what it did to this bondholder or in the way in which it did it. For it is manifest that the Resolution in fact injured this bondholder not at all, since his situation would have been the same if it had never been passed.

---

[142] Compare Mr. Justice Stone's compact statement: " I, therefore, do not join in so much of the opinion as may be taken to suggest that the exercise of the sovereign power to borrow money on credit, which does not override the sovereign immunity from suit, may nevertheless preclude or impede the exercise of another sovereign power, to regulate the value of money; or to suggest that, although there can be no present cause of action upon the repudiated gold clause, its obligation is nevertheless, in some manner and to some extent not stated, superior to the power to regulate the currency which we now hold to be superior to the obligation of the bonds." 294 U. S. at 361.

*HARVARD LAW REVIEW* [Vol. 48

Thus, under any view, the Court violated two of its most frequently repeated canons of constitutional decision. It decided a constitutional question when it was not necessary to do so;[143] and it permitted that question to be raised by a litigant who was able to show no interest in its outcome.[144] Probably also it violated a third, and much more important, canon by deciding a constitutional question which upon the facts was not presented for decision.[145] But this cannot surely be determined. For the Court did not stop to answer the basic questions of conventional legal analysis: Exactly what was the obligation? In exactly what respect has it been broken? What then is the appropriate remedy? We cannot know precisely, therefore, what was the constitutional question which the Court decided.

It will be observed that this statement of the opinion avoids attributing its obscurity to design. One cannot of course be sure which is the more accurate judgment, to suppose that the obscurity was advertent or to suppose that it was inadvertent. Another element of the decision may have a bearing on the question. For the Chief Justice did more than vindicate the moral law and decide in favor of the Government. He left a door open for the bondholder. The bondholder's remedy under present circumstances is manifestly useless, or worse than useless.[146] But it may not always be useless. The check upon runaway inflation which is furnished by the opinion will not escape Congress and the President, and it is scarcely to be supposed that it escaped the Court. Whether it influenced its decision one can only speculate.

The check upon runaway inflation comes into the case as a result of the discussion about purchasing power. The treatment of the Joint Resolution provides the first major source of difficulty with the opinion, and that discussion the second. Pur-

---

[143] See notes 133, *supra*, 144, *infra*. Compare the Court's doctrines as to moot cases, California v. San Pablo & T. R. R., 149 U. S. 308, 314 (1893); United States v. Hamburg-American Co., 239 U. S. 466, 475, 476 (1916); and as to construction so as to avoid a constitutional doubt, Crowell v. Benson, 285 U. S. 22, 62 (1932); United States v. Delaware & Hudson Co., 213 U. S. 366, 407, 408 (1909).

[144] *Cf.* Clark v. Kansas City, 176 U. S. 114, 118 (1900); Tyler v. Judges of Court of Registration, 179 U. S. 405, 406 (1900); Engel v. O'Malley, 219 U. S. 128, 135 (1911); Standard Stock Co. v. Wright, 225 U. S. 540, 550 (1912); Frothingham v. Mellon, 262 U. S. 447, 488 (1923); Aetna Ins. Co. v. Hyde, 275 U. S. 440, 447 (1928).

[145] See note 133, *supra*.

[146] See pp. 1090–94, *supra*.

chasing power has herein been dealt with mainly as an ingredient of the original contract, for there is a peculiar irony in supposing that the parties could have intended it to be relevant. But whether it enters the case through the gold clause itself, or through the law of damages, or through the law of the Constitution,[147] it is equally to be regretted. Its practical effect is to open up a wide range of expensive and purposeless controversy and, by doing so, either to deprive the bondholder of any effective remedy whatever (even while telling him he has been wronged) or else to provide a remedy, unequal even in times of drastic inflation, available only to the bondholder with resources for litigation. Upon any theory of its relevancy, its injection into the opinion was unnecessary. No previous decision required or even suggested it.[148]

The supposition that the Court simply thought it fair that the bondholder should recover whenever he proved loss, and said so, can be accepted with equanimity, if not with agreement. Quite different are the implications of supposing such an element to have been dragged into the case deliberately, without sanction in traditional legal materials, in order to control determinations of monetary policy outside the Court's province. Not the least persuasive reason why the Court ought not to have given heed to such a factor, in this instance, is that it is futile. For clearly, if governmental action is to save us from inflation, it will be legislative and not judicial action. If Congress can bring about inflation, and wants to do so, nothing the Court can do in the end will prevent it.

