# EXHIBIT C

LEXSEE 2008 U.S. APP. LEXIS 21938


Analysis
As of: Nov 26, 2008

TRANSPRO, INC., Plaintiffs-Appellants, v. LEGGETT & PLATT, INC., Defendants-Appellees.

NO. 07-4333

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

08a0624n.06; *2008 U.S. App. LEXIS 21938; 2008 FED App. 0624N (6th Cir.)*

October 16, 2008, Filed

**NOTICE:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** [*1]
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.
*Transpro, Inc. v. Leggett & Platt, 2007 U.S. Dist. LEXIS 51202 (N.D. Ohio, July 16, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff seller corporation sued defendant purchaser corporation alleging breach of contract and unjust enrichment. The purchaser filed a counterclaim against the seller asserting breach of the sale agreement's net asset value (NAV) representation. The parties filed cross-motions for summary judgment. The U.S. District Court for the Northern District of Ohio granted the purchaser's motion and denied the seller's motion. The seller appealed.

**OVERVIEW:** The parties entered into a sale agreement for one of the seller's divisions. The transaction price was based in part on the seller's representation that the net asset value (NAV) of the business, i.e., assets minus liabilities, was equal to at least $ 15,500,000. After the closing date, the seller requested reimbursement for employee payroll amounts paid around the time of closing because someone had mistakenly paid $ 573,553 in payroll expenses from the seller's bank accounts during this time even though under the agreement, the seller was to process but not pay the division's payroll for the period immediately prior to the closing date. After the reimbursement request, The seller revisited the NAV calculation following the closing date and determined it was on $ 15,180,373 (a $ 319,627 shortfall of the seller's representation). While the purchaser had learned before closing that the division did not accrue incurred but not recorded (IBNR) medical claims on its balance sheets, there was no evidence to suggest that the purchaser learned or could have learned of the actual existence or the dollar value of the IBNR claims that were incurred prior to but recorded after the closing.

**OUTCOME:** The decision was affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
[HN1] A circuit court of appeals reviews a district court's grant of summary judgment de novo, using the same standard as the district court.

Case: 1:06-cv-01288-CAB Doc #: 55-3 Filed: 11/26/08 3 of 8. PageID #: 1479

Page 2

2008 U.S. App. LEXIS 21938, *; 2008 FED App. 0624N (6th Cir.)

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN2] Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
[HN3] A nonmoving party cannot respond to a motion for summary judgment by merely resting on the pleadings, but rather the nonmoving party must present some specific facts showing that there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Standards > Need for Trial*
[HN4] The central issue on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Contracts Law > Contract Interpretation > General Overview*
[HN5] When considering a claim founded on a contract, if the relevant contract language is clear and unambiguous, courts must give the language its plain meaning. Further, contracts are to be interpreted in a way that does not render any provisions illusory or meaningless.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
[HN6] The fact that parties offer different interpretations of contractual language is insufficient, by itself, to make the language ambiguous, and for good reason. When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented. Ambiguity exists only where the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
[HN7] Only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.

*Contracts Law > Contract Interpretation > General Overview*
*Evidence > Testimony > Experts > Admissibility*
[HN8] Experts are permitted to testify as to terms of art contained in contracts.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
[HN9] A court may interpret an ambiguous contract as a matter of law where the moving party's record is not rebutted. Further, a court may rely on extrinsic evidence to interpret the contract as a matter of law where the extrinsic evidence does not create an issue of material fact.

**COUNSEL:** For TRANSPRO, INC., Plaintiff - Appellant: Andrew J. Wronski, Timothy J. Casey, Foley & Lardner, Milwaukee, WI.

For LEGGETT & PLATT, INC., Defendant - Appellee: Stephen H. Jett, Michael J. Zbiegien, Jr., Taft, Stettinius & Hollister, Cleveland, OH; John B. Nalbandian, Taft, Stettinius & Hollister, Cincinnati, OH.

