# EXHIBIT K

## to

### PLAINTIFF'S MOTION TO STRIKE OR FOR LEAVE TO FILE SURREPLY

**Cenveo, Inc. v. Tant**

**No. 06-1023, 2008 U.S. Dist. LEXIS 25767 (M.D. Tenn. March 28, 2008)**

LEXSEE


Cited
As of: Dec 11, 2008

**CENVEO, INC., Plaintiff, v. LAWRENCE C. TANT, DONNA L. TANT, and INTERNATIONAL CASSETTE CORPORATION, d/b/a "ICC" and as "International Cassette" and its successors, Defendants.**

**No. 3:06-1023**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION**

**2008 U.S. Dist. LEXIS 25767**

**March 28, 2008, Filed**

**COUNSEL:** [*1] For Cenveo, Inc., Plaintiff: Richard S. Busch, LEAD ATTORNEY, King & Ballow, Nashville, TN.

For Cenveo Corporation, Cenveo, Inc., Plaintiff: Douglas Ray Pierce, King & Ballow, Nashville, TN.

For Lawrence C. Tant, Donna L. Tant, Defendants: John R. Jacobson, LEAD ATTORNEY, Salvador M. Hernandez, W. Russell Taber, III, Riley, Warnock & Jacobson, PLC, Nashville, TN.

**JUDGES:** ROBERT L. ECHOLS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ROBERT L. ECHOLS

**OPINION**

**MEMORANDUM**

Three motions are presented to the Court for ruling: "Defendants Lawrence C. Tant And Donna L. Tant's Motion For Summary Judgment" (Docket Entry No. 65), "Cenveo's Motion For Partial Summary Judgment" (Docket Entry No. 62), and "Defendants' Motion To Strike Or, In The Alternative, For Leave To File A Sur-Reply To Plaintiff's Reply To The Tants' Response To Cenveo's Motion For Partial Summary Judgment" (Docket Entry No. 94). The parties responded in opposition to these motions.

Plaintiff Cenveo, Inc. ("Cenveo") filed a Complaint against Defendants Lawrence C. Tant and Donna L. Tant ("the Tants") and their company, International Cassette Corporation ("ICC") on October 24, 2006. (Docket Entry No. 1.) Cenveo amended the Complaint the next day, on October 25, [*2] 2006. (Docket Entry No. 4.) Defendant ICC filed for bankruptcy protection in the Bankruptcy Court for the Northern District of Texas on February 15, 2007. In compliance with the bankruptcy automatic stay, the Court stayed all proceedings against ICC in this lawsuit, (Docket Entry No. 36, Order), and the pending summary judgment motions involve only Cenveo's claims against the Tants.

Cenveo alleged in the Amended Complaint that it is a publishing business incorporated in the State of Delaware with its principal place of business in Stamford, Connecticut. Cenveo further alleged that ICC, in its current form, was incorporated in September 1993 under the laws of the State of Texas, and ICC maintains a principal place of business in Greenville, Texas. Cenveo further alleged that Mr. Tant served as a director,

Page 1

president, and agent of ICC at all times from 1993 to the present, and Mrs. Tant served as a director and secretary of ICC from 2005 to the present. Cenveo alleged that the Tants reside in Nashville, Tennessee, and Mr. Tant operates from his office here.

According to the Amended Complaint, ICC was primarily engaged in the business of manufacturing audiotapes, videotapes and CDs, but [*3] in late 2004 ICC became involved in the business of contracting with publishers for the publication of books, which ICC then sold to distributors for further sale to retailers. Cenveo alleged that it published Bibles and devotional books for ICC in 2005, but that ICC failed to pay all amounts due to Cenveo for printing the books, and ICC owes Cenveo at least $ 457,538.71 plus interest, attorney's fees and costs. Cenveo's Amended Complaint alleged that Mr. Tant, while acting on behalf of ICC on or about March 31, 2005, entered into a written contract in Tennessee with Cenveo for the publication of Bibles, and that the parties subsequently modified the written contract for the publication of additional Bibles and devotional books. Cenveo alleged that Mr. Tant, acting from his office in Tennessee, made certain misrepresentations during ICC's business relationship with Cenveo, and that Cenveo reasonably relied upon Mr. Tant's misrepresentations. Cenveo alleged that Mr. Tant's conduct on behalf of ICC in Tennessee made this District a proper venue for this lawsuit brought under the Court's diversity jurisdiction.

Cenveo alleged the following causes of action against ICC breach of contract [*4] (Count One); breach of the duty of good faith and fair dealing (Count Two); fraud (Count Three); unjust enrichment (Count Four); promissory estoppel (Count Five); and violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-109 (Count Six). Against Mr. Tant, Cenveo alleged the following claims: fraud (Count One); unjust enrichment (Count Two); promissory estoppel (Count Three); violation of the TCPA (Count Four); and violation of Texas Tax Code §§ 171.252(2) and 255 (2006) (Count Five). Against Mrs. Tant, Cenveo alleged two claims: unjust enrichment (Count One) and violation of Texas Tax Code §§ 171.252(2) and 255 (2006) (Count Two). [1] In relation to the Texas Tax Code claims against the Tants, Cenveo alleged that ICC's corporate privileges were revoked in 2005 for failure to pay the corporate franchise tax, and under Texas statutes the Tants may be held personally liable to Cenveo for debts ICC created or incurred thereafter. [2]

1   Cenveo asks the Court to dismiss its claims against the Tants for unjust enrichment and promissory estoppel. (Docket Entry No. 81, Cenveo's Response To Defendant's Motion For Summary Judgment at 2 n.1.) In accordance with Cenveo's [*5] request, those claims will be dismissed with prejudice.

2   The claims seeking to hold the Tants personally liable for the debts of ICC are all the more important to Cenveo in light of ICC's bankruptcy filing.

On January 8, 2008, just two days before the deadline for filing dispositive motions on January 10, 2008, (Docket Entry No. 50, Order), Cenveo moved to amend the Complaint to revise part of its theory of recovery against the Tants. (Docket Entry No. 60.) In a transparent effort to bolster its claims that the Tants should be held personally liable for ICC's debts to Cenveo under Texas Tax Code §§ 171.252(2) and 255, Cenveo sought to remove from its Amended Complaint all allegations that ICC and the Tants acted in Tennessee and to allege instead that the parties' contracts were formed in Texas.