One would like most of all, of course, to regard the discussion of buying power simply as surplusage, irrelevant to the actual grounds of decision. To do so with assurance will scarcely be possible until a bondholder sues, claiming loss of buying power, and is told by the Court that it makes no difference. Meanwhile, however, some support for such a view of the decision may be gathered from the other two opinions. Neither makes any reference to purchasing power. Both assume that the bondholder was foreclosed, in any event, by the legislation restricting the use

[147] See note 129, *supra.*

[148] It occurred to none of the commentators who discussed the problem in advance of the decision. See note 43, *supra.* And the Chief Justice cited no cases.

*HARVARD LAW REVIEW* [Vol. 48

of gold.[149]   Were this indeed so, we should need only Mr. Justice Stone's trenchant refutation of the majority's talk about the invalidity of the Joint Resolution [150] to have a wholly satisfactory ground of decision.

Between this ground and the ground which would have given the bondholder what he was seeking it must be clear that there can be no adequate compromise.  Only one valid reason existed for declaring the Joint Resolution unconstitutional.  That was the reason which the Chief Justice gave, but it was a reason which required, if it was to continue to be valid, that the bondholder should recover.  The maintenance of the credit of the United States, said the Chief Justice, is of paramount importance:

> " The Constitution gives to the Congress the power to borrow money on the credit of the United States, an unqualified power, a power vital to the Government, — upon which in an extremity its very life may depend." [151]

This is a reason which, if it means anything, means a great deal. Credit is maintained by meeting the expectations of lenders, not by adopting the proper form of words to defeat them.  Lenders are ordinary people who understand only whether their expectations have been met, not metaphysicians who can appreciate subtleties obscure even to lawyers.  There is little reason to suppose that in the money markets of the world the credit of the United States would have suffered one whit more by an outright assertion that, as applied to present circumstances, the Joint Resolution was valid, than it did by the actual decision.

There is scarcely stronger reason to suppose that the credit of the United States did in fact suffer, or would have suffered, whichever the basis of decision.  But the desirability of enhancing federal borrowing power through the validation of special inducements to lenders was not, in any event, the only consideration involved.  There was a question of the freedom of government to govern, of its freedom to do so in a field in which narrow judicial restrictions, whether drawn from the Constitution or elsewhere, may prove peculiarly embarrassing.[152]  There was a ques-

---

[149] See 294 U. S. at 360, 369.   [150] See note 142, *supra.*
[151] 294 U. S. at 353.
[152] *Cf.* Thayer, *Legal Tender* (1887) 1 HARV. L. REV. 73, 85, 92–94.

tion of the candid recognition of the peculiar character of governmental undertakings, of the inapplicability to such undertakings of conceptions too easily drawn from the imperfect analogue of undertakings between private individuals.

To say that the United States can invalidate the gold clause in its own contracts is to say that it can do that which, in a private individual, would be a breach of faith. Little is gained by denying that this is true in word while acknowledging it in deed. Much more would have been gained by a strong-fibred explanation of why it should be true. This is not for a moment to say that the Government owes no obligation of good faith. It is only to say, as this decision itself bears witness, that the obligation perforce is different. The obligation needs to be defined, but the definition loses its usefulness if it overlooks or conceals the differences. Consideration must be given in this connection not only to the peculiar position of the United States in making contracts but to the peculiar position of the courts in enforcing them. For many reasons the determinations of a court in such a case are binding only " upon the conscience of the sovereign ".[153] The United States can withdraw its consent to be sued, or, while permitting suit, can refuse to pay a judgment against it. In the case of Liberty Bonds it can resort to such indirect devices as a refunding program. This does not mean that the judicial function is on this account enveloped in an atmosphere of unreality and futility.[154] But it does mean that the relevant considerations in exercising the function are those which *do* address themselves to the conscience, and to the understanding, of the sovereign.

*Henry M. Hart, Jr.**

HARVARD LAW SCHOOL.

[153] See 294 U. S. at 354.
[154] *Cf.* CORWIN, THE TWILIGHT OF THE SUPREME COURT, (1934) 178–79.
* To Mr. James Edmund Bednar, Jr., of the third-year class of the Harvard Law School I am indebted for valuable help in preparing this paper.