**JUDGES:** Before: GILMAN and COOK, Circuit Judges; and HOOD, Senior District Judge. *

> \* The Honorable Joseph M. Hood, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

**OPINION BY:** HOOD

**OPINION**

  **HOOD, Senior District Judge.** This is an appeal from the decision of the district court, granting the motion for summary judgment of Counterplaintiff-Appellee Leggett & Platt, Inc. (hereinafter, "Leggett") on its counterclaim for breach of a representation of a Net Asset Value (hereinafter, "NAV") representation in an agreement with Counterdefendant-Appellant TransPro, Inc. (hereinafter, "TransPro"). TransPro appeals the district court's decision. For the reasons stated below, the Court **AFFIRMS** the decision of the district court.

Case: 1:06-cv-01288-CAB Doc #: 55-3 Filed: 11/26/08 4 of 8. PageID #: 1480

Page 3
2008 U.S. App. LEXIS 21938, *; 2008 FED App. 0624N (6th Cir.)

## I. Factual and Procedural Background

TransPro and Leggett entered [*2] into an Agreement on April 17, 2000, whereby Leggett was to purchase TransPro's Crown North America Division (hereinafter, "Division").

Section 4.22 of their Agreement provides that:

> The [NAV] of the Purchased Assets at Closing will be at least $ 15,500,000. [NAV] shall mean the dollar amount equal to the book value of the Purchased Assets minus the book value of Assumed Liabilities. Book value will be determined from Seller's and VMS' books and records as of the opening of business on the Closing Date (prior to any write ups under purchase accounting on Buyer's books and records) under GAAP as applied by Seller and VMS prior to Closing. The aggregate under-funded pension liability for the Fabricators and 136 Plans shall be deemed to be $ 850,000. If the Closing Date is after April 30, 2000, the [NAV] shall be adjusted by mutual agreement of the parties, and in accordance with the past practice, to reflect the later than expected Closing Date.

Paragraph/Section 11.5(a) of the Agreement provided Leggett with up to "twelve months following the Closing" to bring a claim for breach of representation. Leggett, however, was barred from seeking indemnification for breach of a representation [*3] or warranty "to the extent [Leggett] had actual knowledge of such breach prior to the date [of the Agreement]" pursuant to § 11.5(c).

During negotiations for the Agreement, Leggett was provided access to the Division's books and records as part of the due diligence process, and the Division provided any information that Leggett requested. Among the documents available to Leggett were the Division's own internal, unaudited monthly balance sheets showing the assets and liabilities of the Division's operations in the United States and Canada. Susan McCoy, Leggett's Manager of Due Diligence, learned how the Division and its parent, TransPro, accounted for incurred but not recorded (hereinafter, "IBNR") medical claims. Specifically, she learned that no IBNR accrual was recorded in the financial statements of the Division but was recorded instead on TransPro's books. TransPro prepared its own audited corporate balance sheets showing the assets and liabilities of all of its divisions on a consolidated basis, including the Division, but never provided the audited corporate books to Leggett.[1] McCoy did not review TransPro's books at that time to see what portion of its accrual for IBNR was [*4] attributable to the Division because TransPro's financial statements were not subject to due diligence review and were not available to Leggett. McCoy proposed no specific adjustments in light of the Division's treatments of IBNR claims prior to closing, and no portion of the $ 2.5 million purchase price adjustment was attributable to her findings about the Division's lack of IBNR accrual.

> 1  The Division's balance sheet instead listed an artificial insurance premium amount of approximately $ 2,000, which the Division paid to TransPro's corporate office. Liability for employee medical claims was reflected only on a consolidated basis on TransPro's corporate balance sheet. Because Leggett was never provided with TransPro's corporate books, no one from Leggett reviewed the employee medical claim liability figures recorded on TransPro's corporate balance sheet. Had Leggett reviewed those figures, however, they would have learned very little about the Division's liabilities. TransPro's corporate balance sheet for December 1999 showed $ 1,600,000 as the consolidated liability for employee medical claims for the entire company, not just the Division operations being purchased by Leggett. Even [*5] if Leggett had seen TransPro's corporate balance sheet prior to the Closing Date, Leggett could not have known the actual amount of employee medical claim liability attributed to the Division.