On January 10, 2008, Cenveo filed its motion for partial summary judgment on the Texas Tax Code claims against the Tants, and the Tants filed a motion for summary judgment on all of Cenveo's claims against them. With respect to the tax claims, the Tants' motion for summary judgment addresses Cenveo's original theory that ICC acted in Tennessee, and also addresses Cenveo's revised theory that ICC [*6] acted in Texas. Cenveo advocated throughout as if the Court would grant its request to amend the Amended Complaint. On February 20, 2008, however, the Magistrate Judge denied Cenveo's motion to amend. (Docket Entry No. 96.) In light of the Magistrate Judge's ruling, Cenveo's briefing sails like a ship without a rudder. With this background in mind, the Court turns to the parties' statements of disputed and undisputed facts.

### I. FACTS

The corporate entity of Cenveo is considered to be one of the largest printers in the United States. Cenveo's Internet website at http://www.cenveo.com/company states that "Cenveo, Inc. is the third largest graphics communication company in North America." Cenveo's client base includes large companies that place orders in the hundreds of thousands of dollars. ICC was a small

company with fewer than two dozen employees. At all relevant times, Mr. Tant was ICC's president and sole shareholder, and Mrs. Tant was ICC's secretary. The Tants lived in Nashville, Tennessee, and Mr. Tant worked primarily out of his office in Nashville, even when conducting business on behalf of ICC. (Docket Entry No. 68, Tant Decl. P 2.) Mr. Tant, on behalf of ICC, entered the book [*7] publishing business in late 2004 or early 2005.

There is no agreement between the parties as to whether Cenveo and Mr. Tant, on behalf of ICC, executed a written contract for the publication of Bibles. Although Cenveo alleged in its Amended Complaint that a written contract was executed in Tennessee, Cenveo now attempts to repudiate that position to strengthen the new argument that ICC's debt was created in Texas. The Tants assert the parties executed a contract in Tennessee because it behooves them to take such a position in light of Cenveo's claim that the Tants should be held personally liable for ICC debt that was created in Texas. Thus, the parties argue positions that are mirror images of those they initially took in the case, and this results in a complicated evidentiary record for the Court.

In support of their motion for summary judgment, the Tants state as undisputed fact that, "ICC and Cenveo executed a contract for the publication of 100,000 Bibles on March 31, 2005, referred to by Cenveo as "the Written Contract. (Doe. No. 4 P 86; Bird Depo. Exh. 3; Bird Depo. at 43:2-45:7.)" 3 (Docket Entry No. 67, Tants' Statement of Material Undisputed Facts P 8.) Although Cenveo now [*8] denies this fact in opposing the Tants' motion for summary judgment, (Docket Entry No. 83, Cenveo's Response P 8), Cenveo's Amended Complaint (Docket Entry No. 4 at 14) alleged as follows:

> 86. On or about March 31, 2005, a proposed written contract ("The Written Contract") between Cenveo and Defendant ICC for publication of 100,000 Bibles at a price of $ 2.7504 per Bible was presented to Defendant ICC, through Defendant Mr. Tant acting on its behalf, and Defendant Mr. Tant subsequently signed The Written Contract on behalf of Defendant ICC.

Cenveo also now denies that "[i]n its Amended Complaint, Cenveo alleges that 'the contracts which are subject to the claims were entered in this District [the Middle District of Tennessee]. (Doc. No. 4 at P 50.).'" Rather, Cenveo states:

> Cenveo admits that its Amended Complaint mistakenly made this statement, however, Cenveo filed a Motion to Amend its complaint on January 8, 2008 (Doc. No. 60) which explains that Cenveo subsequently learned that no written contracts were signed by the parties, and therefore the contracts that were subject to this claim were entered in Texas when ICC ultimately accepted Cenveo's offer by sending Cenveo a written purchase [*9] order from its Texas headquarters.

(Docket Entry No. 83 P 10, Response.)

> 3 Bird Deposition Exhibit 3 is Cenveo "Estimate: 28589-3" that Cenveo claimed both parties signed, forming the "Written Contract." Bird testified that he could tell by looking at this document that Cenveo's sales representative, Bill Brown, had prepared at least two prior drafts because the "-3" after the estimate number 28589 indicated this document was the third draft in a sequence. (Docket Entry No. 69-10, Bird Depo. at 45.)

However, Cenveo's Rule 30(b)(6) representative, David Bird, testified in accordance with Cenveo's Amended Complaint at his December 27, 2007 deposition:

> Q. Let's turn to Paragraph 86 of the Amended Complaint. Where is the contract?
>
> * * *
>
> A We can't locate the signed version of the contract at this time. We have an unsigned version, but we had every belief that the signed version exists.
>
> Q What is the basis for that belief?
>
> A Both the sales rep and the sales manager asserted that a signed copy of the contract did exist that they procured Mr. Tant's signature for. You're referring to

this initial contract?

Q The one referenced in Paragraph 86.

A Right.

Q Did Mr. Brown or the other gentleman you referred [*10] to, Mr. Bracken [Cenveo's sales manager], tell you what happened to the contract?

A They didn't know. They believe it was sent to Toledo.

Q As a general matter, would Cenveo Toledo . . . have retained these types of contracts?

A Yes.

(Docket Entry No. 69-3, Bird Depo. at 43-44.) Although "Cenveo admits that Mr. Bird made this statement in his deposition[,]" Cenveo now denies that Mr. Bird's testimony "constitutes admissible evidence that a written contract existed between Cenveo and ICC. Mr. Bird was not present when any alleged contract was entered into and signed." (Docket Entry No. 83 P 9, Cenveo's Response.) During his deposition, Mr. Bird testified, when asked where the discussions concerning ICC and Cenveo's business relationship occurred: "'I wasn't there for those. It was my assumption that they all occurred at ICC's place of business in Texas.' (Bird Depo. at 13:25-14:2.)" Cenveo admits only that Mr. Bird made this statement. (Id. P 14, Cenveo's Response.) Mr. Bird testified that Cenveo believed there would be modifications to the written contract when it was executed and that the written contract and subsequent purchase orders shared many of the same, terms, including payment [*11] terms. (Docket Entry No. 67 PP 16-17 citing Bird Depo. at 51-52, 58-59.) Yet, Cenveo now denies the first statement to the extent it implies there was a signed written contract between Cenveo and ICC (Docket Entry No. 83 P 16 Response), and Cenveo denies the second statement to the extent it implies the purchase orders shared similar terms other than payment and overage charge terms. (Id. at P 17 Response.)