The transaction closed on May 5, 2000 ("Closing Date"), when Leggett acquired the assets and liabilities of the Division. Leggett paid $ 37,500,000 in cash for the Division based in part on TransPro's representation that the net asset value of the business, i.e., assets minus liabilities, was equal to at least $ 15,500,000. In August 2000, McCoy conducted a follow-up visit to the Division's office to calculate the NAV and address other post-closing issues. At that time, she concluded that the NAV exceeded $ 15.5 million and that no payment was due from TransPro.

Even so, after the Closing Date, several adjustments were to be made and were made by the parties. TransPro requested and received reimbursement for $ 600,000 in actual employee medical claim liabilities that had been incurred "as of" May 5, 2000. Leggett paid workers' compensation claims of former Division employees that TransPro was required to reimburse under the Agreement. TransPro also requested reimbursement for em-

Case: 1:06-cv-01288-CAB Doc #: 55-3 Filed: 11/26/08 5 of 8. PageID #: 1481

Page 4
2008 U.S. App. LEXIS 21938, *; 2008 FED App. 0624N (6th Cir.)

ployee payroll amounts [*6] paid in early May 2000 because someone had mistakenly paid $ 573,553 in payroll expenses from TransPro's bank accounts during this time. Under the Agreement, TransPro was to process but not pay the Division's payroll for the period immediately prior to the Closing Date, as Leggett had assumed those liabilities and was responsible for those payroll obligations. TransPro did not discover the mistake until November 2000.

After TransPro demanded reimbursement for the payroll expenses, McCoy revisited the NAV calculation, relying on information that was not available on the Closing Date. To calculate what she thought the accrual "should have been," McCoy included those actual medical claims that were not submitted to the Division until after the Closing Date, meaning that they were not reflected on the Division's books and records on the Closing Date, and including an additional amount for future estimated claims, based on the claims submitted after the Closing Date.

McCoy reviewed information relating to the Division's assets and liabilities "as of May 5, 2000" in order to calculate the NAV as of that date, using the best available actual information as required by Generally Accepted Accounting [*7] Principles (hereinafter, "GAAP") to insure that the calculation was as accurate as possible and including information that resulted in both upward and downward adjustments to the NAV. Ultimately, Leggett determined and its expert confirmed that the NAV was only $ 15,180,373, a shortfall of $ 319,627 from the contractual representation of TransPro. Based on the shortfall, Leggett concluded that it owed TransPro only $ 253,926 for post-closing payroll adjustments, which Leggett paid. TransPro insisted that Leggett was not entitled to any offset and that Transpro was entitled to recover the full amount of $ 573,553 from Leggett.

On November 26, 2002, TransPro sued Leggett alleging breach of contract and unjust enrichment, claiming in part that Leggett had breached the Agreement by failing to reimburse it for $ 319,627 in payroll expenses that TransPro paid after the Closing Date.[2] On January 6, 2003, Leggett filed a Counterclaim against TransPro asserting breach of the Agreement's NAV representation in an amount equal to TransPro's claim, $ 319,627.[3] The parties filed cross-motions for summary judgment, focusing on the validity of Leggett's NAV calculation.

> 2  TransPro sought to recover [*8] for other items, as well, but those claims were resolved by the parties and are not the subject of this appeal.
> 3  In addition, Leggett asserted that TransPro breached the Agreement by failing to reimburse and indemnify Leggett for workers' compensation payments made to three former employees of the Division. The District Court granted judgment to Leggett on this issue, a decision that is not the subject of this appeal.

The district court ultimately granted Leggett's motion and denied TransPro's motion. In its decision, the district court first rejected TransPro's argument that, based on § 11.5(c) of the Agreement, Leggett could not assert a breach of NAV representation based on the IBNR adjustment because Leggett knew before closing that the Division did not accrue the IBNR claims on its financial statements. The district court reasoned that "[t]he Agreement's plain language precluded a claim for breach of a representation of warranty only if Leggett had actual knowledge of a breach." Thus, explained the court, "knowledge of a breach is required, not merely knowledge of a condition that may or may not lead to a breach." Finding that it was undisputed that Leggett did not know of a breach [*9] before the Closing Date, the district court concluded that § 11.5(c) did not preclude Leggett's claim for breach of the NAV representation.