Cenveo admits that its sales representative, Bill Brown, "was based out of the Williamson/Davidson County area in Tennessee to negotiate the contract with ICC." (Docket Entry No. 83 112 Response.) But Cenveo denies that Mr. Tant, who lived and worked predominantly in Nashville, negotiated and executed the contract on behalf of ICC while in Nashville. (Id. P 13 Response.)

Cenveo is not alone in disputing whether a written contract existed that was executed in Tennessee between Mr. Tant and Mr. Brown. Mr. Tant filed two declarations in support of his own motion for summary judgment. First, he attested that he and Mr. Brown "negotiated and executed a contract dated March 31, 2005 between ICC and Cenveo while we were both physically located in Tennessee. I expected that there would be [*12] some later modifications to the contract but that the March 31, 2005 contract would generally govern ICC's business relationship with Cenveo." (Tant Decl. P 4.) In accordance with this testimony, the Tants submitted a statement of undisputed facts citing paragraph 4 of Mr. Tant's declaration as support for the proposition that "The Written Contract was negotiated and executed in middle Tennessee." (Docket Entry No. 67 P 11.) This prompted Cenveo to deny the fact, noting that "Mr. Tant's declaration does not state there was a 'written contract.'" (Docket Entry No..83 P 11.) Cenveo's denial caused Mr. Tant to file a second declaration, in which he stated:

2. On January 10, 2007, I submitted a Declaration in this case in which I stated that I executed a contract dated March 31, 2005 between International Cassette Corporation ("ICC") and Cenveo Corporation ("Cenveo"). I am submitting this Second Declaration to clarify that, while I remember ICC and Cenveo reached an agreement in March 2005 as to the printing of Bibles, I do not remember signing document no. 28589-3 dated March 31, 2005.

(Docket Entry No. 75, Tant Second Decl. P 2.) [4]

4 Thus, Cenveo began this litigation alleging that it entered [*13] into a written contract with Mr. Tant through Bill Brown on March 31, 2005 in Tennessee, but Cenveo now disavows that position in favor of constructing a claim that ICC's issuance of purchase orders from Texas accepted Cenveo's quotations and thereby formed multiple contracts between the parties in Texas.

Such facts are designed to strengthen Cenveo's claims against the Tants under the Texas Tax Code, to be discussed below.

In any event, the record evidence shows that Cenveo sent a number of written quotations or estimates to ICC concerning publication of various types of Bibles, women's devotionals, and Christmas devotionals, not all of which Cenveo ultimately published for ICC. (Docket Entry No. 69-5, Ex. 12; Docket Entry No. 82-1 at 3-10.) The parties do not appear to dispute that ICC sent four purchase orders to Cenveo (Docket Entry No. 69-4 at 18-23):

(1) Purchase Order Number 42484 dated June 3, 2005, revised June 8, 2005, for 5,000 King James Version ("KJV") Bibles (burgundy cover) and 5,000 KJV Bibles (black cover) at a unit cost of $ 3.99 per Bible (extended cost of $ 19,950 for each 5,000 quantity). This order is referred to as the "rush order."

(2) Purchase Order Number 42485 [*14] dated June 6, 2005 and revised on June 8, 2005, for 110,000 KJV Large Print Bibles at a unit cost of $ 2.73 per Bible (extended cost of $ 300,300).

(3) Purchase Order 42698 dated August 31, 2005 for six different women's devotional books, two in quantities of 12,500 at a per unit cost of $ 2.12 per devotional (extended cost $ 26,500 each) and four in quantities of 10,000 at a per unit cost of $ 2.12 per devotional (extended cost $ 21,200 each).

(4) Purchase Order 42779 dated October 20, 2005 for 5,064 Christmas to Remember 5 Packs at a per unit cost of $ 3.45 (extended cost of $ 17,470.80) and expedited paper delivery charge of $ 550 for a total of $ 18,020.80.

Mr. Tant testified that he gave instructions from Nashville to his accounting manager in Texas, Patricia Melton, as to the content of these purchase orders and Ms. Melton then printed the purchase orders in Texas in accordance with his instructions and mailed or faxed them to Cenveo in Toledo. Mr. Tant further testified that some, if not all, of the purchase orders were sent to his Nashville office for his review and that he specifically recalled revising the fourth purchase order, No. 42779, at his office in Nashville and faxing [*15] it from Tennessee to Cenveo in Ohio. (Tant Depo. at 63-64.) But Mr. Tant denied that any ICC records were kept at his Nashville office. (Id. at 66.)

Cenveo asserts that each ICC purchase order issued from Texas formed a contract between the parties in Texas because the purchase order accepted a previous offer for the publication of books made by Cenveo through a quotation. Mr. Bird testified that, before Cenveo issued any quotations or estimates, Mr. Tant or someone else at ICC would have provided Cenveo with a request for a quotation and specifications such as size and quantity to allow Cenveo to quote a price. (Bird Depo. at 28-29.) Yet, Cenveo does not point to which of its many quotations or estimates it claims constitute the Cenveo "offers" which were "accepted" by ICC purchase orders. Each of the quotes or estimates listed specific details including the quantity of books, the price per book, the type of book, the size of the book, the weight of the cover, the material of the cover, the type of paper, the weight of paper, the type of binding, and the type of wrapping and packaging. However, certain pertinent terms on Cenveo's quotations or estimates, such as price, quantity or [*16] one or more other terms, do not match terms listed on ICC's purchase orders. Several of the quotations stated that they were valid for no longer than 30 calendar days from issue. The quotation or estimate sheets did not provide terms of payment, shipping or performance. Mr. Bird filed a declaration after his deposition stating that "[a]ll contracts entered into between Cenveo and ICC had payment terms of net 30 days and 10% overage charge allowances. The contracts at issue in this case otherwise shared no common terms." (Docket Entry No. 85, Bird Decl. P 3.)