The district court next determined that Leggett's interpretation of § 4.22 was correct and that Leggett was permitted to include the IBNR adjustment in the NAV calculation even though that information was not available until after the Closing Date. Based on the proposed readings offered by the parties, the district court concluded that "the phrase 'as of used in § 4.22 of the Agreement is ambiguous because it maybe interpreted in at least two, mutually exclusive ways." The court then considered extrinsic evidence presented by the parties, including Leggett's expert, John Lane, and the deposition testimony of a TransPro officer and a former TransPro officer, to reach its conclusion. Notably, Lane opined that standard accounting practice under GAAP defines "as of" to mean that one calculates the value of an entity's assets on that date and the amount of the entity's incurred liabilities on the same date. Thus, he explained that a balance sheet is actually prepared and published after the closing date of a transaction using information gathered after [*10] the closing date.

TransPro's former CFO, Timothy Coyne, testified that, as a practical matter, it would be impossible to actually prepare the final balance sheet on the closing date of a transaction because all of the necessary information would not be available instantaneously. TransPro's Corporate Controller, Kenneth Flynn, also conceded that balance sheets are, by their very "nature," prepared after the Closing Date using information gathered after that point in time. The district court concluded that their testimony "provided the court with ample evidence of how GAAP is applied by TransPro." TransPro offered no evidence countering Leggett's proffered interpretation. The district court concluded that Leggett's interpretation of "as of" was correct, writing that "expenses incurred be-

Case: 1:06-cv-01288-CAB Doc #: 55-3 Filed: 11/26/08 6 of 8. PageID #: 1482

Page 5

2008 U.S. App. LEXIS 21938, *; 2008 FED App. 0624N (6th Cir.)

fore the Closing Date are to be included in the NAV calculation, even though they may not be reported until after the Closing Date. Leggett's [IBNR] adjustment was proper, as a matter of law."

The district court entered judgment in favor of Leggett on July 16, 2007. On July 27, 2007, TransPro filed a motion to alter or amend the judgment in order to obtain a more definite statement of prejudgment interest [*11] to be awarded. The district court adopted the proposed amended judgment entry on September 21, 2007. On October 1, 2007, TransPro filed its Notice of Appeal of "the final judgment entered in this action on September 21, 2007."

## II. Jurisdiction

The district court had jurisdiction of this matter, an action between citizens of different states with an amount in controversy in excess of $ 75,000, exclusive of interest and costs. [4] *28 U.S.C. § 1332*. In turn, this Court has jurisdiction of this appeal, timely taken on October 1, 2007, from the September 21, 2007, final decision of the district court. *28 U.S.C. § 1291*; *Fed. R. App. P. 4*.

> 4   TransPro is a Delaware corporation with its principal place of business in Connecticut. Leggett is a Missouri corporation with its principal place of business in Missouri.

## III. Standard of Review

[HN1] This Court reviews the district court's grant of summary judgment *de novo*, using the same standard as the district court. *S.S. v. E. Ky. Univ., 532 F.3d 445, 452 (6th Cir. 2008)*. [HN2] Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue [*12] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. [HN3] The nonmoving party "cannot respond by merely resting on the pleadings, but rather the nonmoving party must present some 'specific facts showing that there is a genuine issue for trial.'" *Wiley v. United States, 20 F.3d 222, 224 (6th Cir. 1994)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*.[HN4] The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

## IV. Discussion

### A. Section 11.5(c) of the Agreement Does Not Preclude Leggett's Claim for Breach of NAV Representation Based on IBNR Adjustment Because Leggett Did Not Have Actual Knowledge of Breach Before Closing Date

Section 11.5(c) provides that "[Leggett] shall not be entitled to indemnification for breach [*13] of a representation or warranty under this Article 11 to the extent [Leggett] had actual knowledge of such breach prior to the date hereof." TransPro takes the position that, if § 11.5(c) is read in its entirety and applied properly to the undisputed facts, Leggett had actual knowledge of a breach of the NAV representation made by TransPro and could not base its NAV counterclaim on the known absence of IBNR accrual. For the reasons stated below, TransPro's argument is without merit, and the decision of the district court shall be affirmed in this regard.