Bird also attested in his post-deposition declaration that Cenveo has a policy which requires a purchaser, prior to the start of printing on any project, to send Cenveo a purchase order. (Docket Entry No. 85, Bird Decl. P 4.) Mr. Bird admits, however, that Cenveo printed ICC's initial rush order for 10,000 Bibles before receiving ICC's June 3, 2005 purchase order. He explains Cenveo's policy was not followed because ICC's rush order constituted an unusual circumstance. [5] (Id.)

5 The Court notes that Mr. Bird testified that the

Page 5

written contract, (Bird Depo. Ex. 3), which Cenveo now disavows as the controlling contract, would have taken [*17] effect once ICC provided certain information to Cenveo. According to Bird,

> It was based entirely upon the client's requested schedule and once the client requested, you know, a ship date or ship dates, that would have to be validated that we would be able to produce in a manner to be able to meet at least the start of those dates. And once that was agreed upon, then a formal order would have been -- a formal production order would have been initiated.

(Bird Depo. at 48.) Bird further testified: "The obligation to make payment was made once printing would be --the general obligation for payment would have been, you know, deemed made once production was initiated on the job." (Id. at 50.)

This testimony suggests that ICC's purchase orders were "offers" which would have been "accepted" by Cenveo's formal production orders and that ICC's obligation to pay on the contracts would have materialized when production began.

Moreover, Mr. Bird stated, consistent with his earlier testimony that the parties entered into a written contract on March 31, 2005, that "each of these [purchase orders], these were subsequent orders for different published units based on ICC's specifications that these quantities [*18] tied with their order and their delivery instructions." (Id. at 57.)

When Cenveo initially considered doing business with ICC, Cenveo asked Mr. Tant to fill out a credit application and ICC complied. (Bird Depo., Ex. 4.) ICC was not a publicly-traded company. Cenveo contacted or tried to contact the bank, Bank One, and the trade references ICC listed on the application. Cenveo also ran a Dun & Bradstreet ("D&B") report on ICC, which placed ICC in credit score class 5, the worst rating possible. (Bird Depo. Ex. 6.) The report indicated a high risk of severe payment delinquency and a moderate risk of severe financial stress over the next twelve (12) months. The report showed that ICC's payments to suppliers averaged twenty-four (24) days beyond terms. (Id.)

Cenveo considered the size of ICC's requested publishing transaction to be significant for ICC, and determined that granting credit to ICC in the amount requested would not be without risk. Based on the D&B, Cenveo felt that ICC's credit was inadequate in and of itself and denied credit to ICC. (Bird Depo. at 70-74.)

Cenveo asked Mr. Tant for financial statements and a personal guarantee, but he did not provide those. [6] (Bird Depo. at [*19] 67, 70.) Mr. Tant indicated he had other companies that were in good credit standing and he provided Cenveo with information about CT Distributing. Cenveo ordered a D&B report on CT Distributing. (Bird Depo. Ex. 7.) That report assigned CT Distributing the best possible credit score and financial stress classes, 1 out of 5. After reviewing this report, Cenveo concluded that CT Distributing would be more worthy of granting credit at a safer history. (Bird Depo. at 78.) Cenveo did not ask for a guarantee from CT Distributing. Cenveo also ordered a D&B Credit Limit Recommendation, which recommended extending credit to CT Distributing in the amount of $ 20,000 (Conservative Credit Limit) or $ 35,000 (Aggressive Credit Limit). Cenveo granted ICC $ 99,999 in credit on the initial order in April of 2005, based on the D&B report about CT Distributing, Mr. Tant's assurances that he owned and controlled both ICC and CT Distributing, and Mr. Tant's representation to Cenveo that ICC was ultimately selling books to Wal-Mart and Sam's Club, which Cenveo knew to be well-established companies known for paying their bills on time. (Bird Depo. at 67, 75-80.) Cenveo knew that ICC had been dealing with [*20] a prior publisher, Dickinson Press, but Cenveo did not contact that company to check on ICC because Cenveo does not contact competitors when trying to obtain new business. (Id. at 83.)

> 6  Mr. Bird now states in a declaration that it is customary for Cenveo to request a personal guarantee and financial statements from potential customers and not receive them. (Docket Entry No. 85, Bird Decl. P 2.)

Cenveo printed for ICC all of the books identified on ICC's four purchase orders. Cenveo sent at least some of the printed books to BindTech in Nashville for binding.

(Bird Depo. at 17.) In accordance with Mr. Tant's specific instructions as to freight companies, destinations, and delivery dates, Cenveo arranged for transportation of particular quantities of the books to ICC's distributors, Anderson Merchandising and Levy Entertainment, and remaining quantities were held in storage until Mr. Tant gave instructions for the books' shipment. (Id. at 50.) Cenveo agreed that ICC would be billed once shipments were made to the distributors, as opposed to being required to pay for the entire order at the time production was finished, which would be the normal term of business. (Id.)

Cenveo sent invoices [*21] to ICC's office in Texas seeking payment. (Docket Entry No. 69-4, Ex. 8.) Mr. Tant does not dispute the accuracy of Cenveo's invoices. (Tant Depo. at 71.) By late August 2005, ICC had not paid fifteen Cenveo invoices in the total amount of approximately $ 99,781.92. Cenveo revoked ICC's credit privileges and stated that Cenveo would not produce or ship books without ICC first becoming current or attempting to make itself current.

ICC sent Cenveo only three checks toward payment of its account with Cenveo $ 12,000 on August 30, 2005; $ 29,935.05 on September 27, 2005; and $ 18,000 on October 25, 2005, for a total payment of $ 59,935.05. (Docket Entry No. 69-5, Ex. 10; Tant Depo. at 74-78.). Mr. Tant represented that more payments would be forthcoming (Bird Depo. at 66), but ICC did not make any other payments.