[HN5] When considering a claim founded on a contract, "if the relevant contract language is clear and unambiguous, courts must give the language its plain meaning." *Phillips Home Builders, Inc. v. Travelers Ins. Co., 700 A.2d 127, 129 (Del. 1997)*. [5] Further, "[c]ontracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'" *O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del. 2001)* (quoting *Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177, 1183 (Del. 1992))*.

> 5   The parties to this appeal have uniformly cited Delaware law, as they did while the matter was pending before the district [*14] court. Having reviewed the relevant contract and pleadings, this Court has found no choice of law provision indicating that Delaware rather than Ohio law would apply. Nonetheless, because the parties seem to be in agreement on this issue, the Court has conducted its analysis using the law of Delaware.

While it is undisputed that during due diligence Leggett learned that the Division did not accrue IBNR medical claims on its balance sheets, there is no evidence in the record that suggests that Leggett learned or could have learned of the actual existence or the dollar value of the IBNR claims that were incurred prior to but recorded after the Closing Date. In other words, "to the extent" that Leggett knew that the Division did not accrue IBNR medical claims on its balance sheets, it "knew" only that IBNR claims might exist that would impact the NAV. It was no less possible, as far as Leggett knew, that such IBNR claims might not exist at all or might not be large

Case: 1:06-cv-01288-CAB Doc #: 55-3 Filed: 11/26/08 7 of 8. PageID #: 1483

Page 6

2008 U.S. App. LEXIS 21938, *; 2008 FED App. 0624N (6th Cir.)

enough to cause the NAV to fall below the $ 15,500,000 warranted in the Agreement. Thus, Leggett's knowledge that there might be IBNR claims is not the same as "actual knowledge" of IBNR claims sufficient to reduce the NAV below [*15] the warranted amount of $ 15,500,000 that would constitute a breach.

This reading does not render any provision of § 11.5(c), notably the phrase "to the extent," illusory or meaningless as TransPro suggests. Rather, it respects the plain meaning of the language of the Agreement where, as the district court wrote, "knowledge of a breach is required, not merely knowledge of a condition that may or may not lead to a breach." Section 11.5(c) does not bar Leggett's claim for breach of the NAV representation, and the district court did not err in this regard.

**B. Section 4.22 of Agreement Does Not Bar Leggett From Using Information Obtained After Closing Date Regarding Pre-Closing Date Transactions When Calculating NAV**

Nor did the district court err in determining that § 4.22 does not preclude Leggett from including the IBNR accrual, calculated from information received after the Closing Date, in its valuation of the NAV even though that information was not and could not have been contained in the books and records of the Division on the Closing Date.

Again, if the relevant language in the Agreement "is clear and unambiguous, courts must give the language its plain meaning." *Phillips Home Builders, 700 A.2d at 129*; [*16] *Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991)* (holding that a court may not consider parol evidence to interpret contract which is clear and unambiguous on its face). [HN6] The fact that parties offer different interpretations of contractual language is insufficient, by itself, to make the language ambiguous, and for good reason:

> When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented. By such judicial action, the reliability of written contracts is undermined, thus diminishing the wealth-creating potential of voluntary agreements.

*Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1030 (Del. Ch. 2006)* (citing *Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006)*; and *Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048 (2d Cir. 1982)*). Ambiguity exists only where the "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chem. Co. v. Amer. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992)*.

Before [*17] the district court, as here, Leggett and TransPro both offered reasonable interpretations of this provision, which reads, "Book value will be determined from Seller and VMS' books and records as of the opening of business on the Closing Date . . . as applied by Seller and VMS prior to Closing." Leggett argues that the "as of" language in § 4.22 establishes the point in time for which the NAV is calculated but does not limit the availability date for the information used to calculate that value. Thus, Leggett contends that § 4.22 unambiguously permits Leggett to use information representing assets and/or liabilities incurred by the Division prior to Closing when calculating the NAV, even if that information was obtained after the Closing Date. Leggett's theory allows for events that occur before the Closing Date and which affect the book value of the assets and liabilities "as of" the Closing Date even if that information is not obtained or recorded until after the Closing Date. By contrast, TransPro argues that "as of" "relates only to when the NAV calculation is performed -- not what is included in that calculation" and that only information available on the Closing Date may be used [*18] in the NAV calculation. These opposing theories present a classic instance of ambiguity.