Upon receiving ICC's August and September payments, Cenveo released ICC from credit hold and printed the women's devotionals and the Christmas 5-Packs pursuant to ICC's third and fourth purchase orders. (Bird Depo. at 66.) Cenveo also relied on the fact that ICC planned to sell these books to different customers and indications were that those customers would pay promptly. (Bird [*22] Depo. at 68.) Cenveo extended hundreds of thousands of dollars of additional credit to ICC.

Mr. Tant testified that books he sold to distributors did not sell as well as he expected. The distributors failed to pay ICC for all of the books, amounting to a few hundred thousand dollars, but instead the distributors returned books to ICC for future credit and by then the books returned were damaged and no longer merchantable. Mr. Tant claims he was surprised that the distributors could return books without paying for them, but the distributors pointed out to him language in their contracts giving them the right to return books to ICC. (Docket Entry No. 69-6, Ex. 15.) Dickinson Press refused Mr. Tant's request to accept returns of books. Mr. Tant then decided he would have to increase ICC's profit margin to deal with the book returns. He asked Dickinson Press to give him a better printing price, but no agreement on a better price was reached. About the same time, Mr. Tant spoke with sales representatives of Cenveo and R.R. Donnelly about pricing and decided to use Cenveo as a printer because Cenveo could save ICC twenty-five to thirty-five cents per book and Cenveo offered more "bells and [*23] whistles." Mr. Tant alleges that he told Bill Brown, Cenveo's sales representative, about his problem with the distributors returning books and his cash flow difficulties before ICC issued any purchase orders to Cenveo. According to Mr. Tant, Brown "said not to worry about it; he would handle it all." Mr. Tant also met with Brown and Bracken, Cenveo's sales manager, and told them that ICC's distributor, Anderson, operated on payment terms of 90 days and ICC would pay Cenveo after Anderson paid ICC. Mr. Tant claims that both Brown and Bracken agreed to this payment arrangement. Yet, Mr. Tant testified that it was not until after ICC sent out the first purchase order to Cenveo that ICC first realized it might be having a problem with book returns. (Tant Depo. at 79-102.)

Mr. Brown attests that Tant told him that he was looking for a new printer for Bibles because his previous printer was not able to deliver on time and was raising prices. (Docket Entry No. 86, Brown Decl. P 4.) During initial negotiations, Tant told Brown that ICC would pay Cenveo when it received payment. Tant also agreed to Cenveo terms of net 30 days, meaning ICC would pay Cenveo within 30 days of receiving an invoice [*24] from Cenveo. (Id. P 5.) Brown denies that Tant ever told him that ICC was having trouble paying its previous printer, or that it was seriously past due on its payments to the printer. [7] Rather, Tant told Brown that ICC had every intention of paying for the Bibles it was ordering. (Id. P 6.) Negotiations to print devotionals began after Cenveo was printing Bibles for ICC. (Id. P 7.) When ICC became delinquent in payments to Cenveo, Brown asked Tant when he intended to make payments and Tant repeatedly assured Brown that he would pay Cenveo. Tant also made excuses on more than one occasion why payments were not forthcoming. (Id. P 8.) [8]

7   At the time Cenveo printed ICC's first order of Bibles, ICC was behind on its payments to Dickinson Press in the approximate amount of $ 140,000.

8   Brown also attests that "Tant convinced Cenveo to enter into two more contracts with ICC by repeatedly promising that payment would be forthcoming, after almost bringing his account current in or around September 2005." (Id. P 8.) In its response to the Tants' summary judgment motion, Cenveo goes to great length to explain that ICC was not significantly past due in its payments to Cenveo in the fall of 2005 [*25] when Cenveo agreed to print women's and Christmas devotionals for ICC. (Docket Entry No. 81, Cenveo Response at 15 & n.11.)

Mr. Tant denies that he told Brown that Dickinson Press was not able to meet ICC's needs. Rather, he claims he told Brown only that he was looking for a better price than what ICC could get at Dickinson Press. Mr. Tant admits that ICC was behind in paying Dickinson Press at the time ICC sent its first purchase order to Cenveo. (Tant Depo. at 102, 105-106.)

Cenveo issued a statement dated January 18, 2006 showing that ICC owes Cenveo a total of $ 457,538.44. (Docket Entry No. 69-5, Ex. 9.) Mr. Tant does not dispute the accuracy of Cenveo's statement. (Tant Depo. at 73.) Mr. Bird testified that all of the purchase orders and checks Cenveo received from ICC were sent from Texas and that all initial contacts Cenveo representatives had with ICC concerning billing and collections were at ICC's Texas location. (Bird Depo. at 15.) All of the books were shipped to ICC or its distributors except for a small quantity that Cenveo discovered BindTech still possessed, and Cenveo ordered those destroyed to avoid storage costs. (Bird Depo. at 61-62, 92-93.) According to Mr. Bird, [*26] the Bibles printed for ICC would be harder to sell because they had ICC's name and logo printed on them. (Id. at 94.) One of ICC's distributors, Anderson Merchandising, was not interested in maintaining the books in stock, and Cenveo's attempts to sell the books to other distributors and retailers failed. (Id. at 95, 97.)

Cenveo claims that Mr. Tant made a number of misrepresentations to Cenveo representatives at the beginning and during ICC's business relationship with Cenveo upon which Cenveo relied in conducting business with Mr. Tant and ICC. [9] Mr. Bird testified that Mr. Tant told Bill Brown and Matt Bracken of Cenveo at the outset that ICC's prior printer, Dickinson Press, was unable to respond to the demand and size of work that Mr. Tant or ICC was going to be involved in and for this reason ICC needed to find a new printer. (Bird Depo. at 30.) Cenveo did not try to confirm this information with Dickinson Press because Cenveo does not contact competitors when trying to obtain new business. (Id. at 31.) In early 2006, after ICC had incurred substantial debt with Cenveo, Bird learned during a telephone call from the financial officer at Dickinson Press, Bill Krombeen, that Mr. [*27] Tant's representation to Cenveo was incorrect and that Dickinson Press had, in fact, refused ongoing business with ICC because of ICC's failure to pay what it owed in 2004 and 2005. (Id. at 32-34; Docket Entry No. 69-5, Ex. 14; Docket Entry No. 84, Krombeen Decl. P 8.) Dickinson Press wanted Cenveo to join it in pursuing legal action against ICC for nonpayment. (Id. at 34.) Mr. Bird testified that, had Mr. Tant truthfully informed Cenveo that he was no longer working with Dickinson Press because of nonpayment, Cenveo would not have done business with ICC. (Id. at 35.) Mr. Tant testified that Cenveo never asked him about his payment status with Dickinson Press. (Tant Depo. at 176.)

9   In certain paragraphs of the Amended Complaint, Cenveo alleges "on information and belief that Mr. Tant made misrepresentations. (Amended Complaint PP 63-65, 80.)

Cenveo claims that Mr. Tant made other misrepresentations as well, such as that he intended to make payments to Cenveo that did not materialize. Cenveo further alleges that Mr. Tant misrepresented his relationship with a bank. Mr. Tant told Cenveo he had an open credit line when in fact Cenveo learned in late 2005 or early 2006 that Mr. Tant had [*28] a factoring relationship with First Capital Corporation; i.e., Mr. Tant sold some of ICC's receivables, including all of ICC's invoices to its distributors, Anderson and Levy, to First Capital in order to receive payment before the distributors and other customers paid on ICC invoices. (Tant Depo. at 108, 110.) Mr. Tant then allegedly misrepresented to Cenveo that he could not make payments on his account with Cenveo because he was waiting for payments from distributors and customers when, in fact, Mr. Tant had received payments from First Capital and from other customers that he did not forward to Cenveo. Mr. Bird testified that, if Cenveo had known ICC was factoring its

receivables, Cenveo would have tried to make an arrangement with both the customers and the bank to be paid directly, and not through ICC. (Bird Depo. at 84-85.)

Cenveo further alleges that, when Cenveo's terms for payment were initially set with ICC for net 30 days, Mr. Tant subsequently stated that he would not be getting paid from his customers based on standard industry practices with publishing distributors which carried terms greater than net 30 days, and that he would have to wait to get paid from those distributors [*29] before ICC could pay Cenveo, all of which were false statements. (Id. at 88.) Cenveo alleges that Mr. Tant made several representations that he would obtain information, return phone calls, and provide specific details for payments, most of which he did not do. (Id. at 81-82.) Cenveo also learned from a Cenveo manager, Max Harris, "who came on board after this took place" that in his prior business relationships he also had outstanding balances due from ICC and nonpayment was a repeated pattern with ICC. (Id. at 90.) Mr. Bird states in his declaration, however, that Harris was not involved in Cenveo's contracts with ICC and Harris did not mention anything about ICC to the Cenveo representatives involved in the contracts with ICC until after Cenveo learned from Dickinson Press that ICC was seriously delinquent on its payments to Dickinson. (Bird Decl. P 5.)

There is no evidence that Mrs. Tant was involved in ICC operations on a daily basis. She visited ICC's office in Texas with Mr. Tant only two or three times to accompany him on business trips, and she waited in the lobby while he conducted business. (Docket Entry No. 69-8, Donna Tant Depo. at 6.) Mrs. Tant signed the corporate minutes [*30] when they were brought to her once a year, but she denied receiving any compensation from Mr. Tant's companies. She also was unaware that ICC had lost its corporate charter. (Id. at 6, 12-13.)

The Tants did not receive any compensation from ICC in the form of salary, dividends or otherwise during the business relationship with Cenveo. ICC may have reimbursed Mr. Tant for some minor business expenses during that time.

ICC's Articles of Incorporation were filed with the Office of the Secretary of State of Texas on September 21, 1993. (Docket Entry No. 69-4, Ex. 1.) ICC filed Texas Franchise Tax Public Information Reports in 2002, 2003 and 2004. (Docket Entry No. 69-4, Ex. 2.) ICC initially failed to file such a report for 2005. It is undisputed that ICC became delinquent in filing a report for an extension to pay its franchise tax on May 15, 2005, as required by Texas Tax Code § 171.152(c).

Patricia Melton, ICC's accounting manager, left employment with ICC in late 2005, and according to Mr. Tant, she failed to send in an extension request for the payment of franchise tax that ICC normally would have sent to Texas state officials. Mr. Tant testified that the franchise tax was very minimal [*31] and to the best of his recollection no franchise taxes were due. When visiting ICC's Texas office in early 2006, Mr. Tant found in a stack of paper on Ms. Melton's desk a letter dated February 10, 2006, from the Texas Secretary of State notifying ICC that its corporate charter had been forfeited because ICC had not revived its forfeited corporate privileges within 120 days after the date the corporate privileges were forfeited. (Docket Entry No. 69-4, Ex. 3; Tant Depo. at 35-37.) Mr. Tant testified he completed forms to resolve the problem. On November 30, 2006, Mr. Tant signed an Application For Reinstatement And Request To Set Aside Revocation Or Forfeiture directed to the Texas Office of the Secretary of State. The application stated that ICC's corporate privileges had been revoked on October 12, 2005, but Mr. Tant denied that he knew in October 2005 that ICC's corporate privileges had been revoked. He further testified that he did not have any reason to doubt that ICC's charter or certificate of authority was revoked on October 12, 2005. (Docket Entry No. 69-4, Exs. 2, 4; Tant Depo. at 37-44.). This application for reinstatement was apparently based on a letter dated November 6, [*32] 2006 from the Texas Comptroller of Public Accounts to ICC indicating that the "above referenced corporation has met all franchise tax requirements and is eligible for reinstatement through May 15, 2007." (Docket Entry No. 69-4, Ex. 5.) ICC's corporate charter was reinstated after November 30, 2006 and before ICC filed bankruptcy in February 2007.

**Defendants' Motion to Strike**

The Tants move to strike (Docket Entry No. 94) two documents Cenveo appended to its reply brief in support of its motion for partial summary judgment. The first document is an unauthenticated Cenveo quotation dated August 12, 2005 for the printing of 26,000 Sam's Club 5 packs at a price of $ 17,656.26. (Docket Entry No. 88-3.) The second document consists of material from the October 23, 2006 "Pulp & Paper Week" newsletter which Cenveo submitted to support its statement in the brief that

market prices for paper are subject to change. (Docket Entry No. 88-4.) If the Court does not strike these documents, the Tants alternatively seek leave to file a sur-reply to address this new evidence. In response, Cenveo states that these documents "are not essential to Cenveo's case," but in any event the quotation was provided [*33] to respond to the Tants' assertion that Cenveo did not identify which Cenveo quotes ICC's purchase orders accepted. Further, Cenveo contends that the Tants were in a better position to locate and authenticate the quotation. Cenveo argues that the newsletter material is not substantive evidence in the case. (Docket Entry No. 100 at 2-4.).

The Tants' motion to strike is granted. The new quotation and the newsletter material are not properly authenticated, cf. Brainard v. American Skandia Life Assur. Corp., 432 F.3d 655, 667 & n.9 (6th Cir. 2005), and the Tants have had no opportunity to respond to Cenveo's belated argument that the newly-produced quotation is one of those ICC accepted by issuing a purchase order to Cenveo from Texas. Because Cenveo concedes that these materials are not essential to its case, the Court will not consider the documents in ruling on the pending cross-motions for summary judgment.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). [*34] The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, [*35] the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## III. ANALYSIS

### A. Texas Tax Code claim

Cenveo claims that ICC's temporary forfeiture of corporate privileges imposes personal liability on the Tants for ICC's debt to Cenveo under Texas Tax Code § 171.255, which provides in pertinent part:

> (a) If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is created or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived.

The statute encourages payment of the franchise tax. Williams v. Adams, 74 S.W.3d 437, 440 (Tex. Ct. App. 2002). Because the statute is penal and remedial, the statute "should be strictly construed and must not be extended beyond the clear meaning of its language." Id. "'Strict construction of a statute' is that which refuses to expand the law by implications or equitable considerations, [*36] but confines its operation to cases which are clearly within the letter of the statute as well as within its spirit or reason, resolving all reasonable doubts against applicability of [the] statute to [a] particular case.'" Id. (quoted authority omitted). When interpreting § 171.255, a court must construe the statute in a way that favors the officers and directors of the corporation. Id.

The statute applies only to debts of the corporation "'created or incurred in [Texas] after the date on which the report, tax, or penalty is due and before the corporate privileges are revived.'" Id. (quoting § 171.255).

Page 10

According to the Texas Supreme Court:

> The words "created" and "incurred," as used in the statute, have a clear and well defined meaning. The word "create" means "To bring into existence something which did not exist." 10 Words and Phrases, Perm.Ed., p. 331; Roth v. State, 158 Ind. 242, 63 N.E. 460, 469. The word "incur" is defined in Ashe v. Youngst, 68 Tex. 123, 3 S.W. 454, 455, as "Brought on," "occasioned," or "caused." ... It thus seems obvious that the liability imposed under the statute is only for debts contracted after the forfeiture of the right to do business, and has no implication [*37] to the renewal of obligations arising prior thereto. Providence Steam-Engine Co. v. Hubbard, 101 U.S. 188, 25 L.Ed. 786; 13 Am. Jur. 1008, Sec. 1071.

Schwab v. Schlumberger Well Surveying Corp., 145 Tex. 379, 198 S.W.2d 79, 81 (Tex. 1946) (construing predecessor statute). The parties agree that a contract debt is "created" or "incurred" in the state where the offer of one contracting party is accepted by the other party. Midwest Swim & Active, LLC v. McFall, 2006 U.S. Dist. LEXIS 70464, 2006 WL 2808628 at *5 (W.D. Mo. Sept. 28, 2006) (applying Texas Tax Code § 171.255); Durant Chevrolet Co. v. Industrial Towel & Uniform Co., 624 S.W.2d 628, 631 (Tex. Ct. App. 1981).

The Tants admit that ICC became delinquent in filing a report for an extension to pay its franchise tax on May 15, 2005, as required by Texas Tax Code § 171.152(c), and ICC's corporate privileges were not reinstated until after November 30, 2006. The evidence is undisputed that ICC's debt to Cenveo was "created" or "incurred" between May 15, 2005 and November 30, 2006. The critical question is whether ICC's debt to Cenveo was "created" or "incurred" *in Texas* as required to impose personal liability upon the Tants pursuant to § 171.255.

Cenveo's operative Amended Complaint [*38] alleges that the parties executed "the Written Contract" pursuant to which ICC's debt to Cenveo was "created" or "incurred" in Tennessee, not Texas. (Docket Entry No. 4, PP 6, 21, 29, 50, 77, 86, 88, 91, 93, 97, 99, 107, 108, 109-113, 116-117, 120-121, 128, 134, 146.) Because Cenveo did not plead facts to show that ICC's debt to Cenveo was "created" or "incurred" in Texas, Cenveo fails to state a claim against the Tants to impose personal liability against them for ICC's debt under § 171.255. According to the Amended Complaint, moreover, "the Written Contract" was executed on March 31, 2005. This was *before* ICC became delinquent under the Texas Tax Code. Giving the Texas statute a strict construction in favor of the Tants as required by the applicable cases, Cenveo's claims against the Tants seeking to hold them personally liable as corporate directors for ICC's debt must fail. Therefore, Cenveo's motion for partial summary judgment will be denied, and the Tants' motion for summary judgment on this issue will be granted.

**B. Cenveo's fraud claim against Mr. Tant**

Fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's [*39] knowledge; however, the plaintiff must still set forth the factual basis for his belief that fraud occurred. U.S. ex rel. Bledsoe v. Community Health Sys., Inc., 501 F.3d 493, 512 (6th Cir. 2007). Although paragraphs 63, 65 and 80 of Cenveo's Amended Complaint alleged fraud based on "information and belief," the Court determines that Cenveo included sufficient specificity to set forth the factual basis for its belief that fraud occurred. The Court declines the Tants' invitation to dismiss the paragraphs on this ground.

Under Tennessee law, the elements of fraud or fraudulent misrepresentation are: (1) an intentional misrepresentation with regard to a material fact; (2) made knowingly and with a fraudulent intent; (3) upon which the plaintiff reasonably relied and suffered damage; and (4) which relates to an existing or past fact or, if the claim is based on promissory fraud, the misrepresentation embodied a promise of future action without the present intention to carry out the promise. First Nat'l Bank v. Brooks Farms, 821 S.W.2d 925, 927 (Tenn. 1991); Stacks v. Saunders 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990). The terms, "intentional misrepresentation," "fraudulent misrepresentation," [*40] and "fraud" are synonymous. Concrete Spaces, Inc. v. Sender, 2 S.W.3d 901, 904 n.1 (Tenn. 1999).

The summary judgment record is replete with genuine issues of material fact as to whether Mr. Tant intentionally made misrepresentations to Cenveo with regard to material facts and whether Cenveo reasonably relied on Mr. Tant's alleged misrepresentations and

Page 11

thereby suffered damage. The Court sees no reason to reiterate all of the evidence set out earlier in this opinion. Suffice it to say that the claim must be submitted to a jury for determination of fact questions. Accordingly, the Tants' motion for summary judgment on the fraud count against Mr. Tant will be denied.

**C. TCPA claim against Mr. Tant**

The Tants first argue that Cenveo's TCPA claim against Mr. Tant is barred by the one-year statute of limitations, which runs for one (1) year from a person's discovery of the unlawful act or practice. Tenn. Code Ann. § 47-18-110. In this state, a cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence it should have been discovered. Power & Tele. Supply Co. v. SunTrust Banks, Inc., 447 F.3d 923, 930 (6th Cir. 2006) [*41] (applying the TCPA).

The Tants contend that Cenveo discovered its injury of not being paid by ICC for printing books and ICG's purported "repeated pattern" of not paying its vendors no later than September 2005, when Cenveo revoked ICC's credit for failure to pay. Cenveo did not file suit until more than one year later, on October 24, 2006.

Cenveo responds that ICC's last payment was a check dated October 25, 2005 for $ 18,000. Cenveo sued on October 24, 2006. Thus, Cenveo claims it is illogical to argue that even while ICC was still paying Cenveo for the books it printed, Cenveo should have been aware that Mr. Tant and ICC would not pay for the books they ordered. Moreover, Cenveo contends it presented evidence that Max Harris did not inform Cenveo that ICC had a "repeated pattern" of failure to pay until after Cenveo learned from Dickinson Press in 2006 that ICC was seriously delinquent on its payments to Dickinson.

The Court concludes that the TCPA claim is not barred by the statute of limitations. Mr. Bird testified that he did not realize the enormity of ICC's payment problem until early 2006, when he received a call from Bill Krombeen of Dickinson Press revealing ICC's outstanding [*42] debt with that company. As Cenveo argues, ICC sent a check to Cenveo on October 25, 2006, even though Cenveo did not realize at the time that it was ICC's last payment check. ICC sued one year later, on October 24, 2006. Under these facts, the Court concludes that the statute of limitations had not run on Cenveo's claim.

Whether Cenveo's injury was reasonably avoidable under the TCPA, as the Tants argue under Tucker v. Sierra Builders, 180 S.W.3d 109, 117 (Tenn. Ct. App. 2005), whether Mr. Tant's purported misrepresentations caused Cenveo injury under the TCPA, and whether Mr. Tant engaged in unfair or deceptive acts or practices or a deliberate scheme and plan to defraud under the TCPA are classic jury questions. Cenveo has presented sufficient evidence to generate genuine issues of material fact for trial on these issues. Therefore, the Tants' motion for summary judgment on the TCPA claim against Mr. Tant will be denied.

**IV. CONCLUSION**

To summarize, Cenveo voluntarily dismisses its claims for unjust enrichment and promissory estoppel against the Tants. Cenveo fails to state a claim against the Tants under Texas Tax Code § 171.255; therefore, Cenveo's motion for partial summary judgment [*43] on this issue will be denied and the Tants' motion for summary judgment on this issue will be granted. Genuine issues of material fact remain for trial on Cenveo's fraud and TCPA claims against Mr. Tant. Thus, the Court will deny the Tants' summary judgment motion on these two claims against Mr. Tant. There are no viable claims remaining against Mrs. Tant and she will be dismissed from the suit.

An appropriate Order shall be entered.

/s/ Robert L. Echols

ROBERT L. ECHOLS

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons explained in the Memorandum entered contemporaneously herewith, the Court rules as follows:

(1) On Cenveo's request, the Court hereby DISMISSES WITH PREJUDICE Cenveo's claims of unjust enrichment and promissory estoppel brought against Lawrence C. Tant and Donna L. Tant.

(2) Defendants Lawrence C. Tant And Donna L. Tant's Motion For Summary Judgment (Docket Entry No.

65) is hereby GRANTED IN PART and DENIED IN PART. The Motion is GRANTED as to Cenveo's claim brought against the Tants under Texas Tax Code § 171.255, which is hereby DISMISSED WITH PREJUDICE. The Motion is DENIED as to Cenveo's claims brought against Mr. Tant for common law fraud and unfair and deceptive acts [*44] under the Tennessee Consumer Protection Act. Cenveo may proceed to trial on these two claims against Mr. Tant. Because no claims remain against Mrs. Tant, the Court hereby DISMISSES Mrs. Tant from this lawsuit.

(3) Cenveo's Motion For Partial Summary Judgment (Docket Entry No. 62) is hereby DENIED.

(4) Defendants' Motion To Strike Or, In The Alternative, For Leave To File A Sur-Reply To Plaintiff's Reply To The Tants' Response To Cenveo's Motion For Partial Summary Judgment (Docket Entry No. 94) is hereby GRANTED. The Court hereby STRIKES the two documents Cenveo attached to its Reply in support of its Motion for Partial Summary Judgment. (Docket Entry Nos. 88-3 & 88-4.)

(5) This case will proceed to Final Pretrial Conference on **Monday, March 31, 2008, at 2:30 p.m.,** as previously scheduled. (Docket Entry No. 43, Order.)

IT IS SO ORDERED.

/s/ Robert L. Echols

ROBERT L. ECHOLS

UNITED STATES DISTRICT JUDGE