Further, there is no merit to TransPro's assertion that the district court erroneously admitted and considered extrinsic evidence -- in the form of Lane's affidavit -- to manufacture ambiguity in § 4.22. In fact, the district court first determined that the contract was, as a matter of law, ambiguous, i.e., susceptible to two reasonable interpretations as presented by the parties. Only after did the district court examine extrinsic evidence in the form of Lane's affidavit, Leggett's expert witness, and the testimony of Flynn and Coyne, an officer and former officer of TransPro, respectively.

The record demonstrates that the district court performed its duty "to examine solely the language of the contractual provisions in question to determine whether the disputed terms are capable of two or more reasonable interpretations," "confin[ing itself] to the language of the document and not [looking] to extrinsic evidence to find ambiguity." *O'Brien, 785 A.2d at 289*. The testamentary evidence offered from Lane, Flynn, and Coyne was only considered after the district court's determination that the words "as [*19] of" were ambiguous and was not used to manufacture an ambiguity, as TransPro suggests. This was not error by the district court. *See Allied Capital Corp., 910 A.2d at 1030* ([HN7] "Only where the con-

Case: 1:06-cv-01288-CAB Doc #: 55-3 Filed: 11/26/08 8 of 8. PageID #: 1484

Page 7

2008 U.S. App. LEXIS 21938, *; 2008 FED App. 0624N (6th Cir.)

tract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.").

TransPro's argument that the district court should not have considered Lane's affidavits because they had "absolutely no relevance to the proper interpretation of § 4.22" is also meritless. Through his first affidavit, Lane testified regarding the use of estimates known to be inaccurate under GAAP, a term used in § 4.22 and a term of art, and spoke specifically to the propriety of McCoy's adjustments to the NAV for the IBNR medical claims using GAAP. In his second affidavit, Lane set forth that, in the accounting industry and under GAAP, "as of" is a term of art and that balance sheets are routinely prepared "as of" a closing date using information acquired and learned after that date. Thus, Lane's affidavits have "a tendency to make the existence of any fact that is of consequence [*20] to the determination of the action more probable or less probable than it would be without the evidence," and they were properly admitted. *Fed. R. Evid. 401* and *402*; *see also Nucor Corp. v. Neb. Public Power Dist., 891 F.2d 1343, 1350 (8th Cir. 1990)* (holding that [HN8] experts are permitted to testify as to terms of art contained in contracts); *Kona Tech. Corp. v. S. Pac. Transp. Co., 225 F.3d 595, 611 (5th Cir. 2000)* (finding expert testimony properly admitted to interpret contract provisions having a specialized meaning in the railroad industry); *see also North Am. Specialty Ins. Co. v. Myers, 111 F.3d 1273, 1281 (6th Cir. 1997)* (quoting *TCP Indus., Inc., v. Uniroyal, Inc., 661 F.2d 542, 549 (6th Cir. 1981))* ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible."); *WH Smith Hotel Servs., Inc. v. Wendy's Int'l Inc., 25 F.3d 422, 429 (7th Cir. 1994)* (finding no error in admitting expert testimony regarding customary and usual meaning of rent provisions in the commercial real estate industry).

Finally, the record contains no evidence rebutting Lane's opinion testimony or countering Flynn and Coyne's [*21] testimony regarding TransPro's own post-Closing Date preparation of balance sheets using data available after a closing date but related to the value of assets or liabilities "as of" a closing date. [HN9] A court may interpret an ambiguous contract as a matter of law where the moving party's record is not rebutted. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232-33 (Del. 1997)*. Further, a court may rely on extrinsic evidence to interpret the contract as a matter of law where the extrinsic evidence does not create an issue of material fact. *Id.; Royal Ins. Co v. Orient Overseas Container Line, Ltd., 514 F.3d 621, 634-35 (6th Cir. 2008)*. It follows that the district court properly construed and interpreted the contract.

In the absence of error, the decision of the district court is **AFFIRMED